## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

KRISTIN WORTH,

AUSTIN DYE,

AXEL ANDERSON,

MINNESOTA GUN OWNERS
CAUCUS,

SECOND AMENDMENT
FOUNDATION

FIREARMS POLICY
COALITION, INC., and

                 Plaintiffs,

    v.

JOHN HARRINGTON, in his
official capacity as Commissioner
of the Minnesota Department of
Public Safety,

DON LORGE, in his official
capacity as Sheriff of Mille Lacs
County, Minnesota,

TROY WOLBERSEN, in his
official capacity as Sheriff of
Douglas County, Minnesota, and

DAN STARRY, in his official
capacity as Sheriff of Washington
County, Minnesota,

                Defendants.

Civil Action No.
0:21-cv-01348-KMM-LIB

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

ARGUMENT .................................................................................................................. 7

  I.    The Second Amendment's Plain Text Covers Plaintiffs' Rights to Carry
       Firearms in Public for Self-Defense ................................................................... 8

  II.   The Carry Ban Cannot Be Justified by Reference
       to Historical Analogues ...................................................................................... 14

       A.  The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-
           Olds to Exercise Their Second Amendment Rights on Equal Footing with
           Other Adults ................................................................................................... 17

       B.  The Overwhelming Practice from the Period Surrounding Ratification of the
           Fourteenth Amendment Likewise Supports Plaintiffs ...................................... 20

CONCLUSION .............................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Cases**                                                                 **Page**

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ........................................ 9

*District of Columbia v. Heller*,
    554 US. 570 (2008) .................................. 1, 2, 7, 8, 9, 10, 11, 13, 14, 15, 16, 18, 24

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ................................................................. 11

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ......................................................... 16

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021) ................................. 9, 10, 13, 14, 19, 21

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) .............. 10, 11, 12, 17, 18, 19, 20, 21, 22, 23

*Malloy v. Hogan*, 378 U.S. 1 (1964) ..................................................................... 15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................... 7, 20, 21

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .......................................................... 16

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*,
    714 F.3d 334 (5th Cir. 2013) ........................................................... 13, 19, 24

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ......................................................... 9, 10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) .......... 1, 2, 7, 8, 9, 14, 15, 16, 17, 18, 20, 21, 22, 23, 24, 25

*Nunn v. Georgia*, 1 Ga. 243 (1846) ....................................................................... 9

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ...................................... 11

*Perpich v. Dep't of Def.*, 496 U.S. 334 (1990) ........................................................ 11

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ............................... 9

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) ........................................ 8

*United States v. Miller*, 307 U.S. 174 (1939) ........................................................... 17

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ............................................. 9

**Statutes**

18 U.S.C. § 3591 ............................................................................................. 5

The Militia Act, Act of May 8, 1792, 1 Stat. 271 (1792).................................. 1, 2, 11, 13

Minn. Stat. Ann.

    § 624.714 ........................................................................................... 1, 6

    § 624.714 subd. 1a.................................................................................... 3

    § 624.714 subd. 2(b)................................................................................. 3

§ 624.714 subd. 2(b)(1)–(5) ........................................................... 3

§ 624.714 subd. 3 ........................................................................... 3

§ 624.7151 ...................................................................................... 6

1856 Ala. Acts. 17 ......................................................................... 20

1856 Tenn. Pub. Acts 92 .............................................................. 20

1883 Kan. Sess. Laws 159 ........................................................... 22

1883 Wis. Sess. Laws 290 ........................................................... 22

N.Y. Penal Code, ch. 375 § 1 (1885) ........................................... 22

## Constitutional Provisions

U.S. CONST. art. I ............................................................... 9, 10, 11

U.S. CONST. amend. II ..................................................................... 1

U.S. CONST. amend. XXVI ............................................................. 9

## Other Authorities

1 BLACKSTONE COMMENTARIES *441 ............................................ 23

2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834) ........... 11, 12

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1890 (1833) ............................................... 8, 9

JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1851) ........ 24

THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA (1880) ............................................. 10, 14

Saul Cornell, *Cherry-picked history and ideology-driven outcomes:* Bruen*'s originalist distortions*, SCOTUSblog (Jun. 27, 2022), *available at* https://bit.ly/3Jp4Eda ..... 18

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204 (1983) ........................... 12

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019). ................................................ 12, 13, 18

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938) ................................. 12

## INTRODUCTION

"[T]he Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022). This right presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 US. 570, 580, 581 (2008). On their eighteenth birthdays, the Plaintiffs in this case became legal adults for almost all purposes and certainly for the purpose of exercising all their other constitutional rights. They can vote, enter contracts, and get married. They can join the military—in fact, they can be conscripted—to fight and die for their country. And as adults, there are no parents or other legal guardians generally responsible for their care and protection. Yet, the Minnesota law challenged in this case, Minn. Stat. Ann. § 624.714 (the "Carry Ban"), categorically bars them from carrying a handgun in public for self-defense as other adult Americans have the undisputed right to do.

