# EXHIBIT H



# Transcript of **Dr. Saul Cornell**

Monday, April 4, 2022

*Kristin Worth v. John Harrington*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 113261

```
 1     IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF MINNESOTA
 2
       Court File No. 21-1348
 3
       - - - - - - - - - - - - - - - - - - - - - - - - -
 4
       KRISTIN WORTH, et al.,
 5
            Plaintiff,
 6
       v.
 7
       JOHN HARRINGTON, in his
 8     individual capacity and in his official
       capacity as Commissioner of the
 9     Minnesota Department of Public
       Safety et al.,
10
            Defendants.
11
       - - - - - - - - - - - - - - - - - - - - - - - - -
12

13

14

15

16

17     - - - - - - - - - - - - - - - - - - - - - - - - -

18            VIDEOTAPED ZOOM DEPOSITION OF
                     DR. SAUL CORNELL
19
       - - - - - - - - - - - - - - - - - - - - - - - - -
20

21

22

23
       Taken April 4, 2022 By Kelly A. Herrick
24

25
```

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1   A.   Yes.
 2   Q.   And then he says, "Since Heller, historians,
 3        scholars, and judges have continued to
 4        express the view that the Court's historical
 5        account was flawed."
 6             And, then, you're one of those
 7        scholars listed there, correct?
 8   A.   Correct.
 9   Q.   And you believe that the Heller Court's
10        historical account of the Second Amendment
11        was flawed, correct?
12   A.   That is correct, which is the general view
13        of most historians.
14   Q.   And you believe that Heller obliterated the
15        real history of the Second Amendment and
16        substituted to displace an originalist
17        fantasy, correct?
18   A.   That is correct.
19   Q.   Okay.  And Justice Breyer's contempt of the
20        Heller majority was well-earned, correct?
21   A.   Sorry, could you rephrase the way you framed
22        that?
23   Q.   Justice Breyer's contempt of the Heller
24        majority was well-earned?
25   A.   Sorry, would you character Justice Breyer as
```

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    And is this Brief of Thirty-Four
2    Professional Historians and Legal Historians
3    as Amici Curiae in Support of Respondents,
4    this is your Amicus Briefs that you joined
5    in McDonald, correct?
6  A. Correct.
7  Q. Okay.  I'm going to ask you about the
8    position you took here.  Okay.  So in this
9    last paragraph of the Summary of Argument
10   you say, "It would therefore be contrary to
11   early practice under the Fourteenth
12   Amendment to block states and cities from
13   enacting reasonable gun regulations,
14   including bans on specific types of
15   dangerous weapons, such as the laws at issue
16   in this case."
17       Now, again, the Supreme Court did
18   not adopt your view in McDonald, correct?
19 A. That is correct.  I'm actually 0 for 4 in
20   front of the court.  I have one of the
21   worst, you know, batting averages of anyone
22   I know.
23       As I tell my students, I really
24   appreciate that they have one of the great
25   losers as their professor.

```
 1                And, you know, I'm sure under
 2     French law that was perfectly legal, but
 3     it's a kind of law that's not very useful in
 4     terms of understanding what was the real
 5     danger of flying saucers interfering with
 6     French wine production in the 1950s?
 7  Q. So I take it there were no such laws in the
 8     Founding Era, correct?
 9  A. It's a bad question because it doesn't --
10     you know, you have to ask a question that's
11     grounded in the actual history.
12                So a question like that,
13     unfortunately, rests on a poorly articulated
14     set of assumptions about what the reality of
15     firearms ownership was in the Eighteenth
16     Century.
17                So, yes, given that there was a
18     shortage of firearms, and government policy
19     was aimed to increase firearm production,
20     passing allow against acquiring firearms
21     wouldn't have made a whole lot of sense.
22  Q. Right.  And, you know, I'm not articulating
23     any theory, you're the historian, I'm asking
24     you a factual question about history.
25                And so, the answer is there were no
```

