UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kristin Worth, Austin Dye, Axel Anderson, Minnesota Gun Owners Caucus, Second Amendment Foundation, and Firearms Policy Coalition, Inc.,

Plaintiffs,

v.

John Harrington, in his individual capacity and in his official capacity as Commissioner of the Minnesota Department of Public Safety, *et al.*

Defendants.

Case No. 0:21-CV-01348 (KMM/LIB)

**DEFENDANDANT JOHN HARRINGTON'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiffs' constitutional claims at the heart of this matter are part of a coordinated, multi-state litigation plan to force a determination on the issue of whether the Second Amendment covers the right of 18-to-20-year-olds to publicly carry handguns. *See Basset et al. v. Slatery, et. al.*, Case No. 3:21-CV-152, E.D. Tenn. (Plaintiff Firearms Policy Coalition); *Baughcum, et al v. Jackson, et al.*, Case. No. 3:21-cv-36-DHB-BKE, S.D. Georgia (Plaintiff Firearms Policy Coalition), *Lara, et al. v. Evanchick*, Case. No. 2:20-cv-1582-WSS, W.D. Penn. (Plaintiffs Firearms Policy Coalition and Second Amendment Foundation), and *Meyer, et al., v. Raoul*, et al., Case. No. 3:21 cv-00518-SMY, S.D. Ill. (Plaintiffs Firearms Policy Coalition and Second Amendment Foundation.) (*See also*

https://www.firearmspolicy.org/legal,      and      https://www.saf.org/?s=young+adults,

describing two organizational Plaintiffs' nationwide efforts on this issue.)

In this challenge to Minnesota's statutory scheme for a permit to carry a firearm, Plaintiffs allege Minnesota Statutes section 624.714 infringes upon the Second Amendment rights of 18-to-20-year-old persons because it requires applicants for a permit to carry to be at least twenty-one years of age. Plaintiffs, three individuals and three gun-rights organizations, claim: 1) section 624.714 subds. 1a and 2(b)(2) are facially unconstitutional as to the Second and Fourteenth Amendments, and (2) section 624.714 subds. 1a and 2(b)(2) are unconstitutional as applied to 18 to 20-year-old-women under the Second and Fourteenth Amendments. Plaintiffs seek declaratory judgment against all Defendants that Minnesota's permit to carry statute is unconstitutional, an injunction, nominal damages, and costs and attorneys' fees.

Defendant John Harrington, in his individual capacity and official capacity as the Commissioner of the Minnesota Department of Public Safety ("Commissioner"), moves for summary judgment on Plaintiffs' claims on the following bases: (1) Plaintiffs' claims against the Commissioner in his individual capacity are barred by qualified immunity, (2) Plaintiffs' claims against the Commissioner in his official capacity are barred by sovereign immunity, (3)) Minnesota's permit to carry statute is facially constitutional as a matter of law, and (4) Minnesota's permit to carry statute is constitutional as applied to 18-to-20-year-old women. For these reasons, the Commissioner is entitled to summary judgment as a matter of law.

## RELEVANT LEGAL FRAMEWORK AND ALLEGATIONS

The Minnesota Supreme Court concluded last year that, "[t]he statutory requirements to receive a permit to carry are not substantially broader than necessary to ensure public safety." *State v. Hatch*, 962 N.W.2d 661, 665 (Minn. 2021).

In Minnesota, a permit is required to carry a handgun on or about a person's clothes in a public place, a motor vehicle, snowmobile, or boat. Minn. Stat. § 624.714, subd. 1a (2021). A permit is not required to keep or carry a firearm in the person's home, premises, land, or place of business, or between these places. *Id.* § 624.714, subds. 9(1)-(3). Nor is a permit required to carry a firearm in the woods, fields, or waters of this State for the purposes of hunting or target practice. *Id.* subd. 9(4). It is similarly not unlawful to transport a firearm if it is unloaded and in a secure case. *Id.* subd. 9(5).

If a Minnesotan wants to carry a handgun in other places, they must apply for a permit to the sheriff in their home county. The sheriff "must issue a permit" if the applicant meets five statutory conditions:

(1) completed training in the safe use of a pistol,

(2) is at least 21 years old and a citizen or permanent resident,

(3) completed a permit application,

(4) is not otherwise prohibited from possessing a firearm for certain criminal convictions or civil commitments, and

(5) is not listed in the criminal gang investigative data system.

*Id.* subd. 2. The sheriff in the applicant's home county is charged with investigating, granting, and denying permit applications, notifying applicants of denial, reviewing

reconsideration requests, and issuing permit cards. *Id.* subds. 4, 6. An applicant denied a permit may appeal by petition to district court, which must list the sheriff as the respondent. *Id.* subd. 12.

As required by statute, the Commissioner adopts statewide standards governing the form and contents of permit applications. Minn. Stat. § 624.7151. The Commissioner maintains a database of license holders for law enforcement use. Minn. Stat. § 624.714, subd. 15. The Commissioner also receives nominal funds from permit application and renewal fees paid to the county sheriffs and deposits them into the state's general fund, publishes a list of states whose license statutes are dissimilar to Minnesota's on an annual basis, executes reciprocity agreements regarding permits from jurisdictions with statutes similar to Minnesota's, annually reports permit data to the legislature, and maintains a database of license holders for law enforcement use. *Id.*, subds. 3(f), 7, 15, 16.

Plaintiffs complain of Defendants' "active enforcement" of section 624.714 (Compl. ¶¶ 19-24), and state they cannot exercise their alleged constitutional rights "because of the laws, regulations, policies, practices, and customs that Defendants have been enforcing and continue to actively enforce today." (Compl. ¶ 6.)

