**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

**Expert Report of Saul Cornell, Ph.D.**

**January 2022**

## I.    <u>Assignment</u>

I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, including the regulation of firearms in public (also referred to as "open") carry of arms and the history of the regulation of minors' access to weapons and the ability to carry them in public.

I have further been asked to opine on how the Founding-era generation understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.  Finally, I was also asked to assess whether Minnesota's requirement that an individual be 21 years of age to obtain a permit to carry a handgun in public imposes an unconstitutional burden on conduct falling within the historical scope of the Second Amendment's guarantee as incorporated by the Fourteenth Amendment.

## II.    <u>Qualifications and Background</u>

I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts.[2]  My scholarship on this topic has appeared in leading law reviews and top peer reviewed legal history journals.  I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3]  Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.  I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.); *Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018), and *Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.)

## III.    Retention and Compensation

I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports, $750 for depositions and court appearances, and an additional $100 per hour for travel time.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## IV.    Basis for Opinion and Materials Considered

The opinion I provide in this report is based on my review of the June 7, 2021 complaint filed by Plaintiffs in the lawsuit pending in the United States District Court for the District of Minnesota as case number 21-cv-1348 ("lawsuit"); my review of the Minnesota statutes at issue in this lawsuit; my education, expertise, and scholarship in the field of legal history; and my review and analysis of the primary sources, secondary sources, and other materials cited in the footnotes and text of this report and listed in the publications noted in CV.

---

[2] For a list of court citations, *see* Exhibit 2.
[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008)  and Gerald Leonard & Saul Cornell, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS CONSTITUTION, 1780S-1830S (2019).

## V.    Summary of Opinion

In *District of Columbia v. Heller* Justice Scalia wrote that "constitutional rights are enshrined with the scope they were understood to have when the people adopted them."[4]  The first inquiry necessary to implement *Heller's* framework in this case is to establish the scope of rights enjoyed by minors at the time of the Second Amendment's enactment.[5]  Rather than undertake the rigorous examination of history, text, and tradition, as *Heller* and *McDonald* require, Plaintiffs' complaint works backwards from modern understandings of minors' rights and incorrectly projects those ideas onto Founding era law.  In short, the legal argument in Plaintiffs' complaint rests on a perfect storm of constitutional error and historical anachronism.

First, Plaintiffs' assertion about the status of minors under modern law is entirely irrelevant to *Heller's* history, text, and tradition framework for evaluating the constitutionality of gun laws.[6]  The legal question presented by *Heller* is not what ***is*** the status of minors under today's law, but what ***was*** the status of minors under Founding era law.[7]

Secondly, the entire weight of Plaintiffs' argument rests on the erroneous claims made by two gun rights advocates, neither of whom have the requisite historical credentials to make authoritative judgments about the meaning of early American law or the many militia statutes enacted in the era of the Second Amendment.[8]  Moreover, this flawed research was published in a minor law review that did not rank in the top 400 legal journals in America at the time of publication.[9]  The standard hierarchy of legal authorities familiar to any first year law student would accord such a source little, if any, authority, but Plaintiffs rest much of their case on the

---

[4] *District of Columbia v. Heller*, 554 U.S. 570, 591, 595, 634 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 767-68 (2010).

[5] *See generally*, T. E. James, *The Age of Majority*, 4 AM. J. LEGAL HIST. 22 (1960).

[6] Complaint at 3.

[7] *Heller*, 554 U.S. at 591, 595, 634.

[8] David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. UNIV. L.J. 495, 530-33 (2019).

[9] The Southern Illinois University Law Journal did not rank in the top 400 law journals according to a recent survey by Washington and Lee Law School.  The rankings are available at https://managementtools4.wlu.edu/LawJournals/Default.aspx (last visited on Jan. 26, 2022).  For discussion of the methodological issues raised by ranking law reviews and the ongoing debate over law review as legal authority, *see generally* Gregory C. Sisk *et al.*, *Scholarly Impact of Law School Faculties in 2018: Updating the Leiter Score Ranking for the Top Third*, 95 UNIV. OF ST. THOMAS LAW JOURNAL (2018), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3230371##

dubious historical arguments asserted in this questionable source.[10]  Indeed, the article has been subjected to withering historical critique, making it even less credible as a scholarly authority.[11]

Finally, Plaintiffs ignore the complex history of regulation in America, including the regulation of minors.  The inclusion of some minors in the Founding era and later militias was a policy choice, not a fixed constitutional requirement.[12]  Most significantly, Plaintiffs fail to address the seismic constitutional shift in American constitutional law wrought by the adoption of the Fourteenth Amendment.[13]  The language of state arms bearing provisions changed dramatically in this period and the number and range of firearms regulations, including regulations of minors, expanded exponentially. [14]  The era of the Fourteenth Amendment is the period that is most relevant to understanding challenges to state gun laws.[15]

At the time of the writing of the Second Amendment individuals below the age of legal majority were infants in the eyes of the law.[16]  As such, infants were dependent, not independent, constitutional actors.  Infants were treated by the law in a similar fashion to married women under the doctrine of coverture, a legal condition that rendered a married women a legal nullity under common law and the early American law of domestic relations.  This legal fact did not change until the latter half of the twentieth century.[17]  Plaintiffs' argument therefore rests on a distorted

---

[10]  *See generally* https://www.law.cornell.edu/wex/order_of_authorities; for a more detailed analytical discussion, *see* Amy J. Griffin, *Dethroning the Hierarchy of Authority*, 97 OR. L. REV. 51, 62 (2018).

[11]  Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 39 YALE L. & POL'Y REV. INTER ALIA 1, 2 n.6 (2021).

[12]  *See* discussion *infra* pp. 13-15, 20.

[13]  On the change in the language of state constitutional arms bearing provisions, *see McDonald*, 561 U.S. at 767-68.

[14]  On the inclusion of new pro-regulation language in these new state constitutions and the expansion of regulation, *see generally* Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65, 75-78 (2021).

[15]  On the consensus that the era of the 14th Amendment is the one most relevant to understanding the scope of state gun regulation consistent with the Second Amendment, see  Joseph Blocher & Darrell A. H. Miller, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *HELLER 94-98, 129-130* (Cambridge Univ. Press 2018); *see McDonald*, 561 U.S. at 767-68; *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *Young v. Hawaii*, 992 F.3d 765, 824 (9th Cir. 2021).

[16]  For a good statement of how American law had adopted English common law's view of infants and the law, *see* Zephaniah Swift, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 213 (1795).  On the emergence of the category of young adult in modern legal theory, *see* Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641,658 (2016).

[17]  Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641 (2016).

understanding of American law in the Founding era: American law at the time of the Second Amendment did not treat infants as autonomous legal actors, they were dependents whose access to the courts and protections of law were mediated through parents or guardians. The dependent status of minors renders plaintiff's claims about Second Amendment rights claims profoundly anachronistic.[18]

Plaintiffs make another fatal constitutional error by confusing rights and duties. Historically, rights are the correlatives of duties.[19] The existence of a rights claim typically imposes on another actor, sometimes government, a duty to respect the right claimed by the holder of the right. Duties did not at the time of the Founding, and do not in modern law, create rights. Plaintiffs treat these two concepts as synonyms, not correlatives, a serious legal and logical error. The fact that early American governments compelled some infants to keep and bear arms did not establish a right that an infant could claim against government. Indeed, some militia statutes expressly recognized this fact and made parents or guardians liable for any penalty that accrued because an infant failed to acquire suitable weapons to meet the obligation to serve in the militia. In those states where this fact was not expressly recognized by statute, well accepted common law rules would have led to the same result. In short, the argument that militia laws demonstrate the existence of a right is simply erroneous.[20]

Finally, Plaintiffs' complaint misses the constitutional forest for the trees by failing to grasp that the original understanding of the Second Amendment and its state constitutional analogs was inextricably linked to the goal of promoting a free state and preserving "the peace."[21] The right of

---

[18] Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 TUL. L. REV. 55 (2016).

[19] For a general overview of modern rights theory, *see* Leif Wenar, *Rights*, *in* THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2021), *available at* https://plato.stanford.edu/entries/rights [https://perma.cc/B7KH-GPTV]. On modern legal conceptions of rights, *see generally* the related article by Kenneth Campbell, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., Fall 2021 Edition), *available at* https://plato.stanford.edu/archives/fall2021/entries/legal-rights/.

[20] *See* discussion, *infra* pp 13-14.

[21] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11, 25 (2017). On the transfer of English common law, including the concept of the peace to early America, *see generally* Alfred L. Brophy, "*For the Preservation of the King's Peace and Justice": Community and English Law in Sussex County, Pennsylvania, 1682–1696*, 40 AM. J. LEGAL HIST. 167 (1996). For the persistence of this fundamental legal concept after the American Revolution, *see generally* Laura F. Edwards, *The Peace: The Meaning and Production of Law in the Post-Revolutionary United States*, 1 U.C. IRVINE L. REV. 565 (2011).

self-defense did not exist in isolation. Long before the adoption of the Second Amendment, the common law recognized this right, but it also recognized the necessity of preserving the peace.[22] It is impossible to make sense of the numerous laws enacted by the Founding generation and later generations of Americans, including the generation that enacted the Fourteenth Amendment, without recognizing that the right to keep and bear arms was understood to further the goals of ordered liberty, not undermine them.[23]

In the era of the Second Amendment, rights and regulation were not antithetical concepts: the two were seen as two sides of the same coin. Without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.[24] Plaintiffs' vision of the Second Amendment as articulated in their Complaint rests on a series of post-Founding era myths that have little connection to the historical realities and legal framework that informed the original understanding of the right to keep and bear arms.[25] The ability to regulate firearms and gunpowder is of ancient vintage and was central to the conception of ordered liberty that defined Anglo-American law from its earliest days.[26] At the very core of the early American understanding of the scope of liberty was the right of self-government and the right of the people themselves to regulate their internal police to promote public safety.[27] Regulations of gunpowder and firearms were therefore at the very core of state police power from the colonial period forward.[28]

---

[22] Eric Ruben, *An Unstable Core: Self-Defense and the Second Amendment*, 108 Cal. L. Rev. 63, 94-95 (2020).

[23] On Founding era conceptions of liberty, *see* John J. Zubly, THE LAW OF LIBERTY 7 (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937). For a more recent elaboration of the concept of ordered liberty, *see generally* James E. Fleming & Linda C. McClain, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard Univ. Press 2013).

[24] H. Richard Uviller & William G. Merkel, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (Duke Univ. Press Books 2002).

[25] *See generally*, Richard Slotkin, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (Univ. of Okla. Press 1992).

[26] Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569, 576-577 (2017).

[27] Jonathan Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115, 118-126 (2019).

[28] *See generally*, William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061 (1994).

## VI.    The Historical Inquiry Required by *District of Columbia v. Heller*

The United States Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008) directed courts to look to history for guideposts in evaluating the scope of permissible regulation under the Second Amendment. At the time *Heller* was decided there was relatively little scholarship on the history of gun regulation.[29]  In the decade since *Heller* was decided, a burgeoning body of scholarship has uncovered a previously unknown history of arms regulation in the Anglo-American legal tradition and the Founding era.[30]  Much of this material was largely unavailable to the *Heller* court because the sources were difficult to identify, search, and collect. The creation of powerful searchable digital "archives" has transformed this sub-field and facilitated a more sophisticated understanding of the scope of gun regulation under Anglo-American law, during the Founding era, and in subsequent periods of American history, including the era of the Fourteenth Amendment.[31]  My report draws on this new body of digital sources and the scholarship that it has generated.[32]

Looking to history for guidance when evaluating modern gun laws requires a deeply contextualized understanding of the fundamental legal and philosophical principles underpinning the Second Amendment, including the common law understanding of the limits on the uses of dangerous or unusual weapons. Two types of inquiry are therefore necessary to begin this inquiry. First, one must gain some familiarity with Founding era rights theory, particularly as it related to the scope of state legislative authority under the police power.[33]  Second, one must canvass the history of state and local regulations to establish the scope and types of laws that have been viewed as within the bounds of the lawful exercise of government power at different moments in American

---

[29] For a notable exception, *see generally* Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[30] *See generally* Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[31] Thus, the new history of firearms regulation's use of powerful digital searching techniques complements the new methods of corpus linguistics.  *See generally,* Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 HASTINGS CONST. L.Q. 509 (2019).

[32] *Compare* Cornell & DeDino, *supra* note  29 (published before the advent of the new digital tools and databases) *with* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017) (published after the creation of these databases and covering a broader chronological sweep).  For an effort to synthesize the new scholarship and apply it using *Heller*'s framework, *see generally* Joseph Blocher & Darrell A. H. Miller, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF HELLER (Cambridge Univ. Press 2018).

[33] *See generally* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31 (2020).

history.  A properly contextualized historical inquiry must also recognize, as *Heller* did, that the specific protections and regulations associated with the right to keep and bear arms lawfully evolved as firearms technology developed.[34]  Obviously, laws against machine guns would have been unthinkable in the Founding era given that these types of weapons did not exist.[35]

In addition, *Heller* requires consideration of "longstanding regulation," an inquiry that necessarily extends beyond the Founding era and the era of the Fourteenth Amendment because many weapons technologies were not invented or had not penetrated the civilian market sufficiently to cause legislatures to regulate them.[36]

## VII.  **Methodology**

The analysis that I used in reaching my opinions draws on recent scholarship and employs the accepted historical and legal methodologies for interpreting such sources, including an analysis of the public meaning of the Second Amendment, various individual state constitutional provisions on the right to keep and bear arms, state statutes, local ordinances, court decisions, and popular and learned legal commentaries.[37]  The methods of legal history require a deep immersion in the primary source materials, conscious attention to the limits and strengths of various types of legal

---

[34] Chief Justice John Roberts' important but under-appreciated comment in the *Heller* oral argument speaks to this point directly: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well." Transcript of Oral Argument at 77, *Heller*, 554 U.S. 570 (No. 07-290).  A similar view was endorsed by Justice Kavanaugh as Circuit Judge. *See Heller v. District of Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).  A corollary of this observation is that the form taken by permissible regulations would also change in response to technological developments.  Laws prohibiting machine guns, a type of regulation *Heller* recognized as constitutional, emerged in the early twentieth century.  Such laws could not have been enacted before the invention of the machine gun.  Nor would there have been a need to enact such laws until the machine gun had achieved a level of market penetration sufficient to cause a public safety issue.  The example of laws limiting or prohibiting machine guns illustrates some regulations adopted in the twentieth century clearly are within *Heller*'s permissible category.

[35] Second Amendment theory and jurisprudence has not grappled with the evolving history of firearms technology.  For a preliminary effort to theorize how courts ought to address this problem, *see* Darrell A.H. Miller, *Second Amendment Equilibria*, 116 NW. U. L. REV. 239, 269-270 (2021).

[36] *Id.*

[37] Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT. REV. 119, 122 n.13 (1965).  As Judge Bybee recently counseled in *Young v. Hawaii*, courts must proceed carefully when tackling complex historical questions, particularly those that span across more than five hundred years.  Plaintiff's argument rests on precisely the type of flawed history that the *Young* court warned against.  *See Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) (en banc).

sources, and a broad knowledge of related historical subfields, both within and outside of Anglo-American legal history.[38]

To avoid approaching history, text, and tradition with an "ahistorical literalism" it is vital to survey historical scholarship across a broad range of subfields.[39] Social history, cultural history, economic history, and military history all shed important light on the original meaning of the Second Amendment. One must avoid the common tendency to treat sources in isolation, decontextualized, floating freely, detached from the web of historical meaning that originally made them comprehensible to Americans in 1791 and ignore the way specific pieces of evidence fit together to form a coherent whole.[40] The eminent English legal historian Frederic Maitland was one of the first modern scholars to recognize that true historical inquiry, particularly the history of the law, requires unraveling multiple webs of meaning. As Maitland sagely noted: "such is the unity of all history that anyone who endeavors to tell a piece of it must feel that his first sentence tears a seamless web."[41]

Rather than follow the best available historical practices grounded in accepted methodologies and professional scholarship, the argument presented by Plaintiff employs an unsophisticated and generally discredited "tunnel vision" approach to historical analysis. The distinguished Yale historian J.H. Hexter warned scholars about the dangers of "tunnel history" more than half a century ago. Understanding the past, he observed, required a broad-based inquiry across disparate subfields of scholarship. Hexter bemoaned the fact that all too often scholars carved out "a series of tunnels, each continuous from the remote past to the present, but practically

---

[38] For a discussion of the minimum standard for undergraduate history majors, *see* Mary Lynn Rampolla, A POCKET GUIDE TO WRITING IN HISTORY 18 (8th ed., 2015). For a primer written for graduate students, *see* Martha Howell & Walter Prevenier, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 128 (2001). On the methods of professional legal history, *see generally* THE OXFORD HANDBOOK OF LEGAL HISTORY (Markus Dirk Dubber and Christopher L. Tomlins, eds., 2018). On the methods of originalism, *see* Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013). One the proper role of history in constitutional law, *see generally* Richard H. Fallon Jr., *The Many and Varied Roles of History in Constitutional Adjudication*, 90 NOTRE DAME L. REV. 1753 (2015).
[39] 139 S. Ct. 1485 (2019) at 1498.
[40] J.H. Hexter, REAPPRAISALS IN HISTORY 194–45 (1961).
[41] Frederic William Maitland, *A Prologue to a History of English Law*, 14 L. QUARTERLY REV. 13 (1898). This approach is consonant with the most influential philosophical work of the twentieth century, LUDWIG WITTGENSTEIN, PHILOSOPHICAL INVESTIGATIONS § 43, at 20e (G. E. M. Anscombe trans., 1953). On the relevance of Wittgenstein and holism to originalist legal inquiries, *see* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935, 945 (2015).

self-contained at every point sealed off from contact with or contamination by anything that was going on in any of the tunnels." [42]

Modern legal history—the methodology employed in this report—approaches the past with a more holistic model of meaning. Modern legal history recognizes that legal meanings, including those relevant to understanding the history of the Second Amendment, the various state constitutional arms-bearing provisions, and gun regulation, must be rigorously contextualized. Any effort to understand the Second Amendment and the history of gun regulation must therefore canvass a variety of historical topics, including such diverse subfields as legal history, social history, cultural history, economic history, and military history. [43]

## VIII.  Opinion

### A.    Infants and Arms Bearing in the Founding Era and Early Republic

Under English common law, individuals under the legal age of majority, twenty-one, were entirely subsumed under the authority of their parents (usually their fathers) or other guardians. The situation of minors, those under the legal age of majority, was comparable to married women under the legal doctrine of coverture. A married woman ceased to exist as a legal entity and her entire legal persona was subsumed within her husband's authority.[44] Sir William Blackstone summarized the doctrine in his *Commentaries*:

> By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and cover, she performs everything; and is therefore called in our law-French a feme-covert.[45]

The comparison between a femme covert and minors was frequently made by writers on domestic law. As one eighteenth-century author on the law of domestic relations observed: "Feme Covert in our Books is often compared to an Infant, both being persons being disabled in the

---

[42] *Supra* note 40.

[43] The best illustration of the breadth of approaches adopted by modern legal historians of the United States is the three volume *Cambridge History of Law in America*. *See generally* THE CAMBRIDGE HISTORY OF LAW IN AMERICA (Michael Grossberg & Christopher L. Tomlins eds., 2008).

[44] J.H. Baker, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 483–84 (Oxford Univ. Press 4th ed. 2002); Allison Anna Tait, *The Beginning of the End of Coverture: A Reappraisal of the Married Woman's Separate Estate*, 26 YALE J. OF L. & FEMINISM 165,167 (2014).

[45] 1 William Blackstone, COMMENTARIES *442.

Law."[46]    This observation cuts to the core of the problem with Plaintiffs' anachronistic assumptions.  Minors were also legally "disabled" in the eyes of the law and hence could not claim any Second Amendment right in the Founding period or during the era of the Fourteenth Amendment. [47]

The American Revolution set in motion a process of change that reformed aspect of the traditional patriarchal model of legal authority governing minors.  Although American law was republicanized in this process, the transformation of American domestic law did not recognize minors as legally autonomous individuals, but rather gave society, acting through courts and legislatures, greater authority to intervene to protect and promote the well-being of those under the age of majority.  Despite the many reforms inaugurated by the American Revolution, minors remained "infants" in the eyes of the law. [48]

The subject of minors' legal status was explored at considerable length by Connecticut jurist Zephaniah Swift, who published a legal treatise four years after the adoption of the Second Amendment:  "Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech—minors."  Swift noted: "by common law an infant can bind himself by his contract for necessaries, for diet, apparel, education and lodging," but little else.[49] In short, infants were severely circumscribed by law and had only a narrow range of legal autonomy.  After the American Revolution, courts became more involved in monitoring contractual arrangements concerning minors and adopted a more aggressive role in protecting the interests of minors, even if it meant voiding contracts.  This new supervisory role narrowed the range of contractual freedom of minors acting without parental consent or a guardians' approval.

---

[46] Anon., BARON AND FEME:  A TREATISE OF LAW & EQUITY CONCERNING HUSBANDS AND WIVES 8 (1738).

[47] David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL.U. L.J. 495, 530  (2019).  The title of this article references "Rights of Young Adults" and the entire article proceeds from ahistorical assumptions based on minors' status as "young adults."  This term is a modern invention and has no foundation in Founding era law.

[48] *See generally* Corinne T. Field, THE STRUGGLE FOR EQUAL ADULTHOOD: GENDER, RACE, AGE, AND THE FIGHT FOR CITIZENSHIP IN ANTEBELLUM AMERICA (Univ. of N. Carolina Press 2014); Jeffrey Shulman, THE CONSTITUTIONAL PARENT RIGHTS, RESPONSIBILITIES, AND THE ENFRANCHISEMENT OF THE CHILD (Yale Univ. Press 2014); Holly Brewer, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY (Univ. of N. Carolina Press 2012); John E.B. Myers, *A Short History of Child Protection in America*, 42 FAM. L.Q. 449 (2008); Elizabeth Pleck, DOMESTIC TYRANNY: THE MAKING OF AMERICAN SOCIAL POLICY AGAINST FAMILY VIOLENCE FROM COLONIAL TIMES TO THE PRESENT (Univ. of Ill. Press 1987).

[49] Swift, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT, 213.

Thus, minors were subject to far greater state supervision than any other legal entity involved in the marketplace during the early years of the republic.[50]

The influential early nineteenth century legal author and jurist James Kent discussed the legal status of minors in 1836 in his *Commentaries on American* law: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years."[51]  When some radical Jacksonian Democrats suggested that the age of majority for voting ought to be lowered for those who had served in the militia, leading Federalists in the New York state constitutional convention mocked them.  Federalist Elisha Williams, a delegate from Columbia County, wondered if his democratic opponents wished to enfranchise "brave infants" by giving them the right to vote.[52]  Extending full rights to minors was literally treated as a joke in early nineteenth century America.

John Bouvier, author of the first American law dictionary, shared the views of Swift and Kent, and his 1858 explanation of the legal significance of the age of majority followed their lead: "The rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States.  At this period, every man is in the full enjoyment of his civil and political rights."[53]  Thus, there was a broad consensus among legal commentators and the "sages of the law" that minors were legally disabled and could not claim legal autonomy until they reached the legal age of majority.[54]

### B.    Minors and Guns: Military Discipline and *In Loco Parentis*

Minors serving in the militia were subject to military order, discipline, and law.  Militia statutes were among the lengthiest laws enacted in the Founding era.  Few members of the

---

[50] Holly Brewer, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY (Univ. of N. Carolina Press 2012).

[51] James Kent, 2 COMMENTARIES ON AMERICAN LAW 259 (3d ed., 1836).

[52] Corinne T. Field, THE STRUGGLE FOR EQUAL ADULTHOOD: GENDER, RACE, AGE, AND THE FIGHT FOR CITIZENSHIP IN ANTEBELLUM AMERICA 58 (Univ. of N. Carolina Press 2014).

[53] John Bouvier, 1 INSTITUTES OF AMERICAN LAW 148 (1858).

[54] A standard legal maxim derived from Lord Coke, and one familiar to judges and lawyers in antebellum America held that "great regard, in the exposition of statutes ought to be paid to, the construction that sages of the law, who lived about the time."  Coke's legal maxim regarding the importance of consulting the sages of the law when interpreting statutes was familiar to lawyers and judges in the early Republic, *see* E. Fitch Smith, COMMENTARIES ON STATUTES AND CONSTITUTIONS 739 (1848).  On Smith's significance to antebellum legal culture, *see* William D. Popkin, STATUTES IN COURT: THE HISTORY AND THEORY OF STATUTORY INTERPRETATION 69 (Duke Univ. Press 1999).

Founding era believed that young men below the age of majority could be trusted with firearms without proper supervision in most circumstances

The militia laws in the Revolutionary era not only defined who was in the militia; they also specified the types of weapons that were required to meet this civic obligation and imposed fines and other punishments on those who failed to show up to mandatory musters properly armed.[55] American citizens did not decide which weapons to bring to muster.  Failure to acquire the officially proscribed type of weaponry could result in fines.[56]  As far as the militia was concerned, all guns were not created equal in the eyes of the law.  Government policy was designed to force Americans, in some cases minors under 21, to acquire the type of weapons the government deemed essential for the militia.[57]  These laws not only prescribed the types of armaments needed to participate in the militia; they also described the range of penalties for those who did not acquire or maintain the weapons in good working order.[58]

Once they had mustered, members of the militia were subject to military discipline and punishment.[59]  Indeed, eighteenth century military discipline was exceedingly harsh, including corporal punishment such as whipping.[60]  During this era, the goal of achieving good military discipline justified a range of discipline and punishment for failure to comply with mandatory *duties* that is hard to reconcile with the idea that these laws offer evidence of a *right* that might be asserted against government.  According to the logic set forth in Plaintiffs' complaint one could be whipped by agents of the government for failing to exercise a "right" according to the government's dictates.  As this example illustrates it makes little sense to treat a government

---

[55] Act of Dec. 20, 1791, 1791 S.C. Acts 16, (amending and putting into force an earlier act entitled "an Act for the regulation of the Militia of this state, passed the 26th day of March 1784"); *see also* Act of Jan. 18, 1815, ch. 131, 1815 Mo. Laws 360 (condensing the several Militia laws into a single act).

[56] For a sampling of Founding-era militia statutes, *see* Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 136 (raising a thousand men to defend the state); Act of Apr. 14, 1778, ch. 21, 1778 N.J. Laws 41, 2d. Gen. Assembly (regulating, training, and arraying the militia); Act of Feb. 16, 1779, 1779 Vt. Acts & Resolves 57 (forming and regulating the militia; encouraging military skill for state defense); Act of 1786, ch. 1, 1786 N.C. Sess. Laws 407 (raising troops to protect the inhabitants of Davidson county).

[57] An Act for Formulating and Regulating the Militia, New Hampshire Session Laws 27-42 (1776).

[58] 1821 Tenn. Pub. Acts 63, An Act To Amend The Militia Laws Of This State, chap. 55, §§ 2-3; Act effective May 5th, 1794, § 10, 1794 R.I. Pub. Laws 14, 21; *see generally*, Cornell & DeDino, *supra* note 29 at 508-10.

[59] *Houston v. Moore*, 18 U.S. 1 (1820).

[60] Laws To authorize a detachment from the militia of the United States., Chapter 55, § 6, 12 Congress, Public Law 12-55. 2 Stat. 705 (1812) (prohibiting whipping, a common form of punishment used by the military in the eighteenth century).

mandate as a right in the sense in which this term is typically used in modern law. It is certainly true that minors enrolled in the militia would have also participated in community-based law enforcement such as the "hue" and "cry," but such actions would have been supervised by adults. A popular South Carolina justice of the peace manual published in 1788, the year the Constitution was adopted, makes clear the limits imposed on minors' law enforcement functions.  The author of this popular legal guide, John Fauchereaud Grimké, was among the state's most distinguished and influential jurists.  He described the categories of person "who shall not be a constable" as including "infants," "madmen," and "idiots."[61]  The fact that he included infants old enough to participate in the militia and local law enforcement in the same category as those the law considered to be incapable of asserting their legal will independently only underscores the absurdity of treating those under 21 as having a robust, freestanding right to keep, bear, and freely acquire whatever arms they desired at the time of the Founding.  Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social realities of domestic life at the Founding.[62]

For additional confirmation that the Founding generation did not believe that arming unsupervised minors was a good idea, one need only consider the stringent rules prohibiting firearms ownership and use enacted by colleges in the era of the Second Amendment.  College was one of the very few situations where minors lived outside of a traditional household.  Minors attending college did not become autonomous individuals who enjoyed broad freedom but instead traded strict parental authority for an equally restrictive rule of in *loco parentis*.[63]  Yale College prohibited students from possessing any guns or gun powder.[64]  Nor were such restrictions

---

[61] John Fauchereaud Grimké, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788).  Grimké was one of the state's most eminent lawyers and became one of its most influential jurists.  For biographical background on his life, see Eli A. Poliakoff, *Grimké, John Faucheraud*, SOUTH CAROLINA ENCYCLOPEDIA (May 17, 2016), *available at* https://www.scencyclopedia.org/sce/entries/grimke-john-faucheraud/.

[62] For a more elaborate argument about the dangers of interpreting the Second Amendment with an ahistorical understanding of rights, *see generally* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31 (2020).

[63] See generally, Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform*, 44 VAND. L. REV.1135 (1991).

