# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| KRISTIN WORTH, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No. 0:21-cv-01348-KMM-LIB |
| JOHN HARRINGTON, et al., | ) ) | |
| *Defendants*. | ) ) ) | |

## BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AND PROTECT MINNESOTA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dated:  August 4, 2022

[Additional Counsel Listed on
Signature Page]

Daniel S. Adkins (Bar No. 0266085)
NORTH STAR CRIMINAL DEFENSE
370 Selby Ave.
St. Paul, MN  55102
(651) 330-9678
dan@northstarcriminaldefense.com

*Counsel of Record for* Amici Curiae
*Giffords Law Center to Prevent Gun*
*Violence and Protect Minnesota*

# TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICI CURIAE* ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ..............................................................................................................8

    I.    THE MINNESOTA LAW IS PRESUMPTIVELY
         CONSTITUTIONAL ..............................................................................8

    II.   NEUROSCIENCE AND SOCIAL SCIENCE CONFIRM
         THAT THE MINNESOTA LAW IS ANALOGOUS TO
         HISTORICAL FIREARM RESTRICTIONS FOR
         GROUPS POSING A HEIGHTENED RISK OF
         VIOLENCE ...........................................................................................12

         A.   Eighteen-to-Twenty-Year-Olds Are Generally More
              Impulsive Than Older Cohorts ..................................................14

         B.   Eighteen-to-Twenty-Year-Olds Are Disproportionately
              Likely to Commit Violent Crimes with Firearms....................16

         C.   Eighteen-to-Twenty-Year-Olds Attempt Suicide at
              Disproportionately High Rates, and Access to Firearms
              Increases the Likelihood and Lethality of Those Suicide
              Attempts ....................................................................................21

         D.   Federal and State Minimum-Age Laws Have Proven
              Effective at Reducing Gun Violence Among Minors...............25

CONCLUSION ........................................................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ...................................................................2

*Binderup* v. *Att'y Gen'l U.S.*,
836 F.3d 336 (3d Cir. 2016) ...................................................................9

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008)...................................................................*passim*

*Gall* v. *United States*,
552 U.S. 38 (2007)...................................................................7

*Graham* v. *Florida*,
560 U.S. 48 (2010)...................................................................7

*Hirschfeld* v. *BATFE*,
417 F. Supp. 3d 747 (W.D. Va. 2019)...................................................................2

*Kanter* v. *Barr*,
919 F.3d 437 (7th Cir. 2019) ...................................................................9

*Lara* v. *Evanchick*,
534 F. Supp. 3d 478 (W.D. Penn. 2021) ...................................................6, 10, 12

*McDonald* v. *City of Chicago*,
561 U.S. 742 (2010)...................................................................2, 8

*Md. Shall Issue* v. *Hogan*,
353 F. Supp. 3d 400 (D. Md. 2018)...................................................................2

*Miller* v. *Alabama*,
567 U.S. 460 (2012)...................................................................14

*Mitchell* v. *Atkins*,
483 F. Supp. 3d 985 (W.D. Wash. 2020) ...................................................................11

*Nat'l Paint & Coatings Ass'n* v. *City of Chicago*,
   45 F.3d 1124 (7th Cir. 1995) ...............................................................27

*NRA* v. *BATFE*,
   700 F.3d 185 (5th Cir. 2012) ...........................................10, 12, 14

*NRA* v. *McCraw*,
   719 F.3d 338 (5th Cir. 2013) ...............................................................10

*NRA* v. *Swearingen*,
   545 F. Supp. 3d 1247 (N.D. Fla. 2021) ...............................................10

*NYSRPA* v. *Bruen*,
   142 S. Ct. 2111 (2022).................................................................*passim*

*Peruta* v. *County of San Diego*,
   824 F.3d 919 (9th Cir. 2016) (en banc) ...............................................2

*Stimmel* v. *Sessions*,
   879 F.3d 198 (6th Cir. 2018) ...............................................................2

*United States* v. *Bena*,
   664 F.3d 1180 (8th Cir. 2011) .........................................8, 11, 12, 13

*United States* v. *Masciandaro*,
   638 F.3d 458, 475 (4th Cir. 2011) .......................................................28

*United States* v. *Seay*,
   620 F.3d 919 (8th Cir. 2010) ...............................................................11

## Constitution, Statutes and Regulation

U.S. CONST. amend. II................................................................*passim*

U.S. CONST. amend. XXVI .....................................................................3

21 U.S.C. § 387f.......................................................................................3

Minn. Stat. § 325E.63 ............................................................................3

Minn. Stat. § 340A.503............................................................................3

Minn. Stat. § 349A.12 ........................................................................................3

Minn. Stat. § 624.714 ...................................................................................*passim*

U.S. Military Academy Regulation 190-3 ............................................................16

**Other Authorities**

*A Partial List of Mass Shootings in the United States in 2022*, N.Y. TIMES (July 20, 2022) ................................................................4, 17, 18

Mark Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Buffalo and Uvalde*, BUSINESS INSIDER (May 26, 2022) ..............................................................................................19

American Public Health Association, *Reducing Suicides by Firearms* (Nov. 13, 2018) ..........................................................................23

Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013) ............................14, 15

Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers that Grow with Each Mass Shooting*, WASH. POST (last updated May 12, 2021) ..............................................................................................20

