IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

KRISTIN WORTH, et al.,

          *Plaintiffs*,

v.

JOHN HARRINGTON, et al.

          *Defendants*.

Civil Action No.
0:21-cv-01348-KMM-LIB

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

   /s Megan Walsh
Megan Walsh (#0394837)
University of Minnesota Law Clinics
190 Mondale Hall
229 19th Avenue South
Minneapolis, MN 55455
Phone: 612-625-5515
Fax: 612-624-5771
wals0270@umn.edu

*Counsel of Record for
Amicus Curiae
Everytown for Gun Safety*

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................ ii
TABLE OF CONTENTS ............................................................................................... iii
TABLE OF AUTHORITIES .......................................................................................... iv
INTEREST OF AMICUS CURIAE ................................................................................ 1
INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 2
ARGUMENT .................................................................................................................... 3
    I.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ......... 3
    II.    The Historical Inquiry Continues Beyond 1868 ..................................................... 9
    III.    Historical Laws Are "Relevantly Similar" to Minnesota Law ............................ 11
CONCLUSION .............................................................................................................. 13

# TABLE OF AUTHORITIES

**CASES**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ................................................................................ 1

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................................. 2, 9, 10

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021) ........................................ 3

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................................... 3, 7

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ............................................................. 4

*Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ........................................................ 3

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................................................... 3, 7

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .............................................................. 3

*New York State Rifle & Pistol Association v. Bruen*,
  142 S. Ct. 2111 (2022) ................................................................................ passim

*Rehaif v. United States*, 139 S. Ct. 2191 (2019) ................................................................ 2

*Rupp v. Becerra*, 401 F. Supp. 3d 978 (C.D. Cal. 2019) .................................................. 1

*Teter v. Connors*, 460 F. Supp. 3d 989 (D. Haw. 2020) .................................................. 2

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) .................................................... 3

**OTHER AUTHORITIES**

A. Amar, *The Bill of Rights: Creation and Reconstruction* (1998) .................................. 6

Brief for Independent Institute as Amicus Curiae, *New York State
  Rifle & Pistol Ass'n v. Bruen*, No. 20-843 ........................................................ 9

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*,
  13 Charleston L. Rev. 205 (2018) ..................................................................... 9

K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021)
  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ...................... 6

K. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*,
  97 Ind. L.J. 1439 (2022) ........................................................................... 5, 7, 8

Opening Brief of Plaintiffs-Appellants, *Jones v. Bonta*, No. 20-56174,
  Dkt. 17 (9th Cir. Dec. 4, 2020) ......................................................................... 12

Plaintiffs' Response to Defendants' Motion to Dismiss or for Summary Judgment

and Memorandum in Support of Plaintiffs' Cross Motion for Summary
Judgment, *Reese v. ATF*, No. 6:20-cv-01438 (W.D. La. June 17, 2021) ...................... 12

Transcript of Oral Argument, *New York State Rifle &
Pistol Ass'n v. Bruen*, No. 20-843 ................................................................................... 9

## INTEREST OF AMICUS CURIAE

Everytown is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 230,000 in Minnesota. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a 20-year-old gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 15 cities, towns, and other localities in Minnesota are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 50 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92 & n.11 (C.D. Cal. 2019),

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

*vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210-11 nn.4 & 7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Minnesota's public-carry restrictions on 18- to 20-year-olds are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons in Defendant Harrington's Memorandum in Support of Motion for Summary Judgment (Dkt. 49). Everytown for Gun Safety submits this amicus brief to expand on some of the methodological points in the State's submission. First, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the historical analysis should center on 1868, not 1791. Second, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). Third, the 19th-century historical laws the State has presented are all "relevantly similar" to Minnesota's challenged law and satisfy *Bruen*'s demands for historical analogues.

