UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Kristin Worth, Austin Dye, Axel Anderson, Minnesota Gun Owners Caucus, Second Amendment Foundation, and Firearms Policy Coalition, Inc., | Case No. 0:21-CV-01348 (KMM/LIB) |
| Plaintiffs, | **DEFENDANT JOHN HARRINGTON'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| John Harrington, in his individual capacity and in his official capacity as Commissioner of the Minnesota Department of Public Safety, et al., | |
| Defendants. | |

## INTRODUCTION

Defendant John Harrington, Commissioner of the Minnesota Department of Public Safety ("Commissioner"), submits the following memorandum of law in opposition to Plaintiffs' Motion for Summary Judgment. Plaintiffs have failed to show the plain text of the Second Amendment covers the rights of 18-to-20-year-olds to publicly carry firearms. Even if they had, their claims fail because the Commissioner has shown that Minnesota's permit-to-carry statute is "consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle and Pistol Association v. Bruen*. 142 S. Ct. 2111, 2126 (2022).

## ARGUMENT

Throughout their argument, Plaintiffs mischaracterize Minnesota's permit-to-carry statute, section 624.714, as the "Carry Ban." But the scope of 18-to-20-year-olds' rights in Minnesota is broader than Plaintiffs describe. 18-to-20-year-olds are not totally banned from carrying a firearm in Minnesota, although section 624.714 requires a permit to carry a firearm in a "public place" and 18-to-20-year-olds are ineligible for a permit (Minn. Stat. § 624.714 §§ subd. 1a, 2(b)(2). In Minnesota, 18-to-20-year-olds have the right to own and bear arms in their homes, on their land, and in their places of business. Minn. Stat. § 624.714, subd. 9(1). They may carry firearms between their home and their place of business without a permit. *Id.*, subd. 9(3). They may also carry a firearm without a permit in woods, fields, or waters for target shooting or hunting. *Id.*, subd. 9(4). It is permissible to transport a gun between home or place of business and a place of repair without a permit. *Id.*, subd. 9(2). And there is no limit on the number of firearms a person can carry if carrying pursuant to these exceptions. *Id.*, subd. 11. Plaintiffs mischaracterize Minnesota's permit-to-carry statute as a total "Carry Ban."

Plaintiffs have failed to show that Minnesota's permit to carry statute is unconstitutional on its face[1]. First, they can not carry their burden of establishing that 18-to-20-year-olds are "the people" in the plain text of the Second Amendment. Second, even if they did meet their burden, the Commissioner has shown a plethora of historical

---

[1] Plaintiffs wholly ignore their second claim, that section 624.714 is unconstitutional as applied to 18-to-20-year-old females, in their motion for summary judgment. Given the Supreme Court's holding in *Bruen* jettisoning a scrutiny analysis in Second Amendment cases, Plaintiffs' claim that there is no rational basis for Minnesota's age-restrictions on females is no longer viable.

analogues for Minnesota's permit-to-carry statute exist from around the time of ratification of both the Fourteenth and Second Amendments, thereby affirming its constitutionality.

## I. THE PLAIN TEXT OF "THE PEOPLE" IN THE SECOND AMENDMENT DOES NOT INCLUDE PEOPLE UNDER 21.

The parties agree on the burden-shifting nature of the test set forth in *New York State Rifle and Pistol Association v. Bruen*. 142 S. Ct. 2111, 2129-30 (2022) (*See* Pl.'s Mem. in Supp. Of Mot. for S.J., Doc. 42 at 7-8.) Under that test, Plaintiffs must show the Second Amendment's plain text covers the conduct at issue. If it does, then the burden falls to Defendants to show that Minnesota's statute is consistent with our Nation's historical tradition of firearm regulation. Because Plaintiffs have not met the initial burden of showing that the Second Amendment's plain text covers the right of 18-to-20-year-olds to publicly carry a firearm, the inquiry stops there. *Bruen* did not establish that 18-to-20-year-olds are part of "the People" to which the Second Amendment applies. "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). Accordingly, the issue is undecided and must be determined through the test set forth in *Bruen*.

