# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| KRISTIN WORTH, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil No. 21-1348 |
| | ) |
| JOHN HARRINGTON, in his | ) Judge Katherine M. Menendez |
| individual capacity and in his | ) Magistrate Judge Leo I. Brisbois |
| official capacity as Commissioner | ) |
| of the Minnesota Department of | ) |
| Public Safety *et al.*, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT

Date: August 25, 2022

Blair W. Nelson
Minnesota Bar No. 0237309

BLAIR W. NELSON, LTD.
205 7th Street N.W. Suite 3
Bemidji, MN 56601
(218) 444-4531
bwnelson@paulbunyan.net

David H. Thompson*
DC Bar No. 450503
Peter A. Patterson*
DC Bar No. 998668
William V. Bergstrom*
DC Bar No. 241500

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
*Admitted pro hac vice

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 3

I.    The Commissioner Is Not Entitled to Eleventh Amendment Immunity. ................. 3

II.   Plaintiffs Do Not Need to Satisfy *Monell* to Maintain Their Claims Against
      the Sheriffs. ................................................................................................. 5

III.  Minnesota's Carry Ban Unconstitutionally Deprives 18-to-20-Year-Olds
      of Their Second Amendment Rights. ................................................................ 12

      A.    *Bruen* Did Not Establish the Constitutionality of Minnesota's
            Age-Based Restrictions. ..................................................................... 12

      B.    Minnesota's Carry Ban is Unconstitutional Under Binding Supreme
            Court Precedent. ................................................................................ 14

            1.    The Conduct Prohibited by the Carry Ban is Covered by the
                  Plain Text of the Second Amendment. ........................................... 14

            2.    When Analyzing the Historical Justifications for the Carry
                  Ban, 1791 Is the Key Year for Assessing the Scope of the Right. .... 18

            3.    The Commissioner Has Failed to Demonstrate that the Carry
                  Ban is Consistent with Our Nation's Tradition of Firearm
                  Regulation. ....................................................................... 24

                  i.    The Minority Status of 18-to-20-Year-Olds at Earlier
                        Periods of American History is Irrelevant. ...................... 25

                  ii.   The Commissioner's Historical Analogues are Inadequate
                        to Support the Carry Ban. ......................................... 28

            4.    Statistical Evidence Regarding the Relative Level of
                  Criminality of 18-to-20-Year-Olds is Irrelevant Under *Bruen*. ....... 36

i

IV.     If the Court Credits Minnesota's Argument that Its Regulation is a Permissible
        Way to Promote Public Safety, It at a Minimum Should Deny Summary
        Judgment in Defendants' Favor on Plaintiffs' As-Applied Claim. ........................ 38

CONCLUSION .............................................................................................................. 41

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Adamson v. California*, 332 U.S. 46 (1947) ................................................................. 23

*Agostini v. Felton*, 521 U.S. 203 (1997) ...................................................................... 20

*Aymette v. State*, 21 Tenn. 154 (1840) ......................................................................... 33

*Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954) .................................................. 23

*Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011) .......................................................... 30

*Calhoun v. Washington Cnty. Cmty. Servs. Child Support Unit*,
   No. 18-cv-1881, 2019 WL 2079834 (D. Minn. Apr. 23, 2019),  ................................. 9

*Calzone v. Hawley*, 866 F.3d 866 (8th Cir. 2017) ....................................................... 3, 4

*Church v. Missouri*, 913 F.3d 736 (8th Cir. 2019) ........................................................... 3

*City of Canton v. Harris*, 489 U.S. 378 (1989) ................................................................ 5

*Cogel v. Ralph*, 24 Minn. 194 (1877) .......................................................................... 39

*Coleman v. State*, 32 Ala. 581 (1858) .......................................................................... 33

*Craig v. Boren*, 429 U.S. 190 (1976) ........................................................................... 38

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................................................ 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................. 1, 2, 15, 16, 20, 33

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) ......................................... 21, 22

*Duncan v. State of Louisiana*, 391 U.S. 145 (1968) ........................................................ 24

*Evans v. City of Helena-West Helena, Ark.*, 912 F.3d 1145 (8th Cir. 2019) ..................... 6

*Ex parte Young*, 209 U.S. 123 (1908) ......................................................................... 3, 4

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021) ............................. 16, 24, 26, 31, 32, 34

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) ............................... 16, 22, 26, 32, 33, 34, 35

*Jordano By and Through Jordano v. Steffen*, 787 F. Supp. 886 (D. Minn. 1992) .............. 8

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ................................................................ 17

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ...................................................................... 19

*Malloy v. Hogan*, 378 U.S. 1 (1964) ................................................................. 19, 23, 24

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...................................... 18, 19, 21, 24

*McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781 (1997) ............................................. 6, 10

*Minnesota RFL Republican Farmer Labor Caucus v. Freeman*,
   33 F.4th 985 (8th Cir. 2022) ................................................................................... 11

*Minnesota RFL Republican Farmer Labor Caucus v. Freeman*,
   No. 19-cv-1949, 2020 WL 1333154 (D. Minn. Mar. 23, 2020) .................................... 7

*Monell v. Department of Soc. Servs. of City of New York*,
   436 U.S. 658 (1978) ......................................................................................... 5

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ........................................... 22

*Myers v. United States*, 272 U.S. 52 (1926) ................................................... 19

*Nat'l Rifle Ass'n, Inc. v. BATFE*, 714 F.3d 334 (5th Cir. 2013) ................. 16, 26

*Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117 (2011) ........... 19

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ......... 1, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 24, 25, 36, 37

*Page v. State*, 50 Tenn. 198 (1871) ............................................................... 33

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ................................................. 19

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008) .................. 20

*St. James v. City of Minneapolis*,
   No. 05-cv-2348, 2006 WL 2591016 (D. Minn. June 13, 2006) ............... 7, 8

*State v. Callicutt*, 69 Tenn. 714 (1878) ......................................................... 33

*Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020) ................. 4, 5

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) ....................................................... 19

*Twining v. State of New Jersey*, 211 U.S. 78 (1908) ....................................... 23

*Udoh v. Minnesota Department of Human Services*,
   No. 16-cv-3119, 2017 WL 9249426 (D. Minn. July 26, 2017) ............... 9, 10

*Ulrich v. Pope County*, 715 F.3d 1054 (8th Cir. 2013) ................................. 10

*United States v. Greeno*, 679 F.3d 510 (6th Cir.2012) ................................. 21

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002) ........... 10

*Virginia v. Moore*, 553 U.S. 164 (2008) ....................................................... 19

*Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989) .......................... 10

*Wilson v. Kan. Children's Home and Serv. League*,
   154 P.2d 137 (Kan. 1944) ....................................................................... 39

## **Statutes**

The Militia Act of 1792, 1 Stat. 271 (1792) ................................................. 16

Minn. Gen. Stat. *c.* 59, § 2 (1866) ................................................................. 39

Minn. Stat.

§ 382.01 ...................................................................................................... 5
§ 387.03 ..........................................................................................................
§ 624.714 ................................................................................................... 4
§ 624.714 subd. 2 ........................................................................... 6, 11, 12
§ 624.714 subd. 2(a) ................................................................................. 7
§ 624.714 subd. 3(f) ................................................................................. 7
§ 624.714 subd. 21 ................................................................................... 7
§ 624.7151 ................................................................................................ 5

1856 Ala. Acts 17 ............................................................................................. 31

1856 Tenn. Pub. Acts 92 .................................................................................. 31

1859 Ky. Acts 245 ..................................................................................... 31, 32

1875 Ind. Acts 86 ............................................................................................. 35

1883 Kan. Sess. Laws 159, § 1 ....................................................................... 39

1885 Nev. Stat. 51, § 1 .................................................................................... 34

1890 La. Acts 39, § 1 ....................................................................................... 35

Iowa Code

§ 724.7 ................................................................................................ 12, 13
§ 724.8(1) ........................................................................................... 12, 13

## Constitutional Provisions

U.S. CONST. amend. II .................................................................................... 14

U.S. CONST. amend XIV, § 1 ................................................................... 22, 23

## Other Authorities

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 441 (1769) ...... 27

1 JOHN BOUVIER, INSTITUTES OF AMERICAN LAW 148 (1858) ......................... 27

2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 233 (O. W. Holmes Jr. ed., 12th ed.,
  Little Brown, and Co. 1873) (1836) ...................................................... 27, 39

16 DAVID SHEPHARD GARLAND, ET AL., THE AMERICAN AND ENGLISH
  ENCYCLOPEDIA OF LAW (1900) ................................................................ 39

Akhil Reed Amar, Heller, *HLR, and Holistic Legal Reasoning*,
  122 HARV. L. REV. 145 (2008) ................................................................. 32

An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), ORDINANCES, OF THE TOWN OF COLUMBIA, (S.C.) PASSED SINCE THE INCORPORATION OF SAID TOWN: TO WHICH ARE PREFIXED, THE ACTS OF THE GENERAL ASSEMBLY, FOR INCORPORATING THE SAID TOWN, AND OTHERS IN RELATION THERETO 61 (1823) .............................................................. 30, 31

