UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| KRISTIN WORTH, *et al.*, ) <br> ) <br>    Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> JOHN HARRINGTON, in his ) <br> individual capacity and in his ) <br> official capacity as Commissioner ) <br> of the Minnesota Department of ) <br> Public Safety *et al.*, ) <br> ) <br>    Defendants. ) | Civil No. 21-1348 <br><br> Judge Katherine M. Menendez <br> Magistrate Judge Leo I. Brisbois |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Date: September 8, 2022

Blair W. Nelson
Minnesota Bar No. 0237309

BLAIR W. NELSON, LTD.
205 7th Street N.W. Suite 3
Bemidji, MN 56601
(218) 444-4531
bwnelson@paulbunyan.net

David H. Thompson*
DC Bar No. 450503
Peter A. Patterson*
DC Bar No. 998668
William V. Bergstrom*
DC Bar No. 241500

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
*Admitted pro hac vice

*Attorneys for Plaintiffs*

## INTRODUCTION

Under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), this challenge to Minnesota's Carry Ban must be analyzed through "a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. First, the Court must determine whether the conduct Plaintiffs wish to engage in is covered by the plain text of the Second Amendment. If it is, the Carry Ban is unconstitutional unless Defendants can show it is consistent with a tradition of regulation found in constitutionally relevant history.

Throughout this analysis, the Commissioner offers the same argument. Plaintiffs' desired conduct does not implicate the Second Amendment, he asserts, because they are in an age group that would have been considered "minors" for most purposes at the Founding. But the plain text of the Second Amendment does not say it is a right of "adults" (which the Plaintiffs are, anyway) but a right of "the people." The Supreme Court has already held that "the people" means *all* Americans, *see District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), and the Commissioner offers no authority that would permit this Court to even entertain his reading.

As to the historical inquiry, the Commissioner again chiefly relies on the fact that 21 was the cutoff for adulthood for most purposes when the Second Amendment was ratified in 1791 and when the Fourteenth Amendment was ratified in 1868. That is not what *Bruen* requires. It is not enough to point to the legal status of a group at the Founding and infer they must not have had full firearm rights. The Commissioner must *prove* they did not. The Commissioner has not identified one law from the Founding era that would

1

generally forbid 18-to-20-year-olds from carrying firearms for self-defense. In fact, they were often *required* to do so. And even in the Reconstruction era, the Commissioner has turned up very few analogous restrictions that limited exercise of the Second Amendment right to the same degree as the Carry Ban. That demonstrates what an outlier Minnesota's law is and ends the inquiry. The Second Amendment means what it says, and Plaintiffs have the right to carry arms in public for self-defense. This Court should grant summary judgment in Plaintiffs' favor.

## ARGUMENT

### I. The Second Amendment Applies to All Americans, Including Plaintiffs.

This is the test under *Bruen*: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129–30. Both in his response and in his opening brief, the Commissioner refers to this as a "burden-shifting" framework, but that is not how *Bruen* described it. *See, e.g.,* Def. John Harrington's Mem. of Law in Opp. To Pls.' Mot. for Summ. J. 2, Doc. 72 (Aug. 25, 2022) ("Comm'r Resp."); Defs.' Don Lorge, Troy Wolbersen, and Dan Starry's Resp. Mem. of Law in Opp. To Pls.' Mot. for Summ. J. 6, Doc. 76 (Aug. 26, 2022) ("Sheriff Resp."). If the Court decides Plaintiffs' claim falls within the scope of the Second Amendment, the burden is *then* placed on the government to justify its law. But Plaintiffs bear no special burden of proof at the outset of the analysis. The Second Amendment is the "supreme law of the land," U.S. CONST. art. VI, and the question of what its text means does not involve any sort of thumb-

on-the-scale analysis. "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule" *Marbury v. Madison*, 5 U.S. 137, 177 (1803). This Court must interpret the Second Amendment in determining the merits of the parties' cross-motions for summary judgment, and Plaintiffs do not shoulder any special "burden" in presenting, for this Court's analysis, the binding authorities that require it to find that when the Amendment refers to "the people," it includes the people who are 18, 19, or 20 years old.

