UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Kristin Worth, Austin Dye, Axel Anderson, Minnesota Gun Owners Caucus, Second Amendment Foundation, and Firearms Policy Coalition, Inc., | Case No. 0:21-CV-01348 (KMM/LIB) |
| Plaintiffs, | **DEFENDANDANT JOHN HARRINGTON'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| John Harrington, in his individual capacity and in his official capacity as Commissioner of the Minnesota Department of Public Safety, *et al.* | |
| Defendants. | |

## ARGUMENT

**I.   THE *EX PARTE YOUNG* EXCEPTION DOES NOT APPLY TO DENY ELEVENTH AMENDMENT IMMUNITY AND PLAINTIFFS LACK STANDING.**

In response to the Commissioner's Motion for Summary Judgment, Plaintiffs agree to dismiss their claims against the Commissioner in his individual capacity and for nominal monetary damages. (Doc. 74 at 3, n.1.) Now, all that remains are claims for injunctive relief against the Commissioner in his official capacity.

The Commissioner has Eleventh Amendment immunity unless Plaintiffs can prove the *Ex Parte Young* exception applies. Because the Commissioner does not have "some connection" to the *enforcement* of Minnesota Statutes section 624.714, the *Ex Parte Young* exception does not apply. "The *Ex parte Young* doctrine does not apply when the

defendant official has *neither enforced nor threatened to enforce* the statute challenged as unconstitutional." *Minnesota RFL Republican Farmer Lab. Caucus v. Freeman*, 33 F.4th 985, 992 (8th Cir. 2022) *citing 281 Care Comm. v. Arneson* (*Care Committee II*), 766 F.3d 774, 797 (8th Cir. 2014) (emphasis in original).

The standard is not whether there is "some connection" between the Commissioner and section 624.714 as Plaintiffs argue (Doc. 74 at 4), but whether there is some connection between the Commissioner and the *enforcement* of section 624.714. *Ex Parte Young*, 209 U.S. 123, 155-60 (1908) (holding a suit is not barred by the Eleventh Amendment so long as the official has "some connection with the enforcement of the act."); *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957 (8th Cir. 2015) ("The Eleventh Amendment does not preclude jurisdiction over the state officials if there is 'some connection' between the officials and enforcement of the challenged state law."); *Final Exit Network, Inc. v. Ellison*, 370 F. Supp. 3d 995, 1012 (D. Minn. 2019) (finding *Ex Parte Young* exception applied because the Attorney General had "some connection" with the enforcement of the statute); *Minnesota RFL Republican Farmer Lab. Caucus v. Freeman*, 19-CV-1949, 2020 WL 1333154 at *2 (D. Minn. 2020). Here there are no facts showing that the Commissioner has any connection with the enforcement of section 624.714.

County sheriffs are statutorily charged with reviewing, investigating, and either approving or denying permit applications; and upon approval, sheriffs are the issuing authority. Minn. Stat. § 624.714, subd. 2. Violations of section 624.714 are either a gross-misdemeanor or a felony. *Id.* subd. 1a. Violations are prosecuted by county attorneys, not

the Commissioner. Minn. Stat. § 388.051, subd.1(3); *see also* Minn. Stat. § 387.03; Plaintiffs have not alleged, nor can they demonstrate, that the Commissioner has some connection with *enforcement* of section 624.714. Accordingly, the Commissioner has Eleventh Amendment immunity as a matter of law.

Similarly, Plaintiffs cannot establish standing. Standing is an element of federal subject matter jurisdiction which cannot be waived and may be raised at any time. *Magee v. Exxon Corp.,* 135 F.3d 599, 601 (8th Cir. 1998). Here, standing is similar to the immunity inquiry.

> [Q]uestions of Article III jurisdiction and Eleventh Amendment immunity are related. Article III requires the plaintiff to show a causal connection between the state officials and the alleged injury. The Eleventh Amendment does not preclude jurisdiction over the state officials if there is "some connection" between the officials and enforcement of the challenged state law.