The Carry Ban must be declared unconstitutional, and its enforcement enjoined, because the Plaintiffs' Second Amendment rights "demand[] our unqualified deference." *Bruen*, 142 S. Ct. at 2131. The text of the Second Amendment leaves no doubt that it extends to typical, law-abiding 18-to-20-year-olds. On its face, the right to keep and bear arms belongs to "the people" as a whole, U.S. CONST. amend. II, not the subset of the people who have attained the age of 21. And the reference to the "militia" makes clear that the right fully vests by age 18. Indeed, just months after ratification of the Second Amendment, Congress enacted the Militia Act of 1792, which required all able-bodied men to enroll in the militia and to arm themselves upon turning 18. Act of May 8, 1792, 1 Stat.

271 (1792). This Act reflected the widespread understanding from the Founding era that citizens reached the age for militia membership by 18—an understanding that simply cannot be squared with the notion that these Plaintiffs, ordinary 18-to-20-year-olds, fall outside the Second Amendment's protective scope. After all, "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms" was the very "reason that [the] right [to keep and bear arms] was codified in a written Constitution." *Heller*, 554 U.S. at 599.

Following *Bruen*, if a law restricts conduct falling within the scope of the Second Amendment's text, as the Carry Ban does, that law is presumed invalid and can only be saved if the Defendants demonstrate the existence of "a distinctly similar historical regulation" that burdened the right to bear arms in the same way and for the same reasons. 142 S. Ct. at 2131, 2133. That task is an impossible one. At the time the Second Amendment was ratified, not only were there *no laws in any state* that purported to limit the rights of 18-to-20-year-olds to carry firearms for self-defense, there were several laws enacted, including the Militia Act of 1792, that *required* 18-year-olds to buy and maintain firearms. Even at the time that the Fourteenth Amendment was ratified no similar ban on firearm carriage by 18-to-20-year-olds existed and only a small minority of states placed *any* restriction on that age group's ability to purchase or own firearms. Defendants will not be able to point to any historical tradition that could justify Minnesota's attempt to deviate from the plain text of the Second Amendment, therefore this Court must declare the Carry Ban unconstitutional.

## BACKGROUND

Minnesota generally bars ordinary citizens from carrying handguns in public for self-defense unless they first acquire a permit to carry. Minn. Stat. Ann. § 624.714 subd. 1a. Minnesota is a so-called "shall issue" state for handgun carriage permits. An individual who seeks to acquire a permit can apply to the county sheriff, and the sheriff *must* issue a permit if the statutory criteria are met. Minn. Stat. Ann. § 624.714 subd. 2(b). The statutory criteria include having been trained in the safe use of a pistol and not being prohibited from possessing a firearm for any of a number of reasons (including prior mental health commitment, the existence of a criminal record, or evidence of affiliation with gang activity). Minn. Stat. Ann. § 624.714 subd. 2(b)(1)–(5). Importantly for this case, the applicant must also be "at least 21 years old." *Id*. The application is made on a form prescribed by the Minnesota Commissioner of Public Safety, Minn. Stat. Ann. § 624.714 subd. 3, which is available online at https://bit.ly/3PuBlRL, and a copy of which is attached hereto as Exhibit A.

Plaintiffs in this case are three 18-to-20-year-old Minnesota residents who desire to carry handguns in public for self-defense but cannot acquire a carry permit because of Minnesota's Ban, as well as three organizations that count them as their members. Plaintiff Kristin Worth is a citizen of Mille Lacs County. Ex. B, Decl. of Kristin Worth in Support of Summ. J. at ¶ 1 ("Worth Decl."). She is a responsible, law-abiding adult who is not disqualified from exercising her Second Amendment rights. *Id.* at ¶ 3. As a petite woman, Ms. Worth feels a particular need for a firearm for self-defense because she is concerned that if she were attacked by a man or men, she would not be able to defend herself or retreat.

3

*Id.* at ¶ 6. This is especially true in winter when the ground is covered in ice, or when she is leaving work wearing high-heeled shoes. *Id.* at ¶ 7. These concerns are unfortunately well founded. Last winter, while working at First National Bank of Milaca one day, Ms. Worth was repeatedly harassed by two men, both of whom were significantly larger than her. *Id.* at ¶ 8. Ms. Worth was afraid that the men would hang around and attack her on the way to her car after work—thankfully her coworkers shared her concern and offered to walk her to her car to help keep her safe. *Id.* at ¶ 8. Of course, her coworkers are not always around, and Ms. Worth fears for her safety when she is out in public running errands, visiting friends and family, or just going about her day alone. *Id.* at ¶ 4. Ms. Worth cannot lawfully carry a firearm unlicensed without risking prosecution. *Id.* at ¶ 5. She would apply for a carry license and carry a handgun with a license if she were not restricted from doing so because of her age. *Id.* at ¶ 5.