```
 1        laws in the Founding Era making it unlawful
 2        for 18-to-20 year olds to acquire firearms,
 3        correct?
 4   A.   No, there -- no, not that I'm aware of,
 5        correct.
 6   Q.   Okay.  And there were no laws in the
 7        Founding Era making it unlawful for 18-to-20
 8        year olds to carry firearms, correct?
 9   A.   Well, that's not entirely true.
10   Q.   Well, let me ask it this way:  Were there
11        any laws in the Founding Era making it
12        unlawful for 18-to-20 year olds to carry
13        firearms on account of their age or status
14        distinct from any restrictions that were on
15        anybody else?
16   A.   So we do have a variety of statutes
17        forbidding 18-year-olds and anyone who is
18        attending a college or university from
19        carrying firearms.
20   Q.   Laws?
21   A.   Yeah.
22   Q.   Okay.
23   A.   And so that was one of the few examples in
24        the Eighteenth Century where you could get
25        an individual outside of the patriarchal
```

```
 1   Q.   Okay.  And outside -- and how many of those
 2        were in place during the Founding Era?
 3   A.   Well, we don't have that many colleges so I
 4        would say a significant number of the
 5        colleges and universities had some kind of
 6        law like that.
 7   Q.   During the Founding Era?
 8   A.   Yeah.
 9   Q.   Okay.  And during -- apart from those during
10        the Founding Era, were there any laws making
11        it unlawful for 18-to-20 year olds to carry
12        firearms distinct from the background
13        principles about carrying firearms --
14        generally acceptable principles?
15   A.   I don't believe so.
16   Q.   And during the Founding Era, did people
17        under the age of 21 carry firearms for
18        hunting?
19   A.   Are you asking, did they carry them for
20        hunting -- you know, again, I haven't -- I
21        haven't done a deep dive into that.
22                  Clearly there was a lot of hunting
23        going on, and clearly I'm sure some people
24        under the age with the approval of their
25        parents went hunting, sure.
```

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1  founding, there was a legal distinction
2  between minors and adults without any middle
3  category of a young adult?
4  A.  Yes.
5  Q.  Okay. And so at the founding -- during the
6      Founding Era, you know, a person would
7      transition from a minor having very
8      restricted legal rights to an adult having
9      full legal rights; is that correct?
10 A.  Yes. It's one of the reasons why life is
11     better now.
12 Q.  Okay. All right. So let's go to page 12
13     now. And you discuss this instance in
14     New York, and you say "Federalist Elisha
15     Williams, a delegate from Columbia County,
16     wondered if his democratic opponents wished
17     to enfranchise 'brave infants' by giving
18     them the right to vote. Extending full
19     rights to minors was literally treated as a
20     joke in early nineteenth century America."
21         Now, the joke you refer to had
22     regards to voting rights, correct, not arms
23     rights?
24 A.  Yes.
25 Q.  Okay. And if we go to 52, it's from this

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1   military law would -- would be -- would be
2   in full operation since you were now -- you
3   had transitioned from your civilian status
4   to your status as an active duty militia
5   person.
6   Q.  Okay.  And did Founding Era militia laws
7       restrict the ability of militia members to
8       carry firearms outside of militia service?
9   A.  No.  By definition, they dealt with the use
10      of arms in the context of militia services.
11  Q.  And did Founding Era militia laws regulate
12      the possession of firearms that were not
13      required for militia service?
14  A.  In one very interesting sense, they did.  So
15      multiple militia statutes from multiple
16      jurisdictions were explicit that the gun you
17      owned for militia service was exempt from
18      seizure in a distress or any kind of debt
19      proceeding and could not be sold to pay for
20      tax arrears, whereas other guns you might
21      have owned were subject to the full force of
22      any kind of Court Ordered seizure.
23              So in that fascinating sense,
24      militia statutes suggest that the gun you
25      owned for the militia enjoyed a higher level