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment must be granted. *Vandewarker v. Cont'l Res., Inc.*, 917 F.3d 626, 629

(8th Cir. 2019) *quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In deciding a summary judgment motion, a court need not accept a nonmoving party's unsupported allegations, *see Reed v. City of St. Charles*, 561 F.3d 788, 790-91 (8th Cir. 2009), conclusory statements, *see Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003), or other statements that are "blatantly contradicted by the record," such that "no reasonable jury could believe" them, *see Edwards v. Boyd*, 750 F.3d 728, 733 (8th Cir. 2014).

## ARGUMENT

Plaintiffs' claims against the Commissioner fail as a matter of law for four reasons. First, qualified immunity bars suit against the Commissioner in his individual capacity. Second, Eleventh Amendment sovereign immunity bars suit against the Commissioner in his official capacity in this forum. Third, Minnesota' permit to carry statute is constitutional on its face as a matter of law. Fourth, Minnesota's permit to carry statute is constitutional as applied to 18-to-20-year-old females.

## I.   PLAINTIFFS' CLAIMS AGAINST THE COMMISSIONER IN HIS INDIVIDUAL CAPACITY FAIL UNDER THE DOCTRINE OF QUALIFIED IMMUNITY.

### A. There is No Basis for a Claim Against the Commissioner in his Individual Capacity.

Plaintiffs made the Commissioner a party to this action as he is "charged with adopting statewide standards governing the form and contents" of "every application for a permit to carry a pistol." (Compl. ¶ 25 *citing* Minn. Stat. § 624.7151.) There is no basis for a claim against the Commissioner in his individual capacity, but even if there was, he is

entitled to qualified immunity. Government officials are personally liable only for their own misconduct. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). To successfully maintain a Section 1983 claim against a government official in their individual capacity, plaintiffs must establish facts showing an official was personally involved in an unconstitutional act. *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001); *see also Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999) (dismissing Section 1983 complaint in which plaintiff "failed to allege facts supporting any individual defendant's personal involvement or responsibility for the violations").

Here, there are no facts establishing that the Commissioner had personal involvement in the claimed deprivation of constitutional rights. The Commissioner is only tangentially involved in Minnesota's permitting scheme. As set forth above, the Commissioner's statutory responsibility is limited to adopting statewide standards for permit applications, maintaining a database for law enforcement use, and serving as a conduit for the transfer of money to the state's general fund. And that is where the Commissioner's statutory involvement ends.

Instead, it is county sheriffs who are responsible for implementing Minnesota's permit to carry statutory scheme. County sheriffs are the issuing authority for permits to carry. Minn. Stat. § 624.714, subd. 2(d). County sheriffs are responsible for accepting, investigating, granting or denying permit applications, notifying applicants of denial, reviewing reconsideration requests, and issuing permit cards. *Id.* 624.714, subds. 4, 6. And county sheriffs are even the required named defendants in any appeal of a permit denial to the state's district court. *Id*. subd. 12.

6

There are no facts that establish the Commissioner's personal involvement in any of the constitutional violations Plaintiffs allege. Further, there are no facts tying the Commissioner to the individual Plaintiffs, nor are there any causal links between the Commissioner's individual actions and Plaintiffs' alleged injuries. Accordingly, as a matter of law the Commissioner in his individual capacity has qualified immunity from Plaintiffs' claims.

### B. The Commissioner has Qualified Immunity from Suit in his Individual Capacity.

Plaintiffs' claims against the Commissioner in his individual capacity fail as a matter of law pursuant to the doctrine of qualified immunity. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity "protects all [government officials] but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted).

To defeat a claim of qualified immunity, a plaintiff must present sufficient facts to establish that, in the light most favorable to the party asserting the constitutional injury: (1) the official's conduct violated a constitutional right and (2) the constitutional right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011). "Unless both of these questions are answered affirmatively, [a government official] is entitled to qualified immunity." *Nord v. Walsh Cnty.*, 757 F.3d 734, 738 (8th Cir. 2014). The court may answer either question first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, Plaintiffs cannot demonstrate a violation of clearly established constitutional rights. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020), *cert. denied*, 141 S. Ct. 1071 (2021). A clearly established constitutional right is not general. "[T]he clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). "The Supreme Court 'has repeatedly told courts ... not to define clearly established law at a high level of generality.' Rather, we look for a controlling case or 'a robust consensus of cases of persuasive authority.'" *Dillard*, 961 F.3d at 1052 (quoting *Al-Kidd*, 563 U.S. at 741-42.) And, while Supreme Court "case law 'do[es] not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, 580 U.S. 73, 73 (2017).

Plaintiffs cannot show a clearly established constitutional right that is burdened. First, there is no controlling case; neither the Supreme Court nor the Eighth Circuit has ruled that 18 to 20-year-olds have the right to a permit to carry a handgun. Second, there is not a robust consensus of persuasive authority supporting Plaintiffs' position.