[64] THE LAWS OF YALE-COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795 26 (1800).

exclusively the province of private institutions.  The University of Georgia, one of the nation's oldest public institutions of higher education, also forbade guns on campus.  The rule was sweeping: "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[65]  A similar law governed students at the University of North Carolina, another public university chartered in the same period:  "No Student shall keep a dog, or firearms, or gunpowder.  He shall not carry, keep, or own at the College, a sword, dirk, sword-cane." [66]  The rules and regulations of American colleges in the era of the Second Amendment further support the conclusion that, for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms.  Rather, access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them:  fathers, guardians, constables, justices of the peace, or militia officers.

### C.    The Police Power, Minors, and Firearms Regulation, 1776-1900

Laws singling out the dangers of allowing minors unsupervised access to guns are also deeply rooted in the American legal tradition.  In 1803, New York city singled out guardians for punishment for firearms infractions committed by minors under their charge.[67]  In 1817, Columbia, South Carolina enacted a law that allowed for the seizure of weapons used by minors within the city limits.[68]  And in 1857, the city of Louisville, Kentucky passed an ordinance stating that "[n]o

---

[65] *The Minutes of the Senate Academicus* 1799–1842, UNIVERSITY OF GEORGIA LIBRARIES (1976), *available at* https://www.libs.uga.edu/hargrett/archives/senatus/senatus%20academicus%201799-1811.pdf.

[66] ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA 15 (1838).

[67] Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803).

[68] An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto 61-61 (1823); Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803). DIGEST OF THE CHARTER AND ORDINANCES OF THE CITY OF MEMPHIS 50 (1857).

person shall retail gunpowder to minors" but included an exception for those who had "authority from his parent or guardian."[69]  As these laws suggest, minors were far more limited in their ability to acquire and use weapons than adults.

Context is key to understanding firearms regulation in the early republic.  The primary goal of government policy was to force Americans to procure the types of weapons needed to arm the militia.  America was far better armed than any other society in the Anglo-American world, but American consumer preferences favored guns most useful to life in an agrarian society.  Lighter hunting muskets and fowling pieces were more practical for farmers than heavy Brown-Bess muskets.  The former weapons were better suited to ridding fields of vermin or putting food on the table.  By contrast the latter class of firearms were better suited to the demands of eighteenth-century land warfare.  Military muskets could be fitted with a bayonet, an indispensable tool in hand-to-hand fighting.  Finally, a military quality musket had to be sturdy enough to serve as an effective club in close in combat, where a sturdy weapon might need to serve as a bludgeon.

Although eighteenth-century military muskets were effective tools on the battlefield, they were not well adapted to farm life and were seldom used in crime or inter-personal violence in the era of the Second Amendment.[70]  Flintlocks and muzzle loading weapons took too long to load and were too inaccurate to make them effective instruments of anti-social violence or criminal activity.  Ohio State historian Randolph Roth's recent work on the history of homicide demonstrates clearly that inter-personnel gun violence was simply not a serious problem in the era of the Second Amendment.  Given that gun violence was not a pressing issue of public concern at the time that the Second Amendment was enacted and the on-going problems of properly arming the militia, neither the federal government not the states had any interest or need to enact modern style gun control laws aimed at reducing the stock of weapons in circulation.  Given these facts it is hardly surprising that government arms policy was not designed to restrict access to weapons.  In fact, the opposite goal was the driving force behind much government regulation: government policy aimed to encourage the ownership of military quality weapons needed for militia service and regulation was designed to further this objective.  There were would have been no need to pass

---

[69] *No. 68. An Ordinance as to Retailing Gun Powder*, in Oliver H. Strattan, A COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO THE CITY OF LOUISVILLE, KY 175 (1857).

[70] For a useful discussion of eighteenth-century firearms that explains why military muskets were less useful to farmers, s*ee* "Firing a Musket," NCpedia, *available at* https://www.ncpedia.org/media/video/firing-musket-18th.

laws discouraging households from acquiring muskets given that there was a pressing need to get Americans to acquire these weapons for militia service.[71]

Modern-style arms control measures targeting weapons better suited for crime and inter-personal violence, and not especially useful for militia service, did not emerge in American law until technological changes, economic efficiencies, and changing consumer preferences made these weapons more common.[72] The market revolution of the Jacksonian period transformed American life, making a host of consumer goods—from wooden clocks to firearms—widely available for the first time.[73] The impact of this inter-connected set of changes in production, marketing, consumption, and technology transformed gun culture by making a variety of weapons, including pistols, more common. At the time of the Second Amendment 90% of the guns owned by Americans were long guns; handguns were relatively rare, expensive, and not very accurate.[74] The market revolution of the early nineteenth century made cheaper handguns widely available for the first time in American history. In response to the perception that these weapons posed a grave danger to public safety, states began passing laws to deal with the negative consequences of these weapons, including the first laws targeting concealed weapons.[75]

---

[71] Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 113, 117 (Jennifer Tucker et al. eds., 2019).

[72] *Id.*

[73] Historians use the term "market revolution" to describe the inter-related changes in technology, culture, and the economy that led to an expansion of consumer goods in pre-Civil War era, *see* John Lauritz Larson, *Foreword: The Market Revolution in Early America: An Introduction* 19 OAH MAGAZINE OF HISTORY 4 (2005). On the importance of the market revolution to the development of the American firearms industry, *see generally* Joshua L. Rosenbloom, *Anglo-American Technological Differences in Small Arms Manufacturing* 23 J. OF INTERDISCIPLINARY HISTORY 683 (1993); Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion* 92 BUSINESS HISTORY REVIEW 57 (2018). Although Samuel Colt's innovations are closely identified with the market revolution there were important improvements in firearms production prior to his entrance into the firearms industry. Government investment and innovation in arms production spilled over into the market for private arms and manufactures and gun smiths took advantage of new techniques and technology to improve weapons and make them more affordable.

[74] Kevin Sweeney, *Firearms Ownership and Militias in* A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 63-66 (Jennifer Tucker et al. eds., 2019).

[75] *See generally* Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS. 73 (2020); for a good example, *see* Of Miscellaneous Offences, ch. 7, § 4, 1841 Ala. Acts 148, 148–49.

In addition to enacting a variety of general firearms regulations, the antebellum era also witnessed a growing concern over the dangers posed by firearms, particularly to minors.[76] In 1856, Alabama adopted a provision focusing on the specific problem posed by the sale of such weapons to minors:

> That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[77]

Tennessee passed a similar law: "That any one who shall sell or give or lend, to any male minor, a . . . air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[78] Kentucky also enacted a similar law, but carved out an exception when a minor was supervised by an adult:

> If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.[79]

The fact that the Kentucky statute expressly mentioned a prohibition on giving or loaning weapons to slaves or free persons of color highlights the complicated connection between slavery and guns in pre-Civil War America. The Slave South was the most violent region of the nation in the period before the Civil War. The violence associated with slavery and the high levels of gun ownership in the region also resulted in this region taking the lead in enacting acting a variety of gun control measures, including laws aimed at preventing minors from acquiring and using dangerous weapons.[80]

---

[76] Cornell and Dedino, *supra* note 29 and discussion supra pp 15,18.

[77] Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, 17.

[78] An Act to Amend the Criminal Law, No. 26, § 1, 1856 Ala. Acts 17.

[79] 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.

[80] *See generally* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121 (2015), *available at* http://www.yalelawjournal.org/forum/firearm-regionalism-and-public-carry. On southern homicide rates, *see* Randolph Roth, AMERICAN HOMICIDE 180-249 (2009). It is important to distinguish between laws primarily aimed at disarming African Americans, including slaves, and laws aimed at preventing minors from acquiring guns or race neutral laws aimed at the problem of gun violence, on the importance of this distinction and the confusion arising from failing to make it, *see generally* Mark A Frassetto, *The Nonracist and Antiracist History of Firearms Public Carry Regulation*, 74 SMU L. REV. F. 169 (2021) and Patrick

### D.    The Expansion of Firearms Regulation in the Era of the Fourteenth Amendment

The problem of gun violence intensified in post-Civil War America.  In response to this expanding threat states and localities enacted a range of new gun laws, including the regulation of minors.  This period also witnessed a profound change in the constitutional treatment of the right to bear arms. Enacting new laws focused on the growing problem of gun violence was facilitated by a wave of state constitution-making after the Civil War.   The new state constitutions adopted during Reconstruction recast the language used to protect the right to keep and bear arms in terms that linked the exercise of this right with the right of legislatures to regulate guns.  Many of the new constitutions adopted after the Civil War in Southern states, and the newly admitted western states, revised the Founding era formulation of the right to bear arms, expressly asserting that the right was subject to regulation.  Gun rights and gun regulation were literally fused together in the new state constitutions enacted in the era of the Fourteenth Amendment.[81]  It is worth comparing Georgia's formulation of the right to bear arms, among the most robust of the new post-Civil War provisions, with Pennsylvania's 1776 arms bearing provision, the first one adopted after American Independence. (See Table One)

**Table One**

| Pennsylvania 1776 [82] | Georgia 1868[83] |
|---|---|
| That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power. | [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |

---

Charles, *Racist History and the Second Amendment: A Critical Commentary* 43 CARDOZO L. REV., Issue 4 (2022, Forthcoming).

[81] *See generally* Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2021).

[82] PA. DECLARATION OF RIGHTS, cl. XIII.

[83] GA. CONST. of 1868, art. I, § 14:

The language employed by Georgia, and sixteen other state arms bearing provisions adopted after the Civil War forged a tight link between the right to regulate and the right to bear arms. This constitutional change, one of the most striking features of post-Civil War constitutionalism, drew on well-established antebellum views of the robust scope of the police power.[84] The new formulation of the right to keep and bear arms included in these constitutions underscored the breadth of the state's police power authority in arms regulation.

The issue of minors and arms bearing even drew comment in at least one state constitutional convention, Utah. The convention considered raising the age to participate in the militia to twenty-one. Although there was some disagreement over the wisdom of changing the policy, there was little disagreement that if such a policy was desirable the state had ample authority to make the change. The contours of the debate in Utah make clear that the there was no constitutional necessity compelling states to either require or prohibit minors from participating in the militia. The decision about the composition of the militia remained one that was dictated by military necessity, not constitutional imperative.[85]

Major constitutional commentators during the period Reconstruction agreed that the scope of legitimate police power regulation of arms was considerable. John Norton Pomeroy, one of the era's most distinguished constitutional authorities writing in this period, observed that the right to keep and bear arms posed no barrier to government authority to regulate or limit persons from "carrying dangerous or concealed weapons."[86] Indeed, the Republicans who wrote the Fourteenth Amendment championed an expanded police power to effectuate their vision of a well-regulated society.[87] Among the most pressing concerns of Republicans in the era of the Fourteenth Amendment was the problem of protecting the lives and rights of African Americans in the South, including the right to keep and bear arms.[88] Support for this goal did not mean that Republicans

---

[84] *See* Cornell, *supra* note 14.

[85] Official Report of the Debates and Proceedings of the Convention Assembled at Salt Lake City 815-19 (1898).

[86] John Norton Pomeroy, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152–53 (1868); Lewis Hochheimer, THE LAW RELATING TO THE CUSTODY OF INFANTS 4 (3ed. 1899).

[87] For a more detailed discussion, *see generally* Laura F. Edwards, *The Reconstruction of Rights: The Fourteenth Amendment and Popular Conceptions of Governance* 41 J. OF SUP. CT. HIST. 310 (2016). For a discussion of how the courts wrestled with the meaning of the Amendment, *see generally* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[88] Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARVARD L. REV. FORUM 238, 241-242 (2014).

opposed strong gun regulations.[89]  Quite the opposite was the case across the South.  In fact, rather than mark a retreat from robust gun regulation, Reconstruction marked an intensification of efforts to regulate firearms—a development spurred in part by the rise of para-military groups such as the KKK.[90]

The robust regulation of firearms during Reconstruction, including regulations on sale or access to firearms for those under the age of majority, was not a novel application of the police power, but simply an example of the flexibility inherent in this legal concept.  Exercises of the police power were seen as consistent with the scope of the Second Amendment's reach understood at the time.  The author of Section One of the Fourteenth Amendment, John Bingham, expressly affirmed the state's ability to promote public safety and welfare during the public campaign to ratify the amendment, assuring Ohioans in Cincinnati that the states would continue to be responsible for all issues of "local administration and personal security."[91]  As long as laws were racially neutral and favored no person over any other, the states were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[92]

The general expansion of firearms regulation during Reconstruction included a spate of new laws governing minors and guns.[93]  Individual states and localities responded to the proliferation of weapons among unsupervised minors by adopting a range of age-specific limits on the purchase and use of firearms by those under the age of legal majority (which remained twenty-one during this period).  The provision adopted by the city of Fresno, California just before the turn of the century is illustrative of these laws: "No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of eighteen years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon."[94]  Some of these laws targeted children

---

[89] *See generally* Ronald M. Labbé & Jonathan Lurie, THE SLAUGHTERHOUSE CASES: REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT (Univ. Press of Kansas 2003).

[90] *See generally* Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South,* 17 STAN. L. & POL'Y REV. 615 (2006).  One of the most horrifying examples was the Colfax massacre.  *See* Leeanna Keith, THE COLFAX MASSACRE: THE UNTOLD STORY OF BLACK POWER, WHITE TERROR, AND THE DEATH OF RECONSTRUCTION (Oxford Univ. Press 2008).

[91] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[92] Michael Les Benedict, *Preserving Federalism: Reconstruction and the Waite Court*, 1978 SUP. CT. REV. 39, 40-41, 47 (1978).

[93] Cornell & Florence, *supra* note 91; Cornell, *supra* note 14.

[94] Misdemeanors. Section 53., *in* L. W. Moultrie, CHARTER AND ORDINANCES OF THE CITY OF FRESNO 37 (1896).

younger than sixteen, but others singled out anyone below the age of twenty-one. For example, Indiana's law cast a broad net, prohibiting "The Sale, Gift or Bartering of Deadly Weapons or Ammunition to Minors":

> Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person to under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. § 2. Be it further enacted, that any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars.[95]

Wisconsin adopted also prohibited minors from going armed or acquiring pistols and revolvers:

> SECTION 1: It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession.

> SECTION 2: It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state[96].

Henry Campbell Black, the author of *Black's Law Dictionary* and a leading post-Civil War legal authority, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined, and that determination of its limits was best left to courts on a case-by-case basis.[97] Christopher G. Tiedeman, a conservative critic of the police power, nonetheless acknowledged the scope of its legitimate purview: "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[98] Other Reconstruction-era commentators on the scope of the police power were more explicit about the reach of the police power over firearms.

In the case of minors, the police power was at its summit. Lewis Hochheimer, one of the leading authorities on the rights of infants in this period, noted that the regulation of firearms and

---

[95] Act of Feb. 27, 1875, ch. 40, 1975 Ind. Acts 59.
[96] 1883 Wis. Sess. Laws 290.
[97] Henry Campbell Black, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).
[98] Christopher G. Tiedeman, A TREATISE ON THE LIMITATIONS OF POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149–50 (1854)).

minors was an area of the law in which the police power was at its apex.  Infants, he conceded, were not entirely beyond the protection of the Bill of Rights, but he was equally quick to point out that the need to protect those below the age of majority meant some regulations that were impermissible if applied to adults, were perfectly legal when placing limits on infants. [99]  Total prohibitions on the sale of dangerous weapons were one such an example.  In this instance the broad power to protect the welfare of minors gave government extraordinary latitude in regulating their conduct. [100]  In fact, the scope of state regulatory authority was at its zenith when regulating arms and minors.  This principle is evident in a Missouri statute that banned weapons in places where young people might gather, such as schools, places of worship, and other venues in which people gathered for "education, literary, or social purposes."  In addition, the law also expressly prohibited loaning, giving, or selling any "deadly weapon" to a minor.

> If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for education, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any unlawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment. [101]

A Kansas statute prohibited selling, trading, giving, loaning pistols or revolvers to minors:

> Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor,

---

[99] Lewis Hochheimer, THE LAW RELATING TO THE CUSTODY OF INFANTS 4 (3ed., 1899).

[100] *Id.*

[101] Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.[102]

The language of a Louisiana law was more comprehensive: "That, hereafter, it shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years.[103] Some states followed Nevada's lead and focused on the particular danger posed by minors carrying guns in public:

> Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.[104]

In his review of the history of gun regulation during this period political scientist Robert Spitzer's concluded that laws limiting the ability of minors to obtain and use arms without appropriate supervision were among the most common firearms regulations in the post-Civil War period. After surveying dozens of laws across the nineteenth century, Spitzer concluded that "numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one— or others deemed irresponsible arose in the late 1800s."[105] In fact, he concluded that restrictions on minors, were more common than limits on felons.[106]

Table Two contains a sample of the different types of laws enacted in the post-Civil War period regulating minors' and guns.

---

[102] 1883 Kan. Sess. Laws 159, § 1

[103] 1890 La. Acts 39, § 1; 1882 Md. Laws 656, § 2.

[104] 1885 Nev. Stat. 51, § 1 (approved March 4, 1881, THE GENERAL STATUTES OF THE STATE OF NEVADA. IN FORCE. FROM 1861 TO 1885, INCLUSIVE. 1077THE GENERAL STATUTES OF THE STATE OF NEVADA: IN FORCE, FROM 1861 TO 1885, INCLUSIVE : WITH CITATIONS OF THE DECISIONS OF THE SUPREME COURT RELATING THERETO 1077 (David E. Baily and John D. Hammond, 1885).

[105] Spitzer, *Gun Law History* at 60.

[106] *Id.*

**Table Two**

**Selected Firearms Laws Limiting Minors enacted between 1875-1900**

| State | Year | Provision |
|---|---|---|
| Indiana | 1875 | Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 (making it unlawful to sell, barter, or give a pistol or other deadly weapon to any person under twenty-one). |
| Georgia | 1876 | Act of Feb. 17, 1876, no. 128, § 1, 1876 Ga. Laws 112, 112 (making it unlawful to sell, give, lend, or furnish any pistol or other deadly weapons to a minor). |
| Mississippi | 1878 | Act of Feb. 28, 1878, ch. 66, §§ 2, 1878 Miss. Laws 175, 175 (making it unlawful to sell a pistol or other similarly deadly weapon to a minor). |
| Delaware | 1881 | Act of Apr. 8, 1881, ch. 548, § 1, 1881 Del. Laws 716 (making it unlawful to sell a deadly weapon to a minor). |
| Florida | 1881 | Act of Feb. 4, 1881, ch. 3285, §§ 1–2, 1881 Fla. Laws 87, 87 (making it unlawful to sell, hire, barter, lend, or give a pistol or other arm or weapon, with certain exceptions, to minors under sixteen). |
| Illinois | 1881 | Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73, 73 (making it unlawful for any person other than a parent, guardian, or employer to sell, give, loan, hire, or barter a pistol, revolver, or other deadly weapon to a minor). |
| Pennsylvania | 1881 | Act of June 10, 1881, no. 124, § 1, 1881 Pa. Laws 111, 111–12 (making it unlawful to sell a revolver, pistol, or other deadly weapon, to a person under sixteen). |
| Maryland | 1882 | Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656, 656 (making it unlawful to sell, barter, or give away any firearm or other deadly weapons, with some exceptions, to a minor under the age of twenty-one). |
| West Virginia | 1882 | Act of Mar. 24, 1882, ch. 135, § 7, 1882 W. Va. Acts 421, 421–22 (making it unlawful to furnish a revolver, pistol, or other dangerous and deadly weapon, to a person under twenty-one). |
| Kansas | 1883 | Act of Mar. 1, 1883, ch. 105, §§ 1–2, 1883 Kan. Sess. Laws 159, 159 (making it unlawful to furnish a pistol, revolver, toy pistol, or other dangerous weapon to a minor, and making it unlawful for any minor to possess such weapons). |
| Missouri | 1883 | Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76, 76 (making it unlawful to sell, deliver, loan, or barter a firearm or other deadly weapon to a minor without their parents' or guardians' consent). |
| Wisconsin | 1883 | Act of Apr. 3, 1883, ch. 329, §§ 1–2, 1883 Wis. Laws 290, 290 (making it unlawful for any person to sell, loan, or give a pistol or revolver to a minor, and making it unlawful for any minor to go armed with any pistol or revolver). |
| Iowa | 1884 | Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86, 86 (1884) (making it unlawful to sell, present, or give any pistol, revolver, or toy pistol to a minor). |

| | | |
|---|---|---|
| Nevada | 1885 | Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51, 51 (making it unlawful for any person under twenty-one to wear or carry any concealed pistol or other dangerous or deadly weapon). |
| Louisiana | 1890 | Act of July 1, 1890, § 1, 1890 La. Acts 39, 39 (making it a misdemeanor to sell, lease, or give any pistol or other dangerous weapon to any person under twenty-one). |
| Oklahoma | 1890 | Penal Code of the Territory of Oklahoma, ch. 25, art. 47, § 3, 1890 Okla. Laws 495, 495 (making it unlawful to sell or give to any minor one of the designated arms or weapons provided in the article). |
| Wyoming | 1890 | Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140 (making it unlawful to sell, barter, or give a pistol or other deadly weapon to any person under twenty-one). |
| North Carolina | 1893 | Act of Mar. 6th, 1893, ch. 514, § 1, 1893 N.C. Sess. Laws 468, 468–69 (making it unlawful to sell, give, or in any way dispose of a pistol or pistol cartridge to any minor). |
| Nebraska | 1895 | Ordinance of August 26, 1895, art. XXVI, § 2, 1895 Neb. Laws Relating to the City of Lincoln 237, 237 (making it unlawful to sell, loan, or furnish any gun, fowling-piece, or other firearm to a minor). |
| Texas | 1897 | Act of May 14, 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221, 221–22 (making it unlawful to sell, give, or barter any pistol or other dangerous weapon to a minor without the written consent of their parent or guardian). |

## E.    The Modern Paradigm Emerges: Gun Regulation 1900-1938

At the dawn of the twentieth century, Congress took up the task of militia reform. The Dick Act of 1903 and the National Defense Act of 1916 transformed the organization of the militia. In place of the traditional civic republican model of the militia favored by the Founding generation—one that was suffused with traditional Whig fears of powerful standing armies—a new National Guard system was created. The new militia would be professionalized and—most importantly—controlled more tightly by the federal government.[107]

The newly structured militia was divided into the organized militia, the National Guard, and a more amorphous, unorganized Militia. In an influential article published in the *Yale Law Journal* in 1917, Brigadier General Samuel T. Ansell, a senior officer in the Office of the Judge Advocate General, reviewed the legal changes that facilitated this transformation.[108]  One key development was the change in the policy preferences of the individual states about how to

---

[107] For a discussion of how the modern national guard replaced the ideals at the core of the Founding era militia, *see generally* Richard R. Uviller R & William Merkel, THE MILITIA AND THE RIGHT TO ARMS: OR, HOW THE SECOND AMENDMENT FELL SILENT (Duke Univ. Press Books 2002).
[108] S. T. Ansell, *Legal and Historical Aspects of the Militia*, 26, YALE L.J. 471, 476 (1917).

structure the militia.   Among the most noteworthy changes discerned by Ansell, was the increasingly popularity of laws that required parental permission for minors to participate in the militia.   Among the states enacting such laws were Connecticut, Idaho, Louisiana, Illinois, Maryland, Nebraska, North Carolina, New Hampshire, New York, South Dakota, Texas, Oregon, West Virginia. The decisions of these states to follow this path only underscores a fact that the previous history had made clear: there was no set age requirement for the militia hardwired into the American constitutional system.   States were perfectly at liberty to raise or lower the age threshold, require parental consent, or prohibit the participation of minors as they deemed necessary.   Defining who would participate in the militia remained a practical policy choice, not a constitutional imperative. [109]

The pace and scope of gun regulation outside of militia regulation also quickened in the twentieth century.   New laws were introduced to address novel problems created by advances in firearms technologies, rising levels of gun crime, and perceptions of gun violence, including increased threats to minors.[110]   Although the right to keep and bear arms continued to be a venerated constitutional value, states and localities vigorously exercised their police power authority to address new problems created by changes in technology and behavior.[111]

Addressing sales and private transfers, Oregon made it "unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years."[112]  An Indiana law took a similarly broad approach to limiting minors' access to dangerous weapons prohibiting the sale, barter, or gift to persons:

> under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver.[113]

---

[109] *Id.*

[110] On changes in technology and perceptions of crime and gun regulation, Spitzer, *supra* note 32 at 60.  On the perception of growing threats to minors, *see* Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Media Coverage of Accidental Shootings Involving Children*, 98 SOCIAL SCIENCE QUARTERLY 397, 404-406 (2017).   The data for the essay is available online at https://onlinelibrary.wiley.com/doi/full/10.1111/ssqu.12416#reference.

[111] Ernst Freund, THE POLICE POWER 246–47 (1904).

[112] Act of Feb. 21, 1917, ch. 377, § 10, 1917 Or. Laws 804, 808.

[113] Weapon— Furnishing to Minor, § 450, 1905 Ind. Acts 688 (1905).

In his classic treatise *The Police Power* (1904), the distinguished legal scholar, Ernst Freund noted that the scope of the police power in relation to minors was extensive, and he singled out limits on access to firearms as an illustration of this power.[114]  And in *Glenn v. State* (1911), the Georgia Court of Appeals observed that "the police power of the states makes a special charge of minors."[115]

In fact, the police power's scope was at its greatest when the health and safety of minors was at issue, a fact evident in this 1917 Oregon law:

> Section 10. It shall be unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years. A violation of this section is a misdemeanor and punishable by imprisonment in the county jail for a period not exceeding six months, or by a fine not exceeding Five Hundred Dollars, or both such fine and imprisonment.[116]

Localities also exercised their ample police power authority to pass laws aimed at limiting the access of minors to guns. For example, the city of Chicago forbade issuing firearms permits to all minors:

> It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar.[117]

The city of Joplin, Missouri banned weapons in places that minors frequented, and prohibited the sale, loan, or gift firearms to minors.  The law placed minors in similar category with intoxicated persons, and the statute characterized prohibited persons as "irresponsible," thus textually underscoring the danger of allowing minors easy and unsupervised access to guns.

> If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any

---

[114] Freund, *supra* note 111 at 187, 247.

[115] *Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911).

[116] 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms.

[117] Cook County Ordinance chap. 53 of Chicago Code of 1911: § 6.

election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.[118]

Harkening back to exceptions based on the concept of traditional parental authority, some jurisdictions allowed minors to use guns while under the supervision of a parent. For example, a 1903 South Dakota law made it "unlawful for any person under the age of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other firearms except with the consent and knowledge of their parents or guardians."[119] But these exceptions only underscored the fact that minors were not viewed as completely responsible citizens, or fully independent legal actors who could claim Second Amendment rights on their own.

### F.    Firearms Regulation and Minors, 1938-2021

The very first issue of the Duke law journal, *Law and Contemporary Problems* (published in 1934), focused on crime and included a comprehensive review of firearms regulation in America. It explained that the most common forms of regulation were restrictions on public carry, restrictions on the purchase of arms (including purchase by minors, who still included those aged 18–20 at that time), and prohibitions on dangerous or unusual weapons.[120] The essay also noted that the use of license or permit requirements for purchase of a firearm expanded in the post-Civil War era and became a standard feature of gun regulation in the twentieth century.[121] Indeed, by 1938, another comprehensive review of firearms regulation concluded that the vast majority of states had either banned the public carry of concealed weapons or adopted a restrictive permitting

---

[118] Joplin Code of 1917, Art. 67, § 1201, Brandishing, Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible.

[119] Act of Mar. 10, 1903, 1903 S.D. Sess. Laws ch. 144, §§ 1–3, 168, 168–69.

[120] *See generally* John Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400 (1934).

[121] *Id.*

scheme similar to New York's Sullivan Law.[122]  In particular localities, especially large urban areas, in the final decades of the nineteenth century and the early decades of the next century increased the level of regulation of arms, including limits on minors.  And another wide-ranging legal survey of firearms regulation published in 1950 found little had changed in the ensuing decades between the publication of the two comprehensive reviews discussed above and post War World Two-era gun regulation.[123]

One of the most significant developments in gun regulation in the twentieth century was the growth of federal firearms regulation, beginning with the New Deal.  As with the state measures addressed above, the threat posed by organized crime and the proliferation of dangerous "gangster weapons," most notably the machine gun, increased public enthusiasm for additional gun control measures.  Repeated popular demands for some type of federal involvement finally bore fruit in 1934, when Congress enacted the first comprehensive federal firearms law.  In contrast to traditional state police power-driven legislation, federal regulation of firearms after the New Deal necessarily focused on interstate commerce.  The National Firearms Act of 1934 regulated firearms dealers and imposed a series of taxes on classes of weapons, including machine guns.  The Act sought to limit access to this class of weapons, which was closely identified with criminal behavior.[124]

Later in the twentieth century, popular concern over crime and civil unrest led to the passage of the federal Gun Control Act of 1968.[125]  In addition to revising the federal licensing scheme for the manufacture, importation, and sale of firearms, the act prohibited a variety of persons from purchasing handguns, including minors, who continued to be defined as those below the age of twenty-one.  In addition, federal licensees were prohibited from selling firearms to out-of-state residents, minors, felons, persons under indictment for felonies, fugitives, and certain other categories of persons.[126]

---

[122] *See generally* Sam B. Warner, *Uniform Pistol Act,* 29 AM. INST. CRIM. L. & CRIMINOLOGY 529 (1938).

[123] *See generally* F.J.K., *Restrictions on the Right to Bear Arms: State and Federal Firearms Legislation*, 98 U. PA. L. REV. 905 (1950).