Kyle Bloyd, *Docs: Fight at Party Preceded 4 Women Shot; At Least 40 Shots Heard on Video*, WISH (June 13, 2022) ................................19

J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094 (2016) ......................................................24

Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES (Nov. 7, 2016) ............................................................24

Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Leading Cause of Death Reports, 1981-2020*....................................................22

Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLIN. PSYCHIATRY 19 (2009)................................................................22

William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, (SUPP.) 17 J. STUD. ON ALCOHOL & DRUGS 108 (2014)........................................................25

Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220 (2014)........................15

Mark Eichmann, *Second Suspect in Custody After South Street Mass Shooting*, WHYY (June 7, 2022)..........................................................18

Madison Goldbeck, *3 Charged in Connection to Mass Shooting That Left 17 Injured on Water Street*, WTMJ (May 17, 2022)....................................18

Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS, Aug. 2019 ................................................26

Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT (2019)......................9

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339 (2009)..................9

E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27 (2013) ........................................................21

Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150 (2019) ..............................................................26

Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022)................23

*Mass Shootings in America*, EVERYTOWN RSCH. & POL'Y (Apr. 14, 2021) ......................................................................21

Daniel A. Medina & Casey Tolan, *Highland Park Gunman's Family Was in Turmoil for Years Leading Up to Parade Shooting*, CNN (July 9, 2022) .................................................................................18

Luis Melgar, *Are School Shootings Becoming More Frequent? We Ran the Numbers*, WAMU (Aug. 13, 2019).......................................19

Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENGL. J. MED. 989 (2008).........................................23

Matthew Miller et al., *Firearm Prevalence and the Risk of Suicide*, 2 HARV. HEALTH POL'Y REV., Fall 2001 ..............................................23

Matthew Miller et al., *Suicide Mortality in the United States*, 33 ANN. REV. PUB. HEALTH 393 (2012) ..........................................................24

Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058, 1061 (2011)..............................................................................21

Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947 (2008).................21

Jillian K. Peterson & James A. Densley, *Database of Mass Shootings in the United States*, VIOLENCE PROJECT (Nov. 2019) .......................................20

Jillian Peterson & James Densley, *School Shooters Usually Show These Signs of Distress Long Before They Open Fire, Our Database Shows*, THE CONVERSATION (Feb. 8, 2019).......................................20

RAND Corp., *The Effects of Minimum Age Requirements* (updated Apr. 22, 2020) ......................................................................24

Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (SUPP.) SUICIDE & LIFE-THREATENING BEHAV. 49 (2001)............................................................................22

Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124 (2010).................................15

*St. Paul Man Kahlil Wiley, 18, Pleads Guilty in MOA Shooting That Injured 2*, CBS MINN. (Mar. 11, 2022) ............................................................... 18

U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex:  April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010-2019 ........................................... 16

U.S. Dep't of Justice, *Crime in the United States*, Arrests by Age, 2019 ................................................................................................................... 16

U.S. Dep't of Justice, Federal Bureau of Investigation, *A Study of Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013* (June 2018) ................................................................................. 26

Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26 (2013) ...................................................... 27

Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004) .............................. 25

Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH. (2012) ...................... 17

Adam Winkler & Cara Natterson, *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016) ........................ 14

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Civil Procedure 7.1, Giffords Law Center to Prevent Gun Violence and Protect Minnesota certify as follows:

Giffords Law Center to Prevent Gun Violence has no parent corporations.  It has no stock and hence no publicly held company owns 10% or more of its stock.

Protect Minnesota has no parent corporations.  It has no stock and hence no publicly held company owns 10% or more of its stock.

## <u>INTEREST OF THE *AMICI CURIAE*</u>[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.[2]   The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords.   Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence.  Together with its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always

---

[1]    *Amici* Giffords Law Center and Protect Minnesota submit this brief in support of Defendants' Motion for Summary Judgment.  No counsel for a party authored this brief in whole or in part.  No person other than *amici* or their counsel contributed money to fund this brief's preparation or submission.

[2]    Giffords Law Center's website, www.giffords.org/lawcenter, is the premier clearinghouse for comprehensive information about federal, state, and local firearms laws and Second Amendment litigation nationwide.

been consistent with gun safety legislation and community violence prevention strategies.

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *District of Columbia* v. *Heller*, 554 U.S. 570 (2008); *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010); *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022). Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Hirschfeld* v. *BATFE*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Md. Shall Issue* v. *Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel* v. *Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta* v. *County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring).[3]

Protect Minnesota is the only state-based gun violence prevention program in Minnesota. Protect Minnesota is a non-profit organization that strives to prevent firearm deaths and injuries through engagement, advocacy, and community led solutions. Our programs are evidenced based and informed by

---

[3]     Giffords Law Center filed the last two briefs under its former name, the Law Center to Prevent Gun Violence.

Minnesota communities.  As Minnesotans continue to witness a rise in firearm homicides and suicides, communities throughout Minnesota are asking for responsible gun ownership measures to ensure the safety of all Minnesotans.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When minors in Minnesota turn 18, certain privileges previously unavailable to them become accessible:  They can cast a ballot in a federal election.[4]  They can waste a couple of dollars on a lottery ticket, apply for a credit card, or deposit money in a bank account they can now open on their own.[5]  But other things remain unavailable, such as buying a beer or a pack of cigarettes.[6]  And for good reason:  although they certainly are more emotionally mature than when they entered high school, their brains are still very much developing.  Their prefrontal cortex—the part of the brain that governs impulsivity and emotional regulation—has not yet fully matured.  That makes them more prone to risk-taking, and to deprioritize long-term outcomes.  When it comes to firearms, 18-year-old Minnesotans can possess a range of firearms for use in the home, at the range, or when hunting—including handguns, rifles, shotguns, and assault weapons.  But

---

[4]   U.S. CONST. amend. XXVI.