## ARGUMENT

I.   **The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791**

For the reasons in the State's submission, Plaintiffs have failed to satisfy their burden under *Bruen*'s textual inquiry. *See* Dkt. 49 at 20-22. That should end the case. But if the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits reached this conclusion in analyzing the Second Amendment and the historical tradition of firearm regulation prior to *Bruen*.[2] *Bruen* does not alter that

---

[2] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27. As the State explains, in applying that first, historical step, several circuits considering challenges to state laws looked to the public understanding of the right in 1868, not 1791. *See* Dkt. 49 at 24 (citing *Gould*, 907 F.3d at 669; *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011)). In addition, the Sixth Circuit followed *Ezell* in *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012), and the Third Circuit in *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021), said that "the question is if the Second and *Fourteenth Amendments*' ratifiers approved [the challenged] regulations …." (emphasis added)). Plaintiffs (at 16) cite *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), but *Moore* did not acknowledge the implications for originalism of the fact that the Second Amendment did not apply against the states until ratification of the Fourteenth Amendment—which is mentioned nowhere in the opinion—in 1868. Instead, *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same. *See id.* (citing *McDonald v. City of Chicago*, 561 U.S. 742, 765 & n.14 (2010)). But that merely flags the issue that *Bruen* acknowledged (*see* 142 S. Ct. at 2137) before leaving open the question whether the 1868 or 1791 understanding should control. Accordingly, *Moore*'s observation has no remaining force after *Bruen*.

3

conclusion for cases, like this one, challenging a state or local law. It expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because the public understanding "for all relevant purposes" in the case before it was the same in both 1791 and 1868).[3] Moreover, it concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Bruen*, 142 S. Ct. at 2127.[4] Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the State's brief, this Court should uphold Minnesota's law whether it focuses on the period around 1791 or the period around 1868. *See* Dkt. 49 at 20-23.[5] But if this Court prefers to settle the issue the Supreme Court left open now, it

---

[3] Plaintiffs misread *Bruen* to have resolved the issue in favor of 1791, claiming that Reconstruction-era laws "are from too late a date." Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 42) at 24. However, the Court could not have resolved the issue it expressly left open. And to the extent that the majority put a thumb on the scale, it was in favor of 1868, not 1791. *See infra* at pp. 5-7 (explaining that majority cited scholarship arguing for 1868 and none arguing for 1791, and approvingly cited consideration of 19th-century laws in sensitive places analysis). For similar reasons, Plaintiffs' argument that *Gamble v. United States*, 139 S. Ct. 1960 (2019), requires this Court to discount the wealth of historical laws from the second half of the 19th century is mistaken. Dkt. 42 at 16. *Bruen* confirms that *Gamble* has no such effect: it acknowledged *Gamble* and still expressly left open the question whether 1868 or 1791 is the proper focus. *See* 142 S. Ct. at 2137-38.

[4] *See also* Dkt. 49 at 18 (explaining that cases analyzing constitutionality of age restrictions at step one of two-step framework remain relevant).

[5] Even if this Court were to focus on 1791 and conclude that history left the Second

4

should conclude that 1868 is the correct focus.

To begin with, in a case involving a state or local law, that focus is the only correct answer to the originalist question: how did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, if a court were to privilege a founding-era understanding of the right over a different Reconstruction-era understanding, it would reject what the people understood the right to be at the time they gave it effect.

To be sure, if the understanding changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." K. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But if the scope of each enumerated right must be the same as against the state and federal governments, *see Bruen*, 142 S. Ct. at 2137, then originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

---

Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century history to clarify that meaning. *See infra* Part II.

5

Existing doctrine does not resolve this issue: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And then it cited two scholars who support the 1868 view, and none who supports 1791. *See id.* (citing A. Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)). On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[6] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash,

---

[6] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government").

6

manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this view: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78. It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

In the face of this evidence, Plaintiffs do little more than assert their preference for the opposite conclusion. They claim that the consequence for originalists of applying the 1868 understanding both against the states and the federal government "would be counterintuitive, to say the least" as against the federal government, and that it "lacks support in precedent." Dkt. 42 at 16. Neither claim is sound.