18-to-20-year-olds fall outside the scope of the Second Amendment. Plaintiffs argue "The 'normal and ordinary meaning' of 'the people' includes *all* the people" and "the right to keep and bear arms belongs to 'the people' as a whole." (Doc. 42 at 8, 1.) But if Plaintiffs' argument is applied literally, there would be no limitation on the right whatsoever, with absurd results. Even toddlers or those declared mentally unfit by the courts would have the right to bear arms. This was not the understanding of the people of

3

the right at the time the Second and Fourteenth Amendments were ratified. In fact, the "right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

At the time of the adoption of both amendments, 18-to-20-year-olds were legally minors and were not part of "the people" covered by the Second Amendment. "The American colonies, then the United States, adopted age twenty-one as the near universal age of majority. The U.S. age of majority remained unchanged from the country's founding well into the twentieth century." Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016); *see also* Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender, Soc. Pol'y & L. 613, 681-86 (2007) (providing appendix with survey of state laws demonstrating that until 1969, the age of majority for unmarried men was 21 in every state). When both the Second and Fourteenth Amendments were adopted, people under 21 were minors without full legal rights. "When it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 142 S. Ct. at 2136, *citing Heller*, 554 U.S. at 634–635. Because 18-to-20-year-olds were minors under the law at the time of the adoption of both the Second and Fourteenth Amendments, there is "no credible legal argument that" they could have made "regarding a Second Amendment right to purchase or use a gun without the permission of a legal guardian."

Saul Cornell[2], *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, Yale L. & Pol'y Rev., Inter Alia (Oct. 26, 2021).

While "Plaintiffs Worth, Dye, and Anderson unquestionably are legal adults" (*See* Doc. 42 at 5), at the time the Second and Fourteenth Amendments were adopted they would be "unquestionably" minors with no independent legal autonomy. "Infants were severely circumscribed by law and had only a narrow range of legal autonomy." (Declaration of Amanda Prutzman (Doc. 50) Ex. A (Doc. 50-1) (Expert Report of Saul Cornell, PhD ("Cornell Rep.") at 11.)) It was not until the 1970's that eighteen became the age of legal majority in this nation. *Nat'l Rifle Assoc. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*BAFTE*"), 700 F.3d 185, 201 (5th Cir. 2012). There is no basis to find that the plain text of the Second Amendment covers individuals who would have been minors even 60 years ago, when the Supreme Court has defined the scope of the right as it was understood in 1791 or 1868.

Indeed, the Supreme Court has recognized that "[o]f course the right was not unlimited, just as the First Amendment's right of free speech was not." *Heller*, 554 U.S. at 595. Now-Justice Barrett acknowledged that this Nation has historically prohibited dangerous people from carrying guns. "History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J. dissenting), *abrogated by Bruen*, 142 S. Ct. 2111.

---

[2] The author of this treatise also authored the expert report in this matter. (*see* Doc. 50-1).

Justice Barrett's dissent acknowledges the right can be constrained, specifically by a state's police powers, and that the right does not apply to "all people." In *Heller*, the Court relied on Thomas M. Cooley's "massively popular" legal treatise written in 1868 as evidence that the Second Amendment conferred a right unconnected to militia service. 554 U.S. at 616-17. That very same treatise also provides that states have inherent police powers to "prohibit the sale of arms to minors." Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883). Throughout this Nation's history, legislatures have placed restrictions on groups they have deemed dangerous pursuant to their police powers, including 18-to-20-year-olds.

### A. Militia Laws Are Not Evidence of 18-to-20-Year-Olds Having Second Amendment Rights.

Even Plaintiffs implicitly acknowledge the scope of the Second Amendment right can be constrained, as they rely on militia laws to support their argument. For their argument that the Second Amendment right vests at eighteen, Plaintiffs heavily rely on the federal Militia Act, which "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." Ch. 33, § 1, 1 Stat. 271. But the militia laws are not evidence that 18-to-20-year-olds had independent Second Amendment rights; many required parents to obtain their minor children's firearms and imposed punishments for failing to do so. And imposition of a duty does not equate to a right that can be claimed against one's government.