THOMAS M. COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATION (6th ed. 1890) ......................................................................................... 33, 34

JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788) ................................................................................................... 25, 26

*Homicide Rate per 100,000 Residents*, NYC MAYOR'S OFFICE OF CRIM. JUST. (last visited Aug. 24, 2022), *available at* https://bit.ly/3pEv7Dw ................................ 29

David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U.L.J. 119 (2018) ........................................................... 34

Jack D. Marietta & G.S. Rowe, *Violent Crime, Victims, and Society in Pennsylvania, 1682-1800*, 66 PENNSYLVANIA HIST. 24 (1999)........................................... 28

Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Females*, U.S. DEP'T OF JUST., *available at*, https://bit.ly/3mbxA65 ................................................. 40

Ordinance of the City of New York, to Prevent the Firing of Guns in the City of New York § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF SAID CITY (1803).............. 30

*Permit to Carry Reciprocity*, Out of State Permits Valid in Minnesota, MINN. BUREAU OF CRIM. APPREHENSION (last visited Aug. 24, 2022), *available at* https://bit.ly/3TbUkCX .............................................................. 4

RANDOLPH ROTH, AMERICAN HOMICIDE 162 (2012) ................................. 28, 29

*Underlying Cause of Death*, 1999-2020 Results, CDC (click "agree" and table will be generated), *available at* https://bit.ly/3PRNbEJ ............................................ 29

*University Church in Yale marks 250 years of tradition and reform*, 36 YALE BULLETIN & CALENDAR 4 (Sept. 28, 2007), *available at* https://bit.ly/3PNmwt1 ...................... 30

## INTRODUCTION

The Second Amendment "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580, 581, 592 (2008). Indeed, the Amendment states clearly it is a right of "the people" to carry arms. The individual plaintiffs in this case are part of "the people." They are 18-to-20-year-old adult citizens who are barred by nothing but their age from acquiring a carry permit from Defendants and carrying handguns in public for self-defense. Because the "plain text" of the Second Amendment covers the conduct being restricted by Minnesota's Carry Ban, *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022), it follows that the Carry Ban must fall unless Defendants can prove that it "is consistent with this Nation's historical tradition." *Id.* Defendants have not, and cannot, make such a showing. There is absolutely zero historical warrant for banning any category of law-abiding adults from exercising their Second Amendment rights on account of their age. Just today an effectively identical restriction on the rights of 18-to-20-year-old Texans was held unconstitutional on precisely these grounds. *See* Ex. A, Op. & Order, *Firearms Policy Coalition, Inc. v. McCraw*, No. 4:21-cv-1245-P, Doc. 74 (Aug. 25, 2022).

As an initial matter, both the Commissioner and the Sheriffs claim they are not appropriate defendants in this case, but they are wrong. They are all appropriate defendants for prospective relief under *Ex parte Young* because they all have some connection to the enforcement of Minnesota's Carry Ban. The Commissioner creates the forms, administers the carry permitting program on a state-wide level, and keeps a running list of states with

similar carry permitting schemes (including similarly exclusionary of 18-to-20-year-olds).

The Sheriffs, who misunderstand Plaintiffs as bringing a defective *Monell* claim, are also

appropriate defendants under *Ex parte Young* because they are state actors when they

administer the state's carry permitting scheme by reviewing and acting on applications for

permits.

The Commissioner offers a defense of Minnesota's law on the merits (which the

Sheriffs endorse), but it is unconvincing.

First, the Commissioner argues that *Bruen* already established the constitutionality

of Minnesota's carry scheme, but it did no such thing. While *Bruen* indicated that it may

be constitutional for states to maintain "shall issue" permitting processes as a general

matter, it said nothing about whether states can exclude law-abiding, 18-to-20-year-olds

adults from eligibility for a license.

Second, the Commissioner strains to read the text of the Second Amendment as

excluding Plaintiffs because people in the Plaintiffs' age group were "minors" for certain

purposes at the time of the Founding. But there is nothing in the text of the Second

Amendment indicating that "minors" or any other Americans are categorically excluded,

and *Heller* forecloses any such holding. There, the Court held the use of the phrase "right

of the people" in the Second Amendment's text creates "a strong presumption that the

Second Amendment right is exercised individually and belongs to *all Americans*." 554 U.S.

at 579, 581 (emphasis added). It, therefore, is the burden of the government to prove that

any restrictions placed on any particular group of Americans seeking to exercise the right

to keep and bear arms are historically justified.

Third, in seeking to meet his burden, the Commissioner wrongly places the emphasis on history surrounding 1868, rather than 1791, when the Second Amendment was ratified. And the evidence from 1791 demonstrates unequivocally that 18-to-20-year-olds have full Second Amendment rights. Even with respect to 1868, the Commissioner does not claim to have identified any statute from around that time that restricted the right of legal adults to carry firearms on account of their age.

Finally, the Commissioner attempts to bring in statistical evidence regarding the relative dangers of permitting 18-to-20-year-olds to have firearms, but this evidence is irrelevant under *Bruen*. What is more, an examination of statistical evidence highlights the particular indefensibility of the Carry Ban as applied to women like Plaintiff Worth.

## ARGUMENT

## I.   The Commissioner Is Not Entitled to Eleventh Amendment Immunity.

The Commissioner argues that he is entitled to Eleventh Amendment immunity from Plaintiffs' official capacity claims for injunctive relief.[1] The Eleventh Amendment generally bars suits against state officials in their official capacities, subject to a key exception: "Under the *Ex parte Young* doctrine, a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." *Church v.*

---

[1] Plaintiffs also note that the Commissioner argues he is immune from claims for nominal damages in his official capacity as well under the Eleventh Amendment. Plaintiffs agree to dismiss their claims for nominal damages. Additionally, Plaintiffs note that the Commissioner seeks summary judgment for claims against him in his individual capacity (for both nominal damages and injunctive relief) based on qualified immunity. As in Plaintiffs' stipulation regarding these same claims as to the Sheriffs, *see* Am. Stip. of Dismissal Without Prejudice, Doc. 29 (Nov. 16, 2021), Plaintiffs agree to dismiss the individual capacity claims against the Commissioner.

*Missouri*, 913 F.3d 736, 747 (8th Cir. 2019). In order for the *Ex parte Young* exception to apply, relief must be prospective, as it is here, and the official sued "must have 'some connection to the enforcement of the challenged laws.' " *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908)).

As the Commissioner admits, he is charged by statute with a variety of duties that make the Carry Ban effective, including adopting statewide standards governing the form and contents of every application for a permit to carry a handgun as well as receiving funds from sheriffs for permit applications, publishing a list of states whose license statutes are similar or dissimilar to Minnesota's,[2] and executing reciprocity agreements with jurisdictions whose statutes are similar. *See* Def. John Harrington's Mem. in Supp. of His Mot for Summ. J. 13, Doc. 49 (Aug. 4, 2022) ("Comm'r Br."); Minn. Stat. §§ 624.714, 624.7151. That is sufficient to satisfy the requirement for "some connection." In *Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020), for example, the court found *Ex parte Young* permitted an official capacity suit against the Texas secretary of state in a challenge to an age-based absentee voting provision based on the secretary's duties to "design the application form for mail-in ballots and to provide the form to local authorities and others who request it" as well as "furnish forms to those who request them for distribution to others." *Id.* at 179–180 (citations omitted). In that case, the secretary

---

[2] The current version of this list excludes all states that allow permitted carry by 18-to-20-year-olds. *See Permit to Carry Reciprocity*, Out of State Permits Valid in Minnesota, MINN. BUREAU OF CRIM. APPREHENSION (last visited Aug. 24, 2022), *available at* https://bit.ly/3TbUkCX ("Nevada has been withdrawn as a similar state because age 21 is no longer the minimum age for all permit applicants. Minnesota law requires all applicants to be at least 21 years old, without exception.").

included a check box for an applicant for an absentee ballot to mark indicating they were entitled to vote absentee because they were at least 65 years old, and the Fifth Circuit concluded that "a finding that the age-based option denies or abridges younger voters' right to vote might lead to prohibiting the Secretary from using an application form that expressed an unconstitutional absentee-voting option." *Id.* at 180. Notably, it did not matter that the applications themselves were reviewed by local officials: "Though there is a division of responsibilities, the Secretary has the needed connection." *Id.*

The same is true here. A finding that Plaintiffs have a right to apply for and receive carry licenses would require action on behalf of the Commissioner, including prohibiting him from placing any indication on the application form that individuals must be 21 years of age to apply. The Commissioner is subject to suit on behalf of the State under *Ex parte Young*.