In any event, this Court is *bound* to reject the Commissioner's argument that "the people" excludes certain Americans, because the Supreme Court already has. In *Heller*, the Court noted that "[t]he first salient feature of the operative clause [of the Second Amendment] is that it codifies a 'right of the people.' " 554 U.S. at 579. *Heller* examined the meaning of this clause at length, *see id.* at 579–81, and ultimately concluded that the term refers to *all* the people who form "the political community" of the United States, "not an unspecified subset"—in other words, the right "belongs to all Americans," *id.* at 580–81. *Bruen* reiterated that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." 142 S. Ct. at 2156 (quoting *Heller* 554 U.S. at 581). This Court cannot limit "the people" to just those who would have been considered adults for some purposes at earlier points in our nation's history. *See Firearms Pol'y Coal., Inc. v. McCraw*, --- F. Supp. 3d ----, 2022 WL 3656996, at *4 (N.D. Tex. Aug. 25, 2022).

3

To avoid having the burden placed on him in the historical inquiry, as the proper analysis would require, the Commissioner reiterates his argument that, because Plaintiffs would have been considered minors for some purposes when the Second and Fourteenth Amendments were ratified, they are not part of "the people." Comm'r Br. 3–5. He argues that including "all Americans" would lead to "absurd results" like providing "[e]ven toddlers or those declared mentally unfit by the courts [with] the right to bear arms." Comm'r Resp. 3. But *Bruen* requires a "textual analysis focused on the normal and ordinary meaning of the Second Amendment's language." 142 S. Ct. at 2127 (cleaned up). Correctly finding (as this Court must) that the Second Amendment right belongs to "all Americans" just means the Second Amendment is implicated, it does not end the inquiry. The mentally unfit are, no less than the mentally fit, "the people," but "[t]hat does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting).

The Commissioner also relies on then-Judge Barrett's dissent in *Kanter*, but he takes the wrong lesson from it. He claims the dissent stands for the proposition that "the right does not apply to 'all people,'" Comm'r Resp. 6, but Justice Barrett said exactly the opposite. She was critical of the majority opinion for taking an "approach [that] is at odds with *Heller* itself. There, the Court interpreted the word 'people' as referring to 'all Americans.'" *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting). Although Kanter was a felon, Justice Barrett would have treated him "as falling within the scope of the Second

4

amendment and ask[ed] whether Congress and Wisconsin can nonetheless prevent him from possessing a gun." *Id.* That is exactly how this Court should proceed.

The Commissioner next turns his attention to militia laws from the Founding. As *Heller* explained, the Second Amendment was codified "to prevent elimination of the militia." 554 U.S. at 599. "Either at the same time or right after" the Second Amendment was ratified, "every state's militia law obliged young adults to acquire and possess firearms." *Jones v. Bonta*, 34 F.4th 704, 719 (9th Cir. 2022). This is strong evidence "at least that young adults needed to have their own firearms" at the time the Second Amendment was ratified. *Id.* at 721. The Commissioner argues militia service at the Founding is irrelevant because (1) militia laws required parents to obtain firearms for their children and (2) the "imposition of a duty" to serve in a militia "does not equate to a right that can be claimed against one's government." Comm'r Br. 6.

Regarding the first objection, the Commissioner asserts that many militia laws from the period required guardians to equip their children with firearms because "minors did not have the right to obtain guns." Comm'r Br. 7. But that is not what the laws say. To take a representative example from the ten laws the commissioner cites, a New Hampshire statute read: "That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements." 1792 N.H. Laws 441, 447 (1792). Nothing in the statute says that minors could not purchase their own firearms, just that parents had to ensure they were equipped with a firearm. And furthermore, "the point remains that those minors were in the militia and, as such, they were required to own their own weapons, even if their parents had to buy those weapons or consent to them joining."

5

*Hirschfeld v. BATFE*, 5 F.4th at 407, 434 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) (citation omitted).