*Hutchinson*, 803 F.3d at 957. To establish standing for prospective relief, a plaintiff "must show [he is] likely to suffer future injury that will be remedied by the relief sought." *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006). The imminence of future harm requirement is essential because it ensures "that the alleged injury is not too speculative for Article III purposes – that the injury is *certainly* impending." *Clapper v. Amnesty Intern'l USA*, 568 U.S. 398, 409 (2013). Allegations of merely possible future injury are not sufficient. *Id.* Associational Plaintiffs have no standing if their members' interests are "merely 'abstract concern' or 'unadorned speculation.'" *ARRM v. Piper*, 367 F. Supp. 3d 944, 953–54 (D. Minn. 2019) *citing Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40, 44 (1976). Here, there are no material facts sufficient to establish imminent

future harm. At no time have the individual plaintiffs claimed they actually applied for and were denied a permit due to their age. All individual plaintiffs state carrying a firearm without a permit would "potentially subject me to arrest and prosecution." (Docs. 43-2, 43-3, 43-4, ¶¶ 5.) Fear of potential future actions is not sufficient. There are no facts establishing the Commissioner has threatened to enforce section 624.714 against any Plaintiff; indeed, he has no authority to do so. The Associational Plaintiffs allege no injury to themselves, only those of their members. Accordingly, Plaintiffs have not established standing as a matter of law.

## II. NO SUPREME COURT CASE HAS DETERMINED 18-TO-20-YEAR-OLDS ARE AMONG "THE PEOPLE" IN THE PLAIN TEXT OF THE SECOND AMENDMENT.

Plaintiffs ask this Court to conclude that foundational Second Amendment precedent says something it does not. In erroneously claiming *Heller* held that "the people" refers to "all Americans," they disingenuously state the Supreme Court has already determined 18-to-20-year-olds are covered by the plain text of the Second Amendment. (Doc. 74 at 15-16.) But if *Heller* did so hold, this suit (and the at least five other identical suits Plaintiffs are currently litigating across the country) would not exist. In fact, were this Court to make such a determination, it would be in the minority of courts nationwide to so hold.[1] (*See* Doc. 49 at 8-10.)

---

[1] *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022), the single case Plaintiffs cite most in their opposition besides *Bruen*, has just been vacated and remanded. *See Jones v. Bonta*, No. 20-56174, 2022 WL 4090307 (9th Cir. Sept. 7, 2022).

*Heller*'s discussion surrounding "the people" was focused on the analysis and conclusion that the Second Amendment set forth an *individual right. District of Columbia v. Heller*, 554 U.S. 570, 580 (2008). "[T]he key point that we decided [in *Heller*] was that 'the people,' not just members of the 'militia,' have the right to use a firearm to defend themselves." *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111, 2157 (2022) (Alito, J., concurring). This individual right was not historically, and is not now, unlimited. 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited.") *Heller* acknowledged the right may be limited as to some classes of people with certain characteristics. "[W]ithout undertaking an exhaustive historical analysis of the full scope of the Second Amendment", the Court noted some restrictions on people were presumptively valid, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626-27. *Heller* did not hold that "the people" included all people without limitation.

Further, as Plaintiffs point out, "the people" is a term that "unambiguously refers to all members of *a political community*, not an unspecified subset." *Heller* 554 U.S. at 580 (emphasis added) (Doc. 74 at 15). But "infants" were not part of the political community at the time the Second and Fourteenth Amendments were ratified. History is the focus according to *Bruen*, and it is an inescapable fact that throughout history, as minors, 18-to-20-year-olds had little independent legal autonomy. Contrary to Plaintiffs' assertions, *Heller* did not establish that 18-to-20-year-olds were part of "the people"

5

because they were not part of our Nation's political community until they reached the age of majority at 21.[2]

*Bruen* further underscored that "the people" does not include everyone without limitation. In narrowing the issues for discussion, the Court noted what was not at issue: "It is undisputed that petitioners Koch and Nash – two ordinary, law-abiding, *adult* citizens – are part of 'the people' whom the Second Amendment protects." 142 S. Ct. at 2134 (emphasis added). Thus, the Court implied there could be valid legal questions about who constitutes "the people." And, by noting petitioners' ages, the Court further implied that age may be a factor in who the founders intended to comprise "the people."

Faced with historical context placing 18-to-20-year-olds squarely in the category of minors with limited rights in 1791 and 1868, Plaintiffs attempt two workarounds. First, they switch the focus from the historical analysis required of Second Amendment cases to a cross-comparison of the Second Amendment with other amendments. Second, they overlay our modern definitions of "minor" and "adult" onto historical text, in direct contravention of *Bruen*.