Like Ms. Worth, Plaintiff Austin Dye is a responsible and law-abiding Minnesotan. Ex. C, Decl. of Austin Dye in Support of Summ. J. at ¶ 1 ("Dye Decl."). He is a resident of Washington County and like Ms. Worth, he also fears for his safety. *Id.* at ¶ 6. He has noticed a rise in civil unrest and some types of crime both in Washington County, as well as in St. Paul where he visits his stepfather. *Id.* at ¶ 6. He fears being a victim of a crime and being unable to defend himself without a firearm. *Id.* at ¶ 6. As a result of his inability to carry a handgun for self-defense, Dye has found himself visiting his stepfather in St. Paul less frequently than he would like to. *Id.* at ¶ 6. Dye cannot carry a firearm unlicensed without risking prosecution and, like Worth, he would apply for a carry license and carry a handgun with a license if his age did not bar him from doing so. *Id.* at ¶¶ 3, 5.

4

Plaintiff Axel Anderson likewise would carry a handgun if he could do so lawfully, but Minnesota offers him no way to do so because of his age. Ex. D, Decl. of Axel Anderson in Support of Summ. J. at ¶ 3 ("Anderson Decl."). Anderson is a resident of Douglas County and a law-abiding citizen who is not disqualified from exercising his Second Amendment rights. *Id.* at ¶ 1. Anderson fears being the victim of a crime and being unable to defend himself without a firearm. *Id.* at ¶ 6. Like Worth and Dye, Anderson cannot carry a firearm unlicensed without risking prosecution, and he cannot apply for a license and carry a handgun lawfully because his age bars him from doing so. *Id.* at ¶ 5. If he could acquire a carry license, Anderson would carry a firearm in public for self-defense. *Id.* at ¶ 3.

Plaintiffs Worth, Dye, and Anderson unquestionably are legal adults. They, and other Minnesotans like them, can vote, serve on a jury, hold public office, marry, sign legally binding contracts, join the armed forces, and be held fully accountable before the law for criminal conduct—including numerous firearms-related offenses—to the point of being executed, *see* 18 U.S.C. § 3591. They have adult concerns and responsibilities, and yet they are completely prohibited by the Carry Ban, on pain of criminal punishment, from carrying firearms in public for their self-protection.

The Individual Plaintiffs are all members of Minnesota Gun Owners Caucus, Second Amendment Foundation, and Firearms Policy Coalition, Inc. Ex. E, Decl. of Bryan Strawser in Support of Summ. J. at ¶ 2 ("Strawser Decl."); Ex. F, Decl. of Alan Gottlieb in Support of Summ. J. at ¶ 2 ("Gottlieb Decl."); Ex. G, Decl. of Brandon Combs in Support of Summ. J. at ¶ 2 ("Combs Decl."). The Organizational Plaintiffs are all non-profit

5

organizations founded for and dedicated to the purpose of promoting the fundamental, Second Amendment right to keep and bear arms through advocacy, litigation, education, and other programs. Strawser Decl. at ¶ 3; Gottlieb Decl. at ¶ 3; Combs Decl. at ¶ 3. SAF and FPC have hundreds of thousands of members across the United States and all three Organizational Plaintiffs have members in Minnesota. Strawser Decl. at ¶ 4; Gottlieb Decl. at ¶ 4; Combs Decl. at ¶ 4. Some of those Minnesota members—including the Individual Plaintiffs—are 18-to-20-year-olds who wish to carry loaded firearms in public for lawful purposes including self-defense and would do so immediately but for the Carry Ban. Strawser Decl. at ¶¶ 5, 6; Gottlieb Decl. at ¶¶ 5, 6; Combs Decl. at ¶¶ 5, 6.

The Defendants have key roles in enforcing the Carry Ban. Defendant John Harrington is the Commissioner of the Minnesota Department of Public Safety. In his role as Commissioner, Harrington is charged with "adopt[ing] statewide standards governing the form and contents, as required by . . . [section] 624.714, of every . . . application for a permit to carry a pistol." Minn. Stat. Ann. § 624.7151. Defendants Don Lorge, Troy Wolberson, and Dan Starry are sheriffs of Mille Lacs, Douglas, and Washington Counties, respectively, where the Individual Plaintiffs reside. As sheriffs, these Defendants are responsible for processing applications for permits as well as enforcing in their respective counties Minnesota's laws, regulations, policies, practices, and customs concerning the carrying of firearms. *See, e.g.*, Minn. Stat. Ann. § 624.714.