Instead, the overwhelming majority of cases on this issue find firearm age restrictions, particularly for those for people under age 21, fall outside the protection of the Second Amendment.[1] These cases all rely on our Nation's historical tradition of age-based

---

[1] Two cases finding to the contrary are readily distinguishable. First, in an unpublished opinion challenging a Virginia law regarding sales of handguns to those under twenty-one pursuant to the Virginia Constitution's second amendment, a state circuit court found the law facially valid but unconstitutional as applied. *See Elhert v. Settle*, 105 Va. Cir. 544,

firearms regulation in reaching their conclusions. *See, e.g.*, *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (finding Texas' law requiring applicants to be 21 or over for license to carry is likely outside the scope of Second Amendment and such restrictions are consistent with the longstanding tradition of age-and safety-based restrictions on ability to access arms); *Nat'l Rifle Assoc. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives ("BAFTE")*, 700 F.3d 185, 193-204 (5th Cir. 2012) (finding federal law preventing persons under 21 from purchasing handguns was safety-driven, age-based categorical restriction on handgun access that was consistent with longstanding, historical tradition.); *Nat'l Rifle Assoc. of Am., Inc. v. Swearingen*, 545 F. Supp. 3d 1247, 1263-67 (N.D. Fla. 2021) (finding "restrictions on 18-to-20-year-olds' right to purchase firearms are longstanding in time" and analogous to restrictions listed in *Heller*, "all target specific groups that are thought to be especially dangerous with firearms"); *Lara v. Evanchick*, 534 F. Supp. 3d 478, 489 (W.D. Pa. 2021) (finding Pennsylvania law requiring permit to carry applicants to be 21 years or older did not violate Second Amendment because "the established consensus of federal appellate and district courts

---

2020 WL 8839732 (2020). This case used the modern definition of minor, has no precedential value, and analyzes a state second amendment. In the second case, which was vacated for mootness, the Fourth Circuit found a federal law prohibiting sales of handguns and ammunition to those under twenty-one violated the Second Amendment. *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 14 F.4th 322, 325 (4th Cir. 2021), *cert. denied sub nom. Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 142 S. Ct. 1447 (2022). Not only was the opinion vacated, but it also failed to review the historical tradition by looking to the status of "infants" and their parents or guardians under the common law at the time of the amendments as required by *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *New York State Rifle and Pistol Association v. Bruen*, . 142 S. Ct. 2111 (2022). !

from around the country is that age-based restrictions limiting the rights of 18-20-year-old adults to keep and bear arms fall under the 'longstanding' and 'presumptively lawful' measures recognized by the Supreme Court in *Heller* as evading Second Amendment scrutiny"); *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1326-27 (S.D. Cal. 2020) (finding California law prohibiting gun sales to people under 21 did not violate the Second Amendment because "age-based restrictions like the one [at issue] are longstanding and presumptively Constitutional" and the "reasoning behind those prohibitions was that these groups were considered incapable of the trust required to ensure proper and safe use of firearms"); *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 992-93 (W.D. Wash. 2020) (finding Washington law prohibiting sales of semi-automatic weapons to those under 21 did not violate the Second Amendment because "reasonable age restrictions on the sale, possession, or use of firearms have an established history in this country" and are "consistent with longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety"); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 385-87 (D. Mass. 2013) (finding Massachusetts law which effectively banned 18-to-20-year-olds from owning and carrying guns did not violate Second Amendment and, after engaging in historical review, "certain access-limiting conditions were and may lawfully be imposed upon individuals seeking to own and use firearms. Age-based restrictions, enacted for reasons of public safety, are among those lawful impositions").

Federal circuit and district courts confronted with this question have overwhelmingly found age restrictions on the sale and carrying of firearms for those under twenty-one comport with America's historical tradition of firearms regulation and do not

violate the Second Amendment. Given that the overwhelming majority of courts to consider similar statutes have found them to pass constitutional muster, it certainly cannot be said that "controlling authority or a robust consensus of cases of persuasive authority" dictated that Commissioner Harrington should decline to enforce Minnesota's permitting scheme against individuals under the age of 21. For these reasons, Commissioner Harrington is entitled to qualified immunity because clearly established, existing precedent did not place the "constitutional question beyond debate."

## II.   PLAINTIFFS' CLAIMS AGAINST THE COMMISSIONER IN HIS OFFICIAL CAPACITY FAIL AS A MATTER OF LAW PURSUANT TO ELEVENTH AMENDMENT SOVEREIGN IMMUNITY.

Plaintiffs' claims against the Commissioner in his official capacity fail as a matter of law because they are jurisdictionally barred by Eleventh Amendment sovereign immunity. A state is immune from suit unless the state has consented to be sued or Congress has expressly abrogated the state's immunity. U.S. Const. amend. XI; *see also Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 968-69 (8th Cir. 2000). A lawsuit against "a state official in his or her official capacity is not a suit against the official, but rather is a suit against the officials' office" and is "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). "Sovereign immunity is jurisdictional in nature." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). As a result, Plaintiffs' official-capacity claims, for both damages and injunctive relief, fail as a matter of law.

Although "section 1983 provides a federal forum to remedy many deprivations of civil liberties, [] it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will,* 491 U.S. at 66; *see also 281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011) ("The Eleventh Amendment establishes a general prohibition of suits in federal court by a citizen of a state against his state or an officer or agency of that state."). "Section 1983 does not override Eleventh Amendment immunity." *Hadley v. N. Ark. Cmty. Tech. Coll.*, 76 F.3d 1437, 1438 (8th Cir. 1996).

While a state may waive its immunity from suit, waiver will only be found where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Fla. Dep't of Health & Rehab. Serv. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)). Minnesota has not waived its Eleventh Amendment immunity from suit in federal court. *See DeGidio v. Perpich*, 612 F. Supp. 1383, 1388-89 (D. Minn. 1985) (recognizing State of Minnesota's limited waiver of sovereign immunity from tort actions in state court is not waiver of Eleventh Amendment immunity from suit in federal court.)