[124] National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–5872 (2012); The Federal Firearms Act of June 30, 1938, 15 U.S.C. §§ 901–09. On the history of gun regulation up to and including the act, *see* Alexander DeConde, GUN VIOLENCE IN AMERICA (2001).

[125] *See generally* William J. Vizzard, *The Gun Control Act of 1968*, 18 ST. LOUIS UNIV. PUB. L. REV. 79 (1999).

[126] 18 U.S.C. § 922(b)(1) and 922(c).

The Firearm Owners' Protection Act of 1986 loosened some restrictions on ammunition and prohibited the creation of a federal firearms registry, but it added additional categories of persons who were barred from possessing firearms, including illegal aliens, dishonorably discharged members of the armed forces, and U.S. citizens who renounce their citizenship.[127]  The Brady Handgun Violence Protection Act of 1993 (Brady Act) created a background check system for the purchase of firearms from federally licensed dealers.[128]  Notably, neither the 1986 nor the 1993 federal legislative amendments lowered the age for sale of handguns to those under 21, even after the Twenty-Sixth Amendment was adopted and ratified in 1971, setting the voting age at 18.

The next major turning point in the debate over firearms regulation focused on "assault weapons," and was closely connected to the rise of mass shootings.[129]  California led the way with its ban on assault weapons enacted after the Stockton School Massacre in 1989.[130]  Currently, eight states have passed similar laws. [131]

Current efforts to improve the effectiveness of firearms regulation include additional regulation—by California and other states—focused on limiting the access to firearms by those under the age of 21, on top of those regulations already imposed by the 1968 federal Gun Control Act.[132]  A recent survey of age restrictions on the acquisition of guns by minors reported the following conclusions:

> As of January 1, 2020, 17 states and the District of Columbia have minimum age requirements that exceed the federal minimum for the purchase of a handgun from unlicensed persons, and eight states and the District of Columbia have minimum age requirements that exceed the federal minimum for handgun possession. Several states also have minimums that are higher than the federal law for long gun purchase and possession.[133] *(Footnotes omitted)*.

The scope of the police power regarding firearms and gunpowder has been among the most expansive in any area of the law.  In the case of minors, the legitimate reach of the police is at its

---

[127] Firearm Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449 (1986).

[128] Brady Handgun Violence Protection Act of 1993, Pub. L. No. 103-159, 110 Stat. 3009 (1993).

[129] *See generally* Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction* 68 EMORY L.J. 1043 (2020).

[130] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

[131] *See generally* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 LAW & CONTEMP. PROBS. 231 (2020).

[132] https://www.rand.org/research/gun-policy/analysis/minimum-age.html.

[133] *Id.*

peak.  For more than a century, state and federal judges have recognized that minors are among the categories of persons whose access to guns must be carefully regulated.  More recently, the United States Court of Appeals for the Fifth Circuit observed that "[f]rom the mid-19th century through the early 20th century, twenty-one other States imposed age qualifications on the purchase or use of certain firearms."[134]  Federal courts have concluded that laws restricting minors' access to firearms are deeply rooted in American history and tradition.[135]

## IX.    **CONCLUSIONS**

A review of the historical record demonstrates conclusively that "infants"—individuals below the legal age of majority, which has been 21 for most of American history—have never had an unfettered constitutional right to keep, bear, or acquire arms.  This was true in the era of the Second Amendment's adoption and has continued to be true in subsequent periods of American history.  For most of the pre-Civil War period in American history, minors only had legal access to arms when under the patriarchal authority of a head of household, when assisting sheriffs, justices of the peace or constables to preserve the peace, or when performing militia duties and supervised by militia officers.  The adoption of the Fourteenth Amendment did not alter these facts.  Firearms regulation, including regulations of minors, intensified after the Civil War as Americans enacted a variety of different types of laws to deal with the grown danger of gun violence.  Thus, asserting a constitutional right of those under 21 to keep, bear, and acquire arms rests on a serious misunderstanding of a core principle of Anglo-American law regarding the status of those below the age of legal majority.

The central fact asserted by Plaintiffs in this case is uncontroversial: in the Founding era and for much of American history, governments compelled some minors under 21 to serve in the militia and participate in related forms of community-based law enforcement.  But the existence of such duties does not provide any concomitant evidence of the existence of a constitutional *right* to keep, bear, or acquire firearms for those under the age of 21.  Rather, it demonstrates that governments have imposed a constitutional duty and obligation upon generations of Americans, including some minors, to contribute to public defense and preserve the peace.

---

[134] *Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911); *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 202 n.16 (5th Cir. 2012).

[135] *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013); *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012).

Plaintiffs' argument not only confuses rights with obligations, but it conflates specific public policy choices made by states and the federal government about the composition of the militia with fixed constitutional principles about the role of the military in the American constitutional scheme of government and the scope of individual rights. State and local governments were free to expand or contract the age restrictions on participation in the militia in response to the needs of public defense and safety. When it proved advantageous to include males below 21 in the militia, governments adopted regulations to achieve that policy goal. If public defense or other policy goals were better served by excluding this portion of the population from militia service, legislatures enacted laws to implement that policy objective.

The regulation of gun powder and firearms has always been understood to be a core feature of the state's considerable police powers. The scope of state police power is greatest when protecting the health and safety of minors. Given these two facts, it is not surprising that there is a long history of state regulations targeting minors and guns. Most states have had laws regulating arms, including regulations of minors, for more than a century. Many of these laws date to the era of the Fourteenth Amendment and regulate the conduct of those under 21. Public perception that minors were especially at risk to harm from firearms intensified in the post-Civil War era. As has been true for the entire arc of American legal history government efforts to regulate dangerous conduct increase when the public perception that such activity poses a threat to safety and welfare reaches a threshold. By the start of Reconstruction American concerns over gun violence, including the danger guns posed to minors, had reached a new level and states and localities acted accordingly, enacting a wide range of laws to address this problem.

Thus, firearms regulation, including limits on the ability of minors under 21 to access and use arms, clearly falls within long-standing American historical and legal traditions. In short, Plaintiffs' contention that individuals under the age of 21 have always enjoyed a robust Second Amendment right to purchase, receive, and transfer firearms has no foundation in history, text, or tradition. The Minnesota statutes at issue in this case are consistent with this historical tradition and would not have violated the Second Amendment or the right to bear arms as understood at the Founding, in the antebellum era, or at the time of ratification of the Fourteenth Amendment.

Saul Cornell, Ph.D.

Redding, CT

1/30/2022

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

## Prizes and Awards

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

## Publications, Presentations and Media Appearances

### Books:

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Interviews, Editorials, Essays, Podcasts:

The Supreme Court's Latest Gun Case Made a Mockery of Originalism  *Slate* November 10, 2021

"'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021

Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms, *Slate* November 02, 2021

Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism? *Slate* November 1, 2021

"Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021

"Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate

"What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021

"Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019

"Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019

"The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019

"The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.

"Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018

"Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017

"The State of the Second Amendment," National Constitution Center, Podcast October, 2017

"Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017

"Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017

"Half Cocked," *Book Forum* April 2016

"Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016

"Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015

"The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]

PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013

"All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

"What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court,"  *Christian Science Monitor* May 20, 2010

"Gun Points,"  *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)

"What's Happening to Gun Control,"    To the Point*, NPR. March 11, 2010

"Getting History Right," *National Law Journal*, March 1, 2010

"History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008

"The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008

"Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007

"A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV  ( 2006)

"Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005

"Gun Control," Odyssey, Chicago NPR September 8, 2004

"Loaded Questions," *Washington Post Book World*  February 2, 2003

"The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002

"Real and Imagined," *New York Times*, June 24, 1999

## Scholarly Articles, Book Chapters, and  Essays:

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

 "President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" <u>William & Mary  Quarterly</u> 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" <u>William & Mary Quarterly</u> 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," <u>Yale Journal of Law and the Humanities</u> 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," <u>Northwestern University Law Review</u> 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" <u>UCLA Law Journal</u>  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" <u>Ohio-State Law Journal</u>  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the <u>Cambridge</u> <u>History of  A merican Law</u> (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  <u>Albany Government Law  Review</u>  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique,"  <u>Maryland Law Review</u>  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion,"  <u>Chicago-Kent Law Review</u>  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," <u>Law and History Review</u>  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u>  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  <u>Stanford Law and</u> <u>Policy Review</u>  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  <u>Fordham Law Review</u> 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political</u> <u>History of the Early Republic</u> (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom</u> <u>in A Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers? Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed: The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II: The Return of the Founders," Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?: The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993): 26-30

"Politics of the Middling Sort: The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed: Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History

- Law and History Review

**Journal Manuscript Referee:**

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review
- Stanford Law Review
- Yale Law Journal

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

## Amicus Briefs:

- Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]
- Amicus Brief, *Young v. State of Hawaii*  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

- Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
- Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case (2018) [2nd Amendment]
- Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017) [Partisan Gerrymandering]
- Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]
- Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]
- Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court, 2010) [14th Amendment]
- Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]
- Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]
- Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]
- Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## Expert Witness Testimony

- Expert Witness, Chambers v. City of Boulder (Colorado Appeals Court 2020)
- Expert Witness, Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper, (Colorado District Court, 2016)
- Expert Witness, Zeleny v. Newsom, No. 17-CV-07357-RS (TSH) (N.D. Cal. 2020)

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council, Society of Historians of the Early American Republic (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004, 2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations

**US Supreme Court:**

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44 (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

*Young v. Hawaii*, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

**Saul Cornell**
**Court Citations**

## Supreme Court

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## Federal Courts

*Young v. Hawaii*, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom. United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom. United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

## UNITED STATES DISTRICT COURT

## EXPERT REPORT OF PROFESSOR JOHN J. DONOHUE

### I.    ASSIGNMENT

I have been asked to provide an expert opinion on the relationship between Minn. Stat. § 624.714, subds. 1a & 2 (2020), which regulate the concealed carry of firearms by individuals aged 18 to 20, and public health and safety, as well as the nature of that relationship. In particular, I was asked to review and opine on the social science and criminology research literature that addresses the risks of criminal violence presented by the age group of people 18 to 20 years old. I was further asked to both review and opine on any neurobiological and behavioral factors revealed by that literature and the relationships of such factors to policy decisions such as the state of Minnesota's adoption of the age-based restrictions on firearm carrying that are challenged in the *Worth v. Harrington* lawsuit pending in the District of Minnesota as case number 21-cv-1348.

### II.    QUALIFICATIONS AND BACKGROUND

I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School. (A copy of my complete *curriculum vitae* (CV) is attached as Exhibit 1.) I earned a law degree from Harvard and a Ph.D. in economics from Yale and have been a member of the legal academy since 1986. I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School. I have also been a visiting professor at a number of law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), and Renmin University (Beijing).

I am a Research Associate of the National Bureau of Economic Research, and a member of the American Academy of Arts and Sciences. I was a Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01 and served as the co-editor (handling empirical articles) of the American Law and Economics Review for six years. I have also served as the President of the American Law and Economics Association and as Co-President of the Society of Empirical Legal Studies. At Stanford, I regularly teach a course on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, St. Gallen University School of Law in Switzerland, and the Universidad del Rosario in Bogota, Colombia. From 2011-2018, I served on the Committee on Law and Justice of the National Research Council (NRC),

which "reviews, synthesizes, and proposes research related to crime, law enforcement, and the administration of justice, and provides an intellectual resource for federal agencies and private groups." (*See* National Academies, Committee on Law and Justice, https://www.nationalacademies.org/claj/committee-on-law-and-justice, for more information about this NRC committee.)

Since gun crime is such an important aspect of overall American crime, my courses evaluate both the nature of gun regulation in the United States and the impact of gun regulation on crime. This topic is an important part of my research, about which I have published extensively (as reflected in my CV). I have also consistently taught courses on law and statistics for over two decades.

I filed an expert declaration in two cases challenging city restrictions on the possession of large-capacity magazines: *Fyock v. City of Sunnyvale*, Case No. C-13-5807-RMW, United States District Court (N.D. Cal.), January 2014; *Herrera v. San Francisco*, Case No. CV 13-5351 WHA, United States District Court (N.D. Cal.), January 2014.

I also filed an expert declaration in a case involving a challenge to Maryland's restrictions on assault weapons and large-capacity magazines: *Tardy v. O'Malley*, Case No. 1:13-cv-02841-CCB, United States District Court (D. Maryland), February 2014. I filed an expert declaration, and provided live expert witness testimony, in response to a motion for a preliminary injunction in a case challenging New Jersey's restrictions on large-capacity magazines: *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, Case No. 3:18-cv-10507-PGS-LHG, United States District Court (D.N.J.), August 2018.

I also submitted, on June 1, 2017, an expert declaration in a case involving a challenge to California's restrictions on the carrying of weapons in public: *Flanagan v. Becerra*, Case No. 2:16-cv-06164-JAK-AS, United States District Court (C.D. Cal.); expert declarations on June 4, 2017 and June 16, 2017 in two separate cases challenging California's ban on the possession of large-capacity magazines: *Duncan v. Becerra*, Case No. 17-cv-1017-BEN-JLB, United States District Court (S.D. Cal.), and *Weise v. Becerra*, Case No. 2:17-cv-00903-WBS-KJN, United States District Court (E.D. Cal.); and expert declarations on October 25, 2018 and November 21, 2018 in *Rupp v. Becerra*, Case No. 8:17-cv-00746-JLS-JDE, United States District Court (E.D. Cal.), and in January 2020 in *Miller v. Becerra*, Case No. 19-cv-1537-BEN-JLB, United States District Court (S.D. Cal.), two cases challenging California's restrictions on rifles classified as

2

assault weapons. I also provided live expert witness testimony in *Miller v. Becerra* in October 2020. On June 2, 2021, I submitted an expert report on behalf of the state of California in *Jones v. Bonta*, Case No. 3:19-cv-01226-L-AHG, United States District Court (S.D. Cal.), which involved a challenge to age-based restrictions on sale of guns to those under 21.

I filed an expert declaration in October 2018 in a case involving a challenge to Vermont's restrictions on large-capacity magazines in *Vermont Federation of Sportsmen's Clubs v. Birmingham*, Case No. 224-4-18 Wncv (Vermont Superior Court, Washington Unit). I also filed an expert declaration in *Chambers v. City of Boulder*, Case No. 2018CV30581, in the District Court of Boulder County in September 2020, involving a challenge to the City of Boulder's restrictions on assault weapons.

At the request of the United States Department of Justice, I filed an expert declaration in July 2020 and testified at trial in April 2021 in a case arising out of the Sutherland Springs mass shooting that killed 26 in November 2017: *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR United States District Court (W.D. Tex.).

On September 21, 2021, the Brief of Amici Curiae Social Scientists And Public Health Researchers In Support of Respondents, of which I was the main author, was submitted to the United States Supreme Court in the challenge to New York's licensing regime for concealed carry: *New York State Rifle & Pistol Association v. Bruen*, Case No. 20-843.

## III.    RETENTION AND COMPENSATION

I am being compensated for my time on this case on an hourly basis at the rate of $850 per hour. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## IV.    BASIS FOR OPINION AND MATERIAL CONSIDERED

The opinion I provide in this expert report is based on:

- My review of the complaint filed in this lawsuit;
- My review of the statutory provisions relevant to this lawsuit;
- My education, expertise, experience, and research in the fields of law, criminal justice, econometrics, statistics, and policy evaluation; and,

- My review and analysis of the materials cited in the footnotes and text of this report and the materials listed in my c.v. in Exhibit 1 on the relationship between guns and crime.

## V.    SUMMARY OF OPINION

It is my opinion that the age-based restrictions on gun carrying adopted by Minnesota and challenged in this case promote public health and safety by generating meaningful reductions in violent crime, firearm accidents, gun theft, and suicide.

## VI.    METHODOLOGY

The opinions expressed in this report are based on decades of research that I have personally conducted with various coauthors and a talented team of researchers working at my direction, as well as my own extensive review of the best available research by others using appropriate data that has been analyzed with scientifically valid methods.  In particular, I have published extensively on the impact of gun carrying on crime, with the work predominantly appearing in peer-reviewed journals and other academic venues using the most rigorous and up-to-date econometric methods for estimating the impact on violent crime of legal changes, such as the proliferation of laws allowing citizens to carry concealed weapons.  This scientific approach to data analysis and evaluation is widely accepted as an appropriate methodology for estimating the impact of law and public policy, although of course there are those who wield the tools of econometrics and statistics effectively and wisely and those who do so in decidedly less-sound ways.

## VII.    MINNESOTA'S REGULATION OF CONCEALED CARRY BY 18-20-YEAR-OLDS

Minnesota enacted a right-to-carry law in 2003 that generally requires those who wish to carry guns outside the home to have a permit.[1]  Plaintiffs' lawsuit challenges Minnesota's statutory

---

[1] The possession of pistols in public by individuals aged 18 to 20 without a permit is not strictly prohibited, because Minnesota's carry-permit requirement is limited.  Under Minn. Stat. § 624.714, individuals who are not otherwise prohibited from possessing a firearm—because, for example, they have been convicted of a crime of violence—may lawfully possess a pistol in public under certain circumstances without a permit.  *See* Minn. Stat. § 624.714, subd. 9; *State v. Ndikum*, 815 N.W.2d 816, 821 (Minn. 2012); *State v. Theng Yang*, 814 N.W.2d 716, 723 (Minn. Ct. App. 2012).

restriction on issuing concealed carry permits to individuals under the age of 21. *See* Minn. Stat. § 624.714, subd. 2(b)(2).

As the Minnesota Supreme Court recently stated in a decision upholding the constitutionality of its right-to-carry ("RTC") law:

> To receive a permit to carry, a person is required to submit an application to the sheriff in the county where the person resides. *Id.*, subd. 2(a). "A sheriff *must* issue a permit to an applicant if the person" has completed gun safety training, is at least 21 years old, is a citizen or permanent resident of the United States, has completed an application for the permit, is not prohibited by law from possessing a firearm, and is not listed in the Minnesota Bureau of Criminal Apprehension's criminal gang investigative data system. *Id.*, subds. 2(b)(1)-(5) (emphasis added). The only reason that a sheriff may deny a permit application (aside from failing to satisfy the statutory criteria) is if "there exists a 7 substantial likelihood that the applicant is a danger to self or the public if authorized to carry a pistol under a permit." *Id.*, subd. 6(a)(2)–(3). If a sheriff denies a permit application, the applicant has a right to appeal the denial by filing a petition with the district court. *Id.*, subd. 12.

> The permit-to-carry statute also provides for certain circumstances where a person may lawfully carry or possess a pistol without a permit. No permit is required to possess a pistol in one's home, place of business, or on land that a person owns. *Id.*, subd. 9(1). Nor is a permit required to carry a pistol in public for the purpose of repair. *Id.*, subd. 9(2). A pistol may be carried without a permit between one's home and place of business. *Id.*, subd. 9(3). A permit is not required to carry a pistol "in the woods or fields or upon the waters of this state" for hunting or target shooting. *Id.*, subd. 9(4). And an unloaded pistol secured in a "closed and fastened case" may be transported in a vehicle without a permit. *Id.*, subd. 9(5).

*State v. Hatch*, 962 N.W.2d 661, 665 (Minn. 2021). In short, Minnesota's RTC law is not a draconian measure "to restrict gun ownership and possession" in public. *State v. Ndikum*, 815 N.W.2d 816, 821 (Minn. 2012). Indeed, following its description of Minnesota's RTC statutory regime in *Hatch*, the Minnesota Supreme Court concluded, "[t]he statutory requirements to receive a permit to carry are not substantially broader than necessary to ensure public safety." *Hatch*, 962 N.W.2d at 665.

## VIII.   OPINION AND ANALYSIS

It is my opinion that the age-based restrictions on gun carrying adopted by Minnesota and challenged in this case promote public health and safety by generating meaningful reductions in violent crime, firearm accidents, gun theft, and suicide. The literature on public policy, criminology and social science has identified a number of factors that increase the risk of gun

violence, violent conduct, and other harms caused by firearms by young adults in the absence of restrictions on the carrying of firearms. Section A notes that these factors include the incomplete maturation of neurobiological systems associated with decision-making for the 18-20-year-old age group, as well as high levels of untreated mental illness, stress, and risky behavior, including heightened susceptibility to alcohol and drug abuse. Section B further opines that Minnesota's firearm rules are effective at mitigating the harms caused by these factors, given the high levels of homicidal and suicidal behavior of this age group, and the demonstrated links between gun carrying and violent crime and access to guns and suicide. Section C opines that violent crime in Minnesota would be expected to rise if the state's RTC law permitted 18-20-year-olds to carry weapons outside the home.

A.     BACKGROUND AND CONTEXT: NEUROBIOLOGICAL AND BEHAVIORAL FACTORS OF THE 18-20-YEAR-OLD AGE GROUP INCREASE THE RISKS OF GUN VIOLENCE.

There is considerable evidence that a substantial number of 18-20-year-olds are impulsive, immature, and prone to making poor or unreasoned decisions for a number of reasons, including underdeveloped cognitive abilities and issues with mental health, such as depression, anxiety, and suicidality. Neuroscience and social science data support the conclusion that 18-20-year-olds pose a considerable risk of increased danger to themselves and others if they possess firearms. The heightened risk is due to three principal factors: (1) the still-developing cognitive systems of 18-20-year-olds increases their risk of impulsive behavior; (2) the onset of mental illness during emerging adulthood is correlated with self-harm and suicide attempts; and (3) the frequency of binge drinking during emerging adulthood is a stimulant to violence that is obviously more dangerous when accompanied with gun possession.[2]

When one considers that the majority of 18-20-year-olds struggle with some form of untreated mental illness, stress, and/or risky behavior with alcohol and illegal drugs,[3] it is advisable

---

[2] *See* Daniel Webster, John Donohue et al., Johns Hopkins Bloomberg School of Public Health, Firearms on College Campuses: Research Evidence and Policy Implications (2016), https://bit.ly/33WaMPp (hereinafter Webster, *Firearms on College Campuses*).

[3] Well over half of 18-20-year-olds suffer from mental illness, engage in illicit substance abuse, binge drinking or heavy alcohol use, or have serious thoughts of suicide. Moreover, this age group had the highest need for substance abuse treatment, and, with less than 5 percent of those with a substance abuse disorder receiving treatment, it had the lowest percentage receiving treatment of any age group. Substance Abuse and Mental Health Services Administration, Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health, Publication Number PEP21-07-01-003, October 2021.

that greater restrictions on gun use would apply to this age group in order to protect them from harming themselves and others. The state of Minnesota has not imposed a blanket prohibition on gun acquisition but rather has provided a more targeted restriction on gun-carrying outside the home for this vulnerable age group. Because this is the period when so many of these pathologies first present themselves, the opportunities to identify *in advance* those who will commit suicidal and homicidal acts is far more limited than those who are 21 or older, by which time a greater history of potential or actual pathology will have been established and observed. This information can then be used to limit all access to weapons by those whose prohibiting behavior will be entered into the national firearm background check system.

     1.    **The Observed Pattern of Young Adult Violence Is Consistent with the Neurobiological Development of 18-20-year-olds.**

Young adults are at an increased risk of violence and misuse of firearms in part because emerging adulthood is a time of considerable change in the neurobiological systems that support decision-making, emotional and behavioral regulation, and motivation.[4] Indeed, the brain's higher association areas continue to develop well into the third decade of life.[5] One of the last parts of the brain to mature—and which continues to develop into the mid-twenties—is the prefrontal cortex, which supports self-control, including judgment, impulse control and inhibition, and long-range planning.[6] The limbic system, which controls basic emotions like anger, pleasure, and fear, develops well before the prefrontal cortex, meaning that until the cerebral cortices can catch up with the limbic system, the desire for rewards and susceptibility to social pressures can, at times, lead to an overriding of rational thinking by more impulsive, emotional, or irrational behavior.[7]

As a result of the limbic system developing faster than the cerebral cortex, adolescents (including older adolescents aged 18-20) and young adults in their early- to mid-twenties may be

---

[4] *See generally* Jay N. Giedd et al., *Brain development during childhood and adolescence: a longitudinal MRI study*, 2 Nature Neuroscience 861 (1999), https://go.nature.com/3hEOJoc. The "higher association areas" of the brain are "parts of the cerebral cortex that receive inputs from multiple areas; association areas integrate incoming sensory information, and also form connections between sensory and motor areas. Because they are involved in organizing information that comes from various other areas of the brain, association areas are often linked to complex functions." *See* https://www.neuroscientificallychallenged.com/glossary/association-areas.

[5] BJ Casey et al., *The Adolescent Brain*, 1124 Annals of the N.Y. Academy of Sciences 111, 120 (2008), https://bit.ly/2ScxOyz.

[6] Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 453, 456 (2013), https://bit.ly/3bGgw3N.

[7] *Id.* at 453.

more likely to act on negative emotions like stress or rage and are thus more prone to using firearms impulsively and dangerously.[8]  Studies in psychology and neuroscience confirm that members of this age group typically have lower self-control and react more impulsively to perceived threats than do their younger counterparts and older adults.[9]  This explains some adolescents' and young adults' proclivity towards more risky and violent behavior, and explains why gun possession among 18-20-year-olds correlates with such high rates of firearm violence, as discussed in detail below.

The ability to responsibly carry a gun outside the home for protection is dependent upon a complicated assessment of the likely costs and benefits of such behavior, which is beyond the capacity of a substantial number of those under 21.  One reflection of the drastically inadequate competence in risk assessment for this age group was captured by the National Longitudinal Study of Youth, which asked 17- and 18-year-olds about their risk of dying in the next year.  The black youthful respondents predicted their chance of death was 22 percent, while white youth estimated the risk of death in the next year to be 16 percent.  As Nobel economist James Heckman notes in commenting on these responses, "Both numbers are absurdly high."[10]  Such gross misperceptions of risk are incompatible with sensible decisions about carrying guns outside the home.

## 2. The Onset of Mental Illness During Emerging Adulthood Is Correlated with Self-harm and Suicide Attempts, Which Has an Established Link to Violence That Can Only be Exacerbated by Access to Firearms.

The stresses associated with the life transitions inherent in this age group place adolescents and young adults at an increased risk of conditions like depression and anxiety.[11]  According to a

---

[8] *Id.*

[9] *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 Developmental Neuroscience 220 (2014), *available at* https://bit.ly/33Z0nT6 (finding that adolescents—particularly males—were more likely to react impulsively to threat cues than their older and younger peers); Laurence Steinberg et al., *Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems Model*, 44 Developmental Psychology 1764, 1766 (2008), *available at* https://bit.ly/2RvXu9y (finding that adolescents are vulnerable to risk taking because of a combination of higher inclination to seek excitement and immature capacities for self-control).

[10] Pedro Carneiro, James J. Heckman, Dimitriy V. Masterov, "Understanding the Sources of Ethnic and Racial Wage Gaps and their Implications for Policy," 99, 126 in Handbook of Employment Discrimination Research: Rights and Realities (Laura Beth Nielsen and Robert L. Nelson, eds. 2005).

[11] *See* Justin Hunt & Daniel Eisenberg, *Mental Health Problems and Help-Seeking Behavior Among College Students*, 46 J. Adolescent Health, 3, 5 (2010), *available at* https://bit.ly/3f5nzFB ("Mental disorders are as prevalent among college students as same-aged non-students, and these disorders appear to be increasing in number and severity.").

2019 study conducted across two large national datasets of U.S. college students from 2007 to 2018, about 41 percent of college students exhibited symptoms of moderate to severe depression, and about 34 percent exhibited symptoms of moderate to severe anxiety.[12]

Further, many major psychiatric conditions unrelated to life transitions, such as bipolar disorder, depression, and schizophrenia, develop in adolescence.[13] Since the link between these disorders and violence has been found to be high and that the onset of violent crime among such individuals is reduced by restricting gun access via mental health prohibitions,[14] it is of particular concern that despite the high prevalence of mental health issues among college age adolescents, most go untreated.[15] One study of random samples of students on 26 U.S. college campuses in both 2007 and 2009 found that, on average, only 36 percent of students who had one or more mental illnesses had received treatment in the previous year.[16]

The combination of impulsivity, low emotional regulation, and the onset of mental illness in the 18-20-year-old cohort also contributes to high rates of suicide and suicide attempts in that age group. In fact, suicide is the second leading cause of death in the U.S. among this age group.[17] In the American College Health Association's National College Health Assessment for Spring 2019, which surveyed 54,497 undergraduate students, 9.3 percent of students reported "seriously considering suicide" and 1.6 percent reported attempting suicide within the previous 12 months.[18]

---

[12] Mary E. Duffy et al., *Trends in Mood and Anxiety Symptoms and Suicide-Related Outcomes Among U.S. Undergraduates, 2007–2018: Evidence from Two National Surveys*, 65 J. Adolescent Health 590, 593 (2019), *available at* https://bit.ly/3yvk42D.

[13] Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 Nature Reviews Neuroscience 947, 952 (2008), *available at* https://go.nature.com/2RrsnvZ ("Anxiety disorders, bipolar disorder, depression, eating disorder, psychosis including schizophrenia and substance abuse all most commonly emerge during adolescence.").

[14] A study of 23,292 adults with schizophrenia, bipolar disorder, or major depressive disorder who had been hospitalized in a state psychiatric hospital found that a large proportion of these individuals (39.0 percent) was convicted of a violent crime during the study period, with the younger individuals in the sample more likely to be convicted. Importantly, "having a mental health adjudication record archived in the [federal background check system, significantly] reduce[d] the risk of a first violent crime" by 31 percent. Jeffrey Swanson et al., *Preventing Gun Violence Involving People with Serious Mental Illness*, *in* Reducing Gun Violence in America 49 (Daniel Webster & Jon Vernick, eds., 2013).