[5]   Minn. Stat. §§ 349A.12, 325E.63; *see id.* § 645.452.

[6]   Minn. Stat. § 340A.503; 21 U.S.C. § 387f(d)(5).

they are not eligible for licenses that would allow them to carry handguns in public. For that, they have to wait until they turn 21.

The recent wave of mass shootings by 18-to-20-year-olds is a tragic demonstration of the wisdom of Minnesota's decision to regulate gun possession and use for this age group more than for older adults. In the past three months alone, 18-to-20-year-olds have killed ten people and wounded three others at a supermarket in Buffalo, New York; killed 19 children and two teachers at an elementary school in Uvalde, Texas; and killed three people and wounded two others at a mall in Greenwood, Indiana.[7]

Nothing in the Second Amendment prevents Minnesota's commonsense and limited restriction. As the Supreme Court has emphasized, the right to bear arms is far from boundless. Although it protects certain rights of "responsible" and "law-abiding" individuals, the Second Amendment coexists with the extensive authority of state and local governments to regulate firearm purchase, possession, and use, including by banning certain categories of people from possessing firearms and by regulating the carrying of firearms in public spaces. Indeed, in *District of Columbia* v. *Heller*, the Court provided a non-exhaustive list of "presumptively lawful regulatory measures," including "longstanding

---

[7]     *A Partial List of Mass Shootings in the United States in 2022*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/article/mass-shootings-2022.html.

prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. 570, 626-27 & n.26 (2008).

In its most recent Second Amendment decision, *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court reemphasized the limits articulated in *Heller*, and that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128. Though the Court rejected the means-end balancing test most circuits had incorporated into their Second Amendment analysis and held that "courts [should] assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding," it recognized that this task "will often involve reasoning by analogy." *Id.* at 2132. To uphold a "modern-day regulation," courts need not find that the regulation is "a dead ringer for historical precursors." *Id.* at 2133. Instead, they need only find that a challenged regulation has a "well-established and representative historical *analogue*, not a historical *twin*." *Id.*

Plaintiffs' challenge to Minnesota's law prohibiting 18-to-20-year-olds from publicly carrying handguns, Minn. Stat. § 624.714(2)(b)(2) (the "Minnesota Law"), is foreclosed by *Bruen*. As Justice Kavanaugh recognized in his concurrence in that case, "the 43 States that employ objective shall-issue

-5-

licensing regimes for carrying handguns for self-defense"—including Minnesota—"may continue to do so." *Bruen*, 142 S. Ct. at 2162. Indeed, the Court specifically cited the Minnesota law Plaintiffs now challenge as a counterpoint to the New York State law it deemed unconstitutional. *Id.* at 2123 n.1 (majority opinion). And Justice Alito approvingly cited a similar federal law that "bars the sale of a handgun to anyone under the age of 21," noting that *Bruen*, which addressed the right of public carry for "adult[s]," did not "expand the categories of people who may lawfully possess a gun." *Id.* at 2157-58 (Alito, J., concurring).

The Minnesota statute survives constitutional scrutiny under the *Bruen* test because it is analogous to historical restrictions on 18-to-20-year-olds and other groups of individuals who presented a heightened risk of violence. "[T]he established consensus of federal appellate and district courts from around the country is that age-based restrictions limiting the rights of 18-20-year-old adults to keep and bear arms fall under the 'longstanding' and 'presumptively lawful' measures recognized by the Supreme Court in *Heller* as evading Second Amendment scrutiny." *Lara* v. *Evanchick*, 534 F. Supp. 3d 478, 486-89 (W.D. Penn. 2021) (summarizing cases). There is a long, established historical pedigree for recognizing the risk posed by certain subsets of armed individuals. Likewise, Minnesota has identified that armed 18-to-20-year-olds pose a greater risk to the

community than does the rest of the population and accordingly has restricted 18-to-20-year-olds' ability to publicly carry handguns.

That numerous courts have held such restrictions on 18-to-20-year-olds to be among the "longstanding," "presumptively lawful" regulations that *Heller* declared constitutional is reason enough to grant Defendants' motion for summary judgment. *Amici* submit this brief to provide further context for the Minnesota Law, to show how it is consistent with our historical tradition of firearm restrictions on specific groups, and to identify an established body of empirical research that demonstrates the law's soundness and real-world consequences, which confirm its accordance with analogous historical regulations. Research in the fields of neuroscience and social science confirm that 18-to-20-year-olds are analogous to other groups that pose a heightened risk when armed. *Cf. Graham* v. *Florida*, 560 U.S. 48, 68 (2010) ("As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence."); *Gall* v. *United States*, 552 U.S. 38, 58 (2007) ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage."). Young people aged 18-to-20 tend to be more impulsive than older adults because their brains are still developing. Individuals in this age

-7-

group also account for a disproportionate share of homicides and violent crimes and are all too frequently involved in mass shootings.  Neuroscience and social science data thus demonstrate that the reasoning behind Minnesota's restriction on 18-to-20-year-olds' ability to publicly carry handguns is analogous to and consistent with longstanding and presumptively lawful firearms regulations.