*First*, applying the 1868 understanding against both state and federal governments is much *less* counterintuitive than forcing on the states an understanding of the right different from the one they believed they were taking on in ratifying the Fourteenth Amendment. *See* Lash, *Respeaking the Bill of Rights*, 97 Ind. L. J. at 1452 ("There is

7

nothing historically backward about investing the post-Fourteenth Amendment Bill of Rights with the understanding of the people who respoke that Bill of Rights in 1868."). As Professor Lash explains, "Reconstruction-era Americans exercised their sovereign right to alter their original Constitution and invest old words with new meaning." *Id.* at 1452-53. And once the original Constitution was "alter[ed]," it would violate originalist principles to disregard that "new meaning." Plaintiffs assert (Dkt. 42 at 16) that the Court "did not view things that way," but again, Professors Lash and Amar are the *only* scholars the Court cited on this issue; surely it would not have chosen to cite only scholars with whom it disagreed.[7]

*Second*, Plaintiffs' argument—and their claim that looking to the 1868 understanding "lacks support in precedent"—is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of "sensitive places" restrictions. There, the Court indicated that adequate restrictions on guns in legislative assemblies, polling places, and courthouses exist in "18th- *and 19th-century*" laws to satisfy its historical analysis (142 S. Ct. at 2133 (emphasis added))—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were

---

[7] Plaintiffs' reliance on a statement from *Heller*, quoted in *Bruen*, that discussions that "took place 75 years after the ratification of the Second Amendment … do not provide as much insight into its original meaning as earlier sources," Dkt. 42 at 16 (quoting *Bruen*, 142 S. Ct. at 2137, quoting *Heller*, 554 U.S. at 614), is misplaced. *Heller* was referring to the "original meaning" in 1791 without examining—let alone taking a position on—the methodological, 1868-or-1791 question.

from the *late* 19th century.[8]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and counsel for the NRA's New York affiliate, former Solicitor General Paul Clement:

> JUSTICE THOMAS: … [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction as -- you know, and -- and -- and giving preference to that over the founding.

Tr. of Oral Arg., No. 20-843, at 8:2-17.

In sum, the historical inquiry should focus on the period around 1868, not 1791.

## II. The Historical Inquiry Continues Beyond 1868

In recognizing that the period around 1868 is most relevant in determining the scope of the right, this Court should note that 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*,

---

[8] *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36 (2018) (citing no 19th-century laws); *id.* at 244-47 (citing 1873 Texas law and 1874 decision upholding 1870 Georgia law; article also cites 1870 Louisiana and 1874 and 1886 Maryland laws in same section, at 243); Br. for Independent Institute as Amicus Curiae, *Bruen*, No. 20-843, at 11-17 (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting James Madison).

Here, state laws from the second half of the 19th century establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and speak in one voice. But even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it were to conclude (contrary to the State's evidence) that the status of the right vis-à-vis those under 21 was uncertain at the time of the founding, it should then consider the 19th-century evidence and recognize that it "settle[s] the meaning of" the right as one that did not extend to those under 21. It is, after all, simply not plausible for Plaintiffs to contend that today's generation, 231 years removed from the Second Amendment's ratification, is better able to determine the 1791 meaning of its text than was the Reconstruction generation, 77 years removed. Indeed, in relying heavily on *Heller*'s statement, quoted in *Bruen*, that Reconstruction-era evidence "do[es] not provide *as much* insight into [the Second Amendment's] original meaning as earlier sources," plaintiffs implicitly acknowledge that it provides at least *some* insight. *See* Dkt. 42 at 16 (quoting *Bruen*, 142 S. Ct. at 2137) (emphasis added) (cleaned up).