The fact that the government, through the Militia Act and other laws cited by Plaintiffs, compelled people to obtain guns for militia service does not mean that these laws

6

are evidence of a right the people could claim against their government. Yet Plaintiffs argue, without citation to authority "if an individual would have been a member of the 'militia,' *at least* his rights must be protected by the Amendment." (Doc. 42 at 10.) "The fact that early American governments compelled some infants to keep and bear arms did not establish a right that an infant could claim against the government." (Cornell Rep. (Doc. 50-1) at 5.) Indeed, the government can impose a duty upon an individual, but it does not necessarily follow that that individual can declare to be free from government intervention on the same basis as that duty. "Accordingly, while the existence of a right may impose a duty on another legal actor (such as a duty to refrain from interfering with the right), duties do not automatically confer individual rights on those who are required by law to participate in the militia." Cornell, *"Infants" and Arms Bearing*, *supra*. Rights are not corollaries of duties.

A multitude of militia statutes further underscore that minors did not have independent rights to carry firearms. As minors did not have the right to obtain guns, many militia laws required guardians or parents to procure them. *See* Cornell, *"Infants" and Arms Bearing*, *supra*, at Table 1 (*citing* ten state laws between 1776 and 1825 requiring parents to obtain militia weapons for their minor children. *E.g.*, Massachusetts law from 1793 "[A]ll parents, masters and guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipments aforementioned. . .") Further the common law of the time would have imposed punishment on parents or guardians whose minor children did not obtain required weapons, not on the minors themselves. *Id*. These laws demonstrate that 18-to-20-year-olds did not have a Second

7

Amendment right to purchase and carry firearms without the consent of their parent or guardian.

Service in the militia was not seen by people at the time to confer upon minor 18-to-20-year-olds their constitutional rights. For example, when a delegate at the New York State constitutional convention suggested the age to vote be lowered from 21 to 18 for those who had served in the militia, it was mocked by fellow delegates as a joke. (Cornell Rep. (Doc. 50-1 at 12).) Similar to the right to vote, there is no evidence people at the time viewed minors as having the right to bear arms simply because of militia service.

As Plaintiffs point out, the reason males 18 and up were considered suitable to serve in the militia was because of their physicality for warfare, not because they had Second Amendment rights to carry firearms. (Doc. 42 at 12.) Indeed, if the federal Militia Act was evidence of a Second Amendment right, then only "every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years, and under the age of forty-five years" would have a right to keep and bear firearms. *See* Militia Act, 1 Stat. 271. § (1792). Plaintiffs do not argue that the Second Amendment right applies only to these categories of people, just as Plaintiffs do not argue that Second Amendment rights should be stripped from those 55-years-old and older. To do so would be ridiculous. There was no uniform minimum age for militia service in the states. The federal Militia Act gave states the discretion to impose their own age qualifications. *See* 1 Stat. 271, § 2 (1792) ("[A]ll persons who are now or who may hereafter be exempted by the laws of the respective states, shall be, and are hereby exempted from militia duty, notwithstanding their being above the age

8

of 18").[3]  Some states made a policy choice to set the minimum age at 18 while others set the minimum age at 21.  "In times of war, the age for service in the militia crept down towards sixteen; in times of peace, it crept up towards twenty-one."  *Nat'l Rifle Ass'n of Am., Inc. v. Swearingen*, 545 F. Supp. 3d 1247, 1258 (N.D. Fla. 2021).  This makes sense, as in times of war, states would necessarily need access to a larger militia.  A state's policy choice to set a minimum age (as well as a maximum age) for militia service for various practical and policy reasons is not evidence of a fundamental right to firearms.  Founding era militia statutes— which presupposed parental oversight—are entirely consistent with the understanding that 18-to-20-year-olds were minors and fell outside the scope of the Second Amendment.