## II.   Plaintiffs Do Not Need to Satisfy *Monell* to Maintain Their Claims Against the Sheriffs.

The Sheriffs fault Plaintiffs for failing to state a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). *Monell* requires that any complaint bringing claims under Section 1983 against a municipality (or an officer of a municipality sued in his official capacity) must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). The Sheriffs argue that this requirement is triggered because in Minnesota sheriffs are elected officers of their counties. Minn. Stat. § 382.01;

Defs. Don Lorge, Troy Wolbersen, and Dan Starry's Mem. of Law in Supp. of Their Mot.
for Summ. J. 7, Doc. 53 (Aug. 4, 2022) ("Sheriffs' Br.").

As an initial matter, Plaintiffs agree that they have not based their claims upon
policies, customs, or practices specific to the Sheriffs' counties. They are challenging
Minnesota's state law which the Sheriffs enforce. Plaintiffs have therefore not sued the
Sheriffs as representatives of their counties, but as enforcement officials for the State. It is
not as simple, as the Sheriffs assert, as noting that they are elected by their respective
counties to hold they are county and not state officials for purposes of the claims asserted
here. In considering whether the Sheriffs may be appropriately sued as state officials for
their role in processing and denying applications for carry licenses, courts look to state law,
but in doing so the *label* that state law gives to the official or the *general* nature of their
duties does not matter; instead the courts must assess "the actual function of a government
official, in a particular area" to decide the issue. *McMillian v. Monroe Cnty., Ala.*, 520 U.S.
781, 786 (1997); *see also Evans v. City of Helena-West Helena, Ark.*, 912 F.3d 1145, 1146
(8th Cir. 2019) ("Whether the clerk acts on behalf of the State, the City, or the County
depends on the definition of the clerk's official functions under relevant state law.").

In this case, the Sheriffs are arms of the State. Minnesota law shows that the general
the powers of sheriffs are a mix of county and state responsibilities. *See* Minn. Stat.
§ 387.03 (requiring sheriff to, among other things, "pursue and apprehend all felons" and
"execute all processes, writs, precepts, and orders issued or made by lawful authority and
to the sheriff delivered"). As relevant here, the Sheriffs play a role in implementing
Minnesota's Carry Ban that is not in any way a county responsibility. The Sheriffs are

6

charged by Minn. Stat. § 624.714 subd. 2 with accepting and processing applications for carry permits submitted on a form that is created by the State (specifically, as discussed above, by the Commissioner). Notably, sheriffs provide this service not only to people within their county but also to nonresidents seeking a Minnesota carry permit. A nonresident can apply to any sheriff and that sheriff must, under state law, process his application. *Id.* subd. 2(a). Sheriffs are also charged by state law with collecting "a new application processing fee" of which "$10 must be submitted to the commissioner and deposited into the general fund." *Id.* subd. 3(f). No portion of this fee goes to pay general county expenses. Whatever is left over beyond the $10 sent to the Commissioner "must be used only to pay the direct costs of administering [the permitting process]. . . . Fee money may also be used to pay the reasonable costs of the county attorney to represent the sheriff in proceedings under this section." *Id.* subd. 21. If money is left over, it must be kept in a separate fund and carried over year-to-year and reported to the Commissioner annually. *Id.*

These facts conclusively demonstrate that the Sheriffs act as representatives of the State, not their respective counties, when they process applications. This is consistent with several decisions of this Court, which has held that county attorneys in Minnesota are state actors when they prosecute crimes on behalf of the State. *See Minnesota RFL Republican Farmer Labor Caucus v. Freeman*, No. 19-cv-1949, 2020 WL 1333154, at *3 (D. Minn. Mar. 23, 2020) (finding county attorneys were state officials because they "receive[d] referrals for violations . . . from a state office"); *St. James v. City of Minneapolis*, No. 05-2348, 2006 WL 2591016, at *4 (D. Minn. June 13, 2006) ("The prosecutorial role of the county attorney, which is independent from the county board, outweighs the fact that the

county pays the salaries of the county attorney's employees. Additionally, the fact that the Minnesota constitution does not identify [the county attorney] as a member of the executive department is not determinative of whether county attorneys are state actors when prosecuting cases."). Similarly, this Court has held that counties act as agents of the state when they act "as administrator of [a] State plan" for providing state Medicaid services. *Jordano By and Through Jordano v. Steffen*, 787 F. Supp. 886, 893 n.11 (D. Minn. 1992). Because the Sheriffs' actions are taken in support of a State plan for licensing the carriage of firearms for self-defense—in fact, the Commissioner argues that the Sheriffs are the *only* officials with state enforcement authority, *see* Comm'r Br. 13 ("[C]ounty sheriffs are responsible for reviewing, investigating, denying and issuing licenses under the statute. . . . County sheriffs are also responsible for notifying applicants of denial, reviewing reconsideration requests, and responding to appeal petitions in district court.")—they are acting on behalf of the State, and not their counties, so that *Monell* does not apply.

A contrary holding would make no sense. As the Sheriffs themselves admit, the policies they are executing when processing carry license applications are State policies. To ensure effective relief, however, Plaintiffs need an injunction against the Sheriffs. As explained above, an order enjoining the Commissioner from designing the application forms in a way to exclude 18-to-20-year-olds would afford Plaintiffs some redress, but to be ensured the right to a license they need any ruling to bind the Sheriffs. Under the Sheriffs' reasoning, however, Plaintiffs cannot obtain that relief. Indeed, under the Sheriffs' reasoning, if the Commissioner's arguments were correct (or if the State had excluded state officials entirely from the licensing process), then there is *no one* Plaintiffs

could sue to vindicate their Second Amendment rights. But the Sheriffs have no authority for the proposition that a state can evade review of unconstitutional laws by assigning enforcement of those laws to local rather than state officials. That is because, as we have explained, when carrying out such an assignment a local official acts as an agent of the State.

The cases the Sheriffs cite for the proposition that Plaintiffs must satisfy *Monell* are irrelevant because they do not involve cases in which the defendant was properly considered an arm of the state. In *Calhoun v. Washington Cnty. Cmty. Servs. Child Support Unit*, No. 18-cv-1881, 2019 WL 2079834 (D. Minn. Apr. 23, 2019), *adopted by* 2019 WL 2075870 (D. Minn. May 10, 2019), the pro se plaintiff sued a department of Washington County, Minnesota alleging it violated his rights by enforcing child support payment obligations. *Id.* at *1, *4 n.3. Dismissing that claim, the court noted that the only "policy" the plaintiff was arguably challenging was attributable to Washington State, not Washington County and, more importantly, the plaintiff had failed to plead a constitutional violation at all. *Id.* at *5. In *Udoh v. Minnesota Department of Human Services* another pro se plaintiff sued alleging violations of her (and her daughters') constitutional rights in the context of a child abuse investigation. The district court did not reach the question of whether a municipality could be liable under § 1983 for its enforcement of state law because plaintiffs had only offered a "formulaic recitation that statutes [describing the duties and authorities of welfare and law enforcement agencies upon receipt of allegations of child abuse] are unconstitutional" that was insufficient to state a claim for relief. No. 16-cv-3119, 2017 WL 9249426, at *7 (D. Minn. July 26, 2017), *adopted by* 2017 WL 4005606

9

(D. Minn. Sept. 12, 2017), *aff'd* 735 F. App'x 906 (8th Cir. 2018). And in *Ulrich v. Pope County*, the Eighth Circuit rejected a *Monell* challenge based on the county's failure to adequately supervise and train its law enforcement officers because the plaintiff had not alleged facts in the complaint that would demonstrate a policy or custom that led to the deprivation of his constitutional rights. 715 F.3d 1054, 1061 (8th Cir. 2013). Each of these cases, however inartfully pleaded, was at bottom a claim against a county or county official for deprivation of constitutional rights in the ordinary course of *county* business. None of the plaintiffs suggested they were bringing their claims against the county entities in their capacities as representatives of *the state*, as Plaintiffs do here. They are, therefore, irrelevant.