On the second point, the Commissioner is responding to an argument Plaintiffs have not made. Plaintiffs do not suggest that the Militia Act of 1792, or any other statute, gave 18-to-20-year-olds the right to keep and carry firearms. *Heller* said the Second Amendment enshrines "an individual right unconnected with militia service." 554 U.S. at 582. Instead, the point is that "the well-regulated militia" referred to in the Amendment's prefatory clause, which the Constitution assumed to be an entity "already in existence" made up of "all able-bodied men," is the "pool" from which

> Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first Militia Act, which specified that "each and every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years . . . shall severally and respectively be enrolled in the militia."

*Id.* at 596 (quoting Act of May 8, 1792). Given that "the federally organized militia may consist of a subset of" the "militia" referenced in the Second Amendment, but nevertheless must draw from that larger body, the unanimous inclusion of 18-to-20-years-old in organized militias at or shortly after the passage of the Second Amendment establishes that they *must* have been within the militia referenced by the Second Amendment. *Id.*; *see also Hirschfeld*, 5 F.4th 407, 429–30.[1] This also explains why there is nothing inconsistent

---

[1] The Commissioner takes issue with Plaintiffs' claim that "shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well" because, he claims, states "were still adopting 18 as the minimum age" "years later in 1797." Comm'r Resp. 9 n.3. He further argues Plaintiffs' position "does not square with their insistence that 1791 is the most important time period from which to draw historical analogy." *Id.*

6

between Plaintiffs' position and women or those too old for militia service nevertheless having full Second Amendment rights. *See* Comm'r Resp. 8, Sheriff Resp. 11. The Second Amendment right extends to "the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*." Nunn v. State, 1 Ga. 243, 251 (1846); *see also Heller*, 554 U.S. at 612–13 ("*Nunn* . . . perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause, in continuity with the English right."). While Second Amendment rights are not *only* for the militia, for the Amendment to achieve its purposes they must be *at least* for the militia. Whether other justifications for the Carry Ban exist is an issue for the historical inquiry that is required of restrictions that implicate the Second Amendment, which Minnesota's Carry Ban plainly does.

---

This argument is confusing. First, the Commissioner apparently disputes that a period of five years would be "shortly" after the federal militia law. On the timeline of our country's history, its hard to understand that position. Second, the Commissioner misreads the table in *Jones* as showing that some states had minimum ages other than 18 until 1797. In fact, such laws were on the books in every state by 1794. *See NRA II*, 714 F.3d at n.8 (collecting laws from all states but Rhode Island with the latest law dating to 1793); *Jones*, 34 F.4th at 738 (noting Rhode Island law from 1794 which set militia age at 18—an increase from the previous age of 16). Third, this argument is not inconsistent with weighing evidence from the ratification *period* more strongly than later evidence. Although neither *Bruen* nor *Heller* defined that period, they certainly intended it to be more than just the year of ratification. *See Bruen*, 142 S. Ct. at 2127–28 ("[W]e clarified that 'examination of a variety of legal and other sources to determine the public understanding of a legal text in the *period after its enactment or ratification*' was 'a critical tool of constitutional interpretation.'" (quoting *Heller*, 554 U.S. at 605) (emphasis altered)).

## II.  No Historic Analogue Justifies the Minnesota Carry Ban.

Under *Bruen*'s historical test, this Court must decide whether the Carry Ban is in line with historical restrictions on the Second Amendment right that have been accepted and treated as constitutional. But to determine what laws are similar, this Court must also characterize Minnesota's law. The Commissioner, and to a greater extent, the Sheriffs, take issue with Plaintiffs calling Minnesota's law a "Carry Ban" because, they explain, Minnesota issues many carry permits under its shall-issue regime (just not to 18-to-20-year-olds like Plaintiffs), Minnesota does not prevent Plaintiffs from possessing firearms, including handguns, and even without a permit, Plaintiffs can carry handguns on land they own, take a handgun in for repairs, transport a handgun unloaded, carry a handgun in woods or fields for target shooting and hunting, and carry a handgun between their home and their place of business. Sheriff Resp. 3–5; Minn. Stat. § 624.714, subd. 9. Notably absent from this litany is the general ability to carry a loaded, operable firearm for self-protection in public. That is the right that the Second Amendment protects and that is denied here. *See Bruen*, 142 S. Ct. at 2122. Plaintiffs have a right that extends beyond possessing handguns or carrying them in in certain situations; they have a right to carry in public for self-defense, but Minnesota *bans* them from participating in its licensing scheme which provides the only lawful avenue for Minnesotans to exercise their Second Amendment rights. The law is unquestionably a ban.