Plaintiffs' effort to switch the focus from history to a comparison of the scope of rights under other amendments fails. (Doc. 74 at 16.) *Bruen* set out a new and entirely different standard for analyzing Second Amendment rights wherein *only* plain text and

---

[2] Some women's adult status at 18 is irrelevant; the doctrine of coverture "rendered married women a legal nullity" and the minute percentage of adult single women lacked constitutional equality. (*See* Doc. 51-1a; *see also* Rogers M. Smith, *"One United People": Second-Class Female Citizenship and the American Quest for Community*, Yale J.L & Humanities 229, 241-63 (1989.) Given the required focus on history, there is no reasonable argument Early American women had an independent right to carry a firearm.

history are analyzed and no means-end-scrutiny analysis is permissible. 142 S. Ct. at 2127. The Second Amendment stands alone in the strictly historical and textual focus in determining the scope of its right without means-end scrutiny. *Id.* at 2176 (Breyer, J. dissenting.) Therefore, comparing the Second Amendment to other amendments makes little sense. Although now-Justice Barrett opined that it is "an unusual way of thinking about rights" for "certain *people* [to] fall outside the Amendment's scope" in her dissent in *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019), nevertheless, the Supreme Court has already blessed historical exclusions of certain people from having access to firearms in a way which indicates there could be others. *Heller*, 554 U.S. at 626.

Next, Plaintiffs' attempts to overlay modern definitions of "minor" and "adult" onto historical statutes and text fails. The meaning of the plain text "is fixed according to the understandings of those who ratified it." *Bruen*, 142 S. Ct. at 2118. Plaintiffs contradict themselves. While they claim the Commissioner has not met his burden of proving historical analogues to Minnesota's statute, they advocate for applying our modern definition of adult to the text of the Second Amendment. But Plaintiffs are stuck with the purely historical test set forth in *Bruen*. Their claim that "the amendment mentions neither minority nor adult status, so any argument over the importance of such status is not a textual one and must be analyzed as part of *Bruen*'s second step" wholly ignores historical context. (Doc. 74 at 17.) Plaintiffs read *Bruen* too literally when they argue that the founders must have intended minors to be part of "the people" because the Amendment's text does not specifically exclude them. Minors (and a host of other people) were not considered to be part of "the people" the founders imbued with

7

constitutional rights in 1791. Given the fact that 18-to-20-year-olds were minors in 1791 and 1868, there is no reasonable argument that they had a Second Amendment right to independently carry a firearm. It is not only an oversimplification, but contrary to *Bruen*, to ignore historical context and argue that words chosen in 1791 should have a modern definition.

Militia laws further do not establish that 18-to-20-year-olds comprised "the people" that had such a right. As Plaintiffs point out, "the 'Militia' in the Second Amendment is not the entire political community of the United States but is instead a defined 'subset of the people' consisting only of 'those who were male, able bodied, and within a certain age range.'" (Doc. 74 at 15 *citing Heller*, 554 U.S. at 580.) The Militia Act of 1792 hardly defined a right, rather it identified individuals best suited for combat. It mandated that "every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years, and under the age of forty-five years . . . ." Militia Act of 1792, 2 Cong. ch. 33, 1 Stat. 271. It follows that the militia did not include women, non-whites, disabled persons, or anyone over 44. Plaintiffs selectively focus on 18-to-20-year-olds' militia eligibility and extrapolate rights from there, while overlooking the remaining qualifications and the absurd extrapolation that results. The purpose of the Militia Act was not to define Second Amendment rights, but to create an organized "national defence." *Id*. Indeed, the Militia Act allowed the states to set their own minimum age. *Id*. at 272. Militia laws were separate from individual citizens' Second Amendment right. Plaintiffs' focus on militia laws is misplaced and does not prove the existence of the right for 18-to-20-year-olds.

### III. A PLETHORA OF HISTORICAL ANALOGUES ESTABLISH THE CONSTITUTIONALITY OF MINNESOTA'S STATUTE.

As the plain text of the Second Amendment does not include 18-to-20-year-olds, the inquiry should end there. But, even if the plain text did cover this age group, numerous historically analogous age-restrictions on firearms satisfy the Commissioner's burden of demonstrating that Minnesota's modest restrictions are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. There is no binding precedent requiring consideration of only historical analogues from the Founding Era. And there are a multitude of historical analogues through the adoption of the Fourteenth Amendment which establish the constitutionality of section 624.714.

#### a. The Proper Time Period to Analyze Historical Analogues is an Open Question and is Not Controlled by Binding Precedent.

*Bruen* recognized the "ongoing scholarly debate" regarding whether courts should look to analogues from the founding or ratification of the Fourteenth Amendment when defining the scope of the Second Amendment. *Id.* at 2138. In refraining from addressing whether 1791 or 1868 was the proper time period, *Bruen* did exactly the opposite of what Plaintiffs claim: it left open the question. *Id.* ("We need not address this issue today because … the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry.") If the issue was previously decided by binding Supreme Court precedent as Plaintiffs claim, the *Bruen* decision would have so stated. (Doc. 74 at 18.)