Plaintiffs filed their complaint on June 7, 2021, seeking a declaration that the Carry Ban violates the Second and Fourteenth Amendments to the United States Constitution and an injunction against its enforcement. Complaint, Doc. 1. All claims against Defendants in

their individual capacities were dismissed on November 19, 2021. Order of Dismissal, Doc. 30. Plaintiffs now move for summary judgment in their favor and against all Defendants in their official capacities.

## **ARGUMENT**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. This constitutional provision "protect[s] an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. That right presumptively "belongs to all Americans," not "an unspecified subset," *Heller*, 554 U.S. at 580, 581, 592, and applies equally against the states through the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion). The Amendment enshrines " 'the right of law-abiding, responsible citizens to use arms' for self-defense . . . [and] demands our unqualified deference." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). For that reason, no important government interest can justify legislation that conflicts with the protections of the Second Amendment. The test that this Court must apply to assess whether the Carry Ban is constitutional is straightforward:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

7

*Id.* at 2129–30. Here, the text of the Amendment encompasses 18-to-20-year-olds and the Defendants will not be able to demonstrate a historical tradition of firearm regulation at all comparable to the Carry Ban, so Plaintiffs are entitled to summary judgment. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("Summary judgment is proper 'if . . . there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' ").

## I.   The Second Amendment's Plain Text Covers Plaintiffs' Rights to Carry Firearms in Public for Self-Defense.

*Bruen* established once and for all that the Second Amendment right "to keep *and bear* arms" means just what it says—the right to carry (or bear) firearms in public is protected just as much as the right to own (or keep) them. Plaintiffs' challenge is, therefore, within the scope of the Second Amendment, and the burden is on the Defendants to justify the Carry Ban. The only possible feature that could differentiate this case from *Bruen* is the Plaintiffs' age, but the Court should reject any argument to that effect. Under *Bruen*, this first question is a textual one, and here two key elements of the Amendment's text remove any doubt that 18-to-20-year-olds fall within its scope.

*First*, the Amendment refers to a right of "the people" to keep and bear arms without mentioning age. The "normal and ordinary meaning" of "the people" includes *all* the people. *Bruen*, 142 S. Ct. at 2127. As the Supreme Court made clear in *Heller*, "the Second Amendment right is exercised individually and belongs to *all* Americans." 554 U.S. at 581 (emphasis added); *accord* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1890 (1833) ("The right of the *citizens* to keep, and bear arms has

justly been considered, as the palladium of the liberties of a republic.") (emphasis added); *Nunn v. Georgia*, 1 Ga. 243, 250 (1846) ("The right of the whole people, old and young, men, women[,] and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree.") (quoted approvingly, *Heller*, 554 U.S. at 612–13 and *Bruen*, 142 S. Ct. at 2147).

Furthermore, construction of the Constitution requires reading individual amendments and clauses "in the context of the Constitution as a whole." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325–26 (2015). In context, we can see that the Constitution elsewhere explicitly considers and prescribes limits based on age. *See, e.g.*, U.S. CONST. art. I, § 2, cl. 2 (must be 25 years old to serve in the House of Representatives); *id.* amend. XXVI (voting age at 18). "In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment." *Hirschfeld v. BATFE*, 5 F.4th 407, 421 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322, 328 (4th Cir. 2021). And in the two other provisions in the Bill of Rights that explicitly describe a right of "the people" generally, the First and the Fourth Amendments, the rights extend fully to 18-year-olds and in fact extend to *the whole people*, even those under 18. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("Students . . . are 'persons' under our Constitution [who] are possessed of fundamental rights which the State must respect"); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) ("Equally indisputable is the proposition that the Fourteenth Amendment protects the rights of

students against [unreasonable searches and seizures] by public school officials."); *see also Hirschfeld*, 5 F.4th at 421. "When the term *the people* is made use of . . . in all the enumerations and guaranties of rights [in the Constitution] the whole people are intended." THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880). Even where "the people" does not appear, *every other constitutional right* applies *at least* to those 18 and older. *Hirschfeld*, 5 F.4th at 422–23 (noting that the right to jury trial, voting, marriage, and sex apply at least to those 18 years old).

*Second*, the Amendment includes a "prefatory clause" which begins: "[a] well regulated Militia, being necessary to the security of a free State . . . ." As *Heller* explained, this clause "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 595, 599. As such, although the right is not limited to those who were in the militia or eligible for militia service at the Founding (it is unquestionably broader and includes, for example, women like Plaintiff Worth), "[l]ogic demands that there be a link between the stated purpose and the command," *id.* at 577, meaning that if an individual would have been a member of the "militia," *at least* his rights must be protected by the Amendment.