The Commissioner is immune from suit unless Plaintiffs' claims fit within a recognized exception. In *Ex parte Young*, the Supreme Court established a limited exception to Eleventh Amendment immunity, allowing suit against a state official for prospective injunctive relief where: (1) the official has "some connection with the enforcement" of the challenged law; and (2) the official threatens and is "about to commence proceedings" to enforce the statute. 209 U.S. 123, 156–57 (1908). The *Ex parte*

12

*Young* exception "does not apply when the defendant official has neither enforced nor threatened to enforce the statute challenged as unconstitutional." *281 Care Comm*, 766 F.3d at 797.

Here, facts show the *Ex parte Young* exception does not apply. First, the Commissioner is not responsible for the enforcement of section 624.714 as a matter of law. Rather, county sheriffs are responsible for reviewing, investigating, denying and issuing licenses under the statute. Minn. Stat. §§ 624.714, subds. 2, 4, 6. County sheriffs are also responsible for notifying applicants of denial, reviewing reconsideration requests, and responding to appeal petitions in district court. *Id.* subds. 4, 6, 12. Indeed, the Commissioner's only relation to the statute is ministerial and is limited to: (1) adopting the form of the standard statewide application form and permit card. (*Id*. §§ 624.7151, 624.714, subd. 7), (2) receiving $5 or$10 from county sheriffs for permit application and renewal fees paid to the sheriffs and depositing the same into the general fund (*Id.* §§ subds. 3(f), 7(c)(1)), (3) publishing a list of states whose license statutes are dissimilar to Minnesota's on an annual basis, (*Id.* § 624.714, subd. 16), (4) executing reciprocity agreements regarding permits from jurisdictions with statutes similar to Minnesota's (*Id.* § 624.714, subd. 16), (5) reporting permit data to the legislature annually (*Id.* § 624.714, subd. 7), and (6) maintaining a database of license holders for law enforcement use (*Id.* § 624.714, subd. 15.) The Commissioner is not charged with enforcement as a matter of law.

Second, there are no allegations or facts in the record which establish that the Commissioner has threatened or is about to commence proceedings against Defendants, nor can there be because the Commissioner does not have enforcement authority as a matter

13

of law. For these reasons, the *Ex parte Young* exception does not apply, and the State is immune from suit in this forum as a matter of law pursuant to Eleventh Amendment sovereign immunity.

### III.   MINNESOTA'S PERMIT TO CARRY STATUTE IS FACIALLY CONSTITUTIONAL AS A MATTER OF LAW.

In this action, as in Plaintiffs' cases in four other states attempting to force this issue before the Supreme Court, Plaintiffs allege they wish to "to exercise their fundamental, constitutionally guaranteed right to carry loaded, operable handguns on their person, outside their homes, while in public, for lawful purposes including immediate self-defense. But they cannot because of the laws, regulations, policies, practices, and customs that Defendants have been enforcing and continue to actively enforce today." (Compl. ¶ 6.) Therefore, they claim Minnesota's permit to carry statute, section 624.714, unconstitutionally prevents 18-to-20-year-olds from "exercising their fundamental, individual right to bear loaded, operable handguns outside the home." (Compl. ¶ 17.) Plaintiffs ask this Court to extend current Second Amendment jurisprudence beyond what the Supreme Court has previously held and declare that people 18-to-20-years-old have a constitutional right to bear arms in public.

As detailed below, the Supreme Court has implicitly approved statutory permitting schemes like Minnesota's. No Supreme Court case has yet addressed the question Plaintiffs bring. The Court most recently clarified that the test to be applied in Second Amendment challenges requires an analysis of the plain text of the Second Amendment and this Nation's historical tradition. Minnesota's permitting scheme is analogous to historical age

restrictions and is therefore constitutional on its face. Further, Minnesota's permitting scheme is constitutional as applied to 18-20-year-old females.

### A. The *Bruen* Decision Implicitly Acknowledged the Constitutionality of Minnesota's Statute and Age-Based Restrictions.

!       The most recent Supreme Court decision on the Second Amendment, *New York State Rifle and Pistol Association v. Bruen*, extended the Second Amendment right to keep and bear arms to the space outside the home. 142 S. Ct. 2111, 2122 (2022).  But it did not impact the right of 18-to-20-year-olds to bear arms in public; there is not one. The *Bruen* decision only impacted states whose permit-to-carry statutes require an applicant to show "proper cause" or some other subjective metric of suitability, referred to as "may issue" laws. *Id.* at 2124. The 43 states with "shall issue" licensing laws, including Minnesota, are unaffected by *Bruen*'s immediate holding. "[N]othing in our analysis should be interpreted to suggest the unconstitutionality of the 43 'shall issue' licensing regimes[.]" *Bruen*, 142 S.Ct. at 2138 n.9; *see also id*. at 2161-62 (Kavanaugh J., concurring.) The Court specifically identified Minnesota as a jurisdiction with a valid "shall issue" licensing regime. *Id*. at 2124 n.1. Minnesota's statute requires a permit to carry be issued after an applicant meets five objective criteria. *See* Minn. Stat. § 624.714, subd. 2(b).

The Court implicitly approved statutory permitting schemes such as Minnesota's, recognizing that objective prerequisites for a permit are designed to ensure applicants are "law-abiding, responsible citizens":

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko*, 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting).

Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid.* And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut*, 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Bruen*, 142 S. Ct. at 2138, n.9. The Supreme Court implicitly recognized that Minnesota's statute does not prevent law-abiding, responsible citizens from carrying a firearm in public.