[15] *See* Daniel Eisenberg et al., *Mental Health Service Utilization Among College Students in the United States*, 199 J. Nervous & Mental Diseases 301 (2011), *available at* https://bit.ly/3wmzhRY.

[16] *See id.*

[17] Melonie Heron*, Deaths: Leading Causes for 2017*, 68 Nat'l Vital Statistics Reports 1, 11 (2019), *available at* https://bit.ly/3oxWz4C.

[18] Am. College Health Ass'n, Nat'l College Health Assessment, Executive Summary: Undergraduate Student Reference Group (Spring 2019), *available at* https://bit.ly/3fBVzbl.

Suicide attempts resulting in death or hospital treatment "remains high through age 25."[19]  Taken as a whole, these statistics are of particular relevance to the present case because most gun deaths are by suicides and firearms are the most common means of suicide in the United States.[20]

3.     **The 18-20-Year-Old Cohort Is Susceptible to Heavy Alcohol Use, Which Has an Established Link to Violence That Can Only Be Exacerbated by Access to Firearms.**

Eighteen-twenty-year-olds are known to frequently drink heavily at a higher rate than other groups, and there is a close association between alcohol use and violence.[21]  Indeed, my own research has highlighted that increases in alcohol consumption in a state is one of the strongest factors associated with higher homicide rates.[22]  According to a 2019 national survey of approximately 34,000 college-age students from across the U.S., almost 53 percent of college students ages 18 to 22 reported drinking alcohol in the past month, and about 33 percent engaged in binge drinking during the same time frame.[23]  An evaluation of data from the National Highway Traffic Safety Administration, the Centers for Disease Control and Prevention, national coroner studies, census and college enrollment data for 18-24-year-olds, the National Household Survey on Drug Abuse, and the Harvard College Alcohol Survey estimated that, over a three-year period, more than 600,000 students aged 18 to 24 had been assaulted by another student who had been drinking.[24]  The Bureau of Justice Statistics of the U.S. Department of Justice reported that in a year-long period, alcohol was involved in 41 percent of on-campus acts of violence for students living on campus, and 18 percent of on-campus acts of violence for students living off campus.[25]  Off-campus acts of violence involving students were shown to have a similarly high association

---

[19] Webster, *Firearms on College Campuses* at 3.

[20] Suicide Prevention Resource Center, "Means of Suicide," *available at* https://bit.ly/3wnzXGB.

[21] *See* Charles C. Branas et al., *Alcohol Use and Firearm Violence*, 38 Epidemiologic Revs. 32, 42-43 (2016), *available at* https://bit.ly/2Rs9PvC (alcohol and firearm use "studies consistently reported that alcohol use was significantly associated with the possession of firearms, the ownership of firearms, and the use of firearm as a suicide means, and that the association was stronger for heavy alcohol use").

[22] *See* John J. Donohue & Steven Levitt, *The Impact of Legalized Abortion on Crime over the Last Two Decades*, 22 Am. Law & Econs. Rev. 241, 256 tbl. 4 (2020), *available at* https://bit.ly/3oAyfyR.

[23] Substance Abuse and Mental Health Services Administration (SAMHSA), Results from the 2019 National Survey on Drug Use and Health: Percentages, 2018 and 2019, *available at* https://bit.ly/3bKgKXT.

[24] *See* Ralph Hingson et al., *Magnitude of Alcohol-Related Mortality and Morbidity Among U.S. College Students Ages 18-24: Changes from 1998 to 2001*, 26 Ann. Rev. of Pub. Health 259 (2005).

[25] Lawrence A. Greenfeld, *Alcohol and Crime: An Analysis of National Data on the Prevalence of Alcohol Involvement in Crime*, U.S. Dep't of Justice, Bureau of Justice Statistics (1998), *available at* https://bit.ly/3ysMWsn.

with alcohol use: 37 percent for students living on campus, and 31 percent for students living off campus.[26]

The link between alcohol and violence is unmistakable in the crime literature, and an important study by Phillips et al. suggests that removing firearms from those abusing alcohol should lessen the social harm from the alcohol-violence link. This study focused on male-male violence and finds that greater alcohol intoxication is associated with the violence escalating to a lethal level. Crucially, the study concluded that the mediating factor is that the greater the level of intoxication, the more likely that one will have a gun, and it is the presence of the gun that leads to the more homicidal outcome.[27]

Professor Wintemute has reviewed the "existing research on the relationships between alcohol misuse; ownership, access to, and use of firearms; and the commission of firearm violence, and discusses the policy implications of these findings."[28] This research establishes that "Acute and chronic alcohol misuse is positively associated with firearm ownership, risk behaviors involving firearms, and risk for perpetrating both interpersonal and self-directed firearm violence…. For men, deaths from alcohol-related firearm violence equal those from alcohol-related motor vehicle crashes." Moreover, in one study, "frequent and heavy alcohol consumption was directly associated with plans to acquire a 'concealed gun license.'"[29] Since "carrying firearms in public has been linked to both alcohol misuse and criminal activity,"[30] the evidence supports the view that keeping guns away from alcohol abusers would be "an effective violence prevention measure."

### B.    MINNESOTA'S LIMITATIONS ARE EFFECTIVE AT ADDRESSING, AND ARE CAREFULLY TAILORED TO ADDRESS, THE SPECIFIC HARMS CAUSED BY FIREARM USE BY 18-20-YEAR-OLDS.

The following sub-sections make four major points. First, 18-20-year-olds are consistently the most homicidal age groups in America, so without more one knows that successful efforts to restrain violent crime in this group will generate disproportionate social benefits. Second, the best

---

[26] *Id.*

[27] Scott Phillips et al., *Reconsidering the Relationship Between Alcohol and Lethal Violence*, 22 J. Interpers. Violence 66 (2007).

[28] Garen Wintemute, *Alcohol Misuse, Firearm Violence Perpetration, and Public Policy in the United States*, 79 Preventive Med. 15 (2015).

[29] Schwaner, S.L., Furr, L.A., Negrey, C.L., Seger, R.E., *Who wants a gun license?* J. Crim. Just. 27 (1), 1–10 (1999).

[30] Wintemute, *supra* note 28.

empirical research has established that efforts to restrict gun access for those at elevated risk of engaging in criminal activity effectively reduces violent crime.  Third, the best empirical evidence also shows that restricting gun carrying outside the home reduces violent crime.  Fourth, beneficial protective gun use by carriers is rare and does not even remotely approximate the array of harmful consequences that would flow from gun carrying by 18-20-year-olds.  Consequently, limiting the ability of the most homicidal age group to carry guns outside the home can be expected to reduce gun violence.

### 1. Minnesota's Firearm Limitations Are Effective at Addressing Disproportionately Higher Rates at Which 18-20-Year-Olds Commit Homicide and Other Violent Crime.

One of the most consistent facts of crime over time, both in Minnesota and the United States, is that 18-20-year-olds commit homicide at disproportionately high rates.  Therefore, legislative efforts to reduce homicides appropriately focus on this age group and are likely to generate beneficial results.  Figure 1 presents murder arrest rates by age for the U.S. for 2019 (the last year for which murder arrests by age are available for the nation).  The Figure clearly shows that the 18-20-year-old age group is the most homicidal.  Specifically, in 2019, the single most homicidal age group in the nation was age 19, with both 18- and 20-year-olds having higher murder arrest rates than any other age groups except for age 19.[31]

---

[31] U.S. Fed. Bureau of Investigation, Uniform Crime Reports, 2019 (2021), Table 38, *available at* https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topicpages/tables/table-38.  It should also be noted that the FBI violent crimes data for the nation also confirms that 18-20-year-olds consistently have the highest rates of rape and robbery, as well as homicides.  The total number of arrests presented in the FBI Table 38 is based on data from law enforcement agencies that cover 229,735,355 people out of the 329,474,910 total U.S. population in 2019.

**Figure 1**

**The Most Homicidal Three-Year Age Group for the U.S. is 18-20-Year-Olds, 2019**



To highlight this enduring feature of homicide, Figure 2 below depicts murder arrest rates in Minnesota by age for the five-year period from 2015-2019 (2019 is the last year the FBI has relatively complete arrest data from the state). The figure speaks for itself: 18-20-year-olds stand out in Minnesota—as they do throughout the country—by virtue of their highly elevated levels of homicidal violence. Indeed, the murder arrest rate for 18-20-year-olds is almost 33 percent higher than the murder arrest rate for the next most homicidal age group—those aged 21-24. Therefore, the restriction at issue in this case appropriately limits firearm access to the age group carrying the greatest homicide risk. In other words, if one wants to reduce homicidal violence in a targeted fashion, one should focus on age groups that exhibit the highest rates of homicide—namely, 18-20-year-olds—as Minnesota and a substantial majority of states have done.

**Figure 2**

**The Most Homicidal Age Group is 18-20-Year-Olds**

**Minnesota Arrest Data, 2015-2019**



In the United States, most murders are committed with firearms. Specifically, in 2019, 74 percent of homicides were committed with firearms and this number has increased by 10 percentage points since 2014.[32] The 18-20-year-old cohort has not only established an enduring pattern of elevated risk for homicide, but it has long been recognized as the most likely to use firearms to commit homicides and other violent crimes. Specifically, a 1999 joint report of the Department of the Treasury and Department of Justice stated:

> Among murderers, 18 to 20 year olds were more likely to use a firearm than adults 21 and over. More specifically, in 1997, 74 percent of the homicides committed by 18 to 20 year old offenders involved firearms. In contrast, only 61 percent of homicides committed by offenders 21 or over involved firearms. (Table 1). The under-21 offender age groups showed a significant shift toward the use of firearms in committing homicides by the mid-1980's. By the 1990's, these offender groups were using firearms to commit homicides more than 70 percent of the time. Although the proportion of 18 to 20 year olds who use firearms to commit homicides has declined since the 1994 peak, it remains higher than levels recorded

---

[32] Statista, *Percentage of Homicides by Firearm in the United States from 2006 to 2019* (2021), *available at* https://bit.ly/3uAOe1m.

before 1990.  (Figure 2).  Similarly, in non-lethal crimes, including assault, rape, and robbery, 18 to 20 year old offenders were more likely to use guns than both younger and older offender age groups.[33]

Figure 3 below reproduces a chart (Figure 1 from the 1999 joint report) showing that the 18-20-year-old cohort dominates in the commission of gun homicides:  no three-year age group above age 20 is as homicidal.  According to the data, the cohort of 18-20-year-olds commits firearm murder and other non-lethal crimes at a substantially higher rate than other age groups. Thus, targeting effective gun safety measures at this group is likely to generate crime reduction benefits for all violent crime.  The joint report of the Department of the Treasury and Department of Justice concludes:

> The significant role that 18 to 20 year olds have in gun crime and violence in our Nation demands that we make changes in the legal regulation of their access to guns.  A further benefit to restricting possession of firearms by 18 to 20 year olds will be to decrease the likelihood that younger family members, friends, and classmates will be able to obtain guns illegally.[34]

---

[33] Dep't of the Treasury & Dep't of Justice, Gun Crime in the Age Group 18–20 (1999), *available at* https://bit.ly/3hBjp9R.

[34] *Id*. at 4.  Studies of high school students show that a non-trivial number will gain access to guns within the household, and that such "youth reporting gun possession have the strongest associations with alcohol, tobacco, and other drug use overall."  Kelly Ruggles & Sonali Rajan, *Gun Possession Among American Youth: A Discovery-Based Approach to Understand Gun Violence*, PLoS One (2014), *available at* https://bit.ly/3yxKf9d.

15

**Figure 3**

**The 18-20-year-old Cohort Dominates in the Commission of Gun Homicides**



Source: Table from Report of the Department of the Treasury and Department of Justice (see footnote 33 above), Supplemental Homicides Report, 1997.

### 2.    Efforts To Restrict Gun Access for Those at Elevated Risk of Engaging in Criminal Activity Effectively Reduces Crime.

Decades of research has shown that while everything from sticks to knives to firearms can be used in assaults, there is a considerable variation in the survivability of assault depending on the instrumentality employed.  Since firearms are considerably more lethal – greater restrictions on access to firearms by those in the high-crime 18-20-year-old age cohort are likely to reduce firearm deaths and injuries.

Consistent empirical evidence has established that there is a strong instrumentality effect in violent activity.  A seminal 1972 study by UC Berkeley Professor Frank Zimring found "that the outcome of gun assaults had a large random element, and that the power of the firearm was one systematic factor influencing the likelihood that an individual with a gunshot injury would

survive."[35]  Phil Cook and Anthony Braga conducted a study of files of 511 gunshot victims kept by the Boston Police Department and similarly found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound. The authors calculated that switching to less deadly firearm options could reduce the homicide rate substantially.[36]

Based on decades of compelling evidence and research, "It is widely accepted among medical and public health professionals that the likelihood of death in an assault increases with the power of the gun."[37]  In 2020, Frank Zimring and Duke economist Phil Cook shared the Stockholm Prize in Criminology based in part on their work confirming this effect.[38]  For this reason, restricting access to firearms in the hands of those most likely to misuse them would be expected to diminish firearm homicides and injuries.

The best research consistently shows that legislative efforts to keep guns away from higher risk individuals, such as young adults, are beneficial.  For example, in 1991, California expanded the list of conditions that prohibited an individual from legally purchasing a firearm to include the commission of a violent misdemeanor (the prohibition was for a period of 10 years).  Professor Garen Wintemute and a team of researchers did a careful study that showed that the 1991 law reduced criminal offending for the covered group by roughly 22 percent.[39]  Specifically, the researchers examined the criminal records of two groups over a three-year period: the treatment group consisted of 927 persons aged 21 to 34 years who attempted to purchase a handgun in California in 1991 but were denied because of prior convictions for violent misdemeanors.  The control group included 787 persons who also had prior convictions for misdemeanor violence but legally purchased handguns in 1989 or 1990 (prior to the law's adoption) and were of the same age range as the group denied in 1991.  The control group, which was able to buy firearms, had a

---

[35] Zimring FE, *The medium is the message: firearm caliber as a determinant of death from assault*, J Legal Stud. 1972;1:97-124. doi:10.1086/467479.  The description of the Zimring study comes from Anthony A. Braga and Philip J. Cook, *The Association of Firearm Caliber with Likelihood of Death From Gunshot Injury in Criminal Assaults*, JAMA Netw. Open. 2018; 1(3):e180833, *available at* https://bit.ly/2RhJBMc.

[36] Anthony A. Braga & Philip J. Cook, *supra* note 35.

[37] *Id.*

[38] Stockholm Univ., 2020 Winners of the Stockholm Prize in Criminology (Sept. 13, 2020), *available at* https://bit.ly/3fIbiHr.

[39] Garen J. Wintemute et al., *Subsequent Criminal Activity Among Violent Misdemeanants Who Seek to Purchase Handguns: Risk Factors and Effectiveness of Denying Handgun Purchase*, 285 JAMA 1019 (2001), *available at* https://bit.ly/3fy6Rh2.

29 percent higher rate of future criminal offending involving guns and/or violence than the treatment group that was prohibited from purchasing weapons.[40]  Moreover, the two groups did not differ in terms of future criminal offending that did not involve firearms or violence.

This well-crafted study illustrates that when California restricts the ability of certain high-risk individuals to purchase guns, there is a documented reduction in violent crime among those individuals.  By looking at roughly comparable individuals before and after California began barring individuals with convictions for misdemeanor violence from gun possession, the researchers could estimate whether the background check system curtailed the violence of the newly banned individuals.  The study concluded that denying firearm purchases to this category of applicants reduced "future criminal offending involving firearms and/or violence" by 22 percent (=29/129).  This finding was statistically significant at the .05 level.

A second study by Professor Wintemute and his fellow researchers similarly documents that California's efforts to keep guns away from higher-risk individuals are effective and generate a substantial and statistically significant reduction in crime.[41]  This study looked at individuals who were both arrested for felonies and later sought to buy guns.  The treatment group was composed of 177 individuals who were stopped from doing so by background checks because they had been convicted of the felony for which they were arrested, and thus were prohibited from purchasing a firearm.  The control group was composed of 2,470 individuals who succeeded in buying guns because they were not convicted of any felony (despite the felony arrest).  As between the two groups, one would imagine, if anything, the group of those arrested but not convicted would be less likely to commit crime.  Instead, this control group had a higher crime rate by virtue of their ability to legally purchase and possess firearms (adjusting for the nature and extent of their prior criminal history).  The law preventing the felons from buying guns led to a 19.4 percent (=24/124) statistically significant reduction in their future violent criminality.

Because the best evidence indicates that 18-20-year-olds are the most homicidal age group and because allowing concealed carry of guns promotes increases in violent crime through a number of different pathways—as discussed in the following section—it is a widely accepted and adopted approach to limit gun carrying to those who are 21 or older.  The Minnesota legislature

---

[40] The authors controlled for age, sex, and prior criminal history in this analysis.
[41] M. A. Wright et al., *Effectiveness of Denial of Handgun Purchase to Persons Believed to Be At High Risk for Firearm Violence*, 89 Am. J. Pub. Health 88 (1999), *available at* https://bit.ly/3bE1go8.

certainly had strong and compelling reasons to conclude that this measure would promote public safety by reducing violent crime.

### 3. Without Minnesota's Limitations on Concealed Carry by 18-20-Year-Olds, Recent Increases in Violent Crime Would Have Been Even More Significant.

As the recent trials of Kyle Rittenhouse and the killers of Ahmaud Arbery have vividly demonstrated, the risk of harm to the public is substantially elevated when guns are taken outside the home. As econometric methods have improved and more data has become available with more states adopting laws allowing citizens to carry concealed weapons (right-to-carry laws or RTC laws), a strong body of evidence has been amassed that finds that increased gun carrying outside the home increases violent crime.[42] The newer research has also better elucidated the various pathways by which RTC laws lead to greater violence, ranging from the increased deadliness of road rage and angry confrontations, the escalation of the lethality of arguments, enormous increases in gun thefts that arm criminals, the increased tendency of criminals to arm themselves, and the negative consequences for effective policing when officers fear the increased threat from a more actively armed population.[43]

---

[42] With more years of data and more states passing RTC laws, researchers are able to generate more accurate predictions of the impact of these laws. Also, the tools of econometrics have advanced over the last 25 years, and therefore the later studies are more likely to use the newer and better techniques for estimating standard errors (a key input in establishing statistical significance) as well as to understand the threats to validity of the relevant empirical approaches.

[43] Gun carrying by citizens increases crime by impairing police effectiveness in a variety of ways. First, "anything that RTC laws do to occupy police time, from processing permit applications to checking for permit validity to dealing with gunshot victims, inadvertent gun discharges, and the staggering number of stolen guns is likely to have an opportunity cost expressed in higher violent crime." Donohue, John J., Abhay Aneja, and Kyle D. Weber, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, Journal of Empirical Legal Studies 16, no. 2 (2019b): 198–247, *available at* https://doi.org/10.1111/jels.12219. Moreover, just as American criminals shoot faster because of the dangers posed by an armed population, so do American police, who legitimately fear the prospect of facing an armed assailant. As a result, American police officers kill at rates 50-100 times that of their counterparts in other affluent nations. Consider this striking fact: in the first twenty-four days of 2015, police in the United States fatally shot fifty-nine individuals, which was greater than the comparable number of fifty-five shot by police in England and Wales over the past twenty-four years. Jamiles Lartey, *By the Numbers: US Police Kill More in Days than Other Countries Do in Years*, GUARDIAN (June 9, 2015), *available at* https://www.theguardian.com/us-news/2015/jun/09/the-counted-police-killings-us-vs-other-countries [https://perma.cc/3USA-XNKA].

Indeed, the D.C. Circuit recognized the elevated dangers from gun carrying outside the home in *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("Heller IV") when it suggested that requiring individuals to bring firearms into the police station for in-person inspection created "a threat to public safety [because] there is a risk that the gun may be stolen en route or that the would-be registrant may be arrested

In the last four years alone, fourteen journal articles, listed below, have concluded that RTC laws increase violent crime.[44]   Eleven of these articles have already been published in peer-reviewed journals, and three more are in the publication pipeline, authored by economists at Duke University, the University of Colorado at Boulder, the University of Virginia, and Texas A&M University:

1.  Donohue, John J., Abhay Aneja, and Kyle D. Weber. *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, Journal of Empirical Legal Studies 16, no. 2 (2019b): 198–247, *available at* https://doi.org/10.1111/jels.12219.

2.  Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (2017) (finding that RTC laws increase overall homicides by 6.5 percent and firearm homicides by 8.6 percent), *available at* https://bit.ly/3Bqd9JK;

3.  Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 Int'l Rev. Law & Econ. 1 (2019) ("[S]tates that changed from 'prohibited' to 'shall issue' experienced a 12.3% increase in gun-related murder rates and a 4.9% increase in overall murder rates."), *available at* https://bit.ly/3eEFK4a;

4.  John J. Donohue, *Laws Facilitating Gun Carrying and Homicide*, 107 Am. J. Pub. Health 1864, 1865 (2017) (noting that RTC laws increased firearm homicides by 9.5 percent during the 2000-2014 period), *available at* https://stanford.io/2UYDCNR;

___

or even shot by a police officer seeing a 'man with a gun.'" *Id.* at 277 (internal citation and quotation omitted).

[44] While some early studies suggested that right-to-carry (RTC) laws might have some beneficial effects in reducing homicide -- John R. Lott & David B. Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. of Legal Studies 1 (1997) -- a distinguished panel of the National Research Council examined this evidence and in 2005 issued a statement endorsed by 15 of the 16 committee members stating that "the scientific evidence does not support [t]his position," Nat'l Research Council, Firearms and Violence: A Critical Review (2005), at App. B (Committee Response to Dissent from James Q. Wilson), *available at* https://bit.ly/36QGL4G.  Wilson's role as a dissenter from some of the top econometricians in the country on the NRC panel on the econometric evaluation of RTC laws is quite remarkable, especially since he acknowledged in the second sentence of his dissent that he was "not an econometrician."  Nat'l Research Council, Firearms and Violence: A Critical Review (2005), at App. A, 269 (Dissent), *available at* https://bit.ly/3xRRW9j.

5.  Michael Siegel et al., *The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: A Panel Study*, J Gen Intern Med 34(10): 2021–8 (2019), DOI: 10.1007/s11606-019-04922-x. ("After simultaneously controlling for … 10 firearm laws, … 'shall issue' laws were associated with 9.0% higher homicide rates.").

6.  Cassandra K. Crifasi et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. Urban Health 383 (2018) ("Right-to-carry laws are associated with increases in firearm homicide."), *available at* https://bit.ly/3iBgux4;

7.  Erika L. Sabbath et al., *State-Level Changes in Firearm Laws and Workplace Homicide Rates: United States, 2011 to 2017*, 110 Am. J. Pub. Health 230 (2020) (restricting the ability to carry concealed weapons "was associated with a 5.79% reduction" in workplace homicide rates), *available at* https://bit.ly/3BsQfkU.

8.  Doucette, M. L., Crifasi, C. K., & Frattaroli, S., *Right-to-carry laws and firearm workplace homicides: A longitudinal analysis (1992-2017)*, American Journal of Public Health, 109 (12) (2019), 1747–1753. doi:10.2105/AJPH.2019.305307 ("[f]rom 1992 to 2017, the average effect of having an RTC law was significantly associated with 29% higher rates of firearm" workplace homicides).

9.  Emma E. Fridel, *Comparing the impact of household gun ownership and concealed carry legislation on the frequency of mass shootings and firearms homicide*. 38 Justice Quarterly 892 (2020) ("More permissive concealed carry legislation was associated with a 10.8% increase in the firearms homicide incidence rate.").

10. Emma E. Fridel, *The futility of shooting down strawmen: A response to Kleck*, 38 Justice Quarterly 925 (2021) (after showing the robustness of her findings that RTC laws increase firearm homicides, she concludes "it is imperative that firearms research prioritizes the use of contemporary data and methods to shape policies for contemporary problems").

11. Anita Knopov et al., *The Impact of State Firearm Laws on Homicide Rates among Black and White Populations in the United States, 1991–2016*, Health & Social Work (2019), Volume 44, Issue 4, November 2019, Pages 232–40, *available at* https://doi.org/10.1093/hsw/hlz024. (Examining "the relationship between state firearm laws and homicide victimization rates … in 39 states during the period between 1991 and 2016, [the study found that] 'shall issue' laws were associated with [5.7 percent] higher homicide rates among both white and black populations.").

12. Marjorie B. McElroy and Peichun Wang, *Do Concealed Gun Permits Deter Crime? Dynamic Insights from State Panel Data*, January 7, 2018 (Their model indicates that RTC laws increase violent crime and "strongly rejects Lott and Mustard (1997)'s famous deterrence hypothesis.").

13. Stephen B. Billings, *Smoking Gun? Linking Gun Ownership to Neighborhood Crime*, March 9, 2021 (finding "strong evidence that increases in CHPs [concealed handgun permits] coincide with large increases in stolen guns…. Stolen guns increased immediately following increases in CHPs [followed by] an increase in violent crimes as well as an increase in the share of violent crime using guns. This is consistent with a mechanism of stolen guns being transferred to criminals that are using guns to commit violent crimes.").

14. Jonathan Colmer and Jennifer L. Doleac, *Access to Guns in the Heat of the Moment:The Effect of Gun Laws on Violent Crime*, April 23, 2021 ("We find consistent evidence that gun laws that limit residents' rights to carry firearms mitigate the effect of temperature spikes on violence. In places with strict gun laws, a one-degree Celsius increase in daily average temperature is associated with a 0.388% increase in homicides. By contrast, in places with more lenient gun laws, a one degree increase in daily average temperature is associated with a 0.957% increase in homicides; the difference is statistically significant. In other words, higher temperatures increase homicides more in places with lenient gun laws than in places with strict gun laws.").

It is helpful to provide some detail about how the most comprehensive of these studies – the first listed above by Donohue, John J., Abhay Aneja, and Kyle D. Weber, *Right-to-Carry Laws*

*and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*" – was conducted. My research team gathered information on violent crime across all 50 states and the District of Columbia from the FBI Uniform Crime Reports over the period from 1979-2014 to explore what happened to the violent crime rate in each jurisdiction that adopted RTC laws over this period. Because we had data across 51 jurisdictions as well as 36 years of data from each jurisdiction, we were able to use the traditional panel data econometric methodology as well as the more recent synthetic control methodology – and importantly, they both supported the finding that RTC laws substantially elevated violent crime.

Essentially, the panel data methodology estimates how the average pattern of violent crime changes in the years following RTC adoption, controlling for overall trends in crime in the nation, as well as a host of other factors that influence crime, including the economic conditions within a state (per capita income, poverty rate, unemployment rate), the level of police and incarceration, alcohol consumption, changing demographic and urbanization rates, and other enduring features of the individual states that persist over time. Figure 4 shows the effect on violent crime of laws allowing citizens to carry concealed weapons derived from this panel data model. It shows that such RTC laws generate higher levels of violent crime, increasing by roughly 15 percent after ten years, with the rise in crime beginning with the initial year of RTC adoption.[45]

This is a substantial increase in crime, which would lead to many thousands of additional violent crimes each year in a state the size of Minnesota. One way to convey a sense of the magnitude of this level of crime increase is that a rough, consensus estimate from the crime literature is that a doubling of the prison population leads to about a 15 percent decrease in violent crime.[46] In other words, to offset the 15 percent violent crime increase from adopting a RTC law, a state would need to roughly double its prison population. Most RTC states have recognized that this pattern would only be worse if the most homicidal age group (those 18 to 20 years old) were allowed to carry concealed weapons, and therefore have restricted the right to carry to those who are 21 or older. Indeed, in 2020 the rate of firearm homicides per 100,000 in Minnesota was 118.2

---

[45] Figure 4 also usefully shows that the panel data model predicts that RTC laws have no impact on crime in the years prior to adoption – which is necessarily true but serves to validate that the statistical model is working properly. The numbers at the top of each year's estimate shows how many RTC laws were evaluated for each particular year.

[46] John J. Donohue, "Assessing the Relative Benefits of Incarceration: The Overall Change Over the Previous Decades and the Benefits on the Margin" in Steven Raphael and Michael Stoll, eds., "Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom," pp. 269-341 (2009).

percent *higher* (rising from 1.1 to 2.4) than in 2002, the year prior to Minnesota's adoption of its RTC law. Minnesota's experience with firearm aggravated assault has even been worse: from 2002-2019 (the last year for this data), firearm assaults grew by 282.9 percent (rising from 8.4 to 32.1). For the reasons set forth above, the rate of these violent crimes in Minnesota would almost certainly have been greater if its RTC laws permitted 18-20-year-olds to carry weapons outside the home.

**Figure 4:  Violent Crime Starts Rising When RTC Laws Are Adopted (1979-2014)**



NOTE: We regress crime on dummies for pre− and post−passage years and DAW covariates. Reference year is year before adoption and adoption year is first year with RTC in place at any time, meaning that in states that adopt after January 1, this will capture only a partial effect of RTC laws. We display the 95 percent confidence interval for each estimate using cluster-robust standard errors and show the number of states that contribute to each estimate.