## **ARGUMENT**

### I.   THE MINNESOTA LAW IS PRESUMPTIVELY CONSTITUTIONAL.

*Heller* makes clear that "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and added that these "presumptively lawful regulatory measures [serve] only as examples" of permissible firearm regulations and do "not purport to be exhaustive."  554 U.S. at 626-27 & n.26.  In *McDonald* v. *City of Chicago*, the Court "repeated [*Heller*'s] assurances" that such laws should not be called into question, 561 U.S. 742, 786 (2010), and Justice Kavanaugh's concurrence in *Bruen*, joined by Chief Justice Roberts, again confirmed the presumptive legality of these measures.  142 S. Ct. at 2162.  Regulations of this kind are "presumptively lawful because they do not infringe on the Second Amendment right," which "guarantee[s] 'the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home.'"  *United States* v. *Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011).

The notion that dangerous individuals such as felons and the mentally ill may be prohibited from bearing arms was not novel to the Founders. "[T]he founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms." *Binderup* v. *Att'y Gen. U.S.*, 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring); *see also* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1360 (2009) ("[F]rom time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms. American legislators at the time of the Bill of Rights seem to have been aware of this tradition[.]"). Awareness of this tradition—and agreement with it—is evident from colonial ratifying conventions, where these notions were voiced with regularity. *See, e.g.*, Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT 190-215 (2019) (surveying debates at the constitutional ratifying conventions and highlighting the shared understanding that "dangerous persons could be disarmed"). Thus, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns" in order to protect the broader public. *Kanter* v. *Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting).

This "common sense" understanding of presumptively lawful measures is not limited to the laws in place at the Founding. A "regulation can be deemed 'longstanding,'" and therefore constitutional, "even if it cannot boast a precise founding-era analogue." *NRA* v. *BATFE*, 700 F.3d 185, 196 (5th Cir. 2012). Indeed, *Heller*'s enumerated examples of presumptively lawful measures themselves "are of mid-20th century vintage." *Id.*

Age-based restrictions like the one challenged here fall into this presumptively lawful category. "[T]he established consensus of federal appellate and district courts from around the country is that age-based restrictions limiting the rights of 18-20-year-old adults to keep and bear arms fall under the 'longstanding' and 'presumptively lawful' measures recognized by the Supreme Court in *Heller* as evading Second Amendment scrutiny." *Lara*, 534 F. Supp. 3d at 486-89; *NRA* v. *McCraw*, 719 F.3d 338, 346 (5th Cir. 2013) ("[S]tatutes enacted to safeguard the public using age-based restrictions on access to and use of firearms are part of a succession of 'longstanding prohibitions,' that are likely outside the scope of the Second Amendment, because such restrictions are 'consistent with' both the 'longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety' and the 'longstanding tradition of age-and safety-based restrictions on the ability to access arms[.]'" (citation omitted)); *NRA* v. *Swearingen*, 545 F. Supp. 3d 1247, 1267 (N.D. Fla.

2021) (holding that "age-based restrictions on the purchase of firearms are longstanding" because "restrictions on 18-to-20-year-olds' right to purchase firearms are both longstanding in time in relation to *Heller*'s list and analogous to other restrictions on that list"); *Mitchell* v. *Atkins*, 483 F. Supp. 3d 985, 993-94 (W.D. Wash. 2020) ("[R]easonable age restrictions on the sale, possession, or use of firearms have an established history in this country" and are "consistent with a longstanding tradition of targeting select groups' ability to access and use firearms for the sake of public safety.").

Although the Eighth Circuit has not addressed this precise issue, it has noted that regulating firearm possession by minors is similar to *Heller*'s list of constitutional restrictions. *See Bena*, 664 F.3d at 1183 ("[T]he right to arms does not preclude laws disarming the unvirtuous (i.e. criminals) or those who, *like children* or the mentally unbalanced, are deemed incapable of virtue." (emphasis added)). Furthermore, the Eighth Circuit has upheld a comparable (and in fact, more restrictive) federal statute "mak[ing] it unlawful for anyone 'who is an unlawful user of or addicted to any controlled substance' to possess a firearm," because it was "the type of 'longstanding prohibition[] on the possession of firearms' that *Heller* declared presumptively lawful," even though it was not specifically enumerated in *Heller*'s non-exhaustive list of examples. *United States* v. *Seay*, 620 F.3d 919, 924-25 (8th Cir. 2010).

This Court need not go further. Under *Bruen*, Plaintiffs bear the burden of establishing that they "are part of 'the people' whom the Second Amendment protects." 142 S. Ct. at 2134. This they cannot do. Presumptively lawful measures like the Minnesota Law "evad[e] Second Amendment scrutiny" entirely because they "fall outside the scope of the Second Amendment." *Lara*, 534 F. Supp. 3d at 480, 489; *see Bena*, 664 F.3d at 1183 ("presumptively lawful" measures under *Heller* "do not infringe on the Second Amendment right"). Thus, in his *Bruen* concurrence, Justice Alito approvingly cited a similar federal law that "bars the sale of a handgun to anyone under the age of 21," noting that the decision did not "expand the categories of people who may lawfully possess a gun." 142 S. Ct. at 2157-58. However, to the extent this Court proceeds to analyze historical analogues under *Bruen*, *amici* present modern-day empirical research to assist that analysis.