10

### III. Historical Laws Are "Relevantly Similar" to Minnesota Law

The State has set out a robust tradition of firearms age restrictions establishing that Minnesota's law is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Plaintiffs err in suggesting that these laws are "inadequate analogues" under *Bruen*. Dkt. 42 at 24. They base this claim largely on their view that historical laws prohibiting the sale of firearms to those under 21 are not "analogous enough" to modern laws prohibiting the carrying of firearms by those under 21. *See id.* at 22 (acknowledging that these laws "undoubtedly would burden the[] Second Amendment rights [of those under 21]", but arguing that they "would not burden them in the same way" as carry prohibitions, "and that matters under *Bruen*"). This reasoning runs contrary to the guidelines laid out in *Bruen* for conducting the historical analysis.

*Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* Under this analysis, courts must consider whether two regulations are "relevantly similar" rather than identical. *Id.* at 2132. Although the Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it explained that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767) (emphasis in original).

11

Contrary to these principles, Plaintiffs seem to argue that the Court should only consider historical twins to Minnesota's law—such as the 1883 Wisconsin law prohibiting the carry of handguns by those under 21, and presumably Nevada's 1881 law, which Plaintiffs fail to mention but which likewise sets the age for carrying handguns at 21—or laws that went further, such as Kansas's 1883 law banning all possession of pistols by minors. Dkt. 42 at 22. But *Bruen* says that historical laws need only be "relevantly similar"—and historical regulations prohibiting the sale, lending, or furnishing of firearms to those under 21 meet this requirement. At a general level, the numerous, well-established restrictions on the sale of firearms to those under 21 demonstrate a historical understanding that the government could place greater restrictions on the rights of those under 21 to keep and bear arms than it could for those 21 and over. As for the comparability of the burden these laws placed on the Second Amendment right, in other cases challenging age restrictions on purchasing handguns, Plaintiff Firearms Policy Coalition has repeatedly diminished the significance of any difference between a prohibition on sale of handguns to those under 21 and a prohibition on possession, arguing that "the right to possess a handgun implies the right to purchase one. Pls.' Resp. to Defs.' Mot. to Dismiss or for Summ. J. and Mem. in Support of Pls.' Cross Mot. for Summ. J. at 16, *Reese v. ATF*, No. 6:20-cv-01438 (W.D. La. June 17, 2021); *see also*, *e.g.*, Opening Br. of Plaintiffs-Appellants at 18, No. 20-56174, Dkt. 17, in *Jones v. Bonta*, 34 F.4th 704, (9th Cir. 2022), *pet. for reh'g filed*, Dkt. 93 (9th Cir. July 25, 2022). If Plaintiff's argument in those cases holds true, then the burden of a purchase restriction is at least "comparable" to the burden of Minnesota's carry restriction (which, unlike a possession restriction, does not apply inside the home).

Moreover, the burden of the historical laws is comparably justified. These laws were self-evidently motivated by public safety concerns surrounding the handling of deadly weapons by individuals under 21. Accordingly, although historical prohibitions on the sale of firearms to those under 21 are not historical *twins* of the Minnesota law, they are "relevantly similar" and demonstrate a historical tradition of regulating the use of firearms by those under 21.

## CONCLUSION

This Court should conclude that the most important indicators of the scope of the right to keep and bear arms are the wealth of restrictions from the second half of the 19th century, and that they demonstrate beyond doubt that individuals under 21 do not have a right to carry firearms in public.

Respectfully submitted,

Dated:  August 14, 2022

By: /s Megan Walsh
Megan Walsh (#0394837)
University of Minnesota Law Clinics
190 Mondale Hall
229 19th Avenue South
Minneapolis, MN 55455
Phone: 612-625-5515
Fax: 612-624-5771
wals0270@umn.edu

*Counsel of record for Amicus Curiae Everytown for Gun Safety*

Janet Carter*
William J. Taylor, Jr.*
Carina Bentata Gryting*
Kari Still*
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
Phone: (646) 324-8174
jcarter@everytown.org

* Not admitted in the District of Minnesota

*Counsel for Amicus Curiae Everytown for Gun Safety*

14