## II. THERE ARE NUMEROUS HISTORICAL ANALOGUES FOR MINNESOTA'S CHALLENGED STATUTE.

### A. 1868 is the Correct Time Period to Review Historical Analogues in this Case.

The Supreme Court declined to determine which time period, 1868 or 1791, should be used when reviewing the historical record for analogous restrictions.  It expressly left open "whether courts should primarily rely on the prevailing understanding of an

---

[3] Although Plaintiffs claim "shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well," (Doc. 42 at 12) in actuality, even years later in 1797 states were still adopting 18 as the minimum age. *Jones v. Bonta*, 34 F. 4th 704, 719 (9th Cir. 2022), Appendix 2 (Chart of Post-Ratification Militia Laws).  Although the federal statute set a minimum age, the states were in flux.  States did not uniformly agree to set the minimum age at 18 at the time of ratification or at the time the Militia Act was passed. Plaintiffs' reliance on these laws passed after ratification does not square with their insistence that 1791 is the most important time period from which to draw historical analogy.

9

individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Bruen*, 142 S. Ct. at 2138. Plaintiffs acknowledge this is an open question. (Doc. 42 at 15.) Plaintiffs also acknowledge "the difference between 1791 and 1868 in this case is not significant." (*Id.* at 17.) For the purposes of reviewing Minnesota's permit-to-carry statute at issue in this action, the appropriate time period is 1868, when the Fourteenth Amendment made the Second Amendment applicable to the states.

A state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 142 S. Ct. at 2137. Indeed, before 1868 the Second Amendment did not apply to the states. "The Bill of Rights, including the Second Amendment, originally applied only to the Federal Government." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 754 (2010). The best way to determine the public understanding of the Second Amendment at the time it was extended to Minnesota is by viewing sources from 1868 and *thereafter*. A "critical tool of constitutional interpretation" is examining "a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" *Heller*, 554 U.S. at 605 (second emphasis added). The Supreme Court's foundational Second Amendment cases all demonstrate that 1791 is far too narrow a focus to determine the issue in this case.

In *Heller*, the Supreme Court reviewed material from 1868 and later, and found laws with analogues after that period to be presumptively valid. "But ratification is just one snapshot in time. And as *Heller* makes clear, evidence from both before and after ratification is relevant in determining the Second Amendment's meaning." *Swearingen*, 545 F. Supp. 3d at 1257; *see also Heller*, 554 U.S. at 605. *Heller* found Reconstruction

10

era views about the scope of the Second Amendment particularly "instructive" as to the "origins and continuing significance" of the Second Amendment. *Heller*, 554 U.S. at 614. And the *Heller* Court relied on judge, professor, and legal commentator Thomas M. Cooley's "massively popular 1868 Treatise on Constitutional Limitations" as well as his 1880 work as evidence of the scope of the Second Amendment rights. 554 U.S. at 616-17. The "longstanding" and presumptively valid restrictions that *Heller* mentioned -- possession of firearms by felons and the mentally ill – have no analogue near 1791 and instead have foundations much later in time. *BAFTE*, 700 F.3d at 196, *citing Heller*, 554 U.S. at 626. Indeed, "*Heller* articulated a non-exhaustive list of 'longstanding' and presumptively valid firearms regulations, most of which have no Founding-Era analogue." *Swearingen*, 545 F. Supp. 3d. at 1261. *Heller* demonstrates that Plaintiff's suggested focus on 1791 is far too narrow, and a broader view to 1868 and after is required.

Likewise, *McDonald v. City of Chicago* demonstrates that the proper focus is 1868 rather than simply 1791. *McDonald* held that the Second Amendment right stated in *Heller* applies to the states through the Due Process clause of the Fourteenth Amendment. 561 U.S. 742, 791 (2010). To reach this result, the Supreme Court performed an in-depth review of the history of the right to keep and bear arms, with a particular focus on the time around the adoption of the 14th Amendment and after. *See* 561 U.S. at 776-78. "Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental." *Id.* at 776 *McDonald* demonstrates that the proper focus for this case challenging Minnesota's permitting scheme is 1868.

11

Similarly, in *Bruen*, the Court relied on 19th century materials as evidence of "how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens." 142 S.Ct. at 2150. And while "post-Civil War discussions of the right to keep and bear arms [which] 'took place 75 years after the ratification of the Second Amendment … do not provide as much insight into its original meaning as earlier sources," *Bruen*, 142 S. Ct. at 2137, they do provide perfect insight into the "public understanding" of the right at the time it was applied to the states in 1868. *Heller*, 554 U.S. at 605.