Like in *McMillian*, Minnesota sheriffs, when exercising their duties related to reviewing and acting on applications for carry licenses, "represent the State of [Minnesota] not their counties." 520 U.S. at 793. As a result, they are "persons" under 42 U.S.C. § 1983 and may be sued as such. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989). As discussed above, that also means they would be entitled to share in the State's sovereign immunity unless the doctrine of *Ex parte Young* applies, but here it does. Plaintiffs have alleged an "ongoing violation of federal law and seek[] relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

Because Plaintiffs' requested relief is prospective, the only question is whether or not the Sheriffs have "some connection" with the ongoing enforcement of the age restriction in the Carry Ban. They plainly do. The Sheriffs claim in their brief that they

10

"have not exercised any conscious or deliberate choice as it relates to Plaintiffs' alleged constitutional injuries by the way [they] enforced Section 624.714." Sheriffs' Br. 17. But whether the official exercised choice is not the test under *Ex parte Young*. Similarly, that no Sheriff has "ever denied a permit to the individual Plaintiffs or any other person for failure to meet the age criteria prescribed by Section 624.714" is immaterial and unsurprising. *Id.* Presumably the reason the Sheriffs have not done so is that no one has taken the time or spent the money to submit a facially futile application. The Sheriffs certainly have not stated they would defy state law and *grant* a permit application if they received one from someone between 18 and 21 years old. To the contrary, the Sheriffs insist that they "strictly adhere to the requirements of this state law and recognize [they] have no discretion to deviate from its plain language" but rather "follow the requirements in Section 624.714." Decl. of Def. Dan Starry ¶¶ 3–4, Doc. 55 (Aug. 4, 2022); Decl. of Def. Don Lorge ¶¶ 3–4, Doc. 56 (Aug. 4, 2022); Decl. of Def. Troy Wolbersen ¶¶ 3–4, Doc. 57 (Aug. 4, 2022)*.* That is enough to establish "some connection" to the Carry Ban and to distinguish this case from the Eighth Circuit's recent decision in *Minnesota RFL Republican Farmer Labor Caucus v. Freeman*, 33 F.4th 985 (8th Cir. 2022) where it found *Ex parte Young* inapplicable to county attorneys who had authority to enforce a challenged state law, because the attorneys submitted affidavits "show[ing] that they have not enforced or threatened to enforce" the challenged law. *Id.* at 992. In that case the county attorneys could make such a statement because state law only noted that they "may prosecute a violation" of the challenged statute, *id.* at 988 (cleaned up). Here, by contrast, Minn. Stat. § 624.714, subd. 2 requires sheriffs to review applications they receive and to do so in

accordance with the statutory requirements, including the age limits. The Sheriffs have acknowledged that they comply with this requirement. That is enough.

## III. Minnesota's Carry Ban Unconstitutionally Deprives 18-to-20-Year-Olds of Their Second Amendment Rights.

### A. *Bruen* Did Not Establish the Constitutionality of Minnesota's Age-Based Restrictions.

The Commissioner claims that *Bruen* "implicitly approved" of Minnesota's statutory scheme and so this Court should not overturn it. Comm'r Br. 14. The first justification he offers for this surprising claim is that the *Bruen* Court noted in a footnote that its decision finding unconstitutional New York's "may-issue" permitting scheme— referring to licensing schemes which "grant[ed] open-ended discretion to licensing officials and authorize[d] licenses only for those applicants who [could] show some special need apart from self-defense," 142 S. Ct. at 2161 (Kavanaugh, J., concurring)—did not signal that the "shall-issue" regimes in 43 other states including Minnesota were also invalid because unlike New York, those states "appear[ed]" to condition the granting of a license on "narrow, objective, and definite standards" and did not "require applicants to show an atypical need for armed self-defense," 142 S. Ct. at 2138 n.9. As a result, the Supreme Court noted that those regimes "do not necessarily prevent law-abiding responsible citizens from exercising their Second Amendment right to public carry." *Id.* Nothing in Plaintiffs' challenge would require this court to find otherwise. Plaintiffs have not challenged the existence of a "shall-issue" licensing regime in Minnesota—they have challenged the age restriction which makes Minnesota's law effectively a "shall-not-issue" regime as to 18-to-20-year-olds. The Supreme Court did not state that *every* aspect of the 43 existing shall-

issue regimes—which differ among themselves on the issue of the eligibility of 18-to-20-year-olds for licenses, *see, e.g.*, Iowa Code §§ 724.7, 724.8(1) (outlining "shall-issue" regime and precluding issuance of carry license to anyone under 18 years old)—was necessarily constitutional. In fact, the footnote the Commissioner cites says that features of such regimes that "prevent law-abiding responsible citizens from exercising their Second Amendment right to public carry" *would* render them unconstitutional. 142 S. Ct. at 2138 n.9. Minnesota's age-restriction is just such a feature.

Second, the Commissioner points to Justice Alito's statement in his concurrence that "federal law generally forbids . . . sale of a handgun to anyone under the age of 21" as *implying* that that law is constitutional. Comm'r Br. 17. But Justice Alito implied no such thing—he was merely responding to the dissent and noting an issue that was specifically not before the Court in *Bruen*. 142 S. Ct. at 2157 (Alito, J., concurring) (asking "what do[]" "statistics on children and adolescents killed by guns" "have to do with the question whether an adult who is licensed to possess a handgun may be prohibited from carrying it outside the home?"). And in any event, a statement in a concurrence is not a binding holding of the Court.

Far from justifying the Commissioner's conclusion that "clearly" the Carry Ban is constitutional, Comm'r. Br. at 17, if anything, these statements from *Bruen* demonstrate why the Carry Ban should not be thought of as part of a lawful "shall-issue" regime but instead as a distinct ban that operates to "prevent law-abiding responsible citizens from exercising their Second Amendment right to public carry" even more certainly than would

an unconstitutional may-issue regime that included 18-to-20-year-olds as at least *possibly* eligible.

### B. Minnesota's Carry Ban is Unconstitutional Under Binding Supreme Court Precedent.

As Plaintiffs explained in their own motion for summary judgment, *Bruen*'s analysis applied to the facts of this case dictates the conclusion that the Carry Ban is unconstitutional. In conducting that analysis, this Court must first look to the text of the Second Amendment to determine whether or not Minnesota's requirement that adults be at least 21 years old to acquire a carry permit affects conduct covered by the Amendment. *Bruen*, 142 S. Ct. at 2129–30. If it does, the Commissioner bears the burden of proving that the Carry Ban is nevertheless "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Here, both points lie decisively in Plaintiffs' favor.

### 1.   The Conduct Prohibited by the Carry Ban is Covered by the Plain Text of the Second Amendment.

The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Under *Bruen*, the government bears the burden of justifying its laws when "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The Commissioner does not dispute—nor could he after *Bruen*—that carrying arms in public is covered by the Second Amendment's plain text. But the Commissioner does contend that 18-to-20-year-olds are not part of the "people" protected by the Second Amendment. *See* Comm'r Br. 20. This argument, however, ignores binding Supreme Court precedent.

In *Heller*, the Supreme Court already defined "the people" in the Second Amendment. *Bruen*, 142 S. Ct. at 2126. "[T]he people" is a "term" that "unambiguously refers to *all members* of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580 (emphasis added). After all, the Constitution refers to "the people" in "six other provisions." *Id.* These uses indicate that "the people"

> protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* (cleaned up). Accordingly, *Heller* held that the use of the term "the people" created a "strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans*." *Id.* at 581 (emphasis added).

*Heller* thus leaves no doubt that the Second Amendment's plain text covers law-abiding 18-to-20-year-olds. And if there *were* any doubt, the Second Amendment's reference to the "militia"—which the State fails to mention at all in its textual analysis—is additional evidence that the right includes 18-to-20-year-olds. Unlike "the people," the "Militia" in the Second Amendment is not the entire political community of the United States but is instead a defined "subset of the people" consisting only of "those who were male, able bodied, and within a certain age range." *Id.* at 580. "The Militia" would then seem to be a much more natural place for the State to make its argument that 18-to-20-year-olds are excluded from the scope of the Second Amendment based on their age— except that the Militia *very clearly* encompassed 18-year-olds at the Founding. Just months after ratification of the Second Amendment, Congress required all able-bodied men to

enroll in the militia and to arm themselves upon turning 18. *See* Militia Act of 1792, 1 Stat. 271 (1792). This Act reflected the widespread understanding from the Founding era that citizens reached the age for militia membership by 18—an understanding that simply cannot be squared with the notion that these Plaintiffs, ordinary 18-to-20-year-olds, fall outside the Second Amendment's protective scope. *See Jones v. Bonta*, 34 F.4th 704, 719 (9th Cir. 2022); *Nat'l Rifle Ass'n, Inc. v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J. dissental); *Hirschfeld v. BATFE*, 5 F.4th 407, 453–57 (4th Cir. 2021) (collecting Founding-era militia laws), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021).

Fundamentally, the State is asking this Court to reject *Heller*'s holding that "the people" refers to "all Americans" and instead craft a gerrymandered definition of "the people." This Court cannot do that. Unless the State is arguing that this Court should deny 18-to-20-year-olds a whole host of other constitutional rights that apply to 18-to-20-year-olds as part of "the people," the State must be asking this Court to carve out a heretofore unknown exception to "the people" applicable only in the context of the Second Amendment. Under the State's argument, Plaintiffs are part of "the people" for the First Amendment, but not the Second. That cannot be squared with the "plain text" or "the 'normal and ordinary' meaning of the Second Amendment's language" that *Bruen* said must guide this analysis. *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 576–77). In fact, the State has identified *zero* textual clues that "the people" means one group for one constitutional amendment and a different group for another. *Bruen* indicates quite the opposite; the Supreme Court said that the *Heller* standard "accords with how we protect *other* constitutional rights" like "the freedom of speech in the First Amendment." *Bruen*,

16

142 S. Ct. at 2130 (emphasis added). In other words, these rights (and the people to whom they apply) are not to be treated differently. Doing so would make "the constitutional right to bear arms in public for self-defense" a "second-class right." *Id.* at 2156 (quotation omitted).