### A. The Period Surrounding Ratification of the Second Amendment Is the Critical Period for Defining the Scope of the Right.

Defendants misread *Bruen* when they argue this Court could find 1868 is the critical year for evaluating the relevance of historical evidence. *See* Comm'r Br. 9. As explained at length in Plaintiffs' opposition to the Defendants' motions for summary judgment, *Bruen* declined to "address" the issue because it did not make a difference for the outcome of the case. 142 S. Ct. at 2138. *Bruen* did not suggest that its precedent was equivocal on this point—it acknowledged that the Supreme Court had always "assumed that the scope of the protection [of the Bill of Rights] . . . is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," and the only debate on the issue was a scholarly one. *Id.* at 2137–38. It may be that, with this language, the Supreme Court was signaling that parties in future cases should address the issue for the Court, but it was certainly not overruling cases in which it had, dispositively, "look[ed] to the statutes and common law of the founding era to determine the norms that the [Bill of Rights] was meant to preserve." *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (Fourth Amendment). This Court is bound by that precedent and has no authority to predict whether the Court may ultimately take a different direction. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). It is therefore irrelevant that the Bill of Rights did not apply to the states until 1868—there is just one Second Amendment, and in determining its meaning, this Court must look primarily to Founding-era sources.

The Commissioner notes that *Heller* "reviewed material from 1868 and later," Comm'r Resp. 10, and that is true, but that material was "treated as mere confirmation of

9

what the Court thought had already been established" by the earlier sources on which it based its analysis. *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019). The Commissioner quotes *Heller*'s acknowledgement that Reconstruction-era sources are valuable for their "understanding of the origins and continuing significance of the Amendment," but he omits the previous sentence which placed less weight on those sources because they "took place 75 years after the ratification of the Second Amendment, [so] they do not provide as much insight into its original meaning as earlier sources." *Heller*, 554 U.S. at 614; Comm'r Resp. 12.

The Commissioner's reliance on *McDonald v. City of Chicago*, 561 U.S. 742 (2010), on this point is also misplaced. Comm'r Resp. 11. Its unsurprising that *McDonald*, which determined that the Fourteenth Amendment incorporated the Second against the states, conducted an in-depth examination of Reconstruction-era history to make that determination. But the incorporation question is decided. What is at issue here is *the content* of the right, and on that front *McDonald* supports Plaintiffs' position. There the Court rejected "the notion that the Fourteenth Amendment applies to the states only a watered-down, subjective version of the individual guarantees of the Bill of Rights" and said instead that incorporated provisions "are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.* at 765 (quoting *Malloy v. Hogan*, 378 U.S. 1, 10–11). This language cannot be squared with the Commissioner's argument that the meaning of the Bill of Rights shifted in 1868 (and in the case of the Second Amendment, became less expansive, or "watered down"). By referring to "the same standards that protect those

10

personal rights against federal encroachment," the Court was indicating that such standards *already existed* at the time and those standards would now be applied against the states. *See Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) ("1791 . . . [is] the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago*."). The Commissioner also looks to *Bruen* for support for his approach, Comm'r Br. 12, but there, too, the Court preferred evidence from the Founding and treated Reconstruction era sources as less valuable. *See Bruen*, 142 S. Ct. at 2137. And Justice Barrett's concurrence, which provided additional clarity regarding the Court's methods, cautioned that the "decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring).

In the end, the Commissioner asserts both 1791 and 1868 had one thing in common: "the public understanding of the rights of 'infants' or minors was the same in 1791 and 1868." Comm'r Br. 12. But as we have emphasized, Plaintiffs are adults and wholly theoretical restrictions on firearm possession or use by *minors* in 1791 or 1868 are irrelevant to the rights of *adults* today. In any event, the Commissioner is wrong. By 1868, many states—including Minnesota—treated 18-to-20-year-old women (like Plaintiff Worth) as adults. Minn. Gen. Stat. *c*. 59, § 2 (1866).