Plaintiffs claim binding precedent requires consideration of 1791 historical analogues only. First, they argue because the Bill of Rights has the same meaning applied

9

to the states as applied to the federal government. And second, 1791 is the key year for determining the meaning of the Bill of Rights as applied to the federal government. (Doc. 74 at 19.) Plaintiffs' argument merely restates points the Supreme Court acknowledged in *Bruen* before explicitly stating it would "not address this issue today." 142 S. Ct. at 2137-38. *Bruen* specifically declined to address the debate, leaving it open.

Further, *Bruen* does not establish that this Court must prioritize 1791 historical analogues. Plaintiffs point to *Bruen*'s citations to *Heller* in support of this argument. (Doc. 74 at 20.) But no state's regulations were at issue in *Heller*, therefore the Court had less reason to consider the period around ratification of the Fourteenth Amendment. In *Bruen*, the Court considered both time periods as New York's regulations were at issue. *See id.* at 2136, 2150-51 (considering "evidence from around the adoption of the Fourteenth Amendment" for thirteen paragraphs). Multiple courts have considered historical evidence from around the Reconstruction Era (*see* Doc. 49 at 24, Doc. 70 at 3-4). *Bruen*'s edict eliminating means-ends scrutiny does not invalidate the historical analyses in these opinions, especially given that the Supreme Court recognized such historical analyses as "broadly consistent with *Heller*." 142 S. Ct. at 2127. Here, the period around 1868 is relevant to shed light on the public understanding at the time the amendments were made applicable to Minnesota.

Similar to *Bruen*, here the public understanding of minors' rights to firearms was the same in all relevant time periods. Minors had no independent legal authority and were under the control of their legal guardians. (*See* Doc. 49 at 20-22; Doc. 50-1a.) Laws around 1868 are *not* "*inconsistent* with the original meaning of the constitutional text."

10

*Bruen*, 142 S. Ct. at 2137 (Kavanaugh, J. dissenting.) The proper historical framing of the issue should be: did the Second Amendment recognize a right of minors, meaning those under twenty-one, to keep and bear arms? To answer this question, this Court may look to historical analogues and historical context from both time periods, particularly the robust regulations around the ratification of the Fourteenth Amendment.

### b. There are Numerous Historical Analogues from Relevant Periods.

There were many historical analogues from the period around ratification of the Fourteenth Amendment, contrary to Plaintiffs' claim that the Commissioner provided five "generally applicable" laws. (Doc. 74 at 30.) "The scope of state regulatory authority was at its zenith when regulating arms and minors" in the Reconstruction era period. (Doc. 50-1a at 22-23 *citing* Lewis Hochheimer, *The Law Relating to the Custody of Infants* 4 (3ed., 1899.)) In the 19th century, 19 states and the District of Columbia enacted laws restricting the ability of individuals under 21 to purchase or use firearms. *See Nat'l Rifle Assoc. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 202; *see also* (Doc. 50-1a at 25-26, Table Two *citing* a selection of twenty state laws between 1875 and 1897 regulating minors under twenty-one.) Such age restrictions were deemed constitutional under Second Amendment analogues in state constitutions by "19th-century cases" and "legal scholar[s]." 554 U.S. at 610, 616; *see* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Texas Rev. L. & Politics 191, 193–204 (2006) (compiling state Second Amendment analogues).

Plaintiffs' attempts to henpeck historical analogues misses the clear direction from *Bruen* that historical analogues aren't required to be twins or "dead-ringer[s]" to "pass constitutional muster"; they simply must be "relevantly similar." 142 S. Ct. at 2118, 2132. It is this historical backdrop of age-based restrictions on firearms, whether regarding purchase, carry, or concealment, which demonstrates that age-based restrictions like Minnesota's are longstanding, and therefore constitutional.

Dated:  September 8, 2022                    Respectfully submitted,

                                                         KEITH ELLISON
                                                         Attorney General
                                                         State of Minnesota

                                                         s/ Amanda E. Prutzman
                                                         Amanda E. Prutzman
                                                         Assistant Attorney General
                                                         Atty. Reg. No. 0389267

                                                         445 Minnesota Street, Suite 1400
                                                         St. Paul, Minnesota 55101-2131
                                                         (651) 757-1217 (Voice)
                                                         (651) 282-5832 (Fax)
                                                         amanda.prutzman@ag.state.mn.us

                                                         ATTORNEY FOR DEFENDANT COMMISSIONER JOHN HARRINGTON

|#5315724-v1