At the Founding, the "militia" was widely understood to refer to the collection of "all able-bodied men," *id.* at 596, including in the unanimous judgment of the federal government and every state in the union, all men of at least 18 years of age, *Jones v. Bonta*, 34 F.4th 704, 718–19 & App'x 2 (9th Cir. 2022) (collecting post-ratification state militia laws). This is apparent from Congress's initial exercise of its power to "provide for

10

organizing, arming, and disciplining, the militia." U.S. CONST. art. I, § 8, cl. 16. The Militia Act, ch. 33 § 1, 1 Stat. 271, passed by the Second Congress just months after the Second Amendment was ratified, "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones*, 34 F.4th at 719 (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (alterations omitted)). As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that the Second Amendment right vests by age 18.

> [M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment.

*Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570; *see also Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) ("This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given the Constitution's provisions." (cleaned up)).

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834). Although previously "military age ha[d] generally commenced at sixteen," Secretary Knox instead drew the line at 18 because

"the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field." *Id.* at 2153. Representative Jackson explained "that from eighteen to twenty-one was found to be *the best* age to make soldiers of." *Id.* at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, General Washington—who as President in 1792 signed the Militia Act into law—wrote that "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

Shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well. *Jones*, 34 F.4th at 719 & App'x 2. There was thus a consensus in the States that, by age 18, individuals were able to, and hence entitled to, bear arms. This followed from the colonial practice: "From the earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 15, 16, or 18 through 45, 50, or 60 (depending on the colony)." Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 215 n.46 (1983). Plaintiffs are unaware of even a single state that exempted 18-to-20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted

from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was most commonly either 16 or 18, "and never higher (except for one 19-year period in Virginia [between 1738 and 1757])." David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533 (2019).

To be clear, Plaintiffs do not contend that these militia laws somehow *extended* Second Amendment rights to 18-year-olds. Indeed, *Heller* made clear that the Second Amendment enshrines "an individual right unconnected with militia service." 554 U.S. at 582. Instead, the point is that "the well-regulated Militia" referred to in the Amendment's prefatory clause, which the Constitution understood to be an entity "already in existence" made up of "all able-bodied men," is the "pool" from which

> Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first Militia Act, which specified that each and every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years . . . shall severally and respectively be enrolled in the militia.

*Id.* (quoting Act of May 8, 1792) (quotation marks omitted). Given that "the federally organized militia may consist of a subset of" the "militia" referenced in the Second Amendment, but nevertheless *must* draw from that larger body, the unanimous inclusion of 18-to-20-years-old in organized militias at or shortly after the passage of the Second Amendment establishes that they *must* have been within the militia referenced by the Second Amendment. *Id.*; *see also Hirschfeld*, 5 F.4th 407, 429–30 ("Because the individual right is broader than the Second Amendment's civic purpose, those required to serve in the militia and bring arms would most assuredly have been among 'the people' who possessed

13

the right."). As a result, "any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms" is "inconceivable." *Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental) ("*NRA II*").

Finally, it is worth noting that this understanding of the scope of the right, and the importance of the "militia" in the prefatory clause persisted well beyond the time of the Founding. It was still the view in the 19th century following the ratification of the Fourteenth Amendment. As Thomas Cooley wrote in his 1880 treatise, when interpreting the Second Amendment's text,

> [i]t might be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. . . . The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose.

COOLEY, *supra*, GENERAL PRINCIPLES at 271. The Court in *Heller* noted: "All other post-Civil War 19th-century sources we have found concurred with Cooley." 554 U.S. at 618. The text of the Amendment cannot be read in any way to exclude 18-to-20-year-olds from its coverage.

## II.    The Carry Ban Cannot Be Justified by Reference to Historical Analogues.

The Second Amendment's text covers an 18-to-20-year-old individual's right to carry firearms in public for self-defense. Minnesota's Carry Ban nevertheless denies Plaintiffs the ability to exercise that right. Under *Bruen*, the Carry Ban is presumptively unconstitutional unless the Defendants can "justify [the] regulation by demonstrating that

it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. The Supreme Court was clear: the burden is on the government to *prove* that the Carry Ban is constitutional, and the only acceptable standard against which to judge its constitutionality is the history of traditional firearm regulation in this country. *Id.*; *see also id.* at 2131 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference." (quoting *Heller*, 554 U.S. at 635)).

Defendants will not be able to carry this burden, but before we begin analyzing the historical record, it is important to keep in mind that "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' " *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35 (emphasis in *Bruen*)). The most important historical period for interpreting the Second Amendment is the time immediately before and after its ratification in 1791. Although the Second Amendment became applicable against the states in 1868 through the addition of the Fourteenth Amendment, the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2137; *see also Malloy v. Hogan*, 378 U.S. 1, 10 (1964) (collecting cases). The Supreme Court left open the question of whether that meant that the 1791 (the year of the Second Amendment's ratification) or 1868 (the year of the Fourteenth's) understanding of the Amendment controlled, but it noted it had "generally

assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137; *see also Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (noting that the relevant inquiry is "the public understanding in 1791 of the right codified by the Second Amendment"); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) ("1791, the year the Second Amendment was ratified[, is] the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago*[.]").