The *Bruen* decision did not change who may lawfully possess a firearm or the restrictions that may be imposed on the carrying of guns. "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157. (Alito, J. concurring.) In his arguments against the dissent, Justice Alito implicitly acknowledged the constitutionality of restrictions on people less than 21 years of age:

The dissent cites statistics on children and adolescents killed by guns, see *post*, at 2163, 2165, but what does this have to do with the question whether an adult who is licensed to possess a handgun may be prohibited

16

from carrying it outside the home? Our decision, as noted, does not expand
the categories of people who may lawfully possess a gun, and federal
law generally forbids the possession of a handgun by a person who is under
the age of 18, and bars the sale of a handgun to anyone under the age of 21.

*Id.* at 2157-58. Justice Alito implies the constitutionality of laws barring the sale of

handguns to people under 21, as he would not have used that specific law as a response to

the dissent if he believed it to be unconstitutional. Clearly, limitations on those under 21

are constitutional.

### B. Under Current Supreme Court Precedent, Minnesota's Permit to Carry Statute is Constitutional.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that

the Second Amendment protects an individual right, though not unlimited, to keep and bear

arms for self-defense. Next, in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme

Court held that the Second Amendment is fully applicable to the states through the Due

Process Clause of the Fourteenth Amendment. And approximately six weeks ago, the Court

in *Bruen*, held "consistent with *Heller* and *McDonald*, that the Second and Fourteenth

Amendments protect an individual's right to carry a hand-gun for self-defense outside the

home." 142 S. Ct. at 2122. In addition to extending the scope of the right to keep and bear

arms to outside the home, the Court in *Bruen* also clarified the standard by which courts

have analyzed Second Amendment claims since *Heller* and *McDonald.* It rejected the two-

prong analysis focusing on history and employing means-ends scrutiny to review Second

Amendment claims that lower courts had been using: "[W]e decline to adopt that two-part

approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text

covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126.

Although the two-part test is no more, cases employing that test are still precedential as to the first step focusing on the text and history. It is only the "Courts of Appeals' second step [that] is inconsistent with *Heller*'s historical approach." *Id.* at 2129. It acknowledged that "[s]tep one is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127.  Hence, prior cases applying the first step may still inform a court's determination of a novel Second Amendment issue.

As a result, this Court must analyze the Second Amendment's text and historical understanding.  *"*The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. Similar in practice to analyzing other constitutional rights[2], the Supreme Court's discussion of the test indicates burden-shifting:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

---

[2] Burden shifting is employed in analyzing First Amendment claims as well. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (A "plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law.")

*Id.* at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10, (1961)). First, the challenging party must establish that their conduct is covered by the plain text of the Second Amendment. *Bruen* indicates a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If and only if a plaintiff meets their burden, the burden shifts to the government to demonstrate that its regulation is consistent with the country's historical tradition of firearm regulation.

In this case, Plaintiffs must first show the plain text of the Second Amendment covers the conduct of 18-to-20-year-olds carrying handguns for self-defense in public. If Plaintiffs meet this burden (which they cannot) it then falls to the Commissioner to show that requiring individuals to be 21 or older to apply for a permit is consistent with the Nation's historical tradition of firearm regulation.

In implementing this standard, courts must reason by analogy:

When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*Id.* at 2132. The Court instructed that the assessment includes a comparison of the modern and historical laws in two senses: both the burden imposed by and the justification for the law. "'[I]ndividual self-defense is 'the *central component*' of the Second Amendment right." *Id.* at 2133 (*citing McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)). Therefore, whether modern and historical regulations impose a comparable burden on the

right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry.

> ### i. Plaintiffs cannot establish that their desired conduct falls within the plain text of the Second Amendment.

!

Plaintiffs cannot meet their burden to show that the plain text of the Second Amendment covers the proposed conduct of 18-to-20-year-olds carrying a weapon outside the home for self-defense. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II. Plaintiffs first bear the burden to show that their proposed conduct is covered by the plain text of the Amendment. *Bruen*, 142 S.Ct. at 2129–30.

But, Plaintiffs cannot show that their proposed conduct is covered by the plain text Second Amendment, because at the time of the adoption of both the Second and Fourteenth Amendments, 18-to-20-year-olds were not adults under the law. The operative term in this case is "the people," and the issue is whether those younger than 21 are considered part of "the people" whom the Second Amendment protects. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Heller*, 554 U.S. at 634–635 (emphasis added). The Second Amendment was adopted in 1791; the Fourteenth in 1868. "Notably, the term 'minor' or 'infant'—as those terms were historically understood—applied to persons under the age of 21, not only to persons under the age of 18. The age of majority at common law was 21, and it was not until the 1970s that States enacted legislation to lower the age of majority to 18." *BAFTE*, 700 F.3d at 201.

Indeed, at the time of the adoption of the Second Amendment, American law "did not recognize minors as legally autonomous individuals, but rather gave society, acting through courts and legislatures, greater autonomy to intervene to promote the well-being of those under the age of majority." (Declaration of Amanda Prutzman ("Prutzman Decl.") Ex. A, (Expert Report of Saul Cornell, PhD ("Cornell Rep.") at 11.) "Infants were severely circumscribed by law and had only a narrow range of legal autonomy." (*Id*.) In fact, from at all times before, during, and after the adoption of the Second and Fourteenth Amendments, it was not until a person reached the age of 21 that they obtained full legal rights. *See e.g*., William Blackstone, Commentaries on the Laws of England, Vol I at 463 (1st ed. 1765) ("So that full age in male or female, is twenty one years . . . who till that time is an infant, and so styled in law."); Four years after the adoption of the Second Amendment, a legal treatise stated: "Persons within the age of 21, are, in the language of the law denominated infants, but in common speech—minors." (Cornell Rep*.* at 11.) In 1858, the author of our Nation's first legal dictionary wrote, "The rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights." (*Id.* at 12.) Prior to the age of 21, infants did not enjoy full legal rights. See, *e.g.*, "Infant," Black's Law Dictionary (11th ed. 2019) ("An infant in the eyes of the law is a person under the age of twenty-one years") (*quoting* John Indermaur, Principles of the Common Law, 195 (Edmund H. Bennett ed., 1st Am. Ed. 1878)).