4.     **Any Protective Benefits from Gun Carrying by Young Adults are Likely to be Dwarfed by the Social Harms from Such Gun Carrying.**

Some might conjecture that gun carrying by 18-20-year-olds could confer some protective benefits, but there is little reason for optimism on this front. First, the fourteen studies just described all estimate the net effect of RTC laws. Therefore, they collectively establish that any benefits from increased gun carrying are clearly outweighed by the crime-inducing effect of more gun carrying. Second, the fourteen studies showing that RTC laws lead to increases in violent crime do not capture the additional harms of greater gun accidents and suicides that follow from greater gun carrying, so the true cost-benefit calculus around additional gun carrying tips even further against these laws. When one narrows the focus to restraining the most homicidal, accident

prone, and impetuous category of 18-20-year-olds, the cost-benefit scale tips even further in support of the Minnesota restrictions.

Indeed, while anecdotes of instances when guns have been used for protection can perpetuate the myth that gun carrying might provide benefits to offset its large costs, the empirical evidence does not support this view. A study of gun carriers in Philadelphia from 2003-2006, who almost all said they carried to protect against crime, found that gun possession was associated with a significantly *increased* risk of being shot in an assault. On average, guns did not seem to protect those who possessed them from being shot in an assault. Although successful defensive gun uses can and do occur, the findings of this study challenge the view that gun carrying is on balance protective.[47]

While the Philadelphia study focused on those over 21, a recent study has looked at younger gun carriers in Phoenix and Philadelphia from 2000-2010 and found that, at times when they were carrying guns, they were at vastly higher rates of being shot than when they were not carrying:

> The key finding is that even among populations with chronic exposure to gun violence, **gun carrying is associated with increased risk of gun violence victimization** and exposure, while even the temporary cessation of gun carrying is associated with the reduction of such risks.[48]

Moreover, evidence from the National Crime Victimization Survey has consistently shown that people who are confronted by a criminal are able to try to defend with a gun less than 0.9 percent of the time that. One sees in Figure 5 below, that this identical percentage was observed when looking at NCVS data for 1992-2001 as well as for 2007-2011.

The persistence of this minute percentage over a roughly two-decade time period during which time RTC laws expanded greatly across the nation underscores the low level of effectiveness of gun carrying to protect against crime. If greater authorized gun carrying enabled greater lawful defensive gun use, one would have expected the percentage of times that those confronted by criminals would respond with a gun would rise. Instead, there was absolutely no increase in the likelihood that a potential victim would defend against crime with a gun over the two identified

---

[47] Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, Am J Public Health. 2009; 99: 2034–2040. doi:10.2105/AJPH.2008.143099).

[48] David Hureau and Theodore Wilson, *The Co-occurrence of Illegal Gun Carrying and Gun Violence Exposure: Evidence for Practitioners from Young People Adjudicated for Serious Involvement in Crime*, forthcoming 2021 at American Journal of Epidemiology, *available at* https://academic.oup.com/aje/advancearticle/doi/10.1093/aje/kwab188/6311494?guestAccessKey=fc0cb6 7b-f839-4da3-bba7-42c0a8bc9e57 (emphasis added).

time periods as RTC laws expanded throughout the country. Specifically, in the first period from 1992-2001, 41 percent of the U.S. population lived in states with RTC (or permitless carry) laws. By the second period of 2007-2011, this percentage had jumped to 67 percent – a 63% increase in the proportion of the country living in RTC states. And yet this massive increase in gun carrying did *nothing* to elevate the likelihood of defensive gun use, which was at exactly the same low rate it had been in the earlier period. In other words, against the host of ills that have been documented to flow from the adoption of RTC laws, we see no sign of any increase in effectiveness in using guns to confront criminals, even as gun carrying has proliferated.

**Figure 5**



Defensive Gun Use Is Rare and Does Not Increase as RTC Laws Proliferate (NCVS data)

Note: In both periods examined by the National Crime Victimization Survey, individuals confronted by criminals responded using a gun defensively (DGU) less than 0.9 percent of the time with no apparent benefit to their personal safety.

*Never adopter states through 2011: California, Delaware, District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, and Rhode Island

Note the period after 1992 was one of declining crime for a variety of reasons, but the growth in RTC laws was clearly not one of them. The first two rows of Figure 5 highlight that the 64.3 percent drop in violent crime in the nine states and the District of Columbia that had no RTC law at any time over this period 1992-2011 was vastly greater than the crime drop in RTC states.

Effective gun use in response to criminal threat is so rare for a variety of reasons. First, criminals will have the first-mover advantage on potential victims, thereby greatly limiting the possibility of using a gun for defense even when one is armed. Second, a gun can only be useful for self-defense if it is in one's possession when the infrequent need for it arises since typically

less than 1 percent of the population would experience threatened or actual violent crime each year.  Having a gun is useless if not readily accessible for the rare moments when it could be beneficial.  But carrying a gun typically involves a certain level of inconvenience and discomfort since it commonly would have the weight of 3 or 4 iPhones strapped together.  Not surprisingly, many will find this burden prompts them to leave the gun at home or in their car rather than carry it about.  Moreover, in the course of a day's activity outside the home, gun carriers are frequently inclined to put the gun down somewhere.  When you are in the park or playing basketball with friends, or engaging in any of the myriad recreational activities of 18-20-year-olds, the weight of 3 or 4 cellphones is not particularly comfortable – nor is the thought of what happens if you fall and land on your gun.  The consequence is that an enormous number of guns are lost and stolen when left behind in cars or other venues.  Guns left behind are useless when needed and a stimulant to crime when taken by criminals.

Hence, a gun carried for self-defense is rarely needed, and, of course, it is worthless unless it is carried and accessible when the rare event occurs.  The fact that guns are used so infrequently in response to crime establishes that either the carrier frequently will not have or can't access the gun when it is needed, or the carrier will often realize or learn that the gun will not improve the likely outcome of a crime confrontation owing to the first-mover advantage of the criminal.  In other words, gun carrying is generally needless or ineffectual, while raising the risk of a non-trivial array of fatal or harmful adverse outcomes.

Furthermore, even the rare instances of successful defensive gun use can be misleading since the evidence from the NCVS suggests that other measures designed to avoid the harms of violent crime, such as running away or calling the police, are roughly comparable to defensive gun use in protecting against injury.  What matters for reducing crime is not that a gun was shown and a potential criminal ran away but only whether the gun provides better crime outcomes than other alternative responsive measures, which generate fewer socially harmful outcomes.  Here the evidence suggests that defensive gun use does not provide added protection against violent crime.

The best evidence on this comes from the analysis of NCVS data by Hemenway and Solnick,[49] which finds that in five years of data from the National Crime Victimization Survey

---

[49] David Hemenway and Sara J. Solnick, *The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007–2011*, Preventive Medicine. Volume 79, October 2015, Pages 22-27, *available at* https://www.sciencedirect.com/science/article/abs/pii/S0091743515001188.

there were 14,145 crime incidents in which the victim was present and a victim used a gun to threaten or attack the perpetrator in only 127 – just under 0.9 percent. Moreover, half of these self-defense gun uses were in response to verbal threats and other non-violent crimes. Amazingly, 89 percent of the victims who took *no* action in response to the threat escaped injury and 89 percent of those who used a gun escaped injury. Among those who took some action in response to the attack, the percent injured was virtually identical if one defended with a gun (4.1 percent) or took some other evasive action (4.2 percent). This evidence led Hemenway and Solnick to conclude that "Compared to other protective actions, the National Crime Victimization Surveys provide little evidence that [self-defense gun use] is uniquely beneficial in reducing the likelihood of injury…."[50]

Indeed, guns are stolen far more frequently than they are even attempted to be used for defensive purposes, and there is considerable evidence that gun carrying outside the home leads to higher levels of gun thefts.[51] Donohue, et al. estimated that the increased gun carrying by roughly 16 million permit holders induced by RTC laws has increased the number of gun thefts by roughly 100,000 per year since guns left in cars and elsewhere by permit holders are an easy target for thieves.[52] The recent empirical literature on the link between stolen guns and crime powerfully highlights the importance of this pathway in elevating violent crime. Stephen Billings (2021) examines an extraordinarily rich data set from 2007-2011 in Charlotte, NC and concludes that there is a strong link between RTC permits leading to increased gun thefts and then to increased violent crime.[53] Similarly, Khalil (2017) analyzes NIBRS crime data for over 400 jurisdictions from 34 different states from 1993–2010 and finds that the number of firearms reported stolen in each police jurisdiction leads to statistically significant increases in homicide, aggravated assault, and robbery.[54]

---

[50] David Hemenway and Sara J. Solnick, *The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007–2011*, Preventive Medicine 79 (2015) 22–27.

[51] David Hemenway et al., *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*, 4 Injury Epidemiology 1, 3 (2017) (people who carried firearms at least once in the past month were three times more likely to have a firearm stolen than other gun owners).

[52] Donohue, John J., Abhay Aneja, and Kyle D. Weber, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, Journal of Empirical Legal Studies 16, no. 2 (2019b): 198–247 at 207, *available at* https://doi.org/10.1111/jels.12219.

[53] Billings, Stephen B., *Smoking Gun? Linking Gun Ownership to Neighborhood Crime* (March 9, 2021), *available at* https://ssrn.com/abstract=3588439 or http://dx.doi.org/10.2139/ssrn.3588439.

[54] Khalil, U., 2017, *Do more guns lead to more crime? Understanding the role of illegal firearms*, Journal of Economic Behavior & Organization 133, 342–361, *available at*

In my opinion, limiting gun carrying by 18-20-year-olds would generate benefits in reduced gun crime in the same way that efforts to restrict access to firearms for other high-risk groups have proven to be effective.

### C.    MINNESOTA'S LIMITATIONS ON CONCEALED CARRY BY 18-20-YEAR-OLDS ARE BENEFICIAL IN ADDRESSING THE INCREASED RISK OF SUICIDE OF YOUNG ADULTS.

While the dominant purpose and effect of restricting carry permits to those who are 21 is to reduce deaths and injuries from gun violence and accidents by an unusually high-risk age group, these age restrictions will also save lives by decreasing suicides by adolescents and young adults. Of course, more suicides by 18-20-year-olds, who are prone to harming themselves given their particular vulnerability to a range of mental health issues, could be prevented by restricting all gun access for this age group.  Nonetheless, the more limited restrictions on gun carrying at issue in this case will also reduce suicides, for the reasons set forth in detail below.  To adumbrate the more detailed discussion, one must keep in mind the following factors:

1. The link between gun access and suicide is clearly established because suicide attempts by gun are dramatically more successful, thereby forestalling the effective treatment that often follows unsuccessful attempts.

2. Limiting the amount of gun access – even for those who have guns – has been shown to reduce suicides since the amount of time between suicidal ideation and suicide attempt is often quite short.

3. 18-20-year-olds are particularly vulnerable and their rates of suicide have been rising in recent years.

4. The literature confirms that wholesale restrictions on gun access for 18-20-year-olds reduce suicide.

5. Allowing 18-20-year-olds to carry guns increases the percentage of 18-20-year-olds who acquire guns, thereby increasing overall gun access by this vulnerable age group and their siblings, with an attendant increased suicide risk.

6. Guns carried outside the home are far more at risk of theft and loss, thus putting guns in the hands of (typically) youthful thieves, thereby exacerbating the risks

---

https://reader.elsevier.com/reader/sd/pii/S0167268116302669?token=60BB2EEB5789925B6068029FC6 6791CA7A2D3F110FD3B04A71F36850DF1B35BB57D954DB759DDE80951C06D0CFDD702C&origi nRegion=us-east-1&originCreation=20210731012605.

of criminal use of these stolen gun as well as elevating the risks of accidents and suicide.  For example, a gun brought to a college dorm by a youthful gun carrier may well pose a higher level of risk than a gun stored in the home.  Given the impulsive and generally more risky behavior of 18-20-year-olds, gun carrying by this group is expected to have a higher-than-average risk of fireman loss and theft.

The link between access to guns and suicide is clearly established in the literature.  Briggs and Tabarrok describe their work as follows: "This study investigates the relationship between firearm prevalence and suicide in a sample of all US states over the years 2000–2009.  We find strong, positive effects of gun prevalence on suicide…."[55]  A study of 26 million Californians over the age of 21 found that, despite "lower rates of all-cause mortality than nonowners" of firearms, handgun owners committed suicide at much higher rates than nonowners.  The authors of the study conclude:  "Handgun ownership is associated with a greatly elevated and enduring risk of suicide by firearm."[56]  While there are many ways to end one's life, those who attempt suicide with a gun are far more likely to die.  The major study on this point in the *American Journal of Psychiatry* found that "Regardless of sex, those using firearms had 140 times the risk of dying [from a] suicide attempt than those using other methods."[57]

Jeffrey Swanson, one of the top researchers on issues of guns and mental health, emphasizes the considerable risk of firearm suicide among young adults, noting that background checks designed to weed out those with the most serious depression are not likely to adequately address this problem on their own:

> Suicide is the third leading cause of death in Americans age 15 to 24, perhaps not coincidentally the age group when young people go off to college, join the military, and experience a first episode of major mental illness….Depression is the particular psychiatric illness most strongly associated with suicide. …. Depression is not, however, a disorder that gets most individuals a gun-disqualifying record of involuntary commitment.  In other words, people suffering from the one mental health condition that is most closely and

---

[55] Justin Thomas Briggs & Alexander Tabarrok, *Firearms and Suicides in US States*, 37 Int'l Rev. of Law & Econ. 180 (2014), *available at* https://bit.ly/3wkew9r.

[56] David M. Studdert et al., *Handgun Ownership and Suicide in California*, 382 New Eng. J. Med. 2220, 2220, 2224 (2020) ("Handgun ownership is associated with a greatly elevated and enduring risk of suicide by firearm."), *available at* https://bit.ly/2VUfoEG.

[57] J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 American Journal of Psychiatry 1094 (2016), *available at* https://doi.org/10.1176/appi.ajp.2016.15070854.

frequently linked to suicidality are unlikely to show up in a gun background check.[58]

As the American Public Health Association (APHA) recognizes, access to firearms is a key risk factor for suicide, with particularly high risk for young adults.[59]    This APHA policy statement notes:

> While suicide affects all individuals, males are four times more likely than females to die by suicide, and the prevalence of suicidal thoughts, planning, and attempts is significantly higher among younger age groups (18–29 years) than older age groups….
>
> There is ample evidence that suicidality is transitory.  Should a person survive a suicidal impulse, his or her prognosis is quite good.  The results of a meta-analysis of nearly 100 studies of suicide attempters showed that 90% of attempters who survive do not go on to die by suicide.  In fact, many suicide attempts occur with little planning, often in response to a short-term crisis.  However, if a person attempts suicide through a means that is highly lethal, such as a firearm, the odds of survival are quite low.
>
> One must not opt to make a suicide attempt using a highly lethal means such as a firearm if there is to be any opportunity to obtain mental health treatment or endure a painful short-term crisis.[60]

Notably, a cross-sectional study conducted between 2007 and 2014 based on suicidal acts resulting in an emergency room visit, a hospitalization, or death, found that about 90 percent of suicide attempts with a firearm during that period resulted in a fatality compared to 4 percent of all attempts not involving a firearm.[61]  Immediate access to firearms during a suicide attempt often determines whether an individual attempting suicide will die or recover.  A failed suicide attempt is often the entree into effective psychological counseling that reduces the subsequent risk of suicide.  But when a gun is immediately available when the passing state of hopelessness grips a young individual, this avenue for healing treatment is largely foreclosed:

> A suicidal act is the result of a temporary state of the mind.  Once initiated, it is of uttermost importance to win time in order to allow the condition to improve by itself or through treatment.  A low case-fatality rate indicates that there is a low probability that the suicidal act will end as a fatal event; in other words, chances

---

[58] Jeffrey Swanson et al., *Preventing Gun Violence Involving People with Serious Mental Illness*, in Reducing Gun Violence in America 49 (Daniel Webster & Jon Vernick, eds., 2013).
[59] Am. Pub. Health Ass'n, Reducing Suicides by Firearms (2018), *available at* https://bit.ly/2RqBiOd.
[60] *Id.*
[61] Andrew Conner et al., *Suicide Case-Fatality Rates in the United States, 2007 to 2014:  A Nationwide Population-Based Study*, 172 Annals of Internal Medicine 885, 890 (2019).

that the person will get help are good.  Most often, firearms do not allow for a change of mind or medical attention to arrive in time.[62]

Daniel Webster, John Donohue, et al. (2016) summarized the research concerning access to guns on college campuses, noting:

> A large body of literature clearly shows that firearm access is associated with increased rates of suicide, suggesting that increased access to firearms on college campuses could significantly increase suicide in this vulnerable group.  [See, Miller M, Azrael D, and Barber C., Suicide mortality in the United States: the importance of attending to method in understanding population-level disparities in the burden of suicide. Annual Review of Public Health. 2012; 33:393-408.]

> The combination of challenges with impulse control, emotional regulation, and onset of mental illness contribute to high rates of suicide and suicide attempts among adolescents and young adults….

> The lethality of a given means or method of suicide attempt accounts for a substantial portion of the variation observed in suicide mortality and points to the unrealized potential for means restrictions strategies to reduce suicide.  The method used for a suicide attempt depends on availability; there is a strong association between the availability of firearms in households and death by suicide.  Having ready access to firearms is linked with suicide not only for the gun owner but for all members of the household, especially for children and adolescents.[63]

Similar findings have emerged from examination of age restriction laws in the United States.  For example, a 2004 study by David Webster and coauthors documented a significant decline in suicides in the 18-20-year-old group following implementation of age restriction statutes limiting access to firearms.[64]

In 1994, the federal government prohibited handgun possession for those under age 18.  A 2015 study by Mark Gius concluded that this federal minimum-age restriction on firearm possession contributed to a "very significant decline" in youth firearm suicide and unintentional death rates.[65]  While it is challenging to ascertain the impact of a federal law, since there is no

---

[62] Merete Nordentoft et al, *You Seldom Get a Second Chance With a Gunshot: Lethality of Suicidal Acts*, 173 American Journal of Psychiatry 1069 (2016), *available at* https://doi.org/10.1176/appi.ajp.2016.16080943.

[63] Daniel Webster et al., Johns Hopkins Bloomberg School of Public Health, Firearms on College Campuses: Research Evidence and Policy Implications 21 (2016), *available at* https://bit.ly/3p9CeD3 (internal citations omitted).

[64] Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004).

[65] Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 Soc. Sci. J. 168, 173 (2015).

obvious comparison group, the data presented in the Gius study—which I depict in Figures 6 and 7 below—provides visual support for his conclusion that the federal law did curtail both suicides and unintentional firearm deaths in this age group.  Note that in Figure 6, we see that the youth firearm suicide rate had been rising, but this upward trend is abruptly reversed following the adoption of the federal law.  Similarly, Figure 7, which depicts the national youth unintentional firearm death rate over time, reveals another abrupt improvement starting at the time of adoption of the federal gun restriction in 1994, when we see a very substantial drop in youth unintentional firearm deaths.

**Figure 6**

**The Rising Trend in Youth Firearm Suicides was Sharply Reversed in 1994 When the Federal Government Imposed Minimum Age Requirements for Handgun Possession**



Source: M. Gius / The Social Science Journal 52 (2015) 168–175, Chart 1.

**Figure 7**



Source: M. Gius / The Social Science Journal 52 (2015) 168–175, Chart 2.

Four studies cited by RAND describe the strong link between firearms and suicides by youth under 21:

1. Johnson, R. M., C. Barber, D. Azrael, D. E. Clark, and D. Hemenway, *Who Are the Owners of Firearms Used in Adolescent Suicides?*, Suicide and Life-Threatening Behavior, Vol. 40, No. 6, 2010, pp. 609–611.

2. Wright, M. A., G. J. Wintemute, and B. E. Claire, *Gun Suicide by Young People in California: Descriptive Epidemiology and Gun Ownership*, Journal of Adolescent Health, Vol. 43, No. 6, 2008, pp. 619–622.

3. Shah, S., R. E. Hoffman, L. Wake, and W. M. Marine, *Adolescent Suicide and Household Access to Firearms in Colorado: Results of a Case-Control Study*, Journal of Adolescent Health, Vol. 26, No. 3, 2000, pp. 157–163.

4. Kellermann, A. L., F. P. Rivara, G. Somes, D. T. Reay, J. Francisco, J. G. Banton, J. Prodzinski, C. Fligner, and B. B. Hackman, *Suicide in the Home in Relation to Gun Ownership*, New England Journal of Medicine, Vol. 327, No. 7, 1992, pp. 467–472. K

The most recent study of age restrictions that explores the effect of state restrictions on all handgun purchases to those who are 21 on suicide rates is Julia Raifman et al., *State Handgun Purchase Age Minimums in the US and Adolescent Suicide Rates: Regression Discontinuity and Difference-in-Differences Analyses*, 370 BMJ 1 (2020). This study uses a sophisticated and compelling methodology and the most up-to-date data, and for these reasons, provides more useful insights than earlier studies on this topic. The Raifman et al. study clearly finds that these restrictions limiting the sale of handguns to individuals aged 21 and older reduce suicides among those in the 18-20-year-old age group.

The Raifman et al. study makes use of a particularly valuable methodological approach called a "regression discontinuity" analysis to more precisely evaluate the patterns of suicide in 46 states during the time period from 2001 to 2017.[66] These authors leverage the fact that in the states that set the minimum age for handgun purchase at 18 years old, there is a sudden "discontinuity" in an adolescent's access to firearms when they turn 18.[67] Raifman et al.'s regression discontinuity modeling showed that states with these more relaxed restrictions experienced a jump in suicides at 18 when gun access through purchase first became available that was not seen in the states that delayed access until 21. The study describes the conclusion of their regression discontinuity analysis as follows:

> Based on the predicted probabilities of suicide at ages 18 to 20, an average of 344 adolescent suicide deaths would have been averted in each state with a minimum handgun purchaser age of 21 compared with age 18 from 2001 to 2017.[68]

---

[66] For this regression discontinuity analysis, Raifman et al. excluded four states that experienced policy changes during the period: Missouri, South Carolina, West Virginia, and Wyoming.

[67] Standard observational studies (such as panel data studies) do not come as close to mimicking the benefits of randomization (with randomized studies being the gold standard in empirical evaluation when they can be implemented appropriately) as regression discontinuity studies, and therefore a well-done regression discontinuity study using good data will usually be superior to a similarly adept panel data analysis. Michael Bailey, Real Econometrics 375 (2020).

[68] Julia Raifman et al., *State Handgun Purchase Age Minimums in the US and Adolescent Suicide Rates: Regression Discontinuity and Difference-in-Differences Analyses*, 370 BMJ 1, 4 (2020).

This is the single most methodologically sound assessment of the impact of state laws restricting handgun access to those in the precise age category addressed by the Minnesota restrictions at issue in this litigation.

Raifman et al. also discuss one of the four minimum-age purchase studies that Marvell commented on: Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004). Raifman et al. describe and evaluate this study as follows:

> [Webster et al.] evaluated the link between suicides and laws for minimum purchase age passed in 29 states between 1976 and 2001 and found that the policies for limiting handgun sales to those aged 21 or older were associated with statistically significant reductions in firearm related suicides but not in overall suicides. This study was based on a difference-in-differences design but did not examine pre-period trends in all cause suicide to assess the suitability of the comparison group. We conducted an analysis based on more recent data most relevant to the current policy environment, including a difference-in-differences analysis in which we evaluated parallel trends.[69]

Utilizing advances in econometric methodology (with a "regression discontinuity" analysis) and more current data, Raifman et al. buttressed the link Webster identified in 2004 between firearm-related suicides and age restrictions on the ability to purchase handguns, finding that limiting firearm access to those who were 21 led to a large and statistically significant decline in suicides for those aged 18-20.

One might think that if one has access to a gun at all, restricting the ability to carry guns cannot reduce suicides since one can just wait until one gets back to the gun. This conclusion is wrong for three reasons:

First, we have already noted that suicidal thoughts are often transient and having access to a gun when the suicidal thought emerges can make a fatal difference. Since gun carrying increases the amount of time someone has immediate access to a gun, suicide risk is commensurately increased. In other words, gun carrying increases gun access on the intensive margin (existing gun owners have a greater intensity of use and possession since they can have their guns when away from home).

The APHA policy statement referenced above highlights the results of an intervention that only partially reduced gun access for young adults but nonetheless led to substantial reductions in firearm suicides:

---

[69] *Id.* at 2.

> Between 2003 and 2005, about 90% of all suicides in the Israeli Defense Force (IDF), a mandatory population-based army drafting all youths 18–21 years of age, were firearm suicides. Since many IDF soldiers go home on the weekends, the IDF changed its weapons policy in 2006 to require that firearms remain on base when soldiers take a weekend leave. After this policy change, the overall IDF suicide rate decreased by 40% in 2007–2008. Most of this decrease was due to a reduction in weekend firearm suicides; there was no significant change in weekday suicide rates.[70]

Of course, if suicide intention were constant, then restricting weekend access to guns would have had no effect since the soldiers had access to their guns all week long. But the 40 percent reduction in suicides reveals that restricting access during the fleeting periods of suicidal thinking that could quickly become lethal with a gun present was sufficient to reduce suicides – even for those with access to guns at other times in the week. Thus, even 18-20-year-olds who might have access to guns will have lowered risk if they are not allowed to carry those guns outside the home. This research on Israeli data supports the U.S. research indicating that restricting firearm access is effective in decreasing overall suicide rates.

Second, allowing 18-20-year-olds to carry guns increases the number of 18-20-year-olds who acquire guns, thus directly increasing their access to firearms, which the evidence above has shown increases the risk of suicide for this vulnerable age group.[71] In other words, gun carrying increases gun access on the extensive margin (a greater proportion of 18-20-year-olds will have guns if this age group is permitted to carry guns outside the home). This follows directly from consumer theory because as the number of potentially attractive features of a consumer product grows, the demand for the product grows. Thus, as the gun industry clearly knows, more 18-20-year-olds will acquire guns if they can not only keep them at home but carry them outside the home as well.

Third, as previously discussed, 18-20-year-olds are less mature, more impulsive, and more careless than older individuals. Every auto insurance company and rental car company knows this fact, and either refuses to deal with individuals of that age (rental car companies) or charges substantially higher premiums to these youthful drivers to reflect their higher risk of careless behavior (auto insurance companies). Since one of the consequences of carrying guns outside the

---

[70] APHA, *supra* note 59.
[71] As noted in footnote 34 above, the increased gun possession by 18-20-year-olds that would result from allowing them to carry guns would contribute to another problem: it would also provide greater access to underage members of the household, thereby elevating risks of crime, accidents, and suicides.

home is that the risk of loss and theft is greatly increased, and since 18-20-year-olds are more prone to careless and reckless behavior, allowing this age group to carry guns outside the home will lead to a disproportionate increase in gun thefts and losses, which directly leads to more criminal use of guns as well as gun accidents and suicides.

Considering the APHA findings, and the extensive literature linking gun access to firearm suicides in general and specifically among 18-20-year-olds, the restrictions at issue in this litigation are likely to prevent avoidable deaths in this vulnerable age group, given the growing stresses and increased levels of suicidality among 18-20-year-olds, which have experienced a massive 32.2 percent increase in firearm suicides among over the period from 2005-2018 (according to the CDC).

## IX.    CONCLUSION

Based upon the many studies that I have conducted, the studies that I have reviewed, additional data I have analyzed, and the knowledge I have acquired during a 45-year career of studying guns and crime, I conclude that the gun safety measures at issue in this litigation are appropriately targeted to the 18-20 year age group because that group is at heightened risk of committing firearm homicide and other violent crime.  Due to challenges of underdeveloped neurobiological function and worsening levels of stress and mental health issues, this age group is at increased risk of making poor decisions and acting impulsively (in general and in connection with alcohol and drug consumption), which is why in so many dimensions of life, governments and businesses will pursue strategies to reduce the damage that can follow from this incomplete brain maturation by imposing an array of age-based restrictions for those under age 21.

In addition, this age group is suffering from a growing problem of firearm suicide. Moreover, the concerns about the increased risk of violence and suicide raises additional concerns of mass violence by 18-20-year-olds, given the growing problem of public mass shootings.

In my expert opinion, the challenged measures designed to limit gun carrying by the 18-20-age cohort will further the state's compelling interest in reducing firearm deaths and injuries from assaultive crimes and suicide.  The recent example of Kyle Rittenhouse, who killed two and maimed a third during a protest in Kenosha, Wisconsin in August 2020, highlights that a gun taken outside the home by even a well-intentioned young man elevates the danger to the public

considerably over those left in a residence.[72]  In addition, reduced firearm access by 18-20-year-olds can only reduce accidental firearm deaths and injuries.  Indeed, young people appear to be far more likely to be injured or die in firearm accidents than older adults.[73]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 24, 2022 at Stanford, California.

*John J. Donohue III*

John J. Donohue

---

[72] Charles Homans, Kyle Rittenhouse and the New Era of Political Violence, *The New York Times*, October 26, 2021, https://www.nytimes.com/2021/10/26/magazine/kyle-rittenhouse-kenosha-wisconsin.html?referringSource=articleShare.

[73] *See* Sarah J. Solnick & David Hemenway, *Unintentional Firearm Deaths in the United States 2005-2015*, 6 Inj. Epidemiology 1, 3-4 (2019) (finding that "children and teens, ages 10 to 19," and "young adults, aged 20 to 29," have an elevated risk of dying in a gun accident than older adults), *available at* https://bit.ly/3zowb14; Victor Lee et al., *Emergency Department Visits for Firearm-Related Injuries Among Youth in the United States, 2006-2015*, 48 J.L., Med. & Ethics 67, 70 (2020) (finding that, between 2006 and 2015, 36,780 18-20-year-olds reported to a hospital emergency room for unintentional firearm injury and an additional 2,399 reported for firearm injury caused by a suicide attempt or self-harm), *available at* https://bit.ly/3isoUGR).