## II. NEUROSCIENCE AND SOCIAL SCIENCE CONFIRM THAT THE MINNESOTA LAW IS ANALOGOUS TO HISTORICAL FIREARM RESTRICTIONS FOR GROUPS POSING A HEIGHTENED RISK OF VIOLENCE.

Numerous "revolutionary and founding-era gun regulations … targeted particular groups for public safety reasons," including "minors" and "infants," terms which were understood at the time to "appl[y] to persons under the age of 21, not only to persons under the age of 18." *BATFE*, 700 F.3d at 200-01. *Amici* expect that Defendants will provide a thorough review of the Minnesota

-12-

Law's historical precedents.   But *Bruen* contemplates a broader "reasoning by analogy" that compares, at a minimum, "how and why [historical] regulations burden[ed] a law-abiding citizen's right to armed self-defense" to the objectives and methods of modern regulations and determines "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."  142 S. Ct. at 2132-33.  Furthermore, courts may look beyond "how and why" to identify other "features that render regulations relevantly similar."  *Id.*

As part of this inquiry, this Court naturally should consider the modern-day "justifi[cations]" for the Minnesota Law.   Indeed, considering modern-day justifications will often show how modern laws comport with their historical analogues.  *See Bena*, 664 F.3d at 1184 (discussing modern empirical studies and findings from the Surgeon General on domestic violence in order to show how challenged law was justified in a manner "consistent with our common law tradition").   Those justifications include neuroscience and social science research confirming that, similar to groups who were restricted from accessing firearms during the Founding era, 18-to-20-year-olds with unencumbered access to firearms pose a substantial risk to themselves and others.

A. **Eighteen-to-Twenty-Year-Olds Are Generally More Impulsive Than Older Cohorts.**

The scientific literature is clear that the human brain does not finish developing until the mid-to-late twenties.[8]  The *last* part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and long-range planning.[9]  The prefrontal cortex matures well after the limbic system, which controls basic emotions like fear, anger, and pleasure, resulting in a period of reduced self-control in the late teens and early twenties.[10]  As a result, 18-to-20-year-olds are prone to take risks and deprioritize long-term outcomes.  *See BATFE*, 700 F.3d at 210 n.21 ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."); *Miller* v. *Alabama*, 567 U.S. 460, 471-72 (2012) (noting that "developments in psychology and brain science continue to show fundamental

---

[8]     Adam Winkler & Cara Natterson, *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016), https://www.washingtonpost.com/posteverything/wp/2016/01/06/there-a-simple-way-to-fight-mass-shootings-raise-the-gun-age/?utm_term=.e8adc7e6c1da  ("The scientific literature over the past two decades has demonstrated repeatedly that the brain does not fully mature until the mid-to-late 20s.").

[9]     *Id.*; *see* Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453, 456 (2013) ("Behavioral control requires a great involvement of cognitive and executive functions.  These functions are localized in the prefrontal cortex, which matures independent of puberty and continues to evolve up until 24 years of age.").

[10]    Arain, *supra* note 9, at 453.

differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control"—and finding that juveniles possess "transient rashness, proclivity for risk, and inability to assess consequences").

Minors are also uniquely prone to negative emotional states.[11] Adolescents' responses to "frequent" negative states "tend to be more intense, variable and subject to extremes relative to adults."[12]  And minors are also more likely to *act* on negative emotions like stress or rage because their limbic systems have matured while their cerebral cortices (*i.e.*, impulse control centers) are still developing.[13]

Because these behavior-regulating functions of their brains are still developing, 18-to-20-year-olds are at a higher risk of violence when they have unfettered access to firearms.[14]  Indeed, educational institutions serving this age

---

[11]    Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124, 125 (2010).

[12]    *Id*.

[13]    Arain, *supra* note 9, at 458 ("[T]he adolescent brain is structurally and functionally vulnerable to environmental stress.").

[14]    *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the USA and in nearly all industrialized cultures.  Their proclivity toward … risk taking has been suggested to underlie the inflection in criminal activity observed during this time.").

group—such as colleges and military academies, which arguably admit only the most responsible young adults—recognize this risk. *See, e.g.*, U.S. Military Academy Regulation 190-3 at § II.1-6(b)(1) ("No pistols or handguns may be registered or carried by anyone under the age of twenty-one (21) to include Cadets.") (on file with counsel).

### B.   Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit Violent Crimes with Firearms.

Eighteen-to-twenty-year-olds account for a disproportionate share of violent crimes and homicides—both as victims and as perpetrators. The statistics are stark:

- Arrests for homicide, rape, and robbery are higher among 18-to-20-year-olds than older adults.[15]

- Though 18-to-20-year-olds make up less than 5% of the U.S. population, they account for more than 15% of homicide and manslaughter arrests.[16]

- This general pattern has persisted over time. The following chart, showing homicide offending rate by age in 2009, vividly

---

[15]   U.S. Dep't of Justice, *Crime in the United States*, Arrests by Age, 2019, tbl.38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38.