Plaintiffs urge this Court to focus on 1791, citing *Gamble v. United States*, 139 S. Ct. 1960 (2019), as support. But in *Bruen* the Supreme Court specifically acknowledged *Gamble* and still declined to determine whether 1868 or 1791 was the proper inquiry. *See* 142 S. Ct. at 2137-38. In *Bruen* the Court left open the question of what time period to apply because it stated, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 2138. Consequently, it considered laws from both time periods. *See* 142 S. Ct. at 2150.

Here, the public understanding of the rights of "infants" or minors was the same in 1791 and 1868. People under 21 were minors under the law during both time periods, without the full legal rights adults possessed. Similar to *Bruen*, the public discourse and laws around the time of Reconstruction is useful in determining the public understanding of the scope of the Second Amendment right at the time the Fourteenth Amendment secured it for citizens of all states. *Heller*, *McDonald*, and *Bruen* all demonstrate that the

time period surrounding the ratification of the Fourteenth Amendment and later is the proper focus.

### B. Plaintiffs Ignore Historical Context Regarding the Laws Constraining 18-to-20-Year-Olds in the Founding Era.

Plaintiffs argue, without reference to the overarching legal context of the status of minors during the time period, that "young adults" had the right to bear arms on equal footing with adults during the Founding Era. "There was no legal category of 'young adult' in the Founding Era." Cornell, *"Infants" and Arms Bearing, supra*. Instead, "18-to-20-year-olds were minors under the legal protection of their parents or guardians." (Pl.'s Br. (Doc. 42) at 23), *citing* 1 Blackstone Commentaries * 441. Minors who left their parental home and went to college then lived under the guardianship authority of their college *in loco parentis*. Many colleges prohibited students from possessing or keeping firearms. ((Cornell Rep.) at 14.) Similarly, minors serving in the militia also traded one guardian for another. Those joining militias were subject to military law, order, discipline, and punishment, which could be as harsh as whipping. (*Id.* at 12-13.) Plaintiffs ignore the reality that minors had no independent legal agency in 1791 and 1868; and therefore, no independent right to carry a firearm without a guardian's consent.

This context is key to understanding historical analogues to Minnesota's permitting scheme from the Founding Era. Rather than taking into account historical context, Plaintiffs argue there is no law from the Founding Era restricting 18-to-20-year-olds from acquiring or carrying firearms. When asked such a question in his deposition, Professor Cornell provided the necessary context:

> 9  It's a bad question because it doesn't --
> 10 you know, you have to ask a question that's
> 11 grounded in the actual history.
> 12 So a question like that,
> 13 unfortunately, rests on a poorly articulated
> 14 set of assumptions about what the reality of
> 15 firearms ownership was in the Eighteenth
> 16 Century.
> 17 So, yes, given that there was a
> 18 shortage of firearms, and government policy
> 19 was aimed to increase firearm production,
> 20 passing [a law] against acquiring firearms
> 21 wouldn't have made a whole lot of sense.

(Prutzman Decl. in Opp. to Pl.'s Mot. for S.J., Ex. 1. (Cornell Dep. 177:9-21)).

Plaintiffs claim militia laws, *posse comitatus*, and the "hue and cry" support their argument that 18-to-20-year-olds had the right to carry firearms. But minors participated in all of these things with the consent or supervision of a guardians and within a community of adults. Numerous militia laws from the Founding Era required parents to obtain weapons required for militia for their minor children. *See* section I.A. *supra*. Plaintiffs next argue that 18-to-20-year-olds were expected to "bear arms" to assist law enforcement as part of *posse comitatus* and the "hue and cry." (Doc. 42 at 18.) But minors were expected to aid law enforcement under the supervision of adults; they were not acting independently. *See* Cornell, *Infants and Arms Bearing*, *supra*. Further, these activities did not require firearms, but weapons. As John Adams stated regarding the *posse comitatus* "They may take with them such weapons as are necessary to enable them to effectually to do it." *Id.*. As most law enforcement was not armed with firearms at the time, it should not be assumed that minors were to be armed with firearms, rather than other weapons, in order to assist. *See id.* Historical context shows that minors in these settings were

14

supervised by their guardians, adults within their local communities, or adults within the structure of the militia; they were not independent actors with firearms.