As then-Judge Barrett explained, it would be "analytically awkward" to adopt the Commissioner's approach and divvy up the members of our national community as part of "the people" or not. *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). "That is an unusual way of thinking about rights." *Id.* at 452. For instance, "[n]either felons nor the mentally ill are categorically excluded from our national community." *Id.* at 453. Yet "[t]hat does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that *they otherwise possess*." *Id.* (emphasis added).

The Commissioner's rejection of Justice Barrett's analysis in *Kanter*, and *Bruen* and *Heller*'s insistence that the textual inquiry really be rooted in text, is the predictable result of *Bruen*'s squarely placing the burden on the Commissioner to justify the regulation historically. The Amendment mentions neither minority nor adult status, so any argument over the importance of such status is not a textual one and must be analyzed as part of *Bruen*'s second step.

2.     **When Analyzing the Historical Justifications for the Carry Ban, 1791 Is the Key Year for Assessing the Scope of the Right.**

Because the plain text of the Second Amendment covers the conduct restricted by the Carry Ban, the Commissioner has the burden to prove the restrictions are consistent with this Nation's history of firearm regulation. Both the Commissioner and his supporting amici argue that "[e]specially relevant" to the historical analysis required by *Bruen*, "are laws that were in effect around the time of the Fourteenth Amendment [1868], which made the Second Amendment applicable to the States." Comm'r Br. at 24. This is wrong. The Second Amendment does not mean one thing as applied to the federal government and another as applied to the states. The key period for understanding the Second Amendment is the time of *its* ratification—1791. While *Bruen* may have refrained from "addressing" whether 1791 or 1868 is the key year for understanding the scope of the Second Amendment, that does not mean it is an open question. 142 S. Ct. at 2138. This Court would have to defy binding Supreme Court precedent to hold that 1868 is the critical year. Two principles that have been established by Supreme Court precedent require 1791 to be the critical year. One is that incorporated Bill of Rights provisions have the same meaning applied to the states as applied to the federal government, and the other is that 1791 is the key year for determining the meaning of the Bill of Rights as applied to the federal government. The inescapable result of these holdings is that the key year for determining the scope of the Second Amendment as applied to the states is 1791.

First, we know that there is only one Second Amendment, and it has the same meaning as applied against the federal government and the states. *See McDonald v. City of*

*Chicago*, 561 U.S. 742, 765 (2010) (noting the Court's "decisive[]" holding "that incorporated Bill of Rights protections 'are all to be enforced against the States . . . according to the same standards that protect those personal rights against federal encroachment' " (citation omitted)). As *Bruen* reiterated: "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137 (citing *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020); *Timbs v. Indiana*, 139 S. Ct. 682, 686–87 (2019); *Malloy v. Hogan*, 378 U.S. 1, 10–11 (1964)).

Second, as *Bruen* said, the Supreme Court has always treated the ratification of the Bill of Rights as the key period for understanding the scope of the rights enumerated therein. 142 S. Ct. at 2137 (citing *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011)). Almost a century ago, the Court explained that the First Congress of 1789, is "a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument," *Myers v. United States*, 272 U.S. 52, 174–75 (1926), and this practice is no less true in the context of the Bill of Rights, *see, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's [reasoning in *Myers*].").

Therefore, while *Bruen* did not "address" the issue, the Supreme Court's precedent decisively has, and this Court is bound to follow that precedent. Even if this Court views *Bruen* as having cast doubt on the reasoning of those cases in which the Supreme Court

looked to the period surrounding ratification of the Bill of Rights as decisive for understanding their meaning, it has no authority to declare those precedents overruled. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).

In fact, *Bruen* should not be read as casting doubt on any of these practices. Instead, it too treated evidence surrounding 1791 and the Founding as generally dispositive of the contours of incorporated Constitutional rights. "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. That is why courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Id.* "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms came 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.' " *Id.* at 2137 (quoting *Heller*, 554 U.S. at 614); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]."). In fact, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 142 S. Ct. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

*Bruen* thus establishes that this Court must prioritize Founding-era evidence, while evidence from "the mid- to late-19th-century" is at most "secondary." 142 S. Ct. at 2137. After all, in *Heller* "19th-century evidence was 'treated as mere confirmation of what the

Court thought had *already been established*' " by Founding-era sources. *Id.* (emphasis added).

Against this binding precedent, the Commissioner provides no reason for preferring 1868 to 1791 except to say that it was in 1868 that the Second Amendment became applicable against the states. Comm'r Br. at 24. But the Second Amendment *already meant something* when it was applied against the states, and while Reconstruction is the key period for understanding *whether* a right was incorporated against the states, *see McDonald*, 561 U.S. at 777–78, as discussed above, when determining the content of that right, it is useful only as "confirmation of what the Court thought had already been established." *Bruen*, 142 S. Ct. at 2137 (citation omitted).

One of the Commissioner's supporting amici attempts to buttress this point, but its arguments similarly do not provide any basis for ignoring the long line of Supreme Court precedents that treat the historical analysis as centered on Founding era. First, the amicus cites a handful of circuit court decisions that it claims favored 1868 over 1791 when assessing historical evidence regarding the scope of the Second Amendment, *see* Amicus Br. of Everytown for Gun Safety in Supp. of Defs.' Mot. for Summ. J. 3 n.2, Doc. 70 (Aug. 14, 2022) ("Everytown Br."), but counting circuit court decisions' approaches after *Bruen* expressly abrogated the analytical approach of each of those decisions is questionable at best. And in fact, several of the cases cited do not actually favor 1868, but only state that courts should review relevant history from both periods. *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir.2012); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021). It does not save the amicus argument that *Bruen* stated that the "step one" analysis

21

some circuits applied was "broadly consistent with *Heller*." 142 S. Ct. at 2127 (cited at Everytown Br. at 4). As explained above, *Bruen*'s analysis (and binding precedent) is *specifically inconsistent* with treating 1868 as the key date when assessing the validity of a state law under the Second Amendment. What is more, the circuits were not uniform in their treatment of 1868 as the crucial year, *see, e.g.*, *Jones*, 34 F.4th at 714 ("In our historical analysis, the Framers' understanding of the Second Amendment at and around the time of ratification has special significance."), and the Seventh Circuit was not even *internally* consistent on the point and stated in other opinions that 1791 was the key date, *see Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012); *see also id.* at 943 (Williams, J., dissenting). *Bruen* therefore cannot be read to have established the circuit cases focusing on 1868 are "good law" on this point, *see* Everytown Br. 4.

Fundamentally, the argument in favor of 1868 requires this Court to accept that when the Fourteenth Amendment was ratified, it changed the meaning of the Bill of Rights as applied against the federal government. *See* Everytown Br. 7–8. Among the many questions this raises, it certainly requires asking "how?" How did the Fourteenth Amendment do that? Section one of the Fourteenth Amendment states:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend XIV, § 1. This passage, which is the source of the incorporation doctrine, is plainly focused on application of existing rights *against the states*. Due process

was made applicable *to the states*, privileges and immunities of citizenship were inviolable *by the states*, and equal protection of laws must be afforded *by the states*. Indeed, the Supreme Court has been clear that the purpose of the Fourteenth Amendment was to rein in rights abuses by the states, and many contemporaries wanted nothing more than to *defeat that purpose*. *See, e.g.*, *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 489 (1954) ("The most avid proponents of the post-War Amendments undoubtedly intended them to remove all legal distinctions among 'all persons born or naturalized in the United States.' Their opponents, just as certainly, were antagonistic to both the letter and the spirit of the Amendments and wished them to have the most limited effect.").

Fittingly for that purpose, for as long as incorporation doctrine has existed, the focus has only ever been on extending the Bill of Rights *against the states*. *See, e.g.*, *Twining v. State of New Jersey*, 211 U.S. 78, 99 (1908) ("[I]t is possible that some of the personal rights safeguarded by the first eight Amendments against national action may also be safeguarded against state action, because a denial of them would be a denial of due process of law."); *Adamson v. California*, 332 U.S. 46, 71–72 (1947) (Black, J., dissenting) ("My study of the historical events that culminated in the Fourteenth Amendment . . . persuades me that one of the chief objects that the provisions of the Amendment's first section, separately, and as a whole, were intended to accomplish was to make the Bill of Rights, applicable to the states."); *Malloy*, 378 U.S. at 10–11 ("The Court has thus rejected the notion that the Fourteenth Amendment applies to the States only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights.' "); *Duncan v. State of Louisiana*, 391 U.S. 145, 147–48 (1968) ("The Fourteenth Amendment denies the States

the power to 'deprive any person of life, liberty, or property without due process of law.' In resolving conflicting claims concerning the meaning of this spacious language, the Court has looked increasingly to the Bill of Rights for guidance."); *see also*, *McDonald*, 561 U.S. at 758–766 (surveying history of incorporation doctrine). In every incorporation case of which Plaintiffs are aware, the Bill of Rights is treated as if it has some meaning, which by virtue of the Fourteenth Amendment, must now be applied against the states. It is also plain, as the Supreme Court recognized in *Brown*, that there were many people (and indeed, states) with aims antithetical to the Fourteenth Amendment's. It would be very strange to give those states the power to alter the scope of the rights incorporated against them, let alone the power to alter the scope of those rights as against the federal government too. *Cf. Hirschfeld*, 5 F.4th at 440 ("It would also be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period."). Plaintiffs are not aware of a single case, from any time period, applying this odd, alchemical theory and neither the Commissioner nor his amici have cited one. This Court should reject that argument.