### B. Founding Era Evidence Shows That the Carry Ban is Incompatible With the Second Amendment.

The Commissioner claims "context is key to understanding historical analogues to Minnesota's permitting scheme from the Founding era." Comm'r Resp. 13. But the only

11

"context" he offers in response to Plaintiffs' argument that there were *no* laws at the Founding restricting the rights of 18-to-20-year-olds to carry or possess weapons, is to reiterate that they were minors. He concedes, as he must, that 18-year-olds were obliged to own firearms under militia laws, but points out that some militia laws required parents to purchase firearms for them. *Id*. at 13. His objection to the reliance on *posse comitatus* and "hue and cry" laws is the same. *Id.* at 14. But the Commissioner fails to explain how the mere fact that some statutes punished parents who failed to adequately outfit 18-to-20-year-olds for militia service establishes that Minnesota can bar 18-to-20-year-olds from carrying firearms in public for self-defense. It cannot. It is dispositive of this case that the Commissioner has not pointed to a single law from this period that in any way restricted the rights of 18-to-20-year-olds to carry firearms for self-defense. The Second Amendment protects the right to do just that, *Bruen*, 142 S. Ct. at 2156, and without Founding-era evidence of a similar restriction, Minnesota's ban cannot be upheld, *id.* at 2133.

### C. Reconstruction Era Evidence Cannot Support the Carry Ban.

The Commissioner's evidence of a historical tradition of firearm regulation is insufficient to support the Carry Ban even if this Court prioritizes post-Civil War restrictions as the Commissioner requests. The Commissioner cites a list of 20 state laws from 1875-1899 which "regulat[e] minors and guns." Comm'r Br. 16. Notably absent is *any* law that the Commissioner claims restricted legal adults in any way. That should be the end of the matter.

Moreover, many of the laws are not like the Carry Ban. For instance, seven laws restricting sales permitted some method for minors to acquire firearms (either as a gift, or

through a sale with permission from a parent or employer). *See* 1878 Miss. Laws 175–76; 16 Del. Laws 716 (1881); 1881 Fla. Laws 87; 1881 Ill. Laws 73; 1883 Mo. Laws 76; 1893 N.C. Sess. Laws 468–69; 1897 Tex. Gen. Laws 221–22.[2] The Nevada law that the Commissioner says Plaintiffs ignored outlawed *concealed* carry of firearms but did not make it illegal to carry *openly*. Comm'r Br. 16; 1885 Nev. Stat. 51. Two of the laws applied only to minors under the age of 16. 1881 Fla. Laws 87; 1881 Pa. Laws 423. One applied only within the city of Lincoln, Nebraska. 1895 Neb. Laws Relating to the City of Lincoln 237. All told then, the Commissioner has found just ten laws that, either by totally barring the acquisition of handguns, or making all forms of carriage illegal, would burden the right to armed self-defense in a way that is comparable to the Minnesota Carry Ban. Of those, six come from states that had no Second Amendment analogue at the time they were enacted, *see* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. OF L. AND POLITICS 191, 193–204 (2006) (Iowa, Maryland, Louisiana, Oklahoma, West Virginia, Wisconsin), and one comes from Kansas, which had a Second Amendment analogue but was singled out by *Bruen* as an example of a state that, around this time, "operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*," see *Bruen*, 142 S. Ct. at 2155. *Bruen* was also dismissive of overly restrictive

---

[2] The Commissioner suggests these "age-based sales restrictions arguably pose a greater burden than age-based carry restrictions because it is difficult for a person to own or carry a gun if they . . . must rely on others to gift or loan them a gun." Comm'r. Resp. 16 n.4. But that does not make sense. Age-based sales restrictions make it *difficult* for a person to carry a gun in public. The Carry Ban makes it *impossible*. The Carry Ban therefore places a more significant "burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133.

firearm laws in the Western Territories, which "were rarely subject to judicial scrutiny" and deserving of "little weight," *id.* at 2121, and the Commissioner's Wyoming law qualifies. *See* 1890 Wy. Sess. Laws 1253. That leaves laws from Indiana in 1875 and Georgia in 1876. Two laws are not enough to demonstrate a historical tradition that overcomes the plain text of the Amendment, and Plaintiffs have discussed previously, Pls.' Resp. in Opp. To Defs.' Mots. For Summ J. 31–32 (Aug. 25, 2022) (Pls.' Resp."), how strange it would be to rely on laws from southern states like Georgia to adopt a restrictive understanding of the right to keep and bear arms, when Georgia ratified the Fourteenth Amendment only as a necessary precondition to readmission to the union. *See Oregon v. Mitchell*, 400 U.S. 112, 165–66 (1970).