And this makes sense. To hold that the 1868 understanding controls and that the meaning of a Bill of Rights provision is the same against the states and the federal government, a court would need to conclude that adopting the Fourteenth Amendment and extending Bill of Rights protections to the states somehow also changed the meaning of those protections when applied to the federal government. This would be counterintuitive, to say the least, and lacks support in precedent.

While the Court in *Bruen* acknowledged an "ongoing scholarly debate" over whether the ratification of the Fourteenth Amendment imbued the Second Amendment with a new and different meaning in 1868 than it had in 1791, the Court indicated that it did not view things that way, explaining that "post-Civil War discussions of the right to keep and bear arms [which] 'took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.' " *Bruen*, 142 S. Ct. at 2137 (quoting *Heller*, 554 U.S. at 614); *see also id.* at 2163 ("[T]oday's decision should not be understood to endorse freewheeling reliance on

historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." (Barrett, J., concurring)). And evidence from the 20th century was so remote that the *Bruen* court did not even bother to address it, noting that "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28.

Although 1791 is the key year by which to judge the value of historical evidence regarding the Second Amendment's scope, the difference between 1791 and 1868 in this case is not significant. As discussed in detail below, the unanimous practice from the Founding of permitting 18-to-20-year-olds to exercise their Second Amendment rights on equal footing with other adults was still the overwhelming majority practice in the states in 1868.

### A. The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Other Adults.

Even before the Founding era, "[t]he tradition of young adults keeping and bearing arms [was] deep-rooted in English law and custom" and "was brought across the Atlantic by the American colonists." *Jones*, 34 F.4th at 717. As discussed above, immediately after the Amendment was ratified the age for militia participation was set by every state and the federal government at 18. And the point bears underscoring—militia membership did not just entail an entitlement to own a firearm, it *required* ownership. *United States v. Miller*, 307 U.S. 174, 179 (1939) ("[W]hen called for service these men were expected to appear bearing arms supplied by themselves."). This requirement means that not only were 18-year-olds at the Founding entrusted with bearing arms during their time participating in

17

militia service, they were also expected to keep and maintain their arms as private citizens. It also means they were entitled to carry them in public, since there were no laws restricting the carry rights of 18-to-20-year-olds at the Founding. In addition to this "founding-era evidence of militia membership [which] undermines Defendants' interpretation" of the Amendment, young adults were expected to bear arms as part of *posse comitatus*, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace, upon pain of fine and imprisonment." *Jones*, 34 F.4th at 718, 722. Similarly, at common law by age 18 all able-bodied men "were obliged to join in the 'hue and cry' (*hutesium et clamor*) to pursue fleeing criminals." Kopel & Greenlee, *Second Amendment Rights*, *supra* at 534.

Against this extensive evidence of Founding-era arms-bearing by 18-to-20-year-olds, there is no evidence of any laws restricting the carry rights of 18-to-20-year-olds because of their age. Professor Cornell admitted during his deposition that he was not aware of a *single* law from the Founding Era that made it unlawful for 18-to-20-year-olds to acquire or to carry firearms. Excerpts from Professor Saul Cornell Dep. Tr. 177:25–178:4; 180:9–15 (Apr. 4, 2022), attached hereto as Ex. H ("Cornell Dep. Tr.").[1] And Professor

---

[1] To say that Professor Cornell's views differ from the Supreme Court's would be an understatement. He has derided the *Bruen* majority as "bonkers" and applying "fiction, fantasy, and mythology" as an interpretive model. Saul Cornell, *Cherry-picked history and ideology-driven outcomes:* Bruen*'s originalist distortions*, SCOTUSBLOG (Jun. 27, 2022), *available at* https://bit.ly/3Jp4EDa. He shared the same opinion of *Heller* in his deposition, Cornell Dep. Tr. 57:14–18, and candidly admitted he was "0 for 4 in front of the Court. I have one of the worst, you know, batting averages of anyone I know" *id.* at 89:19–22. Counting *Bruen*, he is 0-for-5. Even so, as the quotes from his deposition show, he cannot help but support Plaintiffs' case in several key respects.

Cornell agreed that individuals who had been required to own firearms for militia use were not restricted to using them *only for* militia use but could carry and keep them for other lawful purposes. *See* Cornell Dep. Tr. 225:6–9.