Infants existed under the legal authority of a parent or other guardian. The status of "infants" was similar to that of married women, whose entire legal persona was subsumed

within her husband's authority; infants' legal status was entirely subsumed under the authority of their parents or other guardians. (*Id.* at 10.) This is confirmed by an 1836 publication, *Commentaries on American Law*, wherein it said: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years." (*Id.* at 12.) Infants attending college "traded strict parental authority for the equally restrictive rule of *in loco parentis*" and did not become legally autonomous upon becoming college students. (*Id.* at 14.) "Infants were dependant, not independent, constitutional actors." (*Id.* at 4.) Infants were considered to be legally unable to care for themselves or assert their own legal will. A popular justice of the peace manual from the year the Constitution was adopted, 1788, described "who shall not be a constable" as including "infants," "madmen," and "idiots." (*Id.* at 14.) People under 21 had guardians because 18th century Americans did not trust them to take care of themselves."Thus, asserting a constitutional right of those under 21 to keep, bear, and acquire arms rests on a serious misunderstanding of a core principle of Anglo-American law regarding the status of those below the age of legal majority." (*Id.* at 32.) Given the historical legal status of 18-to-20-year-olds during the time of adoption of the Second and Fourteenth Amendments – that they were not adults but infants who had not reached the age of majority and full legal rights – Plaintiffs will not be able to meet their burden of showing that their proposed conduct of 18-to-20-year-olds carrying firearms in public for self-protection is covered by the plain text of the Second Amendment.

### ii. Age restrictions are firmly within this Nation's longstanding, historical tradition of firearms regulation.

The plain text of the Second Amendment does not cover those under 21, therefore a historical analysis is unnecessary. *Bruen*, 142 S.Ct. at 2129-30. But even if Plaintiffs could met their burden of showing that their desired conduct is within the plain text of the Second Amendment, their claims still fail as a matter of law because this Nation's historical tradition is rich with restrictions on the conduct of 18-to-20-year-olds, including the ability of that age group to carry firearms.

The Second Amendment right is limited in scope. The Supreme Court "recogniz[ed] that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626). The "right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. The Supreme Court cautioned its opinion in *Heller* was not meant to cast doubt on certain longstanding restrictions, such as prohibitions on possession of guns by felons or the mentally ill, while acknowledging it was not engaging in an exhaustive review of the Second Amendment's scope. 554 U.S. at 626–27.

"U.S. law has long recognized that age can be decisive in determining rights and obligations." *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 992 (W.D. Wash. 2020).

> Since even before the Revolution, gun use and gun control have been inextricably intertwined. The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books; these

23

included safety laws regulating … and laws disarming certain groups and restricting sales to certain groups.

*BAFTE*, 700 F.3d at 200, *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 . The right to bear arms, however venerable, is qualified by what one might call the "who," "what," "where," "when," and "why." *United States v. Huitron-Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012). Since the time the Second Amendment was adopted, "who" has the right to bear arms has been regulated.

Especially relevant to the analysis in this matter are laws that were in effect around the time the Fourteenth Amendment, which made the Second Amendment applicable to the States, was ratified. *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."), *cert. denied*, 141 S. Ct. 108 (2020); Ezell v. City of Chicago, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified.") Minnesota became a state in 1858, and the Fourteenth Amendment was adopted in 1868.

In the year of Minnesota's incorporation, "the Alabama Supreme Court upheld a conviction for violating a state law making it a misdemeanor to sell, give, or lend a pistol to a male minor, when the age of majority was set at 21. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) (citing *Coleman v. State*, 32 Ala. 581, 582–83 (1858)). Similarly, ten years after the Fourteenth Amendment was ratified, "the Tennessee Supreme Court upheld a conviction

under a state law making it a misdemeanor to sell, give, or loan a pistol to a minor, when

the age of majority was set at 21." *Id.* (citing *State v. Callicutt*, 69 Tenn. 714, 714-15

(1878)). Notably, the *Callicutt* defendant was unsuccessful even though he argued that his

conviction violated the State's corollary second amendment, "reasoning that because

'every citizen who is subject to military duty has the right 'to keep and bear arms,' . . . this

right necessarily implies the right to buy or otherwise acquire, and the right in others to

give, sell, or loan to him." *Id.* In 1875, Indiana enacted a law making it unlawful to sell,

barter, or give a pistol or other deadly weapon to any person under 21 years old. (Cornell

Rep. at 22, 25.) In 1883, Wisconsin prohibited anyone to "sell, loan, or give any pistol or

revolver to any minor" as well as:

> It shall be unlawful for any minor, within this state, to go armed with any
> pistol or revolver, and it shall be the duty of all sheriff's, constables, or
> other public police officers, to take from any minor, any pistol or
> revolver, found in his possession.

(Cornell Rep. at 22.) Also in 1883, Kansas made it a misdemeanor to "sell, trade, give, loan

or otherwise furnish any pistol, revolver … to any minor, or to any person of notoriously

unsound mind…" (*Id*. at 23-24) In 1890, Louisiana made it "unlawful for any person to

sell, or lease or give through himself or any other person, any pistol … to any person under

the age of twenty-one years." (*Id.* at 24.) In Nevada, in 1881, it was a misdemeanor for

anyone "under the age of twenty-one (21) years who shall wear or carry any … pistol."