# JOHN J. DONOHUE III

Stanford Law School
Stanford, CA 94305
Phone: 650 721 6339
E-mail:  jjd@stanford.edu
Web pages:
http://works.bepress.com/john_donohue/
https://law.stanford.edu/directory/john-j-donohue-iii/

## EMPLOYMENT

### Full-time Positions

- Stanford Law School, C. Wendell and Edith M. Carlsmith Professor of Law, September 2010 to the present.
- Yale Law School, Leighton Homer Surbeck Professor of Law, July 2004 to August 2010.
- Stanford Law School, Professor of Law, September 1995 to June 2004.
    - William H. Neukom Professor of Law, February 2002 – June 2004.
    - John A. Wilson Distinguished Faculty Scholar, March 1997 – January 2002.
    - Academic Associate Dean for Research, since July 2001 – July 2003.
    - Stanford University Fellow, September 2001 – May 2003.
- Northwestern University School of Law:
    - Class of 1967 James B. Haddad Professor of Law, September 1994-August 1995
    - Harry B. Reese Teaching Professor, 1994-1995
    - Professor of Law, May 1991-September 1994
    - Associate Professor, May 1989-May 1991
    - Assistant Professor, September 1986-May 1989.
- Research Fellow, American Bar Foundation, September 1986-August 1995.
- Associate Attorney, Covington & Burling, Washington, D.C., October 1978-July 1981 (including last six months as Attorney, Neighborhood Legal Services)
- Law Clerk to Chief Justice T. Emmet Clarie, U.S. District Court, Hartford, Connecticut, September 1977-August 1978.

### Temporary Appointments

- Affiliated Research Professor, American Bar Foundation, September 2020 – August 2025.
- Lecturer on the Economics of Crime, Bogota Summer School in Economics, Universidad del Rosario, Bogota, Colombia,  June 2020.
- Visiting Professor, Bocconi University, Milan, Italy, October- November 2012, April 2014, and June 2015.
- 2011 Faculty Scholar in Residence, University of Denver Sturm College of Law, April 21-22, 2011.
- Visiting Fellow, The Milton Friedman Institute for Research in Economics, University of Chicago, October 2009.

- Schmidheiny Visiting Professor of Law and Economics, St. Gallen University, November – December, 2007.
- Visiting Lecturer in Law and Economics, Gerzensee Study Center, Switzerland, June 2007.
- Visiting Professor, Tel Aviv University School of Law, May 2007.
- Herbert Smith Visitor to the Law Faculty, University of Cambridge, England, February 2006.
- Visiting Professor, Harvard Law School, January 2003.
- Fellow, Center for Advanced Studies in the Behavioral Sciences, Stanford, California, Academic year 2000-01.
- Visiting Professor, Yale Law School, Fall, 1999.
- Professor, Center for the Study of American Law in China, Renmin University Law School, Beijing, July 1998.
- Visiting Professor of Law and Economics, University of Virginia, January 1997.
- Lecturer, Toin University School of Law, Yokohama, Japan, May-June 1996.
- Cornell Law School, Distinguished Visiting Fellow in Law and Economics, April 8-12, 1996 and September 25-29, 2000
- Visiting Professor, University of Chicago Law School, January 1992-June 1992.
- Visiting Professor of Law and Economics, University of Virginia Law School, January 1990-May 1990.
- Fellow, Yale Law School Program in Civil Liability, July 1985-August 1986.
- Private Practice (part-time), New Haven, Connecticut, September 1981-August 1986.
- Instructor in Economics, Yale College, September 1983-August 1985.
- Summer Associate, Donovan Leisure Newton & Irvine, New York, Summer 1982.
- Summer Associate, Perkins, Coie, Stone, Olsen & Williams, Seattle, Washington, Summer 1976.
- Research Assistant, Prof. Laurence Lynn, Kennedy School of Government, Harvard University, Summer 1975.
- LSAT Tutor, Stanley Kaplan Education Center, Boston, Massachusetts; Research Assistant, Prof. Philip Heymann, Harvard Law School; Research Assistant, Prof. Gordon Chase, Harvard School of Public Health. (During Law School).


**EDUCATION**

**Yale University, 1981-1986**

- University Fellow in Economics; M.A. 1982, M. Phil. 1984, Ph.D. 1986.
  - Dissertation: "A Continuous-Time Stochastic Model of Job Mobility:  A Comparison of Male-Female Hazard Rates of Young Workers."  Awarded with Distinction by Yale.
  - Winner of the Michael E. Borus Award for best social science dissertation in the last three years making substantial use of the National Longitudinal Surveys--awarded by the Center for Human Research at Ohio State University on October 24, 1988.
- National Research Service Award, National Institute of Health.
- Member, Graduate Executive Committee; Graduate Affiliate, Jonathan Edwards College.

**Harvard Law School, 1974-1977 (J.D.)**

- Graduated <u>Cum Laude</u>.

2

- Activities:  Law Clerk (Volunteer) for Judge John Forte, Appellate Division of the District Court of Central Middlesex; Civil Rights, Civil Liberties Law Review; Intra-mural Athletics; Clinical Placement (Third Year):  (a) First Semester:  Massachusetts Advocacy Center; (b) Second Semester:  Massachusetts Attorney General's Office--Civil Rights and Consumer Protection Divisions.  Drafted comments for the Massachusetts Attorney General on the proposed U.S. Department of Justice settlement of its case against BechtelCorporation's adherence to the Arab Boycott of Israeli companies.

## Hamilton College, 1970-1974 (B.A.)

- Departmental Honors in both Economics and Mathematics
  - Phi Beta Kappa (Junior Year)
- Graduated fourth in class with the following academic awards:

  - Brockway Prize (Highest GPA Freshman Year)
  - Edwin Huntington Memorial Mathematical Scholarship
  - Fayerweather Prize Scholarship
  - Oren Root Prize Scholarship in Mathematics

- President, Root-Jessup Public Affairs Council.

**PUBLICATIONS**

## Books and Edited Volumes:

- Law and Economics of Discrimination, Edward Elgar Publishing, 2013.

- Employment Discrimination:  Law and Theory, Foundation Press, 2005, 2009 (2d edition) (with George Rutherglen).

- Economics of Labor and Employment Law:  Volumes I and II, Edward Elgar Publishing, 2007.  http://www.e-elgar.co.uk/bookentry_main.lasso?id=4070

- Foundations of Employment Discrimination Law, Foundation Press, 2003 (2d edition).

- Foundations of Employment Discrimination Law, Oxford University Press, 1997 (Initial edition).

## Book Chapters:

- "Drug Prohibitions and Its Alternatives." Chapter 2 in Cook, Philip J., Stephen Machin, Olivier Marie, and Giovanni Mastrobuoni, eds, *Lessons from the Economics of Crime: What Reduces Offending?* MIT Press. 45-66 (2013).

- "The Death Penalty" Chapter in Encyclopedia of Law and Economics, Spring (2013) and in Alain Marciano & Giovanni Battista Ramello eds., Encyclopedia of Law and Economics (2019).

- "Rethinking America's Illegal Drug Policy," in Philip J. Cook, Jens Ludwig, and Justin McCrary, eds, Controlling Crime: Strategies and Tradeoffs (2011), pp.215-289 (with Benjamin Ewing and David Peloquin).

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous Decades and the Benefits on the Margin" in Steven Raphael and Michael Stoll, eds., "Do Prisons Make Us Safer?  The Benefits and Costs of the Prison Boom," pp. 269-341 (2009).

3

- "Does Greater Managerial Freedom to Sacrifice Profits Lead to Higher Social Welfare" In Bruce Hay, Robert Stavins, and Richard Vietor, eds., Environmental Protection and the Social Responsibility of Firms: Perspectives from Law, Economics, and Business (2005).

- "The Evolution of Employment Discrimination Law in the 1990s:  A Preliminary Empirical Evaluation" (with Peter Siegelman), in Laura Beth Nielsen and Robert L. Nelson, eds., Handbook of Employment Discrimination Research (2005).

- "The Impact of Concealed Carry Laws" in Jens Ludwig and Philip Cook, Evaluating Gun Policy:  Effects on Crime and Violence (Washington D.C.:  Brookings, 2003).

**Articles:**

- "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," The Conversation (December 6, 2021), https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-the-rittenhouse-verdict-172741.

- Lisa Vicen, Samuel Levander, & John J. Donohue III, 'NYSRPA v. Bruen': Studies Show Direct Link Between Right-to-Carry and Violent Crime Increase, The National Law Journal, November 4, 2021. https://www.law.com/nationallawjournal/2021/11/04/nysrpa-v-bruen-studies-show-direct-link-between-right-to-carry-and-violent-crime-increase/

- "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf. This is part of the Brennan Center for Justice *Protests, Insurrection, and the Second Amendment* series.

- "We Must Confront the Threats to America's Democracy" 56 *Idaho Law Review* 119 (2020)."

- The Impact of Legalized Abortion on Crime over the Last Two Decades" *American Law and Economics Review* (Fall 2020)(with Steven Levitt), Volume 22, Issue 2, Pages 241–302. https://academic.oup.com/aler/article/22/2/241/5973959?guestAccessKey=917acf36-918d-4310-9d22-73c713757238
  - NBER Working Paper No. 25863, May 2019, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3391510.
    - Featured on Freakonomics Radio, "Abortion and Crime, Revisited." https://podcasts.apple.com/us/podcast/freakonomics-radio/id354668519?i=1000444184627."

- "The Swerve to 'Guns Everywhere:' A Legal and Empirical Evaluation" 83 *Law and Contemporary Problems* 117-136 (2020). https://scholarship.law.duke.edu/lcp/vol83/iss3/7.

- Daniel Cerqueira, Danilo Santa Cruz Coelho, John J. Donohue, Marcelo Fernandes & Jony Arrais Pinto, A Panel-Based Proxy for Gun Prevalence in the US (Nat'l Bureau of Econ. Research, Working Paper No. 25530, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332277.

- "That Assault Weapon Ban? It Really Did Work" *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html?action=click&module=Opinion&pgtype=Homepage.

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019 (with Abhay Aneja and Kyle Weber), https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

- "RTC Laws Increase Violent Crime: Moody and Marvell Have Missed the Target," *Econ Journal Watch*, Vol. 16, No. 1, 97-113, March 2019 (with Abhay Aneja and Kyle Weber), https://econjwatch.org/File+download/1103/DonohueAnejaWeberMar2019.pdf?mimetype=pdf

- "It's Going to Take More Than Background Checks and AR-15 Bans to Stop Mass Shootings," *Time.com*, November 16, 2018. http://time.com/5456015/gun-control-background-checks-ar15-mass-shootings/

- "What's in a denial? Bayesian Analysis shows that Kavanaugh lied about denials under oath and Trump was foolish to believe MBS," November 2, 2018 (with Aaron Edlin). https://works.bepress.com/john_donohue/176/

- "Brett Kavanaugh won't keep Americans safe," CNN.com, September 5, 2018. https://www.cnn.com/2018/09/05/opinions/kavanaugh-wont-keep-america-safe-donohue/

- "More Gun Carrying, More Violent Crime," *Econ Journal Watch*, Vol. 15, No. 1, 67-82, January 2018. https://econjwatch.org/articles/more-gun-carrying-more-violent-crime

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis" NBER Working Paper w23510, www.nber.org/papers/w23510, January 2018 (with Abhay Aneja, and Kyle Weber).

- "Saving lives by regulating guns: Evidence for policy," *Science* Dec. 8, 2017, Vol. 358, Issue 6368, pp. 1259-1261, http://science.sciencemag.org/content/358/6368/1259.full (with Phil Cook).

- "Laws Facilitating Gun Carrying and Homicide," American Journal of Public Health, Vol 107, No. 12, 1864-1865, December 2017, http://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304144.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117 Columbia Law Review 1297 (2017). http://columbialawreview.org/content/comey-trump-and-the-puzzling-pattern-of-crime-in-2015-and-beyond/.

- "Did Jeff Sessions forget wanting to execute pot dealers?" The Conversation, January 23, 2017 (with Max Schoening), https://theconversation.com/did-jeff-sessions-forget-wanting-to-execute-pot-dealers-71694

  - Reprinted in Huffington Post, http://www.huffingtonpost.com/the-conversation-us/did-jeff-sessions-forget_b_14344218.html

  - Reprinted in Salon, http://www.salon.com/2017/01/30/jeff-sessions-forgetting-he-once-wanted-to-execute-pot-dealers/#comments

- "Jeff Sessions, The Grim Reaper of Alabama," The New York Times, January 9, 2017 (with Max Schoening), http://www.nytimes.com/2017/01/08/opinion/jeff-sessions-the-grim-reaper-of-alabama.html

- "Testing the Immunity of the Firearm Industry to Tort Litigation," JAMA Intern Med. Published online November 14, 2016. http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2582991 (with David Studdert and Michelle Mello).

- "Empirical Analysis and the Fate of Capital Punishment," 11 Duke Journal of Constitutional Law and Public Policy 51-106 (2016). Available at: http://scholarship.law.duke.edu/djclpp/vol11/iss1/3

- "Firearms on College Campuses: Research Evidence and Policy Implications," Johns Hopkins Bloomberg School of Public Health, (October 15, 2016)(with Daniel Webster et al.) http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_pdfs/GunsOnCampus.pdf

- "Be skeptical about claims of benefits of concealed carry permits." Sacramento Bee, (October 6, 2016), http://www.sacbee.com/opinion/op-ed/soapbox/article106329677.html

- "The Death Penalty Does Not Add Up to Smart Justice," California State Treasurer Intersections (September 2016), http://treasurer.ca.gov/newsletter/2016/201609/conversation.asp

- "Reducing civilian firepower would boost police and community safety, Stanford expert says," Stanford News (July 2016), http://news.stanford.edu/2016/07/15/reducing-civilian-firepower-boost-police-community-safety/review/

- "Domestic Violence and Effectively Terminating the Gun Rights of the Dangerous," Legal Aggregate – Stanford Law School (June 2016), https://law.stanford.edu/2016/06/28/domestic-violence-and-effectively-terminating-the-gun-rights-of-the-dangerous/

- "4 Gun Control Steps U.S. Needs Now," CNN.com (June 2016), http://www.cnn.com/2016/06/23/opinions/gun-control-donohue/index.html

- "The Demise of the Death Penalty in Connecticut," Legal Aggregate - Stanford Law School (June 2016), https://law.stanford.edu/2016/06/07/the-demise-of-the-death-penalty-in-connecticut/

- "On Justice Scalia's Legacy," Legal Aggregate - Stanford Law School (February 14, 2016) https://law.stanford.edu/2016/02/15/stanford-law-faculty-on-justice-scalia/

- "Empirical Evaluation of Law: The Dream and the Nightmare," 17 American Law and Economics Review 313 2015.

- "Capital Punishment Does not Deter Homicides," Casetext, August 30, 2015, https://casetext.com/posts/capital-punishment-does-not-deter-homicides

- "There's no evidence that death penalty is a deterrent against crime," The Conversation, August 8, 2015. http://theconversation.com/theres-no-evidence-that-death-penalty-is-a-deterrent-against-crime-43227

  - Reprinted under the title "Does the Death Penalty Deter Killers?" Newsweek, August 19, 2015.
    https://www.newsweek.com/does-death-penalty-deter-killers-364164

- "Glossip v. Gross: Examining Death Penalty Data for Clarity," Stanford Lawyer, June 29, 2015. http://stanfordlawyer.law.stanford.edu/2015/06/glossip-v-gross-examining-death-penalty-data-for-clarity/

- "How US Gun Control Compares to the Rest of the World," The Conversation, June 24, 2015. http://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-43590

  - Reprinted in slightly modified form under the title "Ban guns, end shootings? How evidence stacks up around the world," in CNN.com on August 27, 2015 http://www.cnn.com/2015/08/27/opinions/us-guns-evidence/

- "The 10 day period is reasonable," San Francisco Daily Journal, September 3, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973: Are There Unlawful Racial, Gender, and Geographic Disparities?" 11 Journal of Empirical Legal Studies 637 (2014).

- "The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy," NBER Working Paper 18294. Revised November 2014 (with Abhay Aneja and Alexandria Zhang), http://www.nber.org/papers/w18294

6

- "Do Police Reduce Crime? A Reexamination of a Natural Experiment," in Yun-Chien Chang, ed., Empirical Legal Analysis: Assessing the Performance of Legal Institutions, London: Routledge, Chapt. 5, pp. 125-143, 2014 (with Daniel E. Ho & Patrick Leahy)

- "Reflections on the Newtown Shooting One Year Later," Stanford Lawyer, December 5, 2013. http://stanfordlawyer.law.stanford.edu/2013/12/reflections-on-the-newtown-shooting-one-year-later/

- Outlier Nation:  Homicides, Incarceration, Guns and Gun Culture, TAR 9 (Verona, Italy: 2013).

- "Gun lunacy rides high in America," Special to CNN, September 13, 2013. http://www.cnn.com/2013/09/13/opinion/donohue-gun-control/index.html?iref=allsearch

- "Why the NRA fights background checks," Special to CNN, Wed April 10, 2013. http://www.cnn.com/2013/04/10/opinion/donohue-background-checks/index.html

- "Substance vs. Sideshows in the More Guns, Less Crime Debate: A Comment on Moody, Lott, and Marvell" (with Abhay Aneja, and Alexandria Zhang) ECON JOURNAL WATCH 10(1) January 2013: 32-39

- "More Guns, Less Crime Thesis," Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (volume 2:G-Q, at page 585) (2012).

- "Jury Nullification in Modified Comparative Negligence Regimes," 79 The University of Chicago Law Review 945 (2012)(with Eli K. Best).

- "What Can Be Done to Stem Gun Violence?"  San Francisco Chronicle, December 21, 2012.  http://www.sfgate.com/opinion/article/What-can-be-done-to-stem-gun-violence-4139575.php#ixzz2G4qIkJJ2

- "When Will America Wake Up to Gun Violence?" CNN opinion, July 21, 2012. Posted to: http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/.

- "Time To Kill The Death Penalty?" The California Progress Report, June 28, 2012.

- "Assessing Post-ADA Employment: Some Econometric Evidence and Policy Considerations." Journal of Empirical Legal Studies Vol. 8: No. 3, September 2011, pp. 477-503 (with Michael Ashley Stein, Christopher L. Griffin, Jr. and Sascha Becker).

- "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," American Law and Economics Review (Fall 2011) 13 (2): 565-631 (with Abhay Aneja and Alex Zhang). See January 2014 Revision released as an NBER working paper above.

- "Punishment is a Cost, Not a Benefit," Review of Mark A. R. Kleiman's "When Brute Force Fails: How to Have Less Crime and Less Punishment," XLVII Journal of Economic Literature (March 2010), 168-172.

- "The Politics of Judicial Opposition: Comment," Journal of Institutional and Theoretical Economics, 166(1), 108—114 (2010).

- "Introduction to the Death Penalty Symposium," 11 American Law and Economics Review. (Fall 2009) (with Steve Shavell).

- "Estimating the Impact of the Death Penalty on Murder," 11 American Law and Economics Review 249 (Fall 2009) (with Justin Wolfers).

- "The Impact of the Death Penalty on Murder," Criminology & Public Policy (November 2009, Volume 8, Issue 4) at pp. 795-801.

- "The Impact of Legalized Abortion on Teen Childbearing," 11 American Law and Economics Review 24 (2009) (with Jeff Grogger and Steven Levitt).

- "More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006," 6 Econ Journal Watch 218-233 (May 2009)(with Ian Ayres).

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell," 6 Econ Journal Watch 35-59 (January 2009)(with Ian Ayres).

- "Measurement Error, Legalized Abortion, and the Decline in Crime: A Response to Foote and Goetz," The Quarterly Journal of Economics (2008) 123 (1): 425-440 (with Steven Levitt). http://qje.oxfordjournals.org/content/123/1/425.abstract

- "AntiDiscrimination Law," in Steven Durlauf and Lawrence Bloom, eds., The New Palgrave Dictionary of Economics, 2d Edition, 2008.

- "Murder in Decline in the 1990s: Why the U.S. and N.Y.C. Were Not That Special," Punishment and Society 10: 333 (2008) at http://pun.sagepub.com

- "Understanding the 1990s Crime Drops in the U.S. and Canada," Canadian Journal of Criminology and Criminal Justice, Vol 49, No. 4, p. 552 (October 2007).

- "The Law and Economics of Antidiscrimination Law," A. M. Polinsky and Steven Shavell, eds., Handbook of Law and Economics, Volume 2 (2007), Pages 1387-1472.

- "Economic Models of Crime and Punishment," Social Research, Vol. 74: No. 2, Summer 2007, pp. 379-412.

- "Rethink the War on Drugs," Yale Law Reports, Summer 2007, pp. 46-47.

- "More Cops," Brookings Policy Brief #158, March 2007 (with Jens Ludwig), http://www.brookings.edu/papers/2007/03crime_john-j--donohue-iii.aspx.

- "Studying Labor Market Institutions in the Lab: Minimum Wages, Employment Protection, and Workfare: Comment," Journal of Theoretical and Institutional Economics, 163(1), 46—51 (March 2007).

- "The Impact of Damage Caps on Malpractice Claims: Randomization Inference with Difference-in-Differences," (with Daniel Ho), 4 Journal of Empirical Legal Studies 69 (2007).

- "The Discretion of Judges and Corporate Executives: An Insider's View of the Disney Case," The Economists' Voice: Vol. 3: No. 8, Article 4. Available at: http://www.bepress.com/ev/vol3/iss8/art4

- "The Knicks Boldly Go Where Companies Have Not," The New York Times, July 2, 2006 Sunday (with Ian Ayres).

- "The Death Penalty: No Evidence of Deterrence," The Economists' Voice, (with Justin Wolfers) (April 2006), http://bpp.wharton.upenn.edu/jwolfers/Press/DeathPenalty(BEPress).pdf.

    - Reprinted in Stiglitz, Edlin, and DeLong (eds), The Economists' Voice: Top Economists Take on Today's Problems (2008).

- "The Costs of Wrongful-Discharge Laws," 88 Review of Economics and Statistics (with David Autor and Stewart Schwab)(2006), pp. 211-31.

- "Security, Democracy, and Restraint," 1 Opening Argument 4 (February 2006).

    - Reprinted in Loch Johnson and James Wirtz, Intelligence and National Security: An Anthology 406-407 (2d ed. 2008).

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791 (2005) (with Justin Wolfers).

- Reprinted in Steven Levitt and Thomas Miles, eds., <u>The Economics of Criminal Law</u>, Edward Elgar Publishing (2008).

- Reprinted in Robert Cooter and Francesco Parisi, eds., <u>Foundations of Law and Economics</u>, Edward Elgar Publishing (2010)

- "Does Terrorism Increase Crime? A Cautionary Tale," (with Daniel Ho), 2005.

- "Fighting Crime: An Economist's View," 7 <u>The Milken Institute Review</u> 46 (2005).

  - Reprinted in Kurt Finsterbusch, ed., <u>Social Problems</u> (McGraw-Hill, 2006).

- "Guns, Crime, and the Impact of State Right-to-Carry Laws," 73 <u>Fordham Law Review</u> 623 (2004).

- "Clinton and Bush's Report Cards on Crime Reduction: The Data Show Bush Policies Are Undermining Clinton Gains", <u>The Economists' Voice</u>: Vol. 1: No. 1, Article 4. 2004, http://www.bepress.com/ev/vol1/iss1/art4

- "The Employment Consequences of Wrongful-Discharge Laws: Large, Small, or None at All?" <u>American Economic Review: Papers and Proceedings</u> May, 2004 (with David Autor and Stewart Schwab).

- "Further Evidence that Legalized Abortion Lowered Crime: A Reply To Joyce," 39 <u>Journal of Human Resources</u> 29 (Winter 2004)(with Steven Levitt).

- "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," <u>Criminology & Public Policy</u> (July 2003, Volume 2, Issue 3) at pp. 397-410.

- "Shooting Down the 'More Guns, Less Crime' Hypothesis," 55 <u>Stanford Law Review</u> 1193 (2003)(with Ian Ayres).

- "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 <u>Stanford Law Review</u> 1371 (2003)(with Ian Ayres).

- "Can Guns, Or Gun Violence, Be Controlled?" (Reviewing James Jacobs, <u>Can Gun Control Work?</u>), <u>The American Prospect</u> (December 16, 2002), p. 35, <u>http://prospect.org/article/books-review-4</u>.

- "The Search for Truth: In Appreciation of James J. Heckman," 27 <u>Law and Social Inquiry</u> 23 (2002).

- "The Schooling of Southern Blacks: The Roles of Social Activism and Private Philanthropy, 1910-1960," <u>Quarterly Journal of Economics</u> (Feb. 2002), (with James Heckman and Petra Todd), pp. 225 – 268.

  - Reprinted in Legal Decisionmaking section of the American Bar Foundation Anthology, ABF Press (2007).

  - Reprinted in American Bar Foundation<u>, Anaylzing Law's Reach: Empirical Research on Law and Society</u> (2008)

- "The Impact of Race on Policing and Arrests," <u>Journal of Law and Economics</u>, vol. XLIV October 2001)(with Steven Levitt), pp. 367 – 394.

- "The Impact of Legalized Abortion on Crime," <u>Quarterly Journal of Economics</u> (Vol. CXVI, Issue 2, May 2001)(with Steven Levitt) pp. 379-420.

  - Reprinted in Steven Levitt and Thomas Miles, eds., <u>The Economics of Criminal Law</u>, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., <u>Recent Developments In Law And Economics</u>, Edward Elgar Publishing (2010).

- "Understanding the Reasons for and Impact of Legislatively Mandated Benefits for Selected Workers," 53 Stanford Law Review 897 (2001).

  - Reprinted in Michael Zimmer, Charles Sullivan et al, Cases and Materials on Employment Discrimination (6th edition)(2003).

- "Nondiscretionary Concealed Weapons Law:  A Case Study of Statistics, Standards of Proof, and Public Policy," American Law and Economics Review 436 (1999)(with Ian Ayres).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

- "Why We Should Discount the Views of Those Who Discount Discounting," 108 Yale Law Journal 1901 (1999).

- "Understanding the Time Path of Crime," 88 Journal of Criminal Law and Criminology 1423 (1998).

- "Discrimination in Employment," The New Palgrave Dictionary of Law and Economics (1998).

  - Excerpted in Lynne Dallas, Law and Public Policy:  A Socio-Economic Approach at page 261 (2003).

- "The Legal Response to Discrimination:  Does Law Matter?" in Bryant Garth, Austin Sarat, eds., How Does Law Matter? Pp. 45 – 75 (Northwestern University Press, 1998).

- "Some Thoughts on Law and Economics and the Theory of the Second Best," 73 Chicago-Kent Law Review 257 (1998).

- "Allocating Resources Among Prisons and Social Programs in the Battle Against Crime," 27 Journal of Legal Studies 1 (1998) (with Peter Siegelman).

  - Excerpted in Sanford Kadish & Stephen Schulhofer, Criminal Law and Its Processes (8th ed. 2007),

- "Guns, Violence, and the Efficiency of Illegal Markets," 88 American Economic Review 463 (May 1998)(with Steve Levitt).

- "Did Miranda Diminish Police Effectiveness?" 50 Stanford Law Review 1147 (1998).

- "Some Thoughts on Affirmative Action," 75 Washington University Law Quarterly 1590 (1997).

- "Executive Compensation," 3 Stanford Journal of Law, Business & Finance 1 (1997).

- "Some Perspective on Crime and Criminal Justice Policy," Lawrence Friedman and George Fisher, eds., The Crime Conundrum:  Essays on Criminal Justice  45 (1997). Reissued by Routledge eBooks 2019.

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," 24 Journal of Legal Studies 427 (1995) (with Peter Siegelman).

- "Employment Discrimination Law in Perspective:  Three Concepts of Equality," 92 Michigan Law Review 2583 (1994).

- Reprinted in Frank Ravitch, Janis McDonald, and Pamela Sumners, Employment Discrimination Law (2004).

  - Translated into Chinese and published in Peking University Law Review (2007).

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," 23 Journal of Legal Studies 543 (1994).

- "Liberal Law and Economics," (reviewing Rethinking the Progressive Agenda by Susan Rose-Ackerman), 13 Journal of Policy Analysis and Management 192 (1994).

10

- Review of Richard Epstein's <u>Forbidden Grounds:  The Case Against Employment Discrimination Laws</u>, 31 <u>Journal of Economic Literature</u> 1477 (1994).

- "Law and Macroeconomics:  Employment Discrimination Over the Business Cycle," 66 <u>University of S. Calif. L. Rev.</u> 709 (1993) (with Peter Siegelman).

- "Advocacy Versus Analysis In Assessing Employment Discrimination Law," 44 <u>Stanford Law Review</u> 1583 (1992).

  - Reprinted in Christopher McCrudden, <u>Anti-Discrimination Law</u> (2003).

- Excerpted in Professors Michael J. Zimmer, Charles A. Sullivan, & Rebecca Hanner White, Cases and Materials on Employment Discrimination (Seventh Edition 2008).

- "The Changing Nature of Employment Discrimination Litigation," 43 Stanford Law Review 983 (1991) (with Peter Siegelman).

- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," 54 <u>Law and Contemporary Problems</u> 195 (1991).