[16]   *Id.*; U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010-2019, https://www.census.gov/data/datasets/time-series/demo/popest/2010s-national-detail.html.

illustrates the disproportionate share of homicides committed by 18-to-20-year-olds that year:[17]



In addition to these statistics, our nation has faced a disturbing wave of mass shootings in just the past few months alone, many involving perpetrators in or around the age range targeted by the Minnesota Law.  On May 14, 2022, an 18-year-old gunman at a supermarket in Buffalo, New York, killed ten people and wounded three others.[18]  Just ten days later, on May 24, an 18-year-old killed 19 children and two teachers at an elementary school in Uvalde, Texas.[19]  On July 4, a 21-year-old killed seven people and wounded dozens more at a parade in Highland

---

[17]    Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH. 1, 5 (2012), https://www.jhsph.edu/ research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/ publications/WhitePaper020514_CaseforGunPolicyReforms.pdf.

[18]    *Partial List*, *supra* note 7.

[19]    *Id.*

Park, Illinois—with a gun he purchased prior to turning 21.[20]  And on July 17, a 20-year-old gunman killed three people and wounded two others at a mall in Greenwood, Indiana.[21]

There have also been many recent mass shootings involving 18-to-20-year-olds armed with handguns, including one in Minnesota:

- On New Year's Eve, an 18-year-old with a handgun injured two people in a crowded Mall of America in Minnesota.[22]

- A 20-year-old who possessed a Glock handgun was charged in a Milwaukee mass shooting in May 2022 that left 17 people injured.[23]

- An 18-year-old in Philadelphia was charged for his involvement in a June 4, 2022 mass handgun shooting that left three people dead and 11 injured.[24]

---

[20]   Daniel A. Medina & Casey Tolan, *Highland Park Gunman's Family Was in Turmoil for Years Leading Up to Parade Shooting*, CNN (July 9, 2022), https://www.cnn.com/2022/07/08/us/highland-park-suspect-family-turmoil-invs/index.html.

[21]   *Partial List*, *supra* note 7.

[22]   *St. Paul Man Kahlil Wiley, 18, Pleads Guilty in MOA Shooting That Injured 2*, CBS MINN. (Mar. 11, 2022), https://www.cbsnews.com/minnesota/news/st-paul-man-kahlil-wiley-18-pleads-guilty-in-moa-shooting-that-injured-2/.

[23]   Madison Goldbeck, *3 Charged in Connection to Mass Shooting That Left 17 Injured on Water Street*, WTMJ (May 17, 2022) https://www.tmj4.com/news/local-news/3-charged-in-connection-to-mass-shooting-that-left-17-injured-on-water-street.

[24]   Mark Eichmann, *Second Suspect in Custody After South Street Mass Shooting*, WHYY (June 7, 2022) https://whyy.org/articles/philadelphia-district-attorney-krasner-investigation-ongoing-south-street-mass-shooting/.

- A 19-year-old woman with a handgun shot four people at an Indianapolis party on June 12, 2022 after an argument.[25]

Tragically, these recent mass shootings by 18-to-20-year-olds are not a new phenomenon, as several of the deadliest mass school shootings in our nation's history were also committed by young adults in the age range targeted by the Minnesota Law:  the February 14, 2018 Parkland, Florida school shooting, in which a 19-year-old shooter killed 17 victims; the December 14, 2012 Newtown, Connecticut elementary school shooting, in which a 20-year-old shooter killed, among others, 20 schoolchildren; and the April 20, 1999 Littleton, Colorado shooting at Columbine High School, in which an 18-year-old and a 17-year-old killed 12 students and one teacher.[26]

In the 20 years following the Columbine High School massacre, there have been 486 reported incidents involving firearms at schools and 68 incidents of an active shooter on school property during the school day.[27]   And school

---

[25]    Kyle Bloyd, *Docs: Fight at Party Preceded 4 Women Shot; At Least 40 Shots Heard on Video*, WISH (June 13, 2022) https://www.wishtv.com/news/crime-watch-8/docs-fight-at-party-preceded-4-women-shot-at-least-40-shots-heard-on-video/.

[26]    Mark Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Buffalo and Uvalde*, BUSINESS INSIDER (May 26, 2022), https://www.businessinsider.com/deadliest-mass-shootings-in-us-history-2017-10/.

[27]    Luis Melgar, *Are School Shootings Becoming More Frequent?  We Ran the Numbers*, WAMU (Aug. 13, 2019), https://wamu.org/story/19/08/13/are-school-shootings-becoming-more-frequent-we-ran-the-numbers/.

shootings have only become more frequent:  "From 1999 to 2014, the average number of days between [active school] shootings was 124 days.  From 2015 to 2018, the average was 77 days."[28]   Mass shooters tend to target people or institutions against which they have a grievance,[29] which explains why most school shooters—as high as 91% in one recent study—were current or former students of the school at which the attack occurred.[30]  Furthermore, semiautomatic handguns are especially common in mass shootings.  In a study of 189 mass shootings, 9mm semiautomatic handguns were the most commonly used weapons, including by the student who killed 32 people at Virginia Tech in 2007.[31]  Another study found that

---

[28]    *Id.*

[29]    A comprehensive analysis of mass shootings shows that about "70% of mass shooters knew at least some of their victims," and school shooters "in particular were 'insiders.'"  Jillian K. Peterson & James A. Densley, *Database of Mass Shootings in the United States*, VIOLENCE PROJECT 19 (Nov. 2019), https://www.theviolenceproject.org/wp-content/uploads/2019/11/TVP-Mass-Shooter-Database-Report-Final-compressed.pdf.