### C. A Plethora of Historical Analogues for Minnesota's Permit-to-Carry Statute Before and After the Ratification of the Fourteenth Amendment Establish its Constitutionality.

The significant amount of historical restrictions on 18-to-20-year-old's access to firearms evidence the constitutionality of Minnesota's permit-to-carry statute. In an attempt to distract from these numerous age-based-restrictions. Plaintiffs narrow comparable analogues to an extreme that is not required by *Bruen*. Both *Heller* and *Bruen* found nineteenth century statutes to be instructive.

Plaintiffs incorrectly perform the historical analysis required by *Bruen* and concede only historical twins to Minnesota's permit-to-carry statute. Age-based restrictions on the right to purchase, carry, or keep a firearm are all analogous to Minnesota's section 624.714. *Bruen* required only a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). "[E]ven if a modern regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* Under the analogical inquiry test set forth in *Bruen*, courts must consider whether two regulations are "relevantly similar" rather than *identical* when considering "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33 (quoting *McDonald*, 561 U.S. at 767). Here, Plaintiffs attempt to ignore the numerous historical age-based restrictions and focus only on those age-based restrictions on the right to carry.

15

Plaintiffs' narrow focus on only historical age-based carry restrictions is misplaced. Plaintiffs acknowledge only two laws, Wisconsin and Kansas laws from 1883, are sufficiently similar to Minnesota's statute at issue. They neglect to mention Nevada's 1885 law providing that, "Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, … or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor…" 1885 Nev. Stat. 51 § 1; *see also* Cornell Rep. (Doc. 50-1) at 26, Table Two. Plaintiffs ignore all other historical age-based restrictions, including those prohibiting the sale of firearms to people under 21. (*See id*, listing 20 state laws between 1875 and 1899 regulating minors and guns.); *see also* Doc. 49 at 24-27. Age-based firearm sales restrictions as well as age-based carry restrictions are sufficiently similar historical analogues to Minnesota's law pursuant to *Bruen*.[4] Both affect the same group of people, those under the age of 21. Both limit the targeted group's ability to access guns. Both the historical laws and Minnesota's law are comparably justified to target a specific group of people thought to be dangerous with firearms. The more than twenty age-based firearm restrictions from the 19th century are sufficiently similar historical analogues to Minnesota's permit-to-carry statute with comparable burdens. Minnesota's statute is similar to this nation's longstanding age-based firearms restrictions and is therefore constitutional.

---

[4] In fact, contrary to Plaintiffs' assertions (Doc. 42 at 22), age-based sales restrictions arguably pose a greater burden than age-based carry restrictions because it is difficult for a person to own or carry a gun if they cannot purchase a gun. They must rely on others to gift or loan them a gun. In contrast, age-based carry restrictions do not place burdens on a person's ability to purchase or own firearms.

16

Finally, with no sense of irony, Plaintiffs argue historical age-restriction analogues are "irrelevant" to determining the constitutionality of Minnesota's statute. (Doc. 42 at 23.) Plaintiffs argue this is because historical laws applied to 18-to-20-year-old minors, while that same age group today (as of the 1970's) are considered adults. But *Bruen* mandated that 20th century history be disregarded when in contradicts earlier history. 142 S.Ct. at 2154, n.28. The fact that 18-to-20-year-olds are adults now has no impact on whether the generations that passed the Second and Fourteenth Amendments believed they had a right to carry firearms. Plaintiffs simply ignore the history and status of "infants" or minors throughout most of America's history.

## CONCLUSION

For the aforementioned reasons, the Commissioner respectfully requests the Court deny Plaintiffs' motion for summary judgment as a matter of law.

*SIGNATURE ON FOLLOWING PAGE*

Dated: August 25, 2022　　　　　　　Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota


s/ Amanda E. Prutzman
Amanda E. Prutzman
Assistant Attorney General
Atty. Reg. No. 0389267

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1217 (Voice)
(651) 282-5832 (Fax)
amanda.prutzman@ag.state.mn.us

ATTORNEY FOR DEFENDANT COMMISSIONER JOHN HARRINGTON

|#5304717-v1a