**3.     The Commissioner Has Failed to Demonstrate that the Carry Ban is Consistent with Our Nation's Tradition of Firearm Regulation.**

Plaintiffs are "people" within the meaning of the Second Amendment and so the burden falls on the Defendants to "justify [Minnesota's Carry Ban] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. In assessing historical evidence on this issue, the Court must "reason by analogy" from earlier restrictions on the right to bear arms. *Id.* at 2132. The relevance of a

purported historical predecessor to the Minnesota Carry Ban must be judged by whether it "impose[d] a comparable burden on the right of armed self-defense and whether that burden [was] comparably justified." *Id.* at 2133. The Commissioner has failed to point to any historical tradition adequate to justify the Carry Ban.

### i. The Minority Status of 18-to-20-Year-Olds at Earlier Periods of American History is Irrelevant.

The Commissioner places significant weight on the status of people under 21 as minors for certain purposes during the Founding era (and on into later periods of our history). Comm'r Br. at 20–22. This argument is severely flawed and fails both parts of *Bruen*'s requirement that a historical analogue and its modern counterpart "impose a comparable burden" on the right that is "comparably justified." 142 S. Ct. at 2133. First, the evidence the Commissioner presents does not demonstrate a comparable burden on the right to bear arms to the one imposed by Minnesota's Carry Ban. The Commissioner cites several different sources from the Founding era that stated that "infants" lacked full legal rights which were only conferred upon reaching "adulthood," but these sources do not discuss the right to bear arms specifically, which is fatal to their usefulness under *Bruen*.[3] "Majority or minority is a status that lacks content without reference to the right at issue."

---

[3] The one source that might appear on its face to be related to the right to bear arms is the "popular justice of the peace" manual which the Commissioner cites for the proposition that, in 1788, "infants" were included with "madmen" and "idiots" as individuals who "shall not be constable." Comm'r Br. at 22. But the Commissioner fails to note that the manual also listed "clergymen, attorneys, . . . lawyers, . . . old and sick persons" as those who were exempted from serving as constables. JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788). Plainly, service as a constable was more limited than an individual's right to bear arms.

*Hirschfeld*, 5 F.4th at 435 (cleaned up); *see also Jones*, 34 F.4th at 722. Professor Cornell, on whose opinion the Commissioner relies, claims that minors "had only a narrow range of legal autonomy," Comm'r Br. at 21, but without evidence of restrictions from the Founding showing that firearms *were not* within that "narrow range," assertions about the minor status of 18-to-20-year-olds cannot advance the argument that Minnesota's ban on carriage by 18-to-20-year-olds is in line with historical practice. In fact, the evidence shows that firearms rights *were* within that range. For example, while state militia laws in some cases required parents to pay fines incurred by their minor sons in relation to the service, "the point remains that those minors were in the militia *and, as such*, they were required to own their own weapons. What is *inconceivable* is any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms." *NRA*, 714 F.3d at 342 (Jones, J., dissental).

Second, the evidence regarding the age of minority at the Founding and during Reconstruction fails because the purported justification for treating 18-to-20-year-olds differently—minority status—no longer exists, so even if minority had been attended with lesser firearm rights, it would be completely irrelevant in this case. Minnesota's restriction targets *adults* not minors, and cannot be justified based on these historical sources. Indeed, several of the sources that the Commissioner relies upon actually underscore the inappropriateness of Minnesota's Carry Ban given the Plaintiffs' adulthood. The Commissioner quotes, for example, John Bouvier, the author of the first American legal dictionary, for the proposition that "[t]he rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. *At this period, every man*

26

*is in the full enjoyment of his civil and political rights.*" 1 JOHN BOUVIER, INSTITUTES OF AMERICAN LAW 148 (1858) (emphasis added) (quoted at Comm'r Br. at 21). Another of the Commissioner's sources says: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years. . . [T]hough female infants, in some [states] have enlarged capacity to act at the age of eighteen." 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 233 (O. W. Holmes, Jr. ed., 12th ed., Little Brown, and Co. 1873 (1836)) (quoted in part at Comm'r Br. 22). And the Commissioner also relies on Blackstone, who in an unquoted portion of his influential Commentaries, noted that "the power of a father, I say, over the persons of his children ceases at the age of twenty-one; *for they are then enfranchised.*" 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 441 (1769). What each of these sources makes clear is that the *sole basis* for treating 18-to-20-year-olds differently than 21-year-olds at earlier periods of American history was the fact that they were minors, under the authority of their parents. That is no longer the case. Plaintiffs are legal adults and have full legal rights, including the right to bear arms. There is therefore no basis to extend the entirely hypothetical restrictions on the right of minors to bear arms at the Founding to them today.

> ii. **The Commissioner's Historical Analogues are Inadequate to Support the Carry Ban.**

Turning more directly to the task assigned to him by *Bruen*, the Commissioner collects several laws that he suggests provide authority for the Carry Ban. At the Founding period the evidence is strongly in Plaintiffs' favor. The Commissioner reiterates that 20-

year-olds were still minors at the Founding and also asserts that "gun violence was not a pressing issue of public concern at the time the Second Amendment was enacted," as a way of obliquely acknowledging the fact that there are no historical restrictions from this period that would support Minnesota's Ban. Comm'r Br. 26. The minority issue has been addressed, and it is very misleading to suggest that the Founding era was somehow less concerned with crime. Violent crime was rampant at the Founding. "Philadelphia's homicide rate for 1720-1780 was two and a half times that of London in the same period." Jack D. Marietta & G.S. Rowe, *Violent Crime, Victims, and Society in Pennsylvania, 1682-1800*, 66 PENNSYLVANIA HIST. 24, 26 (1999). The historian Randolph Roth, in his landmark study of homicide in America, noted that homicide rates at the Founding were extremely high across the country. *See, e.g.*, RANDOLPH ROTH, AMERICAN HOMICIDE 162 (2012) ("From the Georgia Piedmont to the Ohio River Valley, homicide rates were extremely high from the mid-1760s through the War of 1812. Rates of 25 to 30 per 100,000 per year were common for white adults in areas where county governments had been established. In the backcountry, where settlers and Indians (and the Spanish and British) were still fighting for control, rates probably reached 200 or more per 100,000. Those numbers had not been seen since the early seventeenth century.") (internal citation omitted).[4] That is not to say homicide was a problem limited to rural areas or the frontier. In New York City, for example, at the end of the 18th century, the rate was nearly 10 per

---

[4] By contrast, the national homicide rate in 2020 was 7.5 per 100,000. *Underlying Cause of Death*, 1999-2020 Results, CDC (click "agree" and the table will be generated), *available at* https://bit.ly/3PRNbEJ.

100,000 per year, *id.* at 185, fig. 5.3, or nearly triple what it was in 2018, *Homicide Rate per 100,000 Residents*, NYC MAYOR'S OFFICE OF CRIM. JUST. (last visited Aug. 24, 2022), *available at* https://bit.ly/3pEv7Dw (displaying rates for 2015-2018). Roth also noted that in the late 1700s criminal gangs accounted for significant homicides across the country. ROTH, *supra*, at 171 (discussing practice of gangs of horse thieves in Georgia "murdering and scalping the families they robbed to make it look as if they had been victims of Creek raiders" and the Harpes brothers who, "terrorized Tennessee and Kentucky in 1789–99, stealing money, clothes, and horses and killing thirty or forty people, some of them children, to eliminate potential witnesses").

The only real restrictions on the rights of 18-to-20-year-olds from around the time of the Founding that the Commissioner points to are rules on certain college campuses that prohibited students from possessing guns or gunpowder, but these restrictions were not bans on carriage by all ordinary 18-to-20-year-olds, and if an individual were 19 years old in New Haven, Connecticut, but not enrolled at Yale College, he could carry freely on campus. *See* Comm'r Br. 26–27. What is more, the basis for these restrictions appears not to have been a generalized police power but rather in loco parentis authority of schools over students in their charge. In this capacity the schools could require other things of their students that, if commanded by the government, would certainly violate their constitutional rights. *See, e.g.*, *University Church in Yale marks 250 years of tradition and reform*, 36 YALE BULLETIN & CALENDAR 4 (Sept. 28, 2007), *available at* https://bit.ly/3PNmwt1 ("Yale students were required to attend daily chapel services for the first 170 years of the church's history."). The restrictions thus reflected the rights of parents, and those standing

29

in their stead, over minors, and say nothing about restrictions the government may impose on law-abiding adults, or even children for that matter. *See Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 795 n.3 (2011).