Defendants complain that Plaintiffs would require them to find "twins" instead of mere analogues, Comm'r Resp. 15, Sheriff Resp. 8–9, but that is not true. The metric by which analogies must be judged is whether they (1) impose a comparable burden on the right to bear arms and (2) they are justified by comparable reasons. *Bruen*, 142 S. Ct. at 2133. Plaintiffs accept that an historical ban on sales *may* be analogous to the Carry Ban *if* it prevented ordinary 18-to-20-year-olds from carrying firearms in public for self-defense like the Carry Ban does. Similarly, a law is not evidence of what was understood to be the scope of the Second Amendment if it comes from a state that had no constitutional right to bear arms provision and did not recognize that state law must comport with the federal Second Amendment. *See Jones*, 34 F.4th at 719 ("[I]n the colonial and founding eras, state laws were made against the backdrop of Second Amendment analogues in their respective

14

[state] constitutions." (citation omitted). And even then, the law must infringe the recognized right to bear arms for the same reasons.

The Commissioner takes issue with Plaintiffs' relying on the fact that 18-to-20-year-olds are adults today, suggesting that this reliance violates *Bruen*'s "mandate[] that 20th century history be disregarded when it contradicts earlier history." Comm'r Resp. 17. But we are not relying on modern circumstances to establish the scope of the Second Amendment. Rather, we are relying on modern circumstances to demonstrate that the "historical justifications," *Heller*, 554 U.S. at 635, for the analogues to Minnesota's Carry Ban posited by the Commissioner do not obtain. "Thus, even if" the Commissioner's laws "prohibited the carrying of handguns" by 18-to-20-year-olds "because they were considered" minors at the time, "they provide no justification for laws restricting the public carry of weapons" by individuals who are "unquestionably" legal adults "today." *Bruen*, 142 S. Ct. at 2143.

### III. Plaintiffs Did Not Waive Their Claim That the Carry Ban is Unconstitutional As Applied to 18-to-20-Year-Old Women.

The Sheriffs last argue that Plaintiffs have "waived" their claim that the Carry Ban is unconstitutional as applied to women and therefore the Court should enter summary judgment in Defendants' favor. Sheriff Resp. 11.[3] But Plaintiffs simply declined to move for summary judgment on the as applied claim; they did not waive the claim altogether, as demonstrated by the response to the Commissioner's motion. *See* Pls.' Resp. 38–40.

---

[3] The Sheriffs also reiterate their argument that they are not proper *Monell* defendants. Plaintiffs have fully responded to this argument already. *See* Pls.' Resp. 5–12.

15

## CONCLUSION

For the foregoing reasons, and those contained in Plaintiffs' opening brief, the Court should grant summary judgment in Plaintiffs' favor.

Dated: September 8, 2022                                    Respectfully submitted,

                                                            /s/David H. Thompson
Blair W. Nelson                                             David H. Thompson*
Minnesota Bar No. 0237309                                   DC Bar No. 450503
                                                            Peter A. Patterson*
BLAIR W. NELSON, LTD.                                       DC Bar No. 998668
205 7th Street N.W. Suite 3                                 William V. Bergstrom*
Bemidji, MN 56601                                           DC Bar No. 241500
(218) 444-4531
bwnelson@paulbunyan.net                                     COOPER & KIRK, PLLC
                                                            1523 New Hampshire Avenue, N.W.
                                                            Washington, D.C. 20036
                                                            (202) 220-9600
                                                            (202) 220-9601 (fax)
                                                            dthompson@cooperkirk.com
                                                            ppatterson@cooperkirk.com
                                                            wbergstrom@cooperkirk.com
                                                            *Admitted *pro hac vice*

                    *Attorneys for Plaintiffs*