Professor Cornell is not alone in reaching these conclusions. The court in *Jones* likewise found that in the period immediately following ratification "every state's militia law *obliged* young adults to acquire and possess firearms." 34 F.4th at 719. After exhaustively surveying historical gun regulations related to firearm purchasing by young adults, the Fourth Circuit in *Hirschfeld* concluded that "[w]hile some gun regulations existed at the Founding, there were no regulations restricting minors' ability to possess or purchase weapons until two states adopted such laws in 1856.' " 5 F.4th at 437. Judge Jones in *NRA II* similarly criticized the panel decision for suggesting that restrictions on purchasing by 18-to-20-year-olds were "longstanding" based on evidence of statutes that were, in many cases, not complete bans on purchasing and, like in *Hirschfeld*, dated to 1856 at the very earliest. 714 F.3d at 344 (Jones, J., dissental) ("With its merely general references to firearms regulations at the founding and its only support in regulations against 18-to-20-year-olds late in the 19th century, the panel is unable to prove that banning commercial firearms sales to late teens has any analogue in the founding era."). There is simply not a shred of evidence from the Founding era of any "historical analogue" that attempted to constrain 18-to-20-year-olds' exercise of their Second Amendment rights in any way like the Carry Ban does here.

**B.  The Overwhelming Practice from the Period Surrounding Ratification of the Fourteenth Amendment Likewise Supports Plaintiffs.**

In the Reconstruction era, "the perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights—the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense." *McDonald*, 561 U.S. at 770. And although at this time the Second Amendment had not been incorporated against the states, many states had Second Amendment analogues that similarly protected an individual right to keep and bear arms.

It is in this period that the first laws regulating access to firearms by those under 21 begin to appear. The Ninth Circuit in *Jones* collected 28 such laws passed between 1856 and 1897. 34 F.4th at 720 & App'x 3. Of these, just two laws existed that placed special restrictions the rights of 18-to-20-year-olds before the Civil War, one from Alabama and one from Tennessee. *See* 1856 Ala. Acts. 17, 17; 1856 Tenn. Pub. Acts 92, 92.

These exceptions merely prove the rule that has been uniformly demonstrated from the Founding—18-to-20-year-olds were considered to have full Second Amendment rights and restrictions on the exercise of those rights are evidenced *nowhere* until over 60 years after the Amendment was ratified. *See Bruen*, 142 S. Ct. at 2137. In this case, leading up to 1856 "there is not just a vacuum at the founding era: instead, the founding-era evidence of militia membership undermines" the importance of these Reconstruction-era outliers. *Jones*, 34 F.4th at 722. This is precisely the sort of history on which the Supreme Court warned against putting "more weight than it can rightly bear" because, "to the extent later

20

history contradicts what the text says, the text controls." *Bruen*, 142 S. Ct. at 2136–37. Furthermore, "[i]t would also be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Hirschfeld*, 5 F.4th at 440; *see also McDonald*, 561 U.S. at 770–78; *Jones*, 34 F.4th at 722 (noting the "deeply offensive nature of many of" "the Reconstruction-era laws" restricting the Second Amendment rights of 18-to-20-year-olds).

In any event, the vast majority of the laws identified by either the *Jones* or *Hirschfeld* panels are inadequate analogues for the Carry Ban that Minnesota has enacted. Noting that "everything is similar in infinite ways to everything else" so that "one needs some metric enabling the analogizer to assess which similarities are important and which are not," the Supreme Court in *Bruen* instructed courts looking for historical analogues to pay careful attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2132–33 (cleaned up). Of the 28 Reconstruction era laws collected by the *Jones* court:

> nineteen banned sales of only pistols to minors, and several had exceptions for hunting or parental consent. Of the non-pistol bans, three only applied to minors under fifteen years old, only required parental consent, or both. Eight states banned the sale of all firearms or deadly or dangerous weapons to minors. Four of these statutes were passed between 1881 and 1885.

34 F.4th at 720.[2] Indeed, of the 20 laws from *Jones* that arguably apply to 18-to-20-year-olds at all, just *one* specifically targeted the right to carry firearms for individuals 18-to-20-years-old like Minnesota's Ban does. *See* 1883 Wis. Sess. Laws 290 ("It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver . . . ."). One other law from the collection, from Kansas, banned all possession of pistols by minors. *See* 1883 Kan. Sess. Laws 159. But on the other side of the ledger, a New York law specifically declined to burden 18-to-20-year-olds' exercise of the right to carry in public by decreeing that "[n]o person *under the age of eighteen years* shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind . . . ." N.Y. Penal Code ch. 375 § 1 (1885). Otherwise, the laws cited in *Jones* exclusively target sales to those under 21, if they say anything at all about 18-to-20-year-olds. Though laws punishing the sale of pistols to those under 21 undoubtedly would burden their Second Amendment rights, they would not burden them in the same way—and that matters under *Bruen*. Individuals under 21 who were subject to such laws would have still, in many cases, been lawfully able to acquire a pistol from a parent or legal guardian and be subject to the same laws governing the carry of firearms as older citizens.