(*Id.*) A review of gun regulation during the later 1800s revealed that "[l]aws limiting the

ability of minors to obtain and use arms without appropriate supervision were among the

most common firearms regulations in the post-Civil War period." (*Id.*) And, "restrictions on minors were more common than limits on felons." (*Id.*)

The work of a leading legal scholar of the times shows that the American public understood that Second Amendment rights did not extend to minors. Thomas Cooley, the "most famous" nineteenth century constitutional law scholar and author of "a massively popular" constitutional law treatise, *Heller*, 554 U.S. at 616, acknowledged that "the State may prohibit the sale of arms to minors." Thomas M. Cooley, A Treatise on the Constitutional Limitations 740 n.4 (5th ed. 1883). In the same volume, Cooley noted that the "federal and State constitutions … provide that the right of the people to bear arms shall not be infringed." *I*d. at 429. Nothing indicates that he perceived any conflict between these principles. There is a robust historical record of age restrictions on firearms in and around the time the Second Amendment was made applicable to the states through the Fourteenth Amendment.

Though less relevant, our Nation's historical tradition also evidences age restrictions around the time the Second Amendment was adopted in 1791. Understanding the historical context and environment in which these laws were enacted is key to understanding the historical record. (*See* Cornell Rep. at 7, 16.) Context here includes both the lack of legal autonomy of "infants" at the time and the fact that "gun violence was not a pressing issue of public concern at the time the Second Amendment was enacted." (*Id*. at 16) Despite this, there are numerous examples of age restrictions on infants at the time of the Second Amendment. For example, public and private American colleges at the time restricted their students from carrying firearms as part of their authority *in loco parentis*. From at least

26

1795, Yale College prohibited students from possessing guns or gun powder. (*Id.* at 14, n. 64.) The University of Georgia provided "no student shall be allowed to keep any gun … in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever." (*Id.* at 15, n. 65.) The University of North Carolina provided, "No Student shall keep … firearms, or gunpowder …" (*Id.* at 15, n. 66.)

In 1803, "New York City singled out guardians for punishment for firearms infractions committed by minors under their charge." (*Id.* at 15.) "In 1817, Columbia South Carolina enacted a law that allowed for the seizure of weapons used by minors within the city limits." (*Id.*) In 1856, Alabama enacted a law making it illegal to "sell or give or lend, to any male minor, a[n] … air gun or pistol." (*Id.* at 18.) Also in 1856, Tennessee enacted a law prohibiting the same. (*Id.*) In 1859, Kentucky also prohibited the same conduct, with an exception for parents or guardians. (*Id.*)

### iii.  Minnesota's permit-to-carry statute is analogous to longstanding firearms restrictions throughout history.

Taken together, these laws demonstrate a historical tradition of limiting firearm access to those twenty-one and older. "The Minnesota statutes at issue in this case are consistent with this historical tradition and would not have violated the Second Amendment or the right to bear arms as understood at the Founding, in the antebellum era, or at the time of ratification of the Fourteenth Amendment." (Cornell Rep. at 33.) The historical gun laws illustrated in Section III.ii, *supra*, are analogous to the challenged statute at issue in this matter and pass constitutional muster. First, the burdens the historical

law posed on self-defense, when compared with the burden the current law poses to self-defense, is nearly identical. Both the historical and modern laws prevent those under twenty-one from carrying a gun in public. And, given that Minnesota's current law allows those under twenty-one to carry a gun at home, on their premises and land, and in the fields and waters of the state for target practice, the current law appears to pose less of a burden than historical laws. Second, the justification for the historical law and the modern laws are near identical. Although historically persons under twenty-one were minors and now those over eighteen have reached the age of majority, the justification for the burden on this age group remains the same. People between the ages of eighteen and twenty-one pose a greater danger to themselves and others than other age groups. States have determined that it was an important use of their police powers to limit the ability of minors to access guns, similar to the limitations they placed on other classes of persons who are dangerous to themselves or others, such as felons or the mentally ill. *See e.g. Heller*, 554 U.S. at 626–27.

## 1. Minnesota's statute is a permissive regulation for public safety.

The right to bear arms, however venerable, is qualified by what one might call the "who," "what," "where," "when," and "why." *Huitron-Guizar*, 678 F.3d at 1166. Age restrictions on the right to carry firearms is part of our Nation's historical tradition and a permissive regulation of "who" has the right to bear arms . This is partly because the 18-to-20-year-old cohort is the most likely to harm themselves or others than any other age

group. Data shows that Minnesota's targeting of the 18-to-20-year-old group is directly related to public safety.

> One of the last parts of the brain to mature – and which continues to develop into the mid-twenties – is the prefrontal cortex, which supports self-control, including judgment, impulse control and inhibition, and long-range planning. The limbic system, which controls basic emotions like anger, pleasure, and fear, develops well before the prefrontal cortex meaning . . . the desire for rewards and susceptibility to social pressures can, at times, lead to an overriding of rational thinking by more impulsive, emotional, or irrational behavior.

(Prutzman Decl., Ex. B, Expert Report of John J. Donahue, J.D. ("Donahue Rep.") at 7.)