- "Re-Evaluating Federal Civil Rights Policy," 79 <u>Georgetown Law Journal</u> 1713 (1991) (with James Heckman).

- "Opting for the British Rule; Or, If Posner and Shavell Can't Remember the Coase Theorem, Who Will?" 104 <u>Harvard Law Review</u> 1093 (1991).

  - Reprinted in Saul Levmore, <u>Foundations of Tort Law</u> 160 (1994).

- "Continuous versus Episodic Change:  The Impact of Civil Rights Policy on the Economic Status of Blacks," 29 <u>Journal of Economic Literature</u> 1603 (December 1991) (with James Heckman).

  - Reprinted in Paul Burstein, ed., <u>Equal Employment Opportunity</u>, Aldine De Gruyter, New York (1994).

- "The Impact of Federal Civil Rights Policy on the Economic Status of Blacks," 14 <u>Harvard Journal of Law and Public Policy</u> 41 (1991).

- "Studying the Iceberg From Its Tip:  A Comparison of Published and Unpublished Employment Discrimination Cases," 24 <u>Law and Society Review</u> 1133 (1990) (with Peter Siegelman).

- "Prohibiting Sex Discrimination in the Workplace:  An Economic Perspective," 56 <u>University of Chicago Law Review</u> 1337 (1989).

- "The Law & Economics of Tort Law:  The Profound Revolution," 102 <u>Harvard Law Review</u> 1047 (1989).

- "Using Market Incentives to Promote Auto Occupant Safety," 7 <u>Yale Law and Policy Review</u> 449 (1989).

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," 99 <u>Yale Law Journal</u> 549 (1989).

  - Winner of the 1989 Scholarly Paper Competition, Association of American Law Schools.

- "Reply to Professors Ellickson and Stigler," 99 <u>Yale Law Journal</u> 635 (1989).

- "Law and Economics:  The Road Not Taken," 22 <u>Law and Society Review</u> 903 (1988).

- "Further Thoughts on Employment Discrimination Legislation:  A Reply to Judge Posner," 136 <u>U. Pa. L. Rev.</u> 523 (1987).

- "Judge Bork, Anti-Trust Law, and the Bending of 'Original Intent'," <u>Chicago Tribune</u>, sec.1, pg. 15, July 22, 1987.

11

- "Posner's Third Symphony:  Thinking about the Unthinkable," 39 <u>Stanford Law Review</u> 791 (1987)(with Ian Ayres).

- "Determinants of Job Turnover of Young Men and Women in the U.S.--A Hazard Rate Analysis," in Schultz, T.P., ed., <u>Research in Population Economics</u>, vol.6, Greenwich, Conn.:  JAI Press (1987).

- "A Comparison of Male-Female Hazard Rates of Young Workers, 1968-1971," Working Paper #48, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Hazard Rates of Young Male and Female Workers--Recent Developments," Working Paper #51, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Is Title VII Efficient?" 134 <u>U. Pa. L. Rev.</u> 1411 (1986).

   - Reprinted in Paul Burstein, ed., <u>Equal Employment Opportunity</u>, Aldine De  Gruyter, New York (1994).

- "Section I Cases," <u>Sherman's Summations</u>, Vol.3, No.2, Sherman Act Committee of the A.B.A. Antitrust Section, Fall, 1982, at 49.

- "An Evaluation of the Constitutionality of S. 114, The Proposed Federal Death Penalty Statute," Hearings before the U.S. Senate Judiciary Committee, April 27, 1981, at 151.

- "<u>Godfrey v. Georgia</u>:  Creative Federalism, the Eighth Amendment, and the Evolving Law of Death," 30 <u>Catholic University Law Review</u> 13 (1980).

- "Criminal Code Revision--Contempt of Court and Related Offenses," Hearings before the Subcommittee on Criminal Justice of the House Judiciary Committee, July 18, 1979, at 1087.

## Blog Posts:

- "Guns, Mass Shootings, and the Law in the U.S.," *Stanford Law School Legal Aggregate Blog* (Dec. 10, 2021), https://law.stanford.edu/2021/12/10/stanfords-john-donohue-on-guns-mass-shootings-and-the-law-in-the-u-s/.

- "Stanford's John Donohue on One Tragic Week, Two Mass Shootings, and the Uniquely American Gun Problem," *Stanford Law School Legal Aggregate Blog* (March 25, 2021), https://law.stanford.edu/2021/03/25/stanfords-john-donohue-on-one-tragic-week-with-two-mass-shootings-and-the-uniquely-american-gun-problem

- "Open Carry Laws, Guns on Capitol Hill, and a Police Force Outgunned by Militias," *Stanford Law School Legal Aggregate Blog* (January 19, 2021), https://law.stanford.edu/2021/01/19/open-carry-laws-guns-on-capitol-hill-and-a-police-force-outgunned-by-militias/.

- "Remembering Justice Ginsburg," *Stanford Law School Legal Aggregate Blog* (September 19, 2020), https://law.stanford.edu/2020/09/19/stanford-laws-john-donohue-remembers-justice-ginsburg/.

- "The Assault Weapon Ban Saved Lives," (with Theodora Boulouta), *Stanford Law School Legal Aggregate Blog*, October 15, 2019, https://stanford.io/2MWNsrV.

- "Stanford Law's John Donohue on Mass Shootings and Gun Regulation in the U.S.,"  *Stanford Law School Legal Aggregate Blog*, August 6, 2019, https://law.stanford.edu/2019/08/06/stanford-laws-john-donohue-on-mass-shootings-and-gun-regulation-in-the-u-s/.

- "Stanford Law Faculty Remember Justice Stevens."  *Stanford Law School Legal Aggregate Blog*, July 18, 2019, https://law.stanford.edu/2019/07/18/stanford-law-faculty-remember-justice-stevens/.

- "Arming Teachers Is Not a Good Option," *Scientific American*, February 28, 2018, https://blogs.scientificamerican.com/observations/arming-teachers-is-not-a-good-option/.

- "Another Mass Shooting: An Update on U.S. Gun Laws," *Stanford Law School Legal Aggregate Blog*, February 18, 2018, https://law.stanford.edu/2018/02/18/another-mass-shooting-qa-us-gun-laws/.

- "Orlando to Las Vegas: Guns, Law, and Mass Shootings in the U.S.," Stanford Law School Legal Aggregate Blog, October 3, 2017, https://law.stanford.edu/2017/10/03/orlando-to-las-vegas-guns-and-law/.

- *"Moore v. Texas* and the Pathologies that Still Mar Capital Punishment in the U.S.," *Stanford Law School Legal Aggregate Blog*, March 29, 2017, https://law.stanford.edu/2017/03/29/moore-v-texas-and-the-pathologies-that-mar-capital-punishment-in-the-u-s/.

- "Trump and Gun Policy," *Stanford Law School Legal Aggregate Blog*, November 12, 2016, http://stanford.io/2eoWnna.

- "Facts Do Not Support Claim That Guns Make Us Safer" *Stanford Law School Legal Aggregate Blog*, October 12, 2015, https://law.stanford.edu/2015/10/12/professor-john-donohue-facts-do-not-support-claim-that-guns-make-us-safer/.

- "When will America wake up to gun violence?" *CNN.com*, July 20, 2012, http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/index.html.

- "It Takes Laws to Control the Bad Guys," The New York Times -- Room For Debate: http://www.nytimes.com/roomfordebate/2011/01/11/more-guns-less-crime (January 11, 2011).

- "Have "Woman-Protective" Studies Resolved the Abortion Debate?  Don't Bet on It," http://balkin.blogspot.com/2008/09/have-woman-protective-studies-resolved.html (September 2008).

- "Dodging the Death Penalty Bullet On Child Rape," http://balkin.blogspot.com/2008/07/dodging-death-penalty-bullet-on-child.html (July 2008).

- "Why I'd Stick With Yale Clerks-- Some Econometric Ruminations," http://balkin.blogspot.com/2008/04/why-id-stick-with-yale-clerks-some.html (April 2008).

## WORKSHOPS AND ADDRESSES:

- Discussant of Richard Berk, "Firearm Sales in California Through the Myopic Vision of an Interrupted Time Series Causal Analysis," Online Causal Inference Seminar, **Stanford University**, April 6, 2021.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," American Law and Economics Association Meetings, **NYU School of Law**, May 18, 2019; Department of Economics, **University of California, Irvine**, October 13, 2020; **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021.

- Discussant of Chika Okafor, "Prosecutor Politics: The Impact of Election Cycles on Criminal Sentencing in the Era of Rising Incarceration," **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021.

- "Guns and Crime," Economic Analysis of Crime course, **Bocconi University**, Dept. of Social and Political Sciences, March 8, 2021.

- Discussant, "How the Massachusetts assault weapons ban enforcement notice changed firearm sales," Firearms and Policy session, **Assoc. for Public Policy Analysis and Management (APPAM) Virtual Fall Research Conference**, November 12, 2020.

- "We Must Confront the Threats to America's Democracy," Idaho Law Review Election Law Symposium, **University of Idaho College of Law**, October 20, 2020.

13

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," Department of Economics, **University of California, Irvine**, October 13, 2020.

- "The Death Penalty: Informing Policy Through Empirical Research," Program in Criminal Law and Policy, **University of Arizona College of Law**, October 6, 2020.

- Discussant, "Mandatory Retirement Improved Performance on State Supreme Courts," Law and Economics Session, **NBER Summer Institute**, July 22, 2020.

- Discussant, "Measuring Racial Discrimination in Bail Decisions," Crime Session, **NBER Summer Institute**, July 15, 2020.

- "Guns and Empirical Evidence in Second Amendment Litigation," **Columbia Law School**, March 24, 2020; **Yale Law School**, March 25, 2020 (Zoom Presentation).

- Panelist, "Guns, Schools, and Adolescents: A Disaster Waiting to Happen," Psychiatry Grand Rounds,

- Sapp Center for Science Teaching and Learning, **Stanford University School of Medicine**, February 20, 2020.

- "The Power of Data to Change Hearts, Minds, and Public Policy," Law and Policy Lab, **Stanford Law School**, February 13, 2020.

- "The Move to 'Guns Everywhere'," Inaugural Cooter-Rubinfeld Lecture, **University of California, Berkeley, Law School**, February 6, 2020.

- "The Swerve:  A Legal and Empirical Evaluation of the Move to 'Guns Everywhere,'" Law and Economic Studies Workshop, **Columbia Law School**, September 23, 2019; Conference on Gun Rights and Regulations Outside the Home, **Duke Law School**, September 27, 2019.

- "Evidence to Guide Gun-related Public Policy," Conference on Gun Violence Epidemic, **Stanford Medical School**, September 16, 2019; Lecturer, Physicians and Social Responsibility Course, **Stanford Medical School**, October 7, 2019; Lecturer, Data Science Course, **Department of Statistics, Stanford University**, November 1, 2019.

- "The Legal and Political Battle over Gun Policy in America," **Hamilton College**, June 7, 2019.

- "Impact of Right to Carry Laws on Violent Crime," Public Policy colloquium, **Stanford Economics Department**, January 22, 2018; SPILS Methods Workshop, **Stanford Law School**, January 25, 2018; Quantlaw, **University of Arizona Law School**, March 2, 2018; Stanford/Berkeley Causal Inference Conference, **Stanford Graduate School of Business**, April 23, 2019; **Baldy Center/Law School Distinguished Speaker Series**, University at Buffalo School of Law, May 3, 2019; Conference on "Synthetic Controls and Related Methods," **Institute for Data, Systems, and Society, MIT**, May 21, 2019.

- "Guns, Abortion, and the Death Penalty: Informing Policy Through Empirical Research," Politics and Public Policy Lecture Series, **Stanford University**, April 1, 2019.

- "Dangers of Guns Carried Outside the Home for Protection," **GVPedia Conference**, Denver, Colorado, April 6, 2019.

- "Understanding California's Red Flag Law: How to Remove Guns from People Who Are a Threat to Themselves or Others," **Stanford Law School**, February 12, 2019.

- "Guns and Crime: Current Empirical and Legal Debates," **Fellowship Forum**, January 22, 2019.

- "Gun Policy in America at a Critical Juncture," SAFE, **Stanford Medical School**, September 17, 2018.

- "Empirical Evaluation of Law and Policy: The Battle for Truth," **Woodside Rotary Club**, September 12, 2018.

14

- "Discussing America's Second Amendment," **San Jose Museum of Quilts & Textiles**, July 15, 2018.

- "The Legal Battle to End the Death Penalty in Connecticut," **Law School of the University of Reggio Calabria,** Italy, June 15, 2018.

- Panelist, "Newtown and Gun Violence in the US, Humanity is Indivisible Series, **Stanford University**, May 31, 2018.

- "Gun Policy In California and the US," Human Rights Seminar; **Stanford Medical School**, May 29, 2018.

- "Gun Policy in the Wake of Parkland," Sigma Alpha Epsilon Leadership Speaker Series, **Stanford Law School**, March 13, 2018; Stanford in Government event, Haas Center, **Stanford University**, April 20, 2018.

- Panelist, Town Hall Meeting on Gun Violence with Congresswoman Jackie Speier, **Burlingame High School**, April 14, 2018.

- Moderator, In Studio Conversation with Berkeley Law School Dean Erwin Chemerinsky: "Defining the Limits of Free Speech," **Palo Alto League of Women's Voters**, March 27, 2018. https://youtu.be/cqHEIAVoTLY

- "More than Thoughts & Prayers," **American Constitution Society** and the **Federalist Society, U.C. Hastings School of Law**, March 14, 2018.

- Panelist, "Addressing Gun Violence," **American Constitution Society**, Stanford Law School, March 8, 2018.

- Panelist, "Public Carry: Defending Against Efforts to Expand Carry Laws," **National Gun Violence Prevention Meeting**, Washington, D.C., October 18, 2017.

- "Keynote Presentation: Right-to-Carry Laws and Violent Crime," Second Amendment Litigation & Jurisprudence Conference, **The Law Center to Prevent Gun Violence**, October 16, 2017.

- "The Latest Evidence on Abortion Legalization and Crime," Conference on Empirical Legal Studies, **Cornell University**, October 13, 2017.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," **University of Texas School of Law and Economics Seminar,** April 24, 2017, Faculty Workshop, **UC Davis School of Law**, April 10, 2017; Law and Social Science Seminar, **Texas A&M University School of Law**, March 6, 2017; Quantlaw, **University of Arizona Law School**, February 17, 2017.

- Debate with Kent Scheidegger on Capital Punishment, Philosophy of Punishment Seminar, **JFK University School of Law,** March 18, 2017.

- "The Evidence on Guns and Gun Laws," **Federal Bar Council Program on Guns and Gun Laws** -- Rancho Mirage, California, February 23, 2017.

- "Guns, Crime and Race in America," Stanford's Center for Population Health Sciences, **Stanford Medical School**, October 17, 2016.

- "Evaluating the Death Penalty," Forum on California Propositions 62 and 66, **Stanford Law School**, September 14, 2016.

- "Empirical Analysis and the Fate of Capital Punishment," Colloquium, Presley Center for Crime and Justice Studies; **University of California, Riverside**, October 24, 2016.

- "Gun Violence and Mental Illness," Department of Psychiatry, **Stanford University**, August 25, 2016.

- "The Battle Over Gun Policy In America," Physicians and Social Responsibility" seminar; **Stanford Medical School**, October 3, 2016; **Bioethics Committee of the San Mateo County Medical Association**, April 27, 2016; **The League of Women Voters of Palo Alto**, April 19, 2016; Human Rights and Health Seminar, **Stanford**

15

**University**, April 12, 2016; Bechtel International Center, **Stanford University**, February 23, 2016; Stanford in Government Seminar, Haas Center, **Stanford University**, February 2, 2016.

- American Economic Association Continuing Education Course "The Economics of Crime" (with Jens Ludwig), **AEA Annual Meeting**, San Francisco, January 5-7, 2016.

- "Race and Arbitrariness in the Connecticut Death Penalty," **University of Connecticut School of Law**, Nov. 20, 2015.

- *"Connecticut v. Santiago* and the Demise of the Connecticut Death Penalty," Faculty Workshop, **Stanford Law School**, August 19, 2015.

- "Do Handguns Make Us Safer? A State-Level Synthetic Controls Analysis of Right-to-Carry Laws," Second Amendment Conference, **Covington and Burling, New York**, May 14,  2015; **NBER Summer Institute**, Cambridge, MA, July 23, 2015; Faculty Workshop, **Stanford Law School**, November 11, 2015.

- "U.S. Criminal Justice Under Siege : Will Becker or Beccaria Prevail?" Faculty Seminar, **Bocconi University School of Law, Milan, Italy**, June 18, 2015.

- "Can You Believe Econometric Evaluations of Law, Policy, and Medicine?" **Stanford Law School**, Legal Theory Workshop, March 1, 2007; Faculty Workshop, **Tel Aviv University School of Law**, May 14, 2007; Faculty Workshop, **University of Haifa Law School**, May 16, 2007; Law and Economics Workshop, **Georgetown Law School**, September 19, 2007; Law and Economics Workshop, **St. Gallen Law School**, Switzerland, November 29, 2007; and Yale Law School, February 25, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 21, 2008; Faculty Workshop, **University of Virginia Law School,** October 24, 2008; Plenary Session, Latin American and Caribbean Law and Economics Association, **Universitat Pompeu Fabra (Barcelona),** June 15, 2009; **Google, Milan**, Italy, June 8, 2015.

- Commentator: ""Throw Away the Jail or Throw Away The Key? The Effect of Punishment on Recidivism and Social Cost,"" by Miguel F. P. de Figueiredo, American Law and Economics Association Meetings, **Columbia Law School**, May 15, 2015.

- "Broken Windows, Stop and Frisk, and Ferguson," 2015 Justice Collaboratory Conference: Policing Post-Ferguson, **Yale Law School**, April 17, 2015.

- "Assessing the Development and Future of Empirical Legal Studies," **Stanford Law School** course on Modern American Legal Thought, February 25, 2015.

- Commentator:  "Payday Lending Restrictions and Crimes in the Neighborhood," by Yilan Xu, 9th Annual Conference on Empirical Legal Studies, **Boalt Hall**, Berkeley, CA, November 7,  2014.

- "An Empirical Evaluation of the Connecticut Death Penalty Since 1973:  Are There Unconstitutional Race, Gender and Geographic Disparities?" Faculty Workshop, **Economics Department, Rice University**, Houston, TX, Feb. 18, 2014; Law and Economics Workshop, **University of Virginia Law School**, September 11, 2014; Faculty Colloquium, **University of San Diego School of Law**, October 3, 2014.

- "What's Happening to the Death Penalty?  A Look at the Battle in Connecticut," **Hamilton College**, Clinton, New York, June 6, 2014.

- Panel Member, Research Methods Workshop, Conference for Junior Researchers on Law and Society, **Stanford Law School,** May 15, 2014.

- "Logit v. OLS: A Matter of Life and Death," Annual Meeting of the American Law and Economics Association, **University of Chicago**, May 9, 2014.

16

- "Guns: Law, Policy, Econometrics," Second Amendment Litigation and Jurisprudence Conference, **Jenner & Block**, Chicago, May 8, 2014.

- "The Impact of Antidiscrimination Law:  The View 50 Years after the Civil Rights Act of 1964," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Concealed Carry and Stand Your Ground Law," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Reducing Gun Violence," Forum on Gun Violence Reduction, **Mountainview City Hall**, Mountainview, CA, Feb. 8, 2014.

- "Gun Policy Debate," **C-SPAN**. National Cable Satellite Corporation, Jan. 16, 2014. <http://www.c-span.org/video/?317256-1/GunPoli>.

- "Trial and Decision in the Connecticut Death Penalty Litigation," Faculty Workshop, **Stanford Law School**, November 20, 2013.

- "Rethinking America's Illegal Drug Policy," Law and Economics Workshop, **Harvard Law School**, April 20, 2010; NBER Conference, "Economical Crime Control," **Boalt Hall**, Berkeley, CA, January 16,  2010; **NBER Summer Institute** Pre-Conference "Economical Crime Control," July 23, 2009; **Whitney Center** Lecture Series, Hamden, CT, October 5, 2009; Law and Economics Workshop, **University of Chicago Law School**, October 13, 2009; Seminar for Spanish Law Professors, **Harvard Law School**, October 23, 2009; The Criminal Law Society, **Stanford Law School**, March 31, 2011, **University of Denver Sturm College of Law**, April 21, 2011; Law and Economics Workshop, **Boalt Hall**, Berkeley, CA, October 17, 2011; Shaking the Foundations Conference, **Stanford Law School**, November 2, 2013.

- "The Challenge to the Connecticut Death Penalty," **Yale Law School**, Death Penalty Clinic, November 5, 2007; Graduate Student Seminar, November 11, 2009; Stanford Program in International Legal Studies Seminar, **Stanford Law School**, Nov. 11, 2010; Faculty Workshop, **Stanford Law School**, June 8, 2011; Faculty workshop, **Duke Law School**, April 13, 2012; Program on Public Policy, **Stanford University**, May 2, 2012; Annual Meeting of the American Law and Economics Association, **Vanderbilt Law School**, Nashville, TN, May 18, 2013; Faculty Workshop, **University of Arizona Law School**, October 17, 2013;  8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 26, 2013.

- Commentator: "How to Lie with Rape Statistics" by Corey Rayburn Yung, 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 2013.

- "An Empirical Look at Gun Violence in the U.S." **University of Arizona Law School**, October 17, 2013

- Discussant, "Sex Offender Registration and Plea Bargaining," **NBER Labor Summer Institute**, Cambridge, MA, July 25, 2013.

- "What Works in the War Against Crime?"  **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Seminar Presentation, "Statistics and the Streets – Curbing Crime, Realities of the Death Penalty, and Successes in Public Safety," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Stemming Gun Violence," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- "Can Laws Reduce Crime?" Safe Oakland Speakers Series, Holy Names University, Oakland, CA, May 1, 2013, http://www.ustream.tv/channel/safe-oakland-speaker-series

- Presentation on "The Death Penalty in America" on a panel on "human rights and criminal justice systems in the world," Science for Peace conference at Bocconi University in Milan, Italy, November 15, 2012. http://

17

www.fondazioneveronesi.it/scienceforpeace2012/

- Seminar Presentation, "America's Criminal Justice System," **Renaissance Weekend**, Santa Monica, CA., Feb. 19, 2012.

- "Statistical Inference, Regression Analysis and Common Mistakes in Empirical Research," SPILLS Fellow's Workshop, **Stanford Law School**, February 2, 2012.

- "New Evidence in the 'More Guns, Less Crime' Debate: A Synthetic Controls Approach," Conference on Empirical Legal Studies, **Northwestern Law School**, November 4, 2011.

- "Drug Legalization and its Alternatives," *Lessons from the Economics of Crime: What Works in Reducing Offending?* **CESifo Venice Summer Institute Workshop,** July 22 , 2011.

- "Incapacitating Addictions: Drug Policy and American Criminal Justice," in Rethinking the War on Drugs through the US-Mexico Prism," **Yale Center for the Study of Globalization**, May 12, 2011.

- Plenary Session: Flashes of Genius (Glimpses of <u>Extra</u>-ordinarily Novel Thinking) -- "Has Legalized Abortion Reduced Crime?" **Renaissance Weekend**, Liguna Niguel, CA., Feb. 18, 2011.

- "An Evidence-Based Look at the More Guns, Less Crime Theory (after Tucson)" The American Constitution Society for Law and Policy (ACS), **Stanford Law School**, January 25, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 19, 2011; "Faculty Forum" at the External Relations Office, **Stanford Law School**, April 5, 2011.

- "Empirical Evaluation of Law: The Dream and the Nightmare," SPILS Fellows Lecture, **Stanford Law School**, January 15, 2015; Legal Studies Workshop, **Stanford Law School**, Feb. 7, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 20, 2011; **University of Denver Sturm College of Law**, April 22, 2011; Presidential Address, Annual Meeting of the American Law and Economics Association, **Columbia University**, May 20, 2011.

- Death Sentencing in Connecticut," **American Society of Criminology Annual Meeting**, San Francisco, Nov. 17, 2010.

- "The Impact of Right to Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Comment on Bushway and Gelbach, "Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Commentator, "A Test of Racial Bias in Capital Sentencing," **NBER Political Economy Program Meeting**, April 23, 2010.

- "The (Lack of a) Deterrent Effect of Capital Punishment," Faculty Workshop, **University of Chicago Economics Department**, October 21, 2009.

- Keynote Address, "The Evolution of Econometric Evaluation of Crime and Deterrence,"1st Paris& Bonn Workshop on Law and Economics: The Empirics of Crime and Deterrence, **University of Paris Ouest Nanterre,** September 24, 2009.

- Comment on Cook, Ludwig, and Samaha, "Gun Control after *Heller*: Litigating Against Regulation," NBER Regulation and Litigation Conference, **The Boulders**, Carefree, Arizona, September 11, 2009.

- "Impact of the Death Penalty on Murder in the US," Faculty Workshop, Law School, **Universitat Pompeu Fabra (Barcelona),** June 18, 2009.

- Comment on Joanna Shepherd's "The Politics of Judicial Opposition," Journal of Institutional and Theoretical Economics Conference, **Kloster Eberbach, Germany**, June 12, 2009.

18

- "The Great American Crime Drop of the '90s:  Some Thoughts on Abortion Legalization, Guns, Prisons, and the Death Penalty," **Hamilton College**, Clinton, NY, June 5, 2009.

- "The Impact of the ADA on the Employment and Earnings of the Disabled," **American Law and Economics Association Meetings**, University of San Diego, May 15, 2009.

- "Crime and Punishment in the United States," **Eastern State Penitentiary, Yale Alumni Event**, Philadelphia, PA, April 26, 2009.

- "Measuring Culpability in Death Penalty Cases," Conference on Applications of Economic Analysis in Law, **Fuqua School of Business, Duke University,** April 18, 2009.

- "Autopsy of a Financial Crisis," Workshop on New International Rules and Bodies for Regulating Financial Markets, **State University of Milan**, March 23, 2009.

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell, Law and Economics Workshop**, NYU Law School**, March 10, 2009.

- Intelligence-Squared Debate:  "Guns Reduce Crime," **Rockefeller University**, New York, October 28, 2008.

- "The D.C. Handgun Controls: Did the Supreme Court's Decision Make the City Safer?" Debate, **The Contemporary Club of Albemarle**, Charlottesville, VA, October 23, 2008.

- "Evaluating the Empirical Claims of the Woman-Protective Anti-Abortion Movement,"  Panel on The Facts of the Matter: Science, Public Health, and Counseling, Yale Conference on the Future of Sexual and Reproductive Rights, **Yale Law School**, October 11, 2008.

-  "Empirical Evaluation of Gun Policy," **Harvard Law School**, October 9, 2008.

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous  Decades and the Benefits on the Margin," **Russell Sage Foundation**, New York, May 3,   2007; Law and Economics Workshop, **Tel Aviv University School of Law**, May 28, 2008.

- Death Penalty Debate with Orin Kerr, Bloggingheads, April 11, 2008.

- "Evaluating Connecticut's Death Penalty Regime," Faculty Public Interest Conversation, **Yale Law School**, April 9, 2008.

- "The Death Penalty in Connecticut and the United States," **The Whitney Center**, Hamden, CT, November 5, 2007; Seminar on Advanced Criminal Law:  Criminal Sentencing and the Death Penalty, **Fordham Law School**, April 8, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 20, 2008.

- Radio Interview, "The Death of Capital Punishment?" Morning Edition: Where We Live. WNPR. Connecticut, March 10, 2008.

- Comment on Thomas Dee's "Born to Be Mild: Motorcycle Helmets and Traffic Safety," **American Economics Association Meetings**, New Orleans, Louisiana, January 4, 2008.

- "The Empirical Revolution in Law and Policy:  Jubilation and Tribulation," **Keynote Address, Conference on Empirical Legal Studies, NYU Law School,** Novermber 9, 2007.

- "The Optimal Rate of Incarceration," **Harvard Law School**, October 26, 2007.

- "Empirical Evaluation of Law:  The Impact on U.S Crime Rates of Incarceration, the Death Penalty, Guns, and Abortion," Law and Economics Workshop, **St. Gallen Law School, Switzerland**, June 25, 2007.

- Comment on Eric Baumer's "A Comprehensive Assessment of the Contemporary Crime Trends Puzzle," Committee on Law and Justice Workshop on Understanding Crime Trends, **National Academy of Sciences**, Washington, D.C., April 25, 2007.

- Comment on Bernard Harcourt, Third Annual Criminal Justice Roundtable Conferemce, **Yale Law School, "**Rethinking the Incarceration Revolution Part II:  State Level Analysis," April 14, 2006.

- "Corporate Governance in America:  The Disney Case," **Catholic University Law School**, Milan, Italy, March 19, 2007.

- "The U.S Tort System," (Latin American) Linkages Program, **Yale Law School**, February 13, 2007.

- Panel Member, "Guns and Violence in the U.S.," **Yale University, International Center**, January 24, 2007.

- **"**Economic Models of Crime and Punishment," Punishment:  The U.S. Record:  A Social    Research Conference at **The New School**, New York City, Nov. 30, 2006

- Comment on Baldus et al, "Equal Justice and the Death Penalty:  The Experience fo the United States Armed Forces, Conference on Empirical Legal Studies, **University of   Texas Law, School**, Austin, Texas, October 27, 2006.

- "Empirical Evaluation of Law:  The Promise and the Peril," **Harvard Law School**, October  26, 2006.