[30]    Jillian Peterson & James Densley, *School Shooters Usually Show These Signs of Distress Long Before They Open Fire, Our Database Shows*, THE CONVERSATION (Feb. 8, 2019), https://theconversation.com/school-shooters-usually-show-these-signs-of-distress-long-before-they-open-fire-our-database-shows-111242.

[31]    Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers that Grow with Each Mass Shooting*, WASH. POST, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/ (last updated May 12, 2021).

81% of mass shootings involved the use of at least one handgun, and that 60% involved only handguns.[32]

### C. Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates, and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts.

Eighteen-to-twenty-year-olds are also disproportionately at risk of attempting suicide, and firearm access exacerbates this risk. Many major psychiatric conditions first develop in adolescence,[33] and "suicide risk increase[s] steeply during the first few years after [an individual's] first contact with psychiatric services."[34] Eighteen-to-twenty-year-olds' impulsivity and propensity toward negative emotional states puts them at particular risk of suicide, which "is commonly an impulsive act by a vulnerable individual."[35] One study found that, of 153 survivors of nearly lethal suicide attempts aged 13-to-34, close to 25% reported that *less than five minutes* passed between their decision to attempt

---

[32]    *Mass Shootings in America*, EVERYTOWN RSCH. & POL'Y (Apr. 14, 2021), https://everytownresearch.org/maps/mass-shootings-in-america-2009-2019/.

[33]    Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947, 952 (2008).

[34]    Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058, 1061 (2011).

[35]    E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27, 27 (2013).

suicide and their attempt.[36]   Another study asked people who were referred to a psychiatric hospital following a suicide attempt how much time passed between when they first began contemplating the act and their attempt, and 47.6% stated that ten minutes or less had passed.[37]   It is unsurprising then that suicide accounts for a higher percentage of deaths for 15-to-24-year-olds than for older age groups.[38]   Indeed, from 2010 to 2020, suicide was the third most common cause of death among 18-to-20-year-olds.[39]   And the upward trend in gun suicides among young people was especially acute among youth of color:  from 2012 to 2020, the firearm suicide rate doubled among Black, Latino, and Asian teens, and rose a

---

[36]   Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (SUPP.) SUICIDE & LIFE-THREATENING BEHAV. 49, 50-52 (2001).

[37]   Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLIN. PSYCHIATRY 19, 20 (2009).

[38]   Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Leading Cause of Death Reports, 1981-2020*, https://webappa.cdc.gov/sasweb/ncipc/leadcause.html.

[39]   *Id.*  Centers for Disease Control and Prevention has not reported cause of death statistics post-dating 2020.

staggering 88% among Native American teens.[40]  During the same period it rose 35% among white teens.[41]

Stemming from the rapidity with which suicidal ideation gives way to action, "[a]ccess to firearms is a key risk factor for suicide."[42]  In fact, "at least a dozen U.S. case-control studies in the peer-reviewed literature … have found that a gun in the home is associated with an increased risk of suicide.  The increase in risk is large, typically 2 to 10 times that in homes without guns…."[43]  Those prone to "act impulsively … are more likely to be affected by availability of the means at hand," which explains why "the preponderance of current evidence indicates that gun availability is a risk factor for suicide, especially among youth."[44]

Compounding the increased risk of suicide posed by firearm access is the inherent lethality of firearms. Firearm suicide is the suicide method with the

---

[40]    Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022), https://www.thetrace.org/2022/02/firearm-suicide-rate-cdc-data-teen-mental-health-research/.

[41]    *Id.*

[42]    American Public Health Association, *Reducing Suicides by Firearms* (Nov. 13, 2018), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2019/01/28/reducing-suicides-by-firearms.

[43]    Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENG. J. MED. 989, 990 (2008).

[44]    Matthew Miller et al., *Firearm Prevalence and the Risk of Suicide*, 2 HARV. HEALTH POL'Y REV., Fall 2001, at 34.

highest fatality rate—the odds of completing a suicide attempt are 140 times greater when a gun is used than for any other commonly used method.[45]   Framed differently, while 4% of non-firearm suicide attempts are fatal, 85% of suicide attempts with a gun are fatal.[46]   In 2017, nearly half of the 3,556 suicide deaths among 16-to-21-year-olds involved a firearm.[47]

Preventing access to firearms can save lives from suicide because research shows that fewer than 3% of people who survive one suicide attempt later die by suicide.[48]   Although "[s]uicide attempters often have second thoughts, ... when a method like a gun works so effectively, there's no opportunity to reconsider."[49]   A young adult's access to firearms when contemplating a suicide attempt, therefore, often determines whether they die or not.

---

[45]     J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094, 1098 (2016).

[46]     Matthew Miller et al., *Suicide Mortality in the United States*, 33 ANN. REV. PUB. HEALTH 393, 397 (2012).

[47]     RAND Corp., *The Effects of Minimum Age Requirements* (updated Apr. 22, 2020).

[48]     Bostwick, *supra* note 45, at 1098.

[49]     Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES (Nov. 7, 2016), https://www.nytimes.com/2016/11/08/well/live/after-a-suicide-attempt-the-risk-of-another-try.html.