The Commissioner points to five generally applicable laws that predate the Fourteenth Amendment (though all but two are still from the mid-19th century) which he contends supports his case. The earliest restrictions are city ordinances, one from New York (1803) and the other from Columbia, South Carolina (1817), both of which banned firing guns within city limits by *all persons*, regardless of age, and distinguished minors only as to the punishment available. In New York, the five dollar penalty was to be paid by the minor's parent in all cases, *see* Ordinance of the City of New York, to Prevent the Firing of Guns in the City of New York § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF SAID CITY 83–84 (1803), and in Columbia, recognizing that minors would "have no ostensible property whereof the said penalty can be levied," the statute permitted their firearm to be seized and sold to pay the fine unless "within ten days after conviction" the minor managed to pay, An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), ORDINANCES, OF THE TOWN OF COLUMBIA, (S.C.) PASSED SINCE THE INCORPORATION OF SAID TOWN: TO WHICH ARE PREFIXED, THE ACTS OF THE GENERAL ASSEMBLY, FOR INCORPORATING THE SAID TOWN, AND OTHERS IN RELATION THERETO 61 (1823). These laws provide no basis for imposing greater restrictions on the arms rights of 18-to-20-year-olds.

As for the other laws he collects, the Commissioner cites two 1856 laws that did restrict the rights of 18-to-20-year-olds by prohibiting anyone to sell, give, or lend them a pistol, one from Alabama and one from Tennessee. *See* 1856 Ala. Acts 17, 17; 1856 Tenn. Pub. Acts 92, 92. Plaintiffs addressed these laws in their brief in support of summary judgment, noting that they were exceptions to the uniform practice up to the Civil War of respecting 18-to-20-year-olds rights regarding firearms, and explaining, as the Fourth Circuit did in *Hirschfeld*, "[it] would also be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." 5 F.4th at 440; Pls.' Mem. of Law in Supp. of Their Mot. for Summ. J. 16, Doc. 42 (Aug. 4, 2022) ("Pls.' Br."). The only other law the Commissioner cites from this period comes from Kentucky in 1859, Comm'r Br. 27, but that law, which again focused on sales of concealable weapons including pistols, specifically permitted parents or guardians to give their children pistols, 1859 Ky. Acts 245, 245. That law is not an analogue under *Bruen* because it did not "comparably burden" the exercise of the Second Amendment right. Unlike the Plaintiffs in this case, an 18-year-old Kentuckian in 1860, given a pistol by his father, would not be forbidden by statute from carrying that pistol in public for self-defense.

More importantly, it must be noted that the Kentucky law's restrictions applied against sales or gifts to "any minor, or slave, or free negro." *Id.* The *Jones* court remarked on the "deeply offensive nature" of firearms laws from around the time of the Reconstruction, 34 F.4th at 722, and this law highlights, as we explained above, what a strange feature it is of the Commissioner's theory that restrictions from nearer 1868 should

31

be accorded more weight so that a law like this one, plainly unconstitutional under the Fourteenth Amendment—and indeed quite likely the type of law that motivated its ratification, *Hirschfeld*, 5 F.4th at 421 ("[T]he self-defense of freed Blacks was central to the passage of the Fourteenth Amendment."); *see also* Akhil Reed Amar, Heller*, HLR, and Holistic Legal Reasoning*, 122 HARV. L. REV. 145, 176 (2008)—should be cited as informative about the appropriate scope of Plaintiffs' constitutional rights.

Finally, Plaintiffs note that in his survey of Founding era laws, the Commissioner makes no mention of militia laws. Undoubtedly, the reason for this omission is because militia laws strongly undercut his case for excluding 18-to-20-year-olds from the right to bear arms. *See, e.g.*, *Jones*, 34 F.4th at 722 ("Here, there is not just a vacuum at the founding era: instead, the founding-era evidence of militia membership undermines Defendants' interpretation.").

Turning to the post-war period, which he mistakenly prioritizes, the Commissioner collects two state court cases upholding restrictions on the right of 18-to-20-year-olds to purchase pistols, five state laws (three restricting the right to purchase pistols, two restricting the right to carry them), and one treatise which notes that the state could prohibit the sale of firearms to minors. Comm'r Br. 24–26. Regarding the court cases, the Commissioner relies on *Coleman v. State*, 32 Ala. 581 (1858) and *State v. Callicutt*, 69 Tenn. 714 (1878), both of which upheld convictions for selling pistols to minors. In neither case did the court state the age of the minor in question and in *Coleman* the court did not address the constitutionality of the law at all. *See Jones*, 34 F.4th at 704.

In *Callicutt*, the court did pass upon the constitutionality of the law but it only "addressed concealed carry of dangerous weapons, not the right to keep and bear arms more generally." *Jones*, 34 F.4th at 720. The only legal reasoning in *Callicutt* on the scope of the right to bear arms is a pair of citations to *Aymette v. State*, 21 Tenn. 154 (1840) and *Page v. State*, 50 Tenn. 198 (1871). *Heller* singled out *Aymette* as demonstrating an "odd reading of the right" which was "not the one [the Court] adopt[ed]," and simultaneously permitted citizens "to carry arms openly, unconnected with any service in a formal militia, but . . . use them only for the military purpose of banding together to oppose tyranny." 554 U.S. at 613. *Page* asserted that the legislature could restrict carrying a revolver because it was not "an arm for war purposes." 50 Tenn. at 198. Again, *Heller* made clear that the Amendment is not limited to protecting arms for war purposes but "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. *Callicutt* is not good law and has nothing informative to say about the appropriate scope of the Second Amendment right.

The Commissioner also relies on a treatise from 1868 which said that "the State may prohibit the sale of arms to Minors." THOMAS M. COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATION 740 n. 4 (6th ed. 1890); Comm'r Br. 26. But this quote is from the section discussing the police power of the state and does not address the Second Amendment or the right to bear arms, and what's more, Cooley's authority for the sentence was *Callicutt*. *Jones*, 34 F.4th at 704. He was not weighing in on the legitimacy of the decision, instead he was "simply identifying [it] as a case related to his discussion, which is how he utilized footnotes to cite thousands of cases throughout the treatise." David B.

33

Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U.L.J. 119, 143 (2018). Cooley did, however, elsewhere address the right to bear arms, but he specifically did not discuss the legitimacy of restrictions on the right:

> [H]ow far it may be in the power of the legislature to regulate the right [to keep and bear arms] we shall not undertake to say. Happily, there neither has been, nor, we may hope, is likely to be, much occasion for an examination of that question by the courts.

COOLEY, *supra* at 427. And again, any justification for a limitation on arms based on minority status has no bearing on this case.

The statutes the Commissioner cites from this period are inadequate to establish the historical tradition necessary to support the Carry Ban. One law, from Nevada, which the Commissioner cites as a historical analogue, Comm'r Br. 25, made it a misdemeanor for a "person under the age of twenty-one (21) years [to] wear or carry any . . . pistol . . . *concealed upon his person*." 1885 Nev. Stat. 51, § 1. The law, by its own terms, applied only to concealed carry of a firearm; it did not criminalize open carriage by those under 21. *See Hirschfeld*, 5 F.4th at 438 n.50. Minnesota, however, offers *no* avenue by which 18-to-20-year-olds may carry a firearm, so the burden on the right in Minnesota today is not "comparable" to the burden in Nevada in the 1880s. Of the remaining four laws the Commissioner cites from this period, the laws from Kansas and Wisconsin were addressed at length in Plaintiffs' brief in support of summary judgment, *see* Pls.' Br. 27, and both specifically restricted the rights of "minors." Thus, if they were in force today, they would not apply to 18-to-20-year-old adults. The Indiana (1875) and Louisiana (1890) laws both

appear primarily to be focused on stopping concealed carriage, though they both do, by their terms, prevent all sales of handguns to individuals under 21. *See An Act Making it a Misdemeanor for Any Person to Sell, Give or Lease, to Any Minor, Any Pistol, Bowie-Knife, Dirk or Any Weapons, intended to be Carried or Used as a Concealed Weapon*, 1890 La. Acts 39, § 1 ("[I]t shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol . . . or any other dangerous weapon which may be carried concealed to any person under the age of twenty-one years."); 1875 Ind. Acts 86 ("[I]t shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol . . . or other deadly weapon that can be worn, or carried, concealed upon or about the person.").