At most, this historical record shows just that two states, Kansas and Wisconsin, enacted restrictions that could plausibly serve as analogues for the Carry Ban under *Bruen*,

---

[2] Notably, the Ninth Circuit did not include in its collection laws from this period that specifically restricted the rights of African Americans or Native Americans to possess firearms. *Id.*

while one state, New York, specifically carved out the age-group targeted by Minnesota today. Two laws, both from 1883, cannot overcome the text of the Second Amendment itself, let alone the unified historical practice from the preceding 90 years of Second Amendment history. What is more, "we do not know the basis of their perceived legality" at the time they were enacted. *Bruen*, 142 S. Ct. at 2155. At least in the case of Kansas we can say that the state was, around this time, laboring under a serious misapprehension of the proper scope of the Second Amendment. *See id.* (labeling as "clearly erroneous" a 1905 Kansas Supreme Court case upholding a complete ban on public carry in Salinas based on the rationale that the Second Amendment did not apply outside the militia or military contexts).

Furthermore, it must be noted that of the 20 laws collected in *Jones* that arguably limit the rights of 18-to-20-year-olds at all, 15 (including both the Kansas and Wisconsin laws discussed above) do so specifically because they are "minors." We therefore can say with confidence that each of these laws is *irrelevant* to the validity of Minnesota's Carry Ban for the simple reason that they are predicated on a status (minority) that does not apply to 18-to-20-year-olds in Minnesota today. *Bruen* requires asking *both* "how and why" past laws infringed on the Second Amendment right, and historical laws can only serve as useful analogues if their modern comparator is "comparably justified." *Bruen*, 142 S. Ct. at 2132–33. To the extent these laws restricting the rights of minors applied to 18-to-20-year-olds, they did so because 18-to-20-year-olds were minors under the legal protection of their parents or guardians. *See, e.g.*, 1 BLACKSTONE COMMENTARIES *441. That is no longer the case. Plaintiffs are legal adults. And we are not aware of any law from any potentially

23

relevant time frame that singled out the firearm rights of legal *adults* for special restrictions based on their being younger than other legal adults. *See, e.g.*, JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1851) (explaining that upon reaching the age of majority, "every man is in full enjoyment of his civil and political rights"); Cornell Dep. Tr. 221:5–10 (acknowledging that during the founding era a person would transition from minority status to "an adult having full legal rights").

In the end then, this case is a relatively easy one. The only possible analogues for the Carry Ban are from too late a date to overcome the text of the Second Amendment and the unanimous practice at the Founding. *See Bruen*, 142 S. Ct. at 2154 ("As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). As Judge Jones remarked in *NRA II*:

> Originalism is not without its difficulties in translation to the modern world. For example, deciding whether the use of a thermal heat imaging device violates the original public meaning of the Fourth Amendment is a hard question. In this case, however, the answer to the historical question is easy. The original public meaning of the Second Amendment include[s] individuals eighteen to twenty. . . . The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar.

714 F.3d at 342 (Jones, J., dissental) (internal citation omitted). The *Bruen* court largely echoed this sentiment, noting that the inquiry it was prescribing "will be fairly straightforward" in cases where "a challenged regulation addresses a general societal problem that has persisted since the 18th century" and a "lack of a distinctly similar historical regulation addressing that problem [provides] relevant evidence that the

challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131. Minnesota has singled out 18-to-20-year-olds for differential treatment from other adults, seemingly out of a concern that they are too young to be trusted with the right to carry a firearm. Yet the Founders knew all about 18-to-20-year-olds; they required them to possess firearms in good working order and to know how to use them so that they could be ready to serve as members of the militia if the need arose. They never enacted a *single* "distinctly similar" ban on carriage by them.

## CONCLUSION

For these reasons, the Court should grant summary judgment in Plaintiffs' favor, declare the Carry Ban unconstitutional, and enjoin its enforcement against Plaintiffs and their members.

Dated: August 4, 2022

Blair W. Nelson
Minnesota Bar No. 0237309

BLAIR W. NELSON, LTD.
205 7th Street N.W. Suite 3
Bemidji, MN 56601
(218) 444-4531
bwnelson@paulbunyan.net

Respectfully submitted,

/s/David H. Thompson
David H. Thompson*
DC Bar No. 450503
Peter A. Patterson*
DC Bar No. 998668
William V. Bergstrom*
DC Bar No. 241500

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
*Admitted *pro hac vice*

*Attorneys for Plaintiffs*