Further, statistics show the 18-to-20-year-old group has higher rates of suicide and homicide than other groups. Suicide is the second leading cause of death in the U.S. among this age group. (*Id.* at 9.) And suicide attempts are dramatically more successful when a gun is used. (*Id.* 29-30.) "Regardless of sex, those using firearms had 140 times the risk of dying [from a] suicide attempt than those using other methods." (*Id.* at 30.) As to homicide, in 2019, the single most homicidal age group in the nation was age 19, with 18- and 20-year-olds having higher murder arrest rates than any other age group except for age 19. (*Id.* at 12-13, *see also id.* fig. 1, below.)

**Figure 1**
**The Most Homicidal Three-Year Age Group for the U.S. is 18-20-Year-Olds, 2019**



The number is the same in Minnesota, 18-to-20-year-olds have the highest number of homicide arrest rates than any other age group. (*Id.* at 13-14, *see also id.* fig. 2, below.) In Minnesota, "the murder arrest rate for 18-to-20-year-olds is almost 33 percent higher than the murder arrest rate for the next most homicidal age group – those aged 21-24." (*Id.* at 13.)

**Figure 2**
**The Most Homicidal Age Group is 18-20-Year-Olds**
**Minnesota Arrest Data, 2015-2019**



In the United States, most murders are committed with firearms. (*Id.* at 14.) And, not surprisingly, the data of gun homicide offenders by age group shows that the "18-to-20-year-old cohort dominates in the commission of gun homicides: no three-year age group above age 20 is as homicidal." (*Id.* at 15-16, *see also* fig. 3, below.) And, as more data has become available due to more states adopting concealed carry laws, "a strong body of evidence has been amassed that finds that increased gun carrying outside the home increases violent crime." (*Id.* at 19.) The social science data indicates that the 18-to-20 age group are statistically more dangerous to themselves and others than other age groups. Minnesota's choice to use its police powers to restrict 18-to-20-year-olds from obtaining permits to carry directly and positively impacts public safety.

**Figure 3**

**The 18-20-year-old Cohort Dominates in the Commission of Gun Homicides**

*Department of the Treasury*             *Department of Justice*

**Gun Homicide Offenders by Age Group**



Source: Table from Report of the Department of the Treasury and Department of Justice (see footnote 33 above), Supplemental Homicides Report, 1997.

## IV.   MINNESOTA'S PERMIT TO CARRY STATUTE IS CONSTITUTIONAL AS APPLIED TO 18-TO-20-YEAR-OLD WOMEN AS A MATTER OF LAW.

Plaintiffs claim section 624.714 is unconstitutional as applied to 18-to-20-year-old women, alleging that they commit less violent incidents than men of their age group. (Compl. ¶¶ 99-101.) Plaintiffs further allege Minnesota has no legitimate justification or compelling interest for its license requirements as applied to women. "Without any legitimate justification, much less one of a 'compelling' or 'substantial' nature as required to survive heightened scrutiny, to the extent a scrutiny analysis applies, Minnesota's ban is unconstitutional, void, and invalid as applied to women between the ages of 18 and 21." (Id. ¶ 103.)

But it is now irrelevant whether 18-to-20-year-old women today have a lower rate of violence than men their age as *Bruen* dispatched with any means-ends scrutiny analysis in Second Amendment claims. *See Bruen*, 142 S. Ct. at 2126. Although, it should be noted that while18-to-20-year-old women commit less violent crime than men in the same age group, they are more violent than women in any other age group, as the Commissioner's expert witness Professor John Donahue testified:.

> 6 **Q**. Okay. So -- but given all that, if you're
> 7 legislator saying, I want to really impact
> 8 public safety, 18-to-20-year-old women would
> 9 not be one of the first places you would
> 10 look, correct?
> 11 **A**. Well, it would be the second place, because,
> 12 you know, if you're looking at women, the
> 13 only group that's worse is 21 to 24, and you
> 14 see that the rate doubles when you go from
> 15 15 to 17 and 18 to 20, so it's not a bad
> 16 place.

(Prutzman Decl., Ex. C. (Donahue Tr.) 130:6-16, *see also* 84:12-22.) The homicide rate of women ages 18-to-20 in the United States is "many times higher than the average rates for all citizens in Western European nations and other affluently [sic]  countries." (*Id.* 128:11-129:1.)

Just as for all Minnesotans of this age group, the proper analysis for this claim is whether the conduct falls within the plain text of the Second Amendment and whether the restriction comports with our Nation's historical tradition. *Bruen*, 142 S.Ct. at 2131. And for the same reasons put forth in Section III.i, *supra,* Plaintiffs cannot meet their burden as 18-20 year old women are also not covered by the plain text of the Second Amendment. Further, the historical restrictions detailed in Section III.ii, *supra*, applied equally to men and women, and are evidence of a long tradition of prohibiting guns to people in that age group. *Bruen*, 142 S. Ct. at 2129–30.

## CONCLUSION

For the aforementioned reasons, the Commissioner respectfully requests the Court grant his motion for summary judgment as a matter of law.

***Signature on following page***

Dated:  August 4, 2022                          Respectfully submitted,

                                                KEITH ELLISON
                                                Attorney General
                                                State of Minnesota


                                                s/ Amanda E. Prutzman
                                                Amanda E. Prutzman
                                                Assistant Attorney General
                                                Atty. Reg. No. 0389267

                                                445 Minnesota Street, Suite 1400
                                                St. Paul, Minnesota 55101-2131
                                                (651) 757-1217 (Voice)
                                                (651) 282-5832 (Fax)
                                                amanda.prutzman@ag.state.mn.us

                                                ATTORNEY      FOR      DEFENDANT
                                                COMMISSIONER JOHN HARRINGTON

|#5284437-v2