- "Estimating the Impact of the Death Penalty on Murder," Law and Economics Workshop, **Harvard Law School**, September 12, 2006; Conference on Empirical Legal Studies, **University of Texas Law School**, October 28, 2006; Joint Workshop, Maryland Population Research Center and School of Public Policy, **University of Maryland,** March 9, 2007.

- "Why Are Auto Fatalities Dropping so Sharply?" **Faculty Workshop, Wharton**, Philadelphia, PA, April 19, 2006.

- "The Law of Racial Profiling," Law and Economic Perspectives on Profiling Workshop, **Northwestern University Department of Economics**, April 7, 2006.

- "Landmines and Goldmines:  Why It's Hard to Find Truth and Easy To Peddle Falsehood in Empirical Evaluation of Law and Policy," **Rosenthal Lectures, Northwestern University School of Law**, April 4-6, 2006.

- "The Impact of Legalized Abortion on Crime," **American Enterprise Institute**, March 28, 2006.

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences,"**Conference on Medical Malpractice, The Rand Corporation**, March 11, 2006.

- "Powerful Evidence the Death Penalty Deters?" **Leighton Homer Surbeck Chair Lecture, Yale Law School**, March 7, 2006.

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," Faculty Workshop, **University of Connecticut Law School,** October 18, 2005; Faculty Workshop, **UCLA Law School,** February 3, 2006; Law and Economics Workshop, **Stanford Law School**, February 16, 2006; ; Law Faculty, **University of Cambridge, Cambridge, England**, February 28, 2006; **University of Illinois College of Law,** Law and Economics Workshop, March 2, 2006; Faculty Workshop, **Florida State University Law School**, March 30, 2006; **ALEA**, Berkeley, CA May 6, 2006; **University of Chicago Law School,** Law and Economics Workshop, May 9, 2006.

- "Is Gun Control Illiberal?" Federalist Society Debate with Dan Kahan at Yale Law School,  January 31, 2006.

- "Witness to Deception:  An Insider's Look at the Disney Trial," **2005-2006 Distinguished Lecture, Boston University School of Law**, November 10, 2005; Center for the Study of Corporate Law, **Yale Law School**, November 3, 2005; **Law Offices of Herbert Smith, London, England**, February 23, 2006; Law Faculty, **University of Cambridge, Cambridge, England**, February 27, 2006.

- "Understanding the Surprising Fall in Crime in the 1990s," **Rotary Club**, Orange, CT, August 5, 2005; Faculty Workshop, **Yale School of Management**, September 21, 2005.

- Panel Member, "The Board's Role in Corporate Strategy," The Yale Global Governance Forum, **Yale School of Management**, September 8, 2005.

- "Crime and Abortion," **Museo de la Cuidad de Mexico**, Mexico City, October 20, 2003.

- "Allocating Resources towards Social Problems and Away From Incarceration as a Means of Reducing Crime," **MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice**, San Francisco, CA, February 28, 2003.

- "Shooting Down the More Guns, Less Crime Hypothesis," **Stanford Law School**, Law and Economics Seminar, January 28, 2003; Faculty Workshop, Center for the Study of Law and Society, **Boalt Hall**, University of California, Berkeley, Feb. 24, 2003; Development Workshop, **Stanford Law School**, April 25, 2003; Faculty Workshop, **Stanford Law School**, July 2, 2003; Law and Public Affairs Program Workshop, **Princeton University,** September 29, 2003; Stanford Alumni Weekend, **Stanford University**, October 17, 2003; Faculty Workshop, **CIDE**, Mexico City, October 20, 2003.

- "The Impact of Legalized Abortion on Teen Childbearing," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2002.

- "Do Concealed Handgun Laws Reduce Crime?" Faculty Workshop, **Stanford Law School**, October 4, 2000; First-Year Orientation, **Stanford Law School**, September 5, 2001; Faculty Workshop, **Harvard Law School**, April 26, 2002; Faculty Workshop, **Columbia Law School**, April 29, 2002.

- "The Evolution of Employment Discrimination Law in the 1990s: An Empirical Investigation," Fellows Workshop, American Bar Foundation, February 11, 2002.

- "The Role of Discounting in Evaluating Social Programs Impacting on Future Generations:  Comment on Arrow and Revesz," Colloquium on Distributive Justice, **Stanford Law School**, Oct. 18, 2001.

- "The Impact of Wrongful Discharge Laws," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2001; Labor and Employment Seminar, **NYU Law School**, October 16, 2001; Faculty Workshop, **Stanford Law School**, September 18, 2002;  **Yale Law School**, January, 2004.

- "Racial Profiling:  Defining the Problem, Understanding the Cause, Finding the Solution," **American Society of Criminology Conference**, San Francisco, CA, November 15, 2000.

- "Institutional Architecture for Building Private Markets," Conference on "Latin America and The New Economy" at **Diego Portales University** in Santiago, Chile, October 26, 2000.

- "The History and Current Status of Employment Discrimination Law in the United States," Unicapital School of Law, (Centro Universitario Capital), Sao Paulo, Brazil, March 10, 2000.

- "Corporate Governance in Developing Countries:  Opportunities and Dangers," Conference on Neoliberal Policies for Development:  Analysis and Criticism," University of Sao Paulo Law School, March 13, 2000

- "Legalized Abortion and Crime," Law and Economics Workshop, **University of Pennsylvania Law School**, September 21, 1999; Faculty Workshop, **Yale Law School**, September 27, 1999; **John Jay College of Criminal Justice**, October 7, 1999; Faculty Workshop, **Quinnipiac Law School**, October 13, 1999; Faculty Workshop, **University of Connecticut Law School**, October 19, 1999; **University of Virginia Law School**, October 25, 1999; Faculty Workshop, **Baruch College**, November 9, 1999; MacArthur Foundation Social  Interactions and Economic Inequality Network Meeting, **Brookings Institution**, December 4, 1999; Faculty Workshop, **NYU Law School**, January 21, 2000; Faculty Workshop, **University of San Diego Law School**, February 18, 2000; Public Economics Workshop, Department of Economics, **Stanford University**, April 28, 2000; Law and Economics

Workshop, **University of California at Berkeley Law School**, September 18, 2000; Faculty Workshop, **Cornell Law School**, September 26, 2000; OB-GYN Grand Rounds, **Stanford Medical School**, October 2, 2000; **Center for Advanced Studies in the Behavioral Sciences,** October 11, 2000; Faculty Workshop, **Graduate School of Business**, February 5, 2002.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 23, 1999.

- "Exploring the Link Between Legalization of Abortion in the 1970s and Falling Crime in the 1990s," Law and Economics Workshop, **Harvard Law School**, March 16, 1999; Law and Economics Workshop, **University of Chicago Law School**, April 27, 1999; Faculty Workshop, **Stanford Law School**, June 30, 1999.

- "Is the Increasing Reliance on Incarceration a Cost-Effective Strategy of Fighting Crime?" Faculty Workshop**, University of Wisconsin School of Social Science**, February 19, 1999.

- "What Do We Know About Options Compensation?" Institutional Investors Forum**, Stanford Law School**, May 29, 1998.

- Commentator on Orlando Patterson's presentation on "The Ordeal of Integration," **Stanford Economics Department**, May 20, 1998.

- "Understanding The Time Path of Crime," Presentation at Conference on Why is Crime Decreasing? **Northwestern University School of Law**, March 28, 1998; Faculty Workshop, **Stanford Law School**, September 16, 1998; Faculty Workshop, **University of Michigan Law School**, February 18, 1999.

- Commentator, Conference on Public and Private Penalties, the **University of Chicago Law School**, Dec. 13-14, 1997.

- "Some Thoughts on Affirmative Action," Presentation at a conference on Rethinking Equality in the Global Society, **Washington University School of Law**, November 10, 1997.

- Commentator on Chris Jencks' Presentation on Welfare Policy, **Stanford Economics Department**, October 8, 1997.

- "The Impact of Race on Policing, Arrest Patterns, and Crime," Faculty Workshop, **Stanford Law School**, September 10, 1997; Law and Economics Workshop, **University of Southern California Law School**, October 23, 1997; Law and Economics Workshop, **Columbia University Law School**, November 24, 1997; Law and Economics Workshop, Haas School of Business**, University of California at Berkeley**, February 19, 1998; Annual Meeting of the American Law and Economics Association, **University of California at Berkeley**, May 8, 1998; Conference on the Economics of Law Enforcement, **Harvard Law School**, October 17, 1998.

- "Crime in America:  Understanding Trends, Evaluating Policy," **Stanford Sierra Camp**, August 1997.

- "Executive Compensation: What Do We Know?"  TIAA-CREF Committees on Corporate Governance and Social Responsibility, Center for Economic Policy Research, **Stanford University**, June 27, 1997; NASDAQ Director's Day, **Stanford University**, June 30, 1997.

- Panel Chair, Criminal Law (Theory), Criminal Law (Empirical), and Labor/Discrimination/Family Law, American Law and Economics Association, **University of Toronto Law School**, May 9-10, 1997.

- Commentator, "Diversity in Law School Hiring," **Stanford Law School**, February 25, 1997.

- Keynote Speaker, "The Optimal Rate of Crime," 11th Annual Conference, **The Oklahoma Academy for State Goals**, Tulsa, Oklahoma, May 7, 1996.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 28-29, 1996.

22

- "The Power of Law: Can Law Make a Difference in Improving the Position of Women and Minorities in the Labor Market?" The Fellows of the **American Bar Foundation**, Baltimore, Maryland, February 3, 1996.

- "Public Action, Private Choice and Philanthropy: Understanding the Sources of Improvement in Black Schooling Quality in Georgia, 1911-1960," **Stanford Faculty Workshop**, January 24, 1996; Faculty Workshop, **University of Virginia Law School**, January 22, 1997; **National Bureau of Economic Research**, Cambridge, Massachusetts, Labor Studies Conference, April 3, 1998.

- Commentator, "The Effect of Increased Incarceration on Crime," Meetings of the **American Economics Association**, San Francisco, January 6, 1996.

- Commentator, Symposium on Labor Law, **University of Texas Law School**, November 10-11, 1995.

- Panel Member, Symposium on Criminal Justice, **Stanford Law School**, October 6-7, 1995.

- Commentator, "The Litigious Plaintiff Hypothesis," Industrial and Labor Relations Conference, **Cornell University**, May 19, 1995.

- Commentator on Keith Hylton's, "Fee Shifting and Predictability of Law," Faculty Workshop, **Northwestern University School of Law**, February 27, 1995.

- "The Selection of Employment Discrimination Disputes for Litigation: Using Business Cycle Effects to Test the Priest/Klein Hypothesis," **Stanford University**, Law and Economics Seminars, October 31, 1994.

- "Is the United States at the Optimal Rate of Crime?" Faculty Workshop, **Indiana University School of Law**, Indianapolis, November 18, 1993; Faculty Workshop, **Northwestern University School of Law**, April 18, 1994; Law and Economics Workshop, **Stanford Law School**, April 28, 1994; Meetings of the American Law and Economics Association, **Stanford Law School**, May 13, 1994; **American Bar Foundation**, September 7, 1994; Faculty Workshop, **DePaul Law School**, September 21, 1994; Law and Economics Workshop, **University of Chicago Law School**, October 11, 1994; Faculty Seminar, **Stanford Law School**, October 31, 1994; Law and Economics Luncheon, **Stanford Law School**, November 1, 1994; Faculty Seminar Workshop, **University of Illinois College of Law**, Champaign, November 22, 1994; Law and Economics Workshop, **Harvard Law School**, November 29, 1994; School Alumni Luncheon, Chicago Club, December 13, 1994; **Northwestern Law School**; Law and Economics Workshop, **Yale Law School**, February 1, 1996; Faculty Workshop, **Cornell Law School**, April 10, 1996; Faculty Workshop, **Tokyo University Law School**, June 4, 1996; Panel on "The Economics of Crime," **Western Economics Association** Meeting, San Francisco, July 1, 1996.

- "The Broad Path of Law and Economics," Chair Ceremony, **Northwestern University School of Law**, September 30, 1994.

- Commentator on Paul Robinson's "A Failure of Moral Conviction," **Northwestern University School of Law**, September 20, 1994.

- "The Do's of Diversity, The Don'ts of Discrimination," Kellogg School of Business, **Northwestern University**, May 17, 1994.

- "Does Law Matter in the Realm of Discrimination?" **Law and Society Summer Institute**, Pala Mesa Lodge, Fallbrook, California, June 25, 1993.

- Commentator, "The Double Minority: Race and Sex Interactions in the Job Market," Society for the Advancement of Socio-Economics, **New School for Social Research**, March 28, 1993.

- "The Effects of Joint and Several Liability on Settlement Rates: Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," <u>Economic Analysis of Civil Procedure</u>, **University of Virginia School of Law**, March 26, 1993.

- Debate with Richard Epstein on Employment Discrimination Law, **Chicago Federalist Society**, February 23, 1993.

- Panel Chair, "Optimal Sanctions and Legal Rules in Tort and Criminal Law," Meetings of Annual Association of Law and Economics, **Yale Law School**, May 15, 1992.

- Panel Member, "The Law and Economics of Employment at Will," **The Institute For Humane Studies**, Fairfax, Virginia, March 27, 1992.

- "The Efficacy of Title VII," Debate with Professor Richard Epstein, **University of Chicago Law School**, February 26, 1992.

- Moderator, "Using Testers to Demonstrate Racial Discrimination," **University of Chicago Law School**, February 13, 1992.

- "Law & Macroeconomics:  The Effect of the Business Cycle on Employment Discrimination Litigation," Law and Society Workshop, **Indiana University**, November 6, 1991; Faculty Workshop, **University of North Carolina Law School**, Chapel Hill, November 8, 1991; Faculty Workshop, **Northwestern University School of Law**, December 11, 1991; Law and

- Economics Conference, **Duquesne Law School**, March 14, 1992; **University of Chicago Law School**, April 2, 1992.

- Panel Chair and Commentator, "New Perspectives on Law and Economics," **Society for the Advancement of Socioeconomics**, Stockholm, June 17, 1991; **Law and Society Meetings**, Amsterdam, June 29, 1991.

- Panel Chair, "Regulation of International Capital Markets," **Law and Society Meetings**, Amsterdam, June 27, 1991.

- Panel Chair, "The Law and Economics of Discrimination," American Association of Law and Economics, **University of Illinois Law School**, May 24, 1991.

- "The Economics of Employment Discrimination Law," **Industrial Relations Research Association**, Chicago, Illinois, March 4, 1991.

- "Does Current Employment Discrimination Law Help or Hinder Minority Economic Empowerment?"  Debate with Professor Richard Epstein, The Federalist Society, **Northwestern Law School**, February 26, 1991.

- Panel Member, "The Law and Economics of Employment Discrimination," **AALS Annual Meeting**, Washington, D.C., January 6, 1991.

- "Re-Evaluating Federal Civil Rights Policy," Conference on the Law and Economics of Racial Discrimination in Employment, **Georgetown University Law Center**, November 30, 1990.

- "Opting for the British Rule," Faculty Seminar, **Northwestern Law School**, September 11, 1990; Faculty Seminar, **University of Virginia Law School**, September 14, 1990; Law and Economics Seminar, **University of Michigan Law School**, October 18, 1990; Faculty Workshop, **NYU Law School**, November 14, 1990; Faculty Workshop, **University of Florida Law School**, March 18, 1991.

- "The Effects of Fee Shifting on the Settlement Rate:  Theoretical Observations on Costs, Conflicts, and Contingency Fees," at the **Yale Law School Conference** "Modern Civil Procedure:  Issues in Controversy," June 16, 1990.

- "Studying the Iceberg From Its Tip?:  An Analysis of the Differences Between Published and Unpublished Employment Discrimination Cases," **Law and Society Meetings**, Berkeley, California, May 31, 1990.

- Panel Discussion on Tort Reform, **University of Pennsylvania Law School**, April 27, 1990.

24

- Panel Discussion of "The Role of Government in Closing the Socio-Economic Gap for Minorities," at the Federalist Society National Symposium on "The Future of Civil Rights Law," **Stanford Law School**, March 16, 1990.

- "Continuous versus Episodic Change:  The Impact of Affirmative Action and Civil Rights Policy on the Economic Status of Blacks," **University of Virginia Economics Department**, February 15, 1990; **Princeton University Department of Economics**, February 21, 1990 (with James Heckman); Law & Economics Workshop, **University of Toronto Law School**, October 8, 1991.

- "Sex Discrimination in the Workplace:  An Economic Perspective," Fellows Seminar, **American Bar Foundation**, October 16, 1989.

- "The Changing Nature of Employment Discrimination Litigation," Law and Economics Workshop, **Columbia Law School**, March 23, 1989; Faculty Seminar, **University of Virginia Law School**, March 24, 1989; Law and Economics Workshop, **University of Chicago**, April 25, 1989; **Law & Society Meeting**; Madison, Wisconsin, June 8, 1989; Labor Economics Workshop, **University of Illinois**, Chicago, November 1, 1989; Law & Economics Workshop, **University of Pennsylvania Law School**, November 9, 1989; Law and Economics Seminar, **University of California at Berkeley**, October 4, 1990; Law and Social Science Workshop, **Northwestern University**, February 3, 1991; Law and Economics Seminar, **Stanford Law School**, March 21, 1991; Faculty Workshop, **Cornell Law School**, April 3, 1991; Visiting Committee, **Northwestern Law School**, April 5, 1991.

- "Law & Economics:  The Third Phase," The Association of General Counsel, **Northwestern University School of Law**, October 14, 1988.

- "Employment Discrimination Litigation," **Northwestern Law School** Alumni Monthly Loop Luncheon.  **Chicago Bar Association**, May 31, 1988.

- "The Morality of the Death Penalty."  A debate with Ernest Van Den Haag. **Northwestern University School of Law**, April 19, 1988.

- "Models of Deregulation of International Capital Markets."  A presentation with David Van Zandt, Faculty Seminar, **Northwestern University School of Law**, April 1, 1988; Visiting Committee, May 5, 1988.

- "Is Title VII Efficient?"  A debate with Judge Richard Posner, Faculty Seminar, **Northwestern University School of Law**, November 20, 1987.

- "The Senate's Role in Confirming Supreme Court Nominees:  The Historical Record," **Northwestern University School of Law**, September 22, 1987.

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," **Yale Law School** Civil Liability Workshop, March 30, 1987; Faculty Seminar, **Northwestern University School of Law**, March 18, 1987; **University of Southern California Law Center**, May 1, 1987; and Seminar in Law and Politics, Department of Political Science, **Northwestern University**, May 8, 1987; Labor Workshop, Department of Economics, **Northwestern University**, October 27, 1987; **AALS Annual Meeting**, New Orleans, January 7, 1989.

- "Women in the Labor Market--Are Things Getting Better or Worse?"  **Hamilton College**, February 23, 1987.

- "The Changing Relative Quit Rates of Young Male and Female Workers," **Hamilton-Colgate Joint Faculty Economics Seminar**, February 23, 1987.

- "Living on Borrowed Money and Time--U.S. Fiscal Policy and the Prospect of Explosive Public Debt," **Orange Rotary Club**, February 22, 1985.

- "Capital Punishment in the Eighties," **Hamilton College**, April 6, 1981.

- "Terms and Conditions of Sale Under the Uniform Commercial Code," Executive Sales Conference, **National Machine Tool Builders' Association**, May 12, 1980.

## AWARDS

- **47th Tikkun Olam Award**, The Haiti Jewish Refugee Legacy Project, February 2014, "Awarded for incredibly significant work that explores and inspires the search for justice and taking serious, correct and timely action." Tikkun Olam is a Hebrew phrase that means 'repairing the world.' https://haitiholocaustsurvivors.wordpress.com/guest-posts/47th-tikkun-olam-award-to-professor-john-j-donohue-iii/

## PROFESSIONAL ACTIVITIES

- Member, USF Institute for Nonviolence and Social Justice Leadership Council, University of San Francisco, June 2021 – present.

- Member, Criminal Justice Expert Panel, @CJExpertPanel, providing information on the relevance of criminal justice research to current events, beginning April 2021.

- Statistical Consultant to the Fairness Committee of the 9th Circuit Court of Appeals investigating issues of sentencing disparities by race, ethnicity, and gender in federal criminal sentencing, March 2018 – March 2020.

- Legal Scholarship Network Advisory Board Member, SSRN.

- Member, Committee on Law and Justice, National Research Council, October 2011 – December 2018.

- Fellow of the Society for Empirical Legal Studies, 2015 - present.

- Member, International Advisory Council, Economic Order Study Center, Federal University of San Paolo, Brazil.

- Co-Editor (with Steven Shavell), American Law and Economics Review, May 2006 – August 2012.

- President, American Law and Economics Association, May 2011 – May 2012.

- Co-President, Society for Empirical Legal Studies, November 2011 - August 2012.  Member, Board of Directors from November 2011 - November 2014.

- Testified before the Connecticut Legislature in Support of Senate Bill 1035 and House Bill 6425 (A Bill to Eliminate the Death Penalty), March 7, 2011; Testified again before the Connecticut Judiciary Committee on March 14, 2012.

- Member of the Special Committee on ALI Young Scholars Medal, October 2009 – February 2011.

- Vice-President/President Elect, American Law and Economics Association, June 2010 – May 2011.

- Secretary-Treasurer, American Law and Economics Association, June 2009 – May 2010.

- Board of Advisors, Yale Law School Center for the Study of Corporate Law, July 2004 – August 2010.

- Evaluated the Connecticut death penalty system: "Capital Punishment in Connecticut, 1973-2007: A Comprehensive Evaluation from 4600 murders to One Execution," http://works.bepress.com/john_donohue/137/.

- Member, Panel on Methods for Assessing Discrimination, National Academy of Sciences, September 2001 – June 2004.  Resulting Publication:  National Research Council, Measuring Racial Discrimination (2004), http://www.nap.edu/catalog/10887.html.

- Member, National Science Foundation Review Panel, Law and Social Sciences, September, 1999 – April 2001.

- Editorial Board, <u>Journal of Empirical Legal Studies</u>, July 2003 – present.

- Editorial Board, <u>International Review of Law and Economics</u>, October 1999 – present.

- Editorial Board, <u>Law and Social Inquiry</u>, February 2000 – present.

- Board of Editors, <u>American Law and Economics Review</u>, August 1998 – April 2013.

- Consultant, Planning Meeting on Measuring the Crime Control Effectiveness of Criminal Justice Sanctions, National Academy of Sciences, Washington, D.C., June 11, 1998.

- Member, Board of Directors, American Law and Economics Association, June 1994-May 1997. Member, ALEA Nominating Committee, July 1995-May 1996.  Member, Program Committee, July 1996-May 1998 and July 2000 – May 2002.

- Statistical Consultant, 7th Circuit Court of Appeals Settlement Conference Project (December, 1994).

- Testified before U.S. Senate Labor Committee on evaluating the Job Corps, October 4, 1994.

- Assisted the American Bar Association Standing Committee on the Federal Judiciary in evaluating the qualifications of Ruth Bader Ginsburg (June 1993) and David Souter (June, 1990).

- Chair, AALS Section on Law and Economics, January 1990-January 1991.

- Economic Consultant to Federal Courts Study Committee.  Analyzing the role of the federal courts and projected caseload for Judge Richard Posner's subcommittee.  February 1989-March 1990.

- Member, 1990 AALS Scholarly Papers Committee.

- Member, Advisory Board, Corporate Counsel Center, Northwestern University School of Law.  Since December 1987.

- Associate Editor, <u>Law and Social Inquiry</u>.  Summer 1987-December 1989.

- Interviewed Administrative Law Judge candidates for U.S. Office of Personnel Management.  Chicago, Illinois. May 23, 1988.

- Member, Congressman Bruce Morrison's Military Academy Selection Committee.  Fall 1983.

- 1982 Candidate for Democratic Nomination, Connecticut State Senate, 14th District (Milford, Orange, West Haven).

## PRO BONO LEGAL WORK

- Co-wrote amicus brief for the United States Supreme Court for "Public Health Researchers and Social Scientists in Support of Respondents" in *New York State Rifle & Pistol Association v. City of New York*, which quotes my article *Right-to-Carry Laws and Violent Crime* in the brief, August 12, 2019.

- Death Penalty case:  <u>Heath v. Alabama</u>.  Fall 1986-Fall 1989.

- Wrote brief opposing death sentence in Navy spy case.  Court ruled in favor of defendant John A. Walker on September 13, 1985.

- Staff Attorney, Neighborhood Legal Services, January-July 1981.

- Appealed sentence of death for Georgia defendant to the United States Supreme Court.  Sentence vacated on May 27, 1980.  <u>Baker v. Georgia</u>.

- Court-appointed representation of indigent criminal defendant in District of Columbia Superior Court, February-July 1980.

## RESEARCH GRANTS

- Stanford University Research Fund, January 1997 and January 1998.

- The National Science Foundation (project with James Heckman), December 1992; (project with Steve Levitt), July 1997.

- Fund for Labor Relations Studies, University of Michigan Law School, March 1988.

## BAR ADMISSIONS

- Connecticut - October 1977; District of Columbia - March 1978 (Currently Inactive Status); United States Supreme Court - November 3, 1980; U.S. District Court for the District of Connecticut – February 14, 1978.

## PROFESSIONAL and HONORARY ASSOCIATIONS

- American Academy of Arts and Sciences (since April 2009).

- Research Associate, National Bureau of Economic Research (since October 1996) – in Law and Economics and Labor Studies.

- Stanford Center for Racial Justice – August 2020 to present.

- American Law Institute (since September 29, 2010).

- Member, Fellows of the Society for Empirical Legal Studies (since October 2015).

- American Bar Association

- American Economic Association

- American Law and Economics Association

## PERSONAL

- Born: January 30, 1953.

28

1        groups in competitor nations.

2               So, again, I think it shows you

3        pretty clearly why guns in America are a

4        not-trivial part of the problem, even in the

5        least problematic areas.

6   Q.   Okay.  So -- but given all that, if you're

7        legislator saying, I want to really impact

8        public safety, 18-to-20-year-old women would

9        not be one of the first places you would

10       look, correct?

11  A.   Well, it would be the second place, because,

12       you know, if you're looking at women, the

13       only group that's worse is 21 to 24, and you

14       see that the rate doubles when you go from

15       15 to 17 and 18 to 20, so it's not a bad

16       place.

17               And remember, in Minnesota people

18       are saying, oh, these lawyers are going to

19       be suing us if we try to restrict above age

20       21 so we're going to be stuck with the 21

21       cutoff.  And so for the place where you can

22       do it, it's still not a bad place to

23       suppress access to guns.

24  Q.   Okay.  I will take that down now and go back

25       to your report.  And now Figure 2 on page

1        know, it's possible that you might be able

2        to craft a sex-based differentiation, but I

3        suspect that that would be struck down.  I

4        could be wrong, but that is my sense on a

5        sex-based restriction on gun exodus.

6   Q.   So your sense is that, because men commit

7        crimes in this age group at elevated rates,

8        which is kind of as collateral damage, the

9        women in this age group are also deprived of

10       the ability to carry a firearm.

11             Is that basically correct?

12  A.   No.  I mean, it's -- the women in this age

13       group are much more likely to commit crime

14       than women in other age groups; it's just

15       that men commit much more of the violent

16       crime.

17             So if you're concerned about those

18       who are at elevated risk, women 18 to 20 are

19       committing violent crime at higher rates

20       than women of other ages.  It's just that

21       all of them are a lot less violent crime

22       than young males.

23  Q.   Okay.  So back to your report now on -- you

24       say Footnote 4 here where you have a quote

25       about complex functions --

Trustpoint.One   Alderson.    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

1        have the highest aggravated assault by

2        firearms.

3    Q.  Okay.  And could that -- I guess that could

4        explain the higher murder arrest rate --

5    A.  Yes.

6    Q.  -- just like the lower aggravated assault

7        rate, right?

8    A.  Yes.

9    Q.  All right.  Now I'm going to open up another

10       one.  This is arrests by offense, age, and

11       gender, but it's specifically for females.

12               MR. PATTERSON:  Counsel, if you

13       want to let me know when that one pops up

14       for you.

15               MS. PRUTZMAN:  Thank you.  I will.

16       Okay.  Got it.

17   BY MR. PATTERSON:

18   Q.  Okay.  Great.  So, again, this is arrest by

19       offense, age, and gender for females in

20       2019, and this shows that for murder

21       non-negligent manslaughter the arrest rate

22       for 18-to-20-year-old females was 1.9,

23       correct?

24   A.  Yes.

25   Q.  So that's lower than the overall rate --

1    that is lower than the overall rate for all

2    Americans of all ages, correct, which is

3    3.4?

4  A.  Yes.

5  Q.  And it's even lower than the rate for

6    21-to-24-year-old females, correct?

7  A.  Yes.

8  Q.  Okay.  So legislative efforts to reduce

9    homicide do not appropriately focus on

10    18-to-20-year-old females, correct?

11  A.  Well, remember, they still have the highest

12    rate of robbery and, you know, the rate

13    doubles when you go from 15 to 17 up to 18

14    to 20 for females, and even a 1.9 homicide

15    rate is nothing to sneeze at.  That would

16    be, you know, many times higher than the

17    average rates for all citizens in Western

18    European nations and other affluently

19    countries.

20          So you can't find another rich

21    country in the world that has a murder rate

22    as high as 1.9, and now we're looking at the

23    least -- you know, least deadly group in the

24    United States, which is females, and they

25    are dramatically higher than, you know, all

Trustpoint.One    Alderson.    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)