### D.     Federal and State Minimum-Age Laws Have Proven Effective at Reducing Gun Violence Among Minors.

Age-based restrictions are also "justifi[ed]" under the *Bruen* framework because they are effective.  Studies have found a connection between age restrictions like the Minnesota Law and a decline in firearm-related adolescent deaths, especially suicides and unintentional shootings.[50]  For instance, a 2004 study found that state laws raising the minimum legal age to purchase a handgun to 21 were associated with a 9% decline in firearm suicide rates among 18-to-20-year-olds.[51]

Age-based restrictions have also proven effective in reducing gun violence among young people, including in the 18-to-20-year-old range.  While a 2019 study found that 18-to-21-year-olds made up more than half (68.7%) of the 21,241 firearm-related deaths among U.S. children and adolescents from 2011 to 2015, the study found that every 10-point increase in a score measuring the strength of a state's gun laws "decreases the firearm-related mortality rate in

---

[50]     The same concerns regarding minors' heightened impulsiveness motivated passage of laws in all 50 states establishing 21 as the minimum legal age for alcoholic beverage consumption.  Studies confirm that these laws led to significant reductions in death from car crashes involving minor drivers. William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, (SUPP.) 17 J. STUD. ON ALCOHOL & DRUGS 108, 113 (2014).

[51]     Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

children by 4%."[52]  Another study using the same gun-law scores found that the pediatric firearm mortality rate amongst children aged 0-to-19-years-old was almost twice as high in the quartile of states with the weakest laws than in the quartile of states with the strongest laws.[53]

Finally, research demonstrates that most mass shooters obtain their weapons lawfully.  In a report examining active shootings from 2000 to 2013, the FBI concluded that "only very small percentages [of shooters] obtain[ed] a firearm illegally,"[54] indicating that the perpetrators seek easy access to weapons and are not necessarily sophisticated participants in the black market for firearms.  Indeed, a survey of convicted gun offenders in 13 states found that 17% of the offenders would have been prohibited from obtaining firearms at the time of the crime if the minimum legal age in that state had been 21 years, a finding that "underscore[d]

---

[52]    Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS, Aug. 2019, at 3 & tbl. 1.

[53]    Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150, 152 (2019).

[54]    U.S. Dep't of Justice, Federal Bureau of Investigation, *A Study of Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, at 7 (June 2018), https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.

the importance of minimum-age restrictions."[55]   Lawmakers therefore can, and should, conclude that restricting access to firearms will deter criminal use of firearms—precisely the type of reasonable conclusion that underlies virtually all laws aimed at regulating dangerous products.  *Cf., e.g.*, *Nat'l Paint & Coatings Ass'n* v. *City of Chicago*, 45 F.3d 1124, 1128-29 (7th Cir. 1995) (discussing the reasonableness of legislatures' restricting access to hazardous products including guns, fireworks, and liquor despite the fact that other means of procurement exist).

## CONCLUSION

For the foregoing reasons and those set forth by Defendants, the Minnesota Law is part of a "longstanding" tradition of regulations restricting firearm access for those who pose a heightened risk of violence.  It is therefore a "presumptively lawful" measure that does not implicate the Second Amendment. And even if it did, it easily survives *Bruen*'s historical analogy test because "how" this measure regulates firearms—restricting access by those posing a heightened risk—and "why" this measure regulates firearms—protecting the public from individuals who pose a danger to themselves and the community—is consistent with a long history of analogous regulation.  The "why" of this analogy is further confirmed by neuroscience and social science research on the dangers of minors

---

[55]     Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26, 29-30 (2013).

under the age of 21 with easy access to firearms.   Nothing in the Second Amendment requires this Court to overrule the Minnesota Legislature's considered judgment on this critical public safety issue.   As one court of appeals stated:   "This is serious business.   We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."[56]

---

[56]      *United States* v. *Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

Dated:  August 4, 2022

Respectfully submitted,

*Of Counsel for* Amicus Curiae *Giffords Law Center to Prevent Gun Violence:*

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA  94104
(415) 433-2062

Robert A. Sacks
Leonid Traps
Sophie A. Kivett
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004-2498
(212) 558-4000

Elizabeth A. Rose
Madeline B. Jenks
David W. Gould
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC  20006
(202) 956-7500

/s/ *Daniel S. Adkins*
Daniel S. Adkins (Bar No. 0266085)
NORTH STAR CRIMINAL DEFENSE
370 Selby Ave.
St. Paul, MN  55102
(651) 330-9678
dan@northstarcriminaldefense.com

*Counsel of Record for* Amici Curiae *Giffords Law Center to Prevent Gun Violence and Protect Minnesota*

*Of Counsel for* Amicus Curiae *Protect Minnesota:*

James Gempeler
NORTH STAR CRIMINAL DEFENSE
370 Selby Ave.
St. Paul, MN  55102
(651) 330-9678

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Daniel S. Adkins, certify that the Memorandum titled *Brief of* Amici Curiae *Giffords Law Center to Prevent Gun Violence and Protect Minnesota in Support of Defendants' Motion for Summary Judgment* complies with Local Rule 7.1(f). I further certify that, in preparation of the document, I used Microsoft Office Word 2016, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count. I further certify that the brief contains 5,914 words.

Dated:  August 4, 2022

/s/ *Daniel S. Adkins*
Daniel S. Adkins (Bar No. 0266085)
NORTH STAR CRIMINAL DEFENSE
370 Selby Ave.
St. Paul, MN  55102
(651) 330-9678
dan@northstarcriminaldefense.com

*Counsel of Record for* Amici Curiae
*Giffords Law Center to Prevent Gun*
*Violence and Protect Minnesota*