In any event, even if *each* of these restrictions were directly on point (and at the very least, Nevada's is not) then Plaintiffs have identified just five purported analogues from this period—too few to justify carving out an exception from the plain text of the Second Amendment. *See Jones*, 34 F.4th at 722.

### 4. Statistical Evidence Regarding the Relative Level of Criminality of 18-to-20-Year-Olds is Irrelevant Under *Bruen*.

The Commissioner argues that the preceding evidence shows a "historical tradition of limiting firearm access to those twenty-one and older." Comm'r Br. 27. For the reasons laid out above, that is not true, so the Court need not go any further into the Commissioner's remaining argument. The Commissioner does go on, however, ostensibly with the goal of showing that the justification for the historical laws he cites matches the justification for Minnesota's Carry Ban: that "[p]eople between the ages of eighteen and twenty-one pose

35

a greater danger to themselves and others than other age groups." Comm'r Br. 28. Again, the Court can stop here, because the Commissioner provides no evidence whatsoever that relative criminality was the motivating concern behind any of the laws he cites. It is his burden to show the laws have comparable justifications, and the Commissioner has presented no evidence to support this assertion. *See Bruen*, 142 S. Ct. at 2133. As explained above, the text of these statutes provides a much more straightforward reason for why 18-to-20-year-olds rights were restricted under some of the Commissioner's putative analogues; the statutes applied to them because they were part of the age group denominated "minors"—a status that does not obtain here.

The Commissioner, however, uses this asserted similarity of interests to make arguments regarding the relative maturity of 18-to-20-year-olds' brains and the share of suicides and violent crimes committed by that group. Comm'r Br. 29–31. This is the sort of argument that used to come in at step two, where the state would seek to justify its regulation under an applicable tier of scrutiny, but *Bruen* was unequivocal: that test was "one step too many." 142 S. Ct. at 2127. The fundamental problem is that, when "federal courts [are] tasked with making such difficult empirical judgments regarding firearm regulations" based on the assertion that government regulations are necessary means to solve important, indeed life-and-death, problems, they "often defer to the determinations of legislatures." *Id.* at 2131. While that is appropriate in some cases,

> it is not deference that the Constitution demands here. The Second Amendment is the very *product* of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

*Id.* (cleaned up, emphasis in original). The Court should therefore reject the Commissioner's invitation to weigh in on the validity of the interest undergirding Minnesota's Carry Ban.

If the Court does review the Commissioner's arguments regarding the government interests served by the Carry Ban, and to be clear, doing so would directly violate one of the core holdings of *Bruen*, it will find that the Commissioner's data distorts the reality of 18-to-20-year-old firearm possession. The Commissioner states, for example, that "the 18-to-20 age group are statistically more dangerous to themselves and others than other age groups" and points to statistics indicating that 18-to-20-year-olds have the highest rate of homicide arrests of any age group in Minnesota. Comm'r Br. 30–31. But this sort of rhetoric disguises the fact that a minuscule portion of all 18-to-20-year-olds commit crimes at all. The Commissioner highlights, for example, that in Minnesota in 2019, 19-year-olds were arrested for homicide at a higher rate than any other age group, at a rate of 13.86 per 100,000. Comm'r Br. 30. Put another way, 0.014% of Minnesotan 19-year-olds were arrested for homicide in 2019. *Id.* This is scarcely any different from the 0.013% of 21-year-olds who were arrested for the same thing that year, yet Minnesota does not seek to curtail their rights. *Id.* More importantly, it shows what should be obvious from common experience—the overwhelming majority of 19-year-olds were not arrested for homicide that year. In other words, Minnesota has made being 19-years-old a proxy for being dangerous, but at 0.014%, just 0.001% higher than an apparently non-dangerous group, it is clear Minnesota has chosen a poor and arbitrary proxy. *See Craig v. Boren*, 429 U.S. 190, 201–02 (1976).

**IV.    If the Court Credits Minnesota's Argument that Its Regulation is a Permissible Way to Promote Public Safety, It at a Minimum Should Deny Summary Judgment in Defendants' Favor on Plaintiffs' As-Applied Claim.**

Plaintiffs have shown that the Carry Ban is unconstitutional as applied to all 18-to-20-year-olds who are not barred by anything but their age from carrying a firearm in public for self-defense. The Second Amendment cannot be read to exclude 18-to-20-year-olds from "the people" and Defendants have failed to demonstrate a history of valid regulations that burdened the rights of 18-to-20-year-olds in "comparable ways" and for "comparable reasons" to the Minnesota Carry Ban. It is therefore unconstitutional regardless of the gender of the 18-to-20-year-old seeking a carry license. If, however, this Court determines that the laws cited by the Commissioner do establish such a tradition, and further decides that the tradition was similarly based in a concern for the criminality of 18-to-20-year-olds—and Plaintiffs stress that neither conclusion is appropriate based on the evidence the Commissioner has assembled—it should nevertheless find the Carry Ban unconstitutional as applied to women like Plaintiff Worth and therefore deny Defendants' motion for summary judgment with respect to the as-applied claim.

First, as noted briefly above, the Commissioner's justification for treating 18-to-20-year-olds as lacking rights today because they were formerly considered to be minors does not obtain as to women. James Kent, on whom the Commissioner relies, wrote in 1836 that "female infants, in some [states] have enlarged capacity to act at the age of eighteen." KENT, *supra* at 233. At the end of the 19th century, women were adults at 18 in more than a dozen states. 16 DAVID SHEPHARD GARLAND, ET AL., THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW, 262 n.4 (1900). In Minnesota, women were adults at 18 in 1868

when the Fourteenth Amendment was ratified. Minn. Gen. Stat. *c.* 59, § 2 (1866) ("Males of the age of twenty-one years and females of the age of eighteen years shall be considered of full age for all purposes; before those ages they shall be considered minors."); *see also*, *Cogel v. Ralph*, 24 Minn. 194 (1877). It was true in Kansas as well, at least by 1889. *See Wilson v. Kan. Children's Home and Serv. League*, 154 P.2d 137, 141–42 (Kan. 1944) ("[W]hen the law here involved . . . was enacted in 1889, the age of majority for females was then eighteen."). At a minimum, one of the Commissioner's laws purportedly establishing a historical tradition of firearm regulations against "minor[s]" would therefore likely not have applied to Plaintiff Worth at all, 1883 Kan. Sess. Laws 159, § 1, and there has never been a time in Minnesota's history when the Fourteenth Amendment applied against it that Plaintiff Worth would have been considered a minor.

Second, the Commissioner's asserted "comparable reason" for restricting carriage by 18-to-20-year-old women is that they are part of 18-to-20-year-olds generally and 18-to-20-year-olds commit violent crimes at higher rates than other age groups. This cannot be a justification for restricting the rights of 18-to-20-year-old women. In contrast to the murder rate of 0.013% for 21-year-olds discussed above, 18-to-20-year-old women nationwide were *six times less likely* to be arrested for a non-negligent homicide, with an arrest rate of 0.0021%. Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Females*, U.S. DEP'T OF JUST., *available at*, https://bit.ly/3mbxA65. The Commissioner's expert, Professor John Donohue, admitted in his deposition that "women of this age group are less criminally violent and are, you know, less prone to the risky behavior tha[n] men," Ex. B,

Dep. of Dr. John Donohue, III, 39:6–8 (Mar. 28, 2022) ("Donohue Dep. Tr."), and so, "if you were able to make sort of sex-based differentiations, you would be more tolerant in allowing women to have access to handguns than you would to men," Donohue Dep. Tr. 82:13–17.

This Court *can* make such differentiations. Indeed, to the extent it credits the Commissioner's argument it *must* distinguish between men and women. The evidence of a historic tradition of restricting 18-to-20-year-olds' rights is even weaker when applied to women. Given that the Commissioner has failed to submit evidence that women were treated as minors under the statutes he identifies as historical precedents for the Carry Ban which specifically applied to "minors" only, the Court should find he has failed to carry his burden of demonstrating a history of restricting the rights of 18-to-20-year-old women in the same way the Carry Ban does. Furthermore, given the minuscule rate at which 18-to-20-year-old women commit violent crimes, it would be wholly inappropriate under *Bruen* to extend historical restrictions purportedly based on a concern about criminality among minors, which may or may not have applied in each case to women, and apply it against women today when doing so advances no such interest.

## CONCLUSION

For the foregoing reasons, the Court should deny the Commissioner's and the Sheriffs' motions for summary judgment.

Dated: August 25, 2022

Blair W. Nelson
Minnesota Bar No. 0237309

BLAIR W. NELSON, LTD.
205 7th Street N.W. Suite 3
Bemidji, MN 56601
(218) 444-4531
bwnelson@paulbunyan.net

Respectfully submitted,

/s/David H. Thompson
David H. Thompson*
DC Bar No. 450503
Peter A. Patterson*
DC Bar No. 998668
William V. Bergstrom*
DC Bar No. 241500

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
*Admitted *pro hac vice*

*Attorneys for Plaintiffs*