## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kristin Worth, Austin Dye, Axel Anderson, Minnesota Gun Owners Caucus, Second Amendment Foundation, Firearms Policy Coalition, Inc., | Case No. 21-cv-1348 (KMM/LIB) |
| Plaintiffs, | |
| v. | |
| John Harrington, *in his official capacity Commissioner of the Minnesota Department of Public Safety*; Don Lorge, *in his official capacity as Sheriff of Mille Lacs County, Minnesota*; Troy Wolbersen, *in his official capacity as Sheriff of Douglas County, Minnesota*; and Dan Starry, *in his official capacity as Sheriff of Washington County, Minnesota*; | **ORDER** |
| Defendants. | |

The State of Minnesota requires a person to obtain a permit to lawfully carry a handgun in public, but does not issue permits to anyone under the age of twenty-one. The Plaintiffs, who are 18-to-20-year-old individuals and firearms advocacy organizations with members in that age range, argue that the minimum age requirement in Minnesota's permit-to-carry law violates their Second Amendment right to keep and bear arms. The parties have filed cross-motions for summary judgment. The Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), compels the conclusion that Minnesota's permitting age restriction is unconstitutional, and Plaintiffs are entitled to judgment as a matter of law.

# I.    Background

The Minnesota Legislature enacted the Minnesota Citizens' Personal Protection Act of 2003 "recognize[ing] and declar[ing] that the second amendment of the United States Constitution guarantees the fundamental, individual right to keep and bear arms," while also enacting statutory provisions considered "to be necessary to accomplish compelling state interests in regulation of those rights." Minn. Stat. § 624.714, subd. 22. As part of that Act, Minnesota requires persons who are not law enforcement officers to obtain a "permit to carry [a] pistol" in a public place. Minn. Stat. § 624.714, subd. 1a.[1] Carrying a pistol in public without a permit is a gross misdemeanor, and a conviction for a second or subsequent offense is a felony. *Id.*

To obtain such a permit, the statute requires a person to submit an application to the sheriff in their county of residence, and the sheriff "must issue a permit to an applicant if the person" satisfies enumerated criteria. *Id.* § 624.714, subd. 2(a)–(b). The condition at issue in this case is that the applicant must be "at least 21 years old." *Id.* § 624.714, subd. 2(b)(2).[2] In addition to completing the application and meeting the age requirement, a

---

[1] There are exceptions to the permitting requirement. For example, a person does not need a permit to carry a handgun about her own place of business or dwelling; to carry a pistol between her home and place of business; to carry a pistol in the woods, fields, or open waters of Minnesota for hunting or target shooting; or to transport a pistol in a motor vehicle if it is unloaded and contained in a closed case or package. Minn. Stat. § 624.714, subd. 9.

[2] In the original version of Minnesota's permit-to-carry statute, enacted in 1975, the minimum age for eligibility was 18. 1975 Minn. Laws 1280–82 (H.F. No. 679, Ch. 378 §§ 3, 4). The Minnesota Citizens' Personal Protection Act of 2003 amended that law to substantially its current form, introducing the language requiring an applicant to be "at least 21 years old." 2003 Minn. Sess. Laws Serv. Ch. 28, art. 2, § 6.

person must also have "training in the safe use of a pistol" within a year of the application and not be prohibited from possessing a firearm by state or federal law. *Id.* §§ 624.714, subd 2a, and subd. 2(b)(1), (3), and (4).[3]

Kristin Worth, Austin Dye, and Axel Anderson, the individual Plaintiffs in this case, are older than 18, but under the age of 21.[4] Except for failing to meet the age requirement, it appears they are otherwise eligible to receive a permit to carry a pistol in Minnesota. They wish to carry pistols for self defense, but don't because they do not want to be subject to arrest or prosecution for violating the permitting requirement. If they could obtain a permit, they state that they would take the required safety training course and submit applications to their respective County Sheriffs. [Doc. 43-2; Doc. 43-3; Doc. 43-4].

The other Plaintiffs are gun-rights advocacy organizations: the Minnesota Gun Owners Caucus ("MGOC"), the Second Amendment Foundation ("SAF"), and the Firearms Policy Coalition ("FPC"). Each of the individual Plaintiffs is a member of all three of these organizations. MGOC has thousands of members in Minnesota, some of

---

[3] If a person meets these criteria, the sheriff may only deny a permit in the event "that there exists a substantial likelihood that the applicant is a danger to self or the public if authorized to carry a pistol under a permit." Minn. Stat. §§ 624.714, subd. 2(b), and subd. 6(a)(3).

[4] At oral argument, counsel for the Plaintiffs confirmed that although this case was filed on June 7, 2021, the individual Plaintiffs are still under the age of 21, and there is no evidence before the Court to suggest otherwise. Accordingly, the Court finds that the "requisite personal interest that must exist at the commencement of the litigation [has] continue[d] throughout its existence," and the controversy is not moot. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). Moreover, the evidence before the Court indicates that the organizational Plaintiffs also have members who are both 18–20-year-olds and otherwise qualified to receive a permit to carry.

whom are over 18, but under the age of 21, and "who would exercise their right to bear arms and acquire carry licenses if it were not for" the age requirement in Minn. Stat. § 624.714. [Doc. 43-5 ¶¶ 4, 6]. Similarly, SAF and FPC have members between the ages of 18 and 21 who would obtain permits and publicly carry pistols in Minnesota if they were legally allowed to do so. [Doc. 43-6 ¶¶ 3–7; Doc. 43-7 ¶¶ 3–7].

Plaintiffs claim that the Defendants' "active enforcement" of the permitting and age requirements bar them from obtaining a permit to carry handguns in public. [Compl. ¶¶ 43–44, 56–57, 69–70]. One of those Defendants is John Harrington, the Commissioner of the Minnesota Department of Public Safety.[5] The statutory scheme tasks the Commissioner with oversight and other responsibilities related to permitting. For example, the Commissioner is required by statute to adopt statewide standards governing the form and contents of all applications for carry permits. Minn. Stat. § 624.7151. The Commissioner must also make the forms for new and renewal applications available on the internet. *Id.* § 624.714, subd. 3(h). Further, the Commissioner is required to maintain a database of persons authorized to carry pistols. *Id.* § 624.714, subd. 15(a). The Commissioner must keep track of other states with laws governing the issuance of permits to carry weapons that differ from Minnesota's permit-to-carry law, and execute reciprocity agreements with

---

[5] Although Plaintiffs originally sued the Commissioner in his individual capacity as well as his official capacity, all that remain are Plaintiffs' official-capacity claims against him. [Doc. 74 at 3 n.1 ("Plaintiffs note that the Commissioner seeks summary judgment for claims against him in his individual capacity (for both nominal damages and injunctive relief) based on qualified immunity. As in Plaintiffs' stipulation regarding these same claims as to the Sheriffs . . ., Plaintiffs agree to dismiss the individual capacity claims against the Commissioner.")].

other jurisdictions whose carry permits are recognized in Minnesota. *Id.* § 624.714, subd. 16(a), (d). Finally, the Commissioner receives set amounts from the fees for new and renewal applications that are paid to the individual county sheriffs who process the applications. *Id.* § 624.714, subd. 3(f).

Defendant Don Lorge is the Sheriff of Mille Lacs County, where Ms. Worth resides; Dan Starry is the Sheriff of Washington County, where Mr. Dye resides; and Troy Wolberson is the Sheriff of Douglas County, where Mr. Anderson resides (collectively "the Sheriffs"). As noted, applications for permits to carry must be made to the sheriff in the county where a person resides. Minn. Stat. § 624.714, subd. 2(a). And a sheriff who receives an application "must issue a permit" if an applicant satisfies the statutory criteria. *Id.* § 624.714, subd. 2(b). Each of the Sheriffs explains that his respective County played no role in the State's enactment of the permit-to-carry law and that he strictly follows the requirements of the statute. Moreover, the Sheriffs declare that they have never received applications from the individual Plaintiffs who reside within their Counties, and indeed, have never received an application for a permit to carry by a person under the age of 21. [Doc. 55; Doc. 56; Doc. 57].

## II.   Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draws

reasonable inferences in that party's favor. *Grant v. City of Blytheville*, 841 F.3d 767, 770 (8th Cir. 2016).

## III.  Plaintiffs' Motion

Plaintiffs seek summary judgment in their favor on their claim that the age requirement in Minn. Stat. § 624.714, subd. 2, violates their Second Amendment rights.[6] In light of the Supreme Court's ruling in *Bruen*, the Court concludes that Plaintiffs are entitled to summary judgment.

### A.  Second Amendment Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II. In two cases decided over a decade ago, the Supreme Court held that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Bruen*, 142 S. Ct. at 2122 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)). And in *Bruen* last year, the Court held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.*

---

[6] In their summary judgment briefing, the Plaintiffs characterize the statute they are challenging as "the Carry Ban." However, it is clear from their arguments that they are specifically challenging the minimum age requirement of the permitting scheme found in Minn. Stat. § 624.714, subd. 2(b)(2). They have neither argued nor demonstrated that any other aspect of Minnesota's permit-to-carry law raises a constitutional concern.

In the decade of litigation following *Heller*, Courts of Appeals around the country adopted a variety of balancing tests which weighed a government's interest in a particular gun control measure against the extent and nature of that law's infringement of Second Amendment rights. *Id.* at 2126–27 (describing the tests in several circuits). Indeed, every Circuit Court to address the issue prior to *Bruen* gave weight in the analysis to the societal goals served by the regulation at issue. *United States v. Jackson*, Crim. No. ELH-22-141, 2023 WL 2499856, at *3 (D. Md. Mar. 13, 2023) (discussing federal appellate courts uniform approach between *Heller* and *Bruen*). But *Bruen* rejected any "two-step," "means-end scrutiny" entirely. 142 S. Ct. at 2125–26. Instead, the Court adopted the following test for evaluating whether a government regulation of firearms is permissible:

> [W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126.[7] Although the first step of the Supreme Court's test refers to the amendment's "plain text" and the second step to "historical tradition," both steps of the analysis are historical in focus.

---

[7] *Bruen* states that it "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. at 2134.

**Step One – Textual Analysis**

At the first step, *Bruen* requires a court to conduct a "textual analysis" that is "focused on the 'normal and ordinary' meaning of the Second Amendment's language." 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 576–77, 578). This inquiry into the "normal meaning" of the "words and phrases used" is backward looking, focused on what those words meant in 1791 when the Second Amendment was ratified, and "excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576–77. A court applying the first step of "*Heller*'s methodological approach," *Bruen*, 142 S. Ct. at 2127, can employ several tools in discerning the text's normal and ordinary meaning. These may include: (1) comparison of a phrase within the Second Amendment to the same or similar language used elsewhere in the Constitution, *Heller*, 554 U.S. at 579–81 (comparing "right of the people" in the Second Amendment to the same and similar language in the First, Fourth, and Ninth Amendments); (2) consideration of historical sources, including dictionaries, founding-era statutes, 18th-century legal treatises, and others, that could suggest a common understanding of the terms used, *id.* at 581–92 (examining the meaning of "keep and bear arms");[8] and (3) evaluation of the historical background leading to the Second Amendment's adoption, *id.* at 592–95. See also *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco, and Explosives*, 5 F.4th 407, 418–19, 421–23 (4th Cir. 2021) (discussing sources relevant to understanding the original public meaning of the Second Amendment), *vacated as moot*, 14 F.4th 322, 328 (4th Cir.

---

[8] *See id.* at 595–96 (consulting "founding-era sources" to illuminate the meaning of "well-regulated militia"); *id.* at 597–98 (similar for "security of a free state").

2021); *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 337 (5th Cir. 2013) ("*NRA II*") (Jones, J., dissenting from denial of rehearing en banc) ("First, the text of the Constitution was interpreted [in *Heller*] in light of historical documents bearing on each phrase and clause of the Second Amendment as those were understood at the time of its drafting.").[9]

### Step Two – Historical Analysis

If the normal and ordinary meaning of the Second Amendment's text protects the individual's proposed course of conduct, then the Amendment "presumptively guarantees" the individual's right related to firearms, and the burden falls on the government to justify the challenged regulation. *Bruen*, 142 S. Ct. at 2135. However, *Bruen* held that this justification cannot be based on the policy reasons that motivated the regulation at issue. *Id.* at 2127 (describing the two-step approach adopted by Courts of Appeals post-*Heller* as "one step too many" and stating that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context"). Instead, the government must show that the law is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135.

Such an assessment ultimately comes down to "reasoning by analogy." *Id.* at 2132. The government must identify historical firearm regulations that are consistent with the modern, challenged regulation, and courts must decide whether a "historical regulation is

---

[9] Though Judge Jones' opinion in *NRA II* was a dissent from the denial of the request for rehearing by the Fifth Circuit *en banc*, her reasoning, including her discussion of *Heller*'s analytical approach, largely tracks the test clarified by the Supreme Court in *Bruen*.

a proper analogue" through "a determination of whether the two regulations are
"'relevantly similar.'" *Id.* (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L.
Rev. 741, 774 (1993)). *Bruen* did not "provide an exhaustive survey of the features that
render regulations relevantly similar under the Second Amendment," but it did instruct
courts to consider "how and why the regulations burden a law-abiding citizen's right to
armed self-defense." *Id.* at 2132–33. Courts applying *Bruen* must consider "whether
modern and historical regulations impose a comparable burden on the right of armed self-
defense and whether that burden is comparably justified." *Id.* at 2133. However, the Court
has cautioned that "[t]his does not mean that courts may engage in independent means-end
scrutiny under the guise of analogical reasoning."[10] *Id.* at 2133 n.7.

 *Bruen* explains that on occasion, the inquiry required at the second step of the test
"will be fairly straightforward" and offers a few examples. *Id.* at 2131. A law directed at a
"general societal problem that has persisted since the 18th century," will likely be
"inconsistent with the Second Amendment," if there is a "lack of distinctly similar

---

 [10] Courts have struggled with deciphering exactly how to apply *Bruen's* instruction
to consider only "relevantly similar" historical analogues through evaluation of how and
why they burden the right to keep and bear arms without engaging in means-end scrutiny.
*E.g.*, *United States v. Price*, No. 2:22-CR-00097, --- F. Supp. 3d ----, 2022 WL 6968457,
at *4 n.3 (S.D.W. Va. Oct. 12, 2022) (stating that the *Bruen* Court's "discussion of what
constitutes an 'analogous regulation' is curious," and noting the tension between applying
the "relevantly similar" analysis and the instruction not to engage in interest-balancing).

historical regulation addressing that problem."[11] *Id.* And a modern regulation might also be unconstitutional if, in the face of a persistent societal problem, historical regulations used "materially different means" to address it. *Id.*

"[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. Although *Bruen* cautioned that it is not enough for a contemporary regulation to "remotely resemble[]" a colonial era law, the government is only required to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. The modern regulation at issue need not be "a dead ringer for historical precursors" to be "analogous enough to pass constitutional muster." *Id.*[12]

The *Bruen* Court acknowledged that the framework it adopted might be challenging to apply. "To be sure, '[h]istorical analysis can be difficult; it sometimes requires resolving

---

[11] According to *Bruen*, the District of Columbia's "flat ban on the possession of handguns in the home" at issue in *Helller* was an example of a case involving a "straightforward historical inquiry." 142 S. Ct. at 2131. The D.C. law addressed an issue— "firearm violence in densely populated communities"—by adopting a measure that the Founders could have just as easily adopted to address the same problem. *Id.* But because the historical tradition of firearm regulation identified nothing analogous to the total ban on firearm possession in the home that D.C. had adopted, the law was unconstitutional. *Id.*

[12] *Bruen* offers as an example another analogical scenario through another reference to *Heller*. 142 S. Ct. at 2133. *Bruen* notes that *Heller* identified a tradition of "'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* (quoting *Heller*, 554 U.S. at 626). Although the *Bruen* Court identified few *other* founding-era sensitive places with outright prohibitions on weapons, the lack of evidence of "disputes regarding the lawfulness of such prohibitions" suggested that "arms carrying could be prohibited [in schools and government buildings] consistent with the Second Amendment." *Id.* Accordingly, a court could permissibly compare those historical regulations to a modern regulation and determine that prohibitions on carrying firearms in "*new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in *Bruen*).

11

threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" *Bruen*, 142 S. Ct. at 2130 (quoting *McDonald*, 561 U.S. at 803–04 (Scalia, J., concurring)). But the *Bruen* Court decided that reliance on history is "more legitimate, and more administrable, than asking judges to make difficult empirical judgments about the costs and benefits of firearms restrictions." *Id.* (cleaned up).

### B. Applying the Textual Analysis

The Court now applies *Bruen*'s two-part framework to Minnesota's age requirement for a permit to publicly carry a handgun. The first step—textual analysis—requires the Court to consider the Plaintiffs' "proposed course of conduct" and ask whether the Second Amendment's plain text "covers" that conduct.[13] 142 S. Ct. at 2134, 2126. It is already settled that the plain text of the Second Amendment covers "carrying handguns publicly for self-defense," *id.* at 2134, and here, the parties do not dispute that the course of conduct proposed by the Plaintiffs involves doing just that. [Doc. 43-2 ¶ 4; Doc. 43-3 ¶ 4; Doc. 43-4 ¶ 4]. So, consistent with *Bruen*'s holding, the parties do not dispute that Plaintiffs'

---

[13] Courts reading the Second Amendment's "plain text" do not always reach the same conclusion about whether it covers particular conduct. *Compare Def. Distributed v. Bonta*, Case No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *3–5 (C.D. Cal. Oct. 21, 2022) (concluding that the plaintiff's proposed conduct of selling a milling machine used for the self-manufacturing of certain untraceable firearms is not covered by the plain text of the Second Amendment because it has nothing to do with keeping or bearing arms), *tentative ruling adopted by* Case No. CV 22-6200-GW-AGRx, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022), *with Rigby v. Jennings*, C.A. No. 21-1523 (MN), --- F. Supp. 3d ---, 2022 WL 4448220, at *8 (D. Del. Sept. 23, 2022) (stating that "the right to keep and bear arms implies a corresponding right to manufacture arms" and concluding that plaintiffs demonstrated a likelihood of success on the merits of their claim that a statute prohibiting them from manufacturing untraceable firearms violated the Second Amendment).

proposed course of conduct is covered by the plain text of the Second Amendment. But that clarity does not end the textual analysis.

In this case, the dispute is not about whether the conduct is covered by the text, but whether the Plaintiffs are covered if they engage in that conduct. The parties disagree whether the Plaintiffs are among "the people" referred to in the Second Amendment's so-called operative clause—"the right of the people to keep and bear arms shall not be infringed." Plaintiffs argue that the Second Amendment's reference to *the people* applies to *all* the people, including adults who are over the age of eighteen, but not yet twenty-one. Defendants argue that the plain and ordinary meaning of "the people," as understood at the time the Second and Fourteenth Amendments were adopted, would not have included persons under twenty-one, and adopting the Plaintiffs' *all*-the-people reading too literally would lead to absurd results, such as allowing young children to publicly carry firearms. For the reasons that follow, the Court concludes that the Second Amendment's plain text is better read to include adults 18 and older in its protections.

First, although it did not address the age-related issue before the Court in this case, *Heller*'s discussion of the normal and ordinary meaning of the phrase "the right of the people" places a thumb on the scale in favor of the Plaintiffs' preferred interpretation. The *Heller* majority compared "the people" in the Second Amendment to the Constitution's other references to the same or similar phrases, then explained that "the term unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. So construed, *Heller* explained that "the people" is a "term of art" within the Constitution that "refers to a class of persons who are a part of a national

community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). The *Heller* Court concluded that such an interpretation supports a "strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans*." *Id.* at 580–81 (emphasis added). *Bruen* repeated this broad articulation of the Second Amendment's scope: "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to reasonable, well-defined restrictions." 142 S. Ct. at 2156 (quoting *Heller*, 554 U.S. at 581). Neither *Heller* nor *Bruen* addressed the specific issue of whether the Second Amendment's text protects the rights of 18-to-20-year-olds. But because the normal and ordinary meaning of "the people" includes all Americans who are a part of the national community, the right codified by the Amendment appears to include them. *Firearms Pol'y Coal. v. McCraw*, No. 4:21-cv-1245-P, --- F. Supp. 3d ---, 2022 WL 3656996, at *4 (N.D. Tex. Aug. 25, 2022) ("*McCraw*") (discussing *Heller*'s interpretation of "the people" and concluding that it protects the rights of 18–20-year-olds).

Second, neither the Second Amendment's text nor other provisions within the Bill of Rights include an age limit. However, the Founders placed age requirements elsewhere in the Constitution, including for eligibility to be a House Member, Senator, or the President. U.S. Const. art I, §§ 2–3; *id.* art II, § 1. "In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment." *Hirschfeld*, 5 F.4th at 421. This

lends additional support to the notion that the Second Amendment's "plain text" does not include an age restriction.

Third, the inclusion of "the people" elsewhere in the Bill of Rights supports the interpretation that the Second Amendment extends to individuals over the age of eighteen. The Supreme Court found meaning in the Constitution's use of the same or a similar phrase as that used in the Second Amendment. *Heller*, 554 U.S. at 579; *McCraw*, 2022 WL 3656996, at *4 (stating that both *Heller* and *Verdugo-Urquidez* "suggest that the term 'the people' is defined consistently throughout the Constitution"). Indeed, in considering the reach of the Second Amendment, the *Heller* Court considered the fact that both the First Amendment and the Fourth Amendment refer to a right belonging to "the people." *Heller*, 554 U.S. at 579. The First, of course, protects "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const., amend. I. And the Fourth proscribes violations of the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Although one can find certain limitations upon the rights of young people secured by both the First and Fourth Amendments, neither has been interpreted to exclude 18-to-20-year-olds from their protections. *Hirschfield*, 5 F.4th at 422 (reasoning that the inclusion of young people within the scope of the First and Fourth Amendments' protections suggests the Second Amendment applies to those over the age of eighteen); *McCraw*, 2022 WL 3656996, at *4–5 (same).

Finally, founding era militia laws lend support to the understanding that "the people" referred to in the Second Amendment includes 18-to-20-year-olds. "Before

ratification, when militias were solely defined by state law, most colonies and states set the age for militia enlistment at 16. . . . Every colony passed, at some point, laws identifying 18-year-olds as persons required to possess arms." *Jones v. Bonta*, 34 F.4th 704, 718 (9th Cir. 2022), *vacated and remanded on rehearing by* 47 F.4th 1124 (9th Cir. 2022) (mem.) (vacating district court decision for further proceedings consistent with *Bruen*). These early laws reflected a "tradition of young adults keeping and bearing arms . . . deep-rooted in English law and custom." *Id.* at 717. While some laws in the colonial period increased the "minimum age requirements for militia service to not include 18- to 20-year-olds," the majority of pre-ratification and post-ratification militia laws suggest that persons between the ages of 18 and 20 were expected to supply their own weapons in connection with their militia service. *Id.* at 718–19, 734–40 (Appendix 1 & 2). Shortly after ratification of the Second Amendment, the Second Congress passed the Militia Act, ch. 33 § 1, 1 Stat. 271, which set the minimum age for membership in the militia at 18 and required each member to "equip himself with appropriate weaponry." *Id.* at 719 (quoting *Perpich v. Dep't of Defense*, 496 U.S. 334, 341 (1990)). Other courts examining founding-era militia laws have similarly found that because 18-to-20-year-olds were "within the 'core' rights-holders at the founding, their rights should not be infringed today." *NRA II*, 714 F.3d at 339–41 (Jones, J. dissenting) (discussing the 1792 Militia Act and the laws prior to and immediately surrounding the ratification of the Second Amendment); *Hirschfeld*, 5 F.4th at 440 ("At the time of ratification, every state and the federal government required 18-year-old men to enroll in the militia."); *McCraw*, 2022 WL 3656996, at *6 (same). Founding-era militia laws requiring service in the militia by 18–20-year-olds who are

16

responsible for supplying their own weapons is consistent with a contemporary understanding that this age group was not excluded from the class of persons who had the right to keep and bear arms. And the fact that the Second Amendment itself discusses the "well regulated militia" means the age-range of militia laws is of particular relevance to the reach of its protections.

The Commissioner suggests several reasons why the Court should find that such militia laws are not evidence that 18–20-year-olds had Second Amendment rights. [Doc. 72 at 6–9]. For example, the Commissioner suggests that militia laws compelling some men under the age of 21 to keep and bear arms did not automatically create a right because imposition of a duty does not necessarily confer individual rights. [*Id.* at 7 ("The fact that early America governments compelled some infants to keep and bear arms did not establish a right that an infant could claim against the government." (quoting Doc. 50-1 at 5))]. While true, the significance of the Militia Act of 1792, or indeed any of the founding-era militia laws referenced in the cases cited above, is not that they *created* a right to keep and bear arms at all. Indeed, *Heller* described the Second Amendment as having "codified a *pre-existing* right." 554 U.S. at 592. Similarly, *Heller* explained that the "well-regulated militia" mentioned in the Amendment's text was a reference to an entity "already in existence." *Id.* at 596. The militia laws' significance is that they provide some indication that the existing right to keep and bear arms likely included those who were included in the already existing militia.

Nor is the Court persuaded by the Commissioner's assertion that because certain state militia laws from 1776 through 1825 required parents to provide weapons to their

minor children, such minors would have been understood to fall outside of the Second

Amendment's scope. As the *Hirschfeld* court noted:

> [T]hose laws do little to suggest that those under 21 were not
> required to keep and bear arms. Most of those laws require 18-
> year-olds to enlist but do not set an age for parental liability,
> just requiring guardians to be liable for the equipment and food
> of those "who shall be under their care." And the existence of
> these laws is unsurprising given that some states required those
> older than 16 to enroll in the militia. Regardless, "the point
> remains that those minors were in the militia and, as such, they
> were required to own their own weapons," even if their parents
> had to buy those weapons or consent to them joining.

5 F.4th at 434 (citations and footnote omitted).

The Commissioner's remaining textual arguments are similarly unavailing. For

example, the Commissioner suggests that a literal reading of Plaintiffs' interpretation

would place no limits on Second Amendment rights such that "even toddlers or those

declared mentally unfit by the courts would have the right to bear arms." [Doc. 72 at 3].

The Court disagrees. Of course, "[l]ike most rights, the right secured by the Second

Amendment is not unlimited." *Heller*, 554 U.S. at 626. No court has read the Second

Amendment to cover those under the age of 18, and this case does not raise that issue.[14]

Moreover, this decision neither addresses nor calls into question whether Minnesota may

constitutionally prohibit the possession or carrying of firearms by any individual whom a

---

[14] At least one court suggested that Second Amendment protections do not "extend
in full force to those under 18" and stated that "the history of the right to keep and bear
arms, including militia laws, may well permit drawing the line at 18." *Hirschfeld*, 5 F.4th
at 422 & n.13.

court has determined is mentally unfit to have a weapon, nor whose right to possess firearms has been restricted due to violations of the law.[15]

Next, the Commissioner argues that the Second Amendment's reference to "the people" should not be understood to include 18–20-year-olds because at the time that both the Second and Fourteenth Amendments were ratified the age of majority was 21. Consequently, 18-to-20-year-olds would have been minors who could not have purchased a firearm without the consent of a parent or guardian and would have been subject to an array of legislative restrictions under states' police powers. [Doc. 72 at 4–6]. However, as other courts have observed, "the age of majority—even at the Founding—lacks meaning without reference to a particular right." *Hirschfeld*, 5 F.4th at 435. Although the full age of majority was often 21, "that only mattered for specific activities"; for others, such as taking an oath (12), selling land (21), receiving capital punishment (14), serving as an executor or executrix (17), being married (for a woman 12), choosing a guardian (for a woman 14), the age of majority varied widely. *Id.* Essentially, 18-year-olds might have been considered minors for some purposes during the founding era, and adults for others. But the Defendants offer no authority to support the proposition that the voters who adopted the

---

[15] *Bruen* referred to the Second Amendment's protections for the rights of "law-abiding" Americans on more than one occasion, but some courts applying *Bruen*'s two-part test have considered whether a person's violations of the law disqualify them from keeping or bearing arms under the second part of the analysis, rather than as an aspect of the textual inquiry. *Price*, 2022 WL 6968457, at *7 (S.D. W. Va. Oct. 12, 2022) ("The plain text of the Second Amendment does not include 'a qualification that Second Amendment rights belong only to individuals who have not violated any laws.'" (quoting *United States v. Jackson*, No. CR-22-59-D, 2022 WL 3582504, at *2 (W.D. Okla. Aug. 19, 2022)).

Second Amendment would have used the phrase "the people" in the "normal and ordinary" sense to express a limitation based on the general common law age of majority. *See Heller*, 554 U.S. at 576 ("In interpreting [the Second Amendment's] text, we are guided by the principle that 'the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from their technical meaning.'" (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)) (cleaned up).

For all these reasons, the Court concludes that the text of the Second Amendment includes within the right to keep and bear arms 18-to-20-year-olds, and therefore, the Second Amendment "presumptively guarantees [Plaintiffs'] right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135.

### C. Applying the Historical Analysis

Because the Second Amendment's text presumptively guarantees Plaintiffs' right to publicly carry a handgun for self-defense, under *Bruen* Defendants must demonstrate that the age requirement in Minn. Stat. § 624.714, subd. 2(b)(2), is consistent with the nation's history and tradition of firearms regulation. Based on a careful review of the record, the Court finds that Defendants have failed to identify analogous regulations that show a historical tradition in America of depriving 18–20-year-olds the right to publicly carry a handgun for self-defense. As a result, the age requirement prohibiting persons between the ages of 18 and 20 from obtaining such a permit to carry violates the Second Amendment.

The Court pauses here to comment on the task set before it by the second step in the *Bruen* framework. This Court shares the reservations about the required historical inquiry

expressed by other courts and commentators. As observed before *Bruen*[16] and after it was decided,[17] judges are not historians. The process of consulting historical sources to divine the intent of those responsible for ratifying constitutional amendments is fraught with potential for error and confirmation bias. *See Bruen*, 142 S. Ct. at 2177–79 (Breyer, J., dissenting) (cataloguing criticism of the historical analysis in *Heller*); *Bullock*, 2022 WL 16649175, at *2 (noting criticism of the Supreme Court's historical analysis in the Second Amendment context as having involved "cherry-picked" evidence from "the historical record to arrive at its ideologically preferred outcome"); *Swearingen*, 545 F. Supp. 3d at 1254 n.8 (quoting David A. Strauss, *The Living Constitution* 20–21 (2010) ("Time and again, judges—and academics, too—have found that the original understandings said pretty much what the person examining them wanted them to say")).

Certainly, the *Bruen* majority expressed a preference for a historical inquiry, despite its flaws, because the Justices considered the problems presented by means-end scrutiny to be a greater threat. 142 S. Ct. at 2130. But even beyond concerns with training and

---

[16] *Nat'l Rifle Ass'n of Am., Inc. v. Swearingen*, 545 F. Supp. 3d 1247, 1254 n.8 (N.D. Fla. 2021) ("Judges are not historians").

[17] *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175, at *1 (S.D. Miss. Oct. 27, 2022) ("This Court is not a trained historian. The Justices of the Supreme Court, distinguished as they may be, are not trained historians. We lack both the methodological and substantive knowledge that historians possess. The sifting of evidence that judges perform is different than the sifting of sources and methodologies that historians perform. . . . And we are not experts in what white, wealthy, and male property owners thought about firearms regulation in 1791. Yet we are now expected to play historian in the name of constitutional adjudication."); *United States v. Kelly*, Case No. 3:22-cr-00037, 2022 WL 17336578, at *3 n.5 (M.D. Tenn. Nov. 16, 2022) (questioning whether appointment of experts pursuant to Fed. R. Evid. 706 "can be scaled to the level that would be required by the federal courts' massive docket of gun prosecutions").

objectivity, the workability of the historical approach presents challenges. The *Bruen* majority says the solution lies in the traditional role of judges to resolve controversies presented through the adversarial process: judges must answer questions about the constitutionality of modern firearm regulations "based on the historical record compiled by the parties." 142 S. Ct. at 2130 n.6. Perhaps this takes the sting out of the concern that lower courts lack the time and research resources to conduct deep historical inquiries on a scale akin to that undertaken by the *Bruen* Court. 142 S. Ct. at 2177 (Breyer, J., dissenting). But relying too heavily on party presentation to resolve a dispute about constitutional history opens the door to other problems. For example, courts faced with virtually identical issues could easily reach different conclusions based not on a complete or accurate picture of the relevant aspects of the nation's history and tradition of firearms regulation, but on something as ahistorical as expert witness availability or the researching acumen of the litigants appearing before them.

In the end, despite its apprehenshion about the historical inquiry that *Bruen* commands, the Court must analyze the age requirement in Minnesota's permit-to-carry law to determine its consistency with the nation's history and tradition of firearms regulation. Applying *Bruen*'s analogical reasoning to decide whether Defendants have identified a tradition of relevantly similar regulations that prohibit 18-to-20-year-olds from publicly carrying handguns for self-defense, the Court concludes that they have not.

### 1.  1791 or 1868?

In searching for historical analogues, the Court must first decide where to look. This is a difficult question and one which highlights a serious tension in *Bruen*'s analytical

framework. Plaintiffs insist that 1791, when the Second Amendment was ratified, and the nearby years of the founding era are the most relevant historical reference points for finding analogous firearms regulations. In contrast, the Commissioner argues that the years surrounding 1868, the year the Fourteenth Amendment was ratified, mark the correct period in which to review historical analogues. It was, after all, the Fourteenth Amendment that "incorporated" the protections of many parts of the Bill of Rights, including the Second Amendment, against the states. *Bruen*, 142 S. Ct. at 2137 (describing incorporation of Bill of Rights against the states through the Fourteenth Amendment); *McDonald*, 561 U.S. at 750 (holding that the Second Amendment is applicable to the states). But *Bruen* left this very question open because it found that the public understanding of the right to keep and bear arms was, for purposes of the New York statute it was considering, the same regardless of which era was considered. 142 S. Ct. at 2138.

In its very recent decision in *National Rifle Ass'n v. Bondi*, No. 21-12314, --- F.4th ----, 2023 WL 2484818 (11th Cir. 2023), the Eleventh Circuit confronted that open question. *Bondi* noted that *Bruen* "expressly declined to decide whether 'courts should primarily rely" on sources from the time of the Fourteenth Amendment's adoption in 1868 when considering the constitutionality of state laws, or sources from 1791 and the founding era. *Id.* at *4 (quoting *Bruen*, 142 S. Ct. at 2138). But unlike in *Bruen*, the *Bondi* court found the dispute before it could not be decided without resolving that issue. *Bondi*, 2023 WL 2484818, at *5. In *Bondi*, the dispute involved the constitutionality of a Florida law that prohibits individuals under the age of 21 from purchasing a firearm. *Id.* at *7 (citing Fla. Stat. § 790.065(13)). The reason *Bondi* could not avoid the issue was because the historical

sources in 1791 and 1868 pointed toward different conclusions about the public understanding of the scope of the right in each of those two periods. *Id.*

*Bondi*'s answer to the question that *Bruen* left open begins with the premise that the "claim to democratic legitimacy" for originalist theory of constitutional interpretation is that it is governed by the understanding of the scope of constitutional rights held by the people who adopted them. *See id.* at *3 (citing *Bruen*, 142 S. Ct. at 2136 and *Heller*, 554 U.S. at 634–35). When courts adhere to originalism, they must "respect the choice that those who bound themselves to be governed by the constitutional provision in question understood themselves to be making when they ratified the constitutional provision." *Id.*

But of course not all individual rights enshrined in the Constitution were ratified at the same time. As *McDonald* made clear, the Bill of Rights did not apply against the states when the Second Amendment was ratified in 1791. 561 U.S. at 742. Most of those rights did not become applicable to the states until 1868 when, according to the theory of incorporation, the Fourteenth Amendment was adopted. *Bondi*, 2023 WL 2484818, at *4 (citing *McDonald*, 561 U.S. at 764). More than 70 years separates the group of people who ratified the Second Amendment, making it applicable to the federal government, and those who agreed that it applied to the states as well.

Notwithstanding the realities of the passage of time, the rights enumerated in the Bill of Rights, including Second Amendment rights, have generally been assumed to have the same scope whether the right is asserted against the federal government or in response to a state regulation. *Bruen*, 142 S. Ct. at 2137. Thus, for the originalist, if the public understood that the Second Amendment would not have permitted certain firearms

regulations in 1791, and the people who chose to make that right applicable against the states in 1868 understood its scope to allow a regulation that was previously forbidden, arguably either principled originalism or uniform application of constitutional rights to states and the federal government must give way.

*Bondi* suggests that the only path through this thicket while following *Bruen*'s emphasis on originalism is to stay "faithful to the principle that constitutional rights are enshrined with the scope that they were understood to have *when the people adopted them*." *Id.* at *5 (quoting *Bruen*, 142 S. Ct. at 2136). Because the later ratification of the Fourteenth Amendment was the act by which the states made the Second Amendment applicable against themselves, the understanding of the scope of the right by those who ratified it in 1868 is, therefore, "the more appropriate barometer" for gauging what scope the Second Amendment right was enshrined with when it was incorporated against the states. *Id.* Per *Bondi*'s reasoning "it makes no sense to suggest that the States would have bound themselves to an understanding of the Bill of Rights—including that of the Second Amendment—that they did not share when they ratified the Fourteenth Amendment." 2023 WL 2484818, at *5; *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.").

It is difficult to see an answer to the question that *Bruen* saw no need to resolve that is different from the one reached by the *Bondi* court if the answer is derived from adherence

to originalist theory. But, in this Court's view, *Bondi* declined to follow rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of "the people" whose understanding of the Second Amendment matters. *See Bruen*, 142 S. Ct. at 2137 ("And we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). *Bondi* does not mention the *Bruen* Court's warning to "guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 142 S. Ct. at 2136. The *Bruen* majority made no small effort to distance itself from even *Heller*'s reliance on postenactment history except to the extent that such history was consistent with the founding-era public meaning. *Bruen*, 142 S. Ct. at 2136–37; *see also Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (stating that *Heller* treated 19th century treatises "as mere confirmation of what the Court thought had already been established"). And the *Bruen* Court further explained that "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Heller*, 670 F.3d at 1274, n.6 (Kavanaugh, J., dissenting). And *Bondi*'s conclusion is difficult to square with the Supreme Court's emphasis on applying the Bill of Rights against the states and federal government according to the same standards. *Bruen*, 142 S. Ct. at 2137; *Ramos v. Louisiana*, 140 S. Ct. 1390, 1398 (2020) (explaining that the Supreme Court has "rejected the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights") (cleaned up); *Timbs v. Indiana*, 139 S. Ct.

682, 687 (2019) ("[I]f a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires.").

This reasoning makes it difficult to agree with the Commissioner's position that 1868 should control. Other courts applying *Bruen*'s second step have similarly placed particular emphasis on founding-era analogues. *Price*, 2022 WL 6968457, at *5–6; *McCraw*, 2022 WL 3656996, at *11; *United States v. Harrison*, Case No. CR-22-00328-PRW, --- F. Supp. 3d ----, 2023 WL 1771138, at *8 & n.41 (W.D. Okla. Feb. 3, 2023), *appeal filed* No. 23-6028 (10th Cir. Mar. 30, 2023). This is not to say that post-enactment history, including that from around the time of the Fourteenth Amendment's ratification, could never shed light on the original understanding of the scope of the Second Amendment. *See Frey v. Nigrelli*, No. 21 CV 05334 (NSR), 2023 WL 2473375, at *13 (S.D.N.Y. Mar. 13, 2023) (finding "no issue in considering the abundance of examples provided by the Defendants regarding the existence of municipal gun regulations from 1750 to the late 19th century" because the Supreme Court left open the question of the appropriate period for consideration). But the Commissioner offers no persuasive reason why this Court should rely upon laws from the second half of the nineteenth century to the exclusion of those in effect at the time of the founding in light of *Bruen*'s warnings not to give post-Civil War history more weight than it can rightly bear. 142 S. Ct. at 2136.

Ultimately, however, *Bondi* does not impact this Court's conclusion because, even if *Bondi* is correct, analyses based on 1791 and on 1868 yield the same results in *this* case. The contour of the Second Amendment right that we are addressing in this case is not whether a law prohibiting the *sale* of handguns to 18-to-21-year-olds is consistent with the

27

nation's history and tradition of firearm regulation as it existed in either 1791 or in 1868, as it was in *Bondi*. Instead, the issue here concerns the right of that cohort to publicly carry a handgun for self-defense. As discussed below, the laws reviewed and considered by the *Bondi* court no more reveal a history and tradition of firearms regulations relevantly similar to Minnesota's age requirement than do those cited by the Commissioner.[18]

### 2. Proposed Analogues

Following the roadmap laid out in *Bruen*, the Court must assess any historical analogues identified by the Commissioner using two metrics to determine if they are "relevantly similar": "how" and "why" they burden the Second Amendment right as compared to the challenged regulation. *Bruen*, 142 S. Ct. at 2132–33. The Commissioner has identified rules limiting students' possession of guns on campus and two municipal ordinances as possible colonial-era analogues for Minnesota's age requirement. The Court considers them in turn.

**College Campus Restrictions**

To support the position that there is a tradition of firearm regulation limiting firearms rights for 18–20-year-olds, the Commissioner first points to policies on college campuses prohibiting students from owning weapons, including firearms. The Defendants

---

[18] Of the laws cited in *Bondi*'s Appendix, only the Nevada (1885) and Wisconsin (1883) statutes outlawed any form of public carry by a person under the age of 21, and Nevada's was limited in its application to "concealed" weapons. *See* 1883 Wis. Sess. Laws 290 § 1 ("It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver . . . ."); 1885 Nev. Stat. 51 § 1 ("Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, . . . or other dangerous or deadly weapon concealed upon his person shall be deemed guilty of a misdemeanor. . .").

assert that persons under the age of 21 "who left their parental home and went to college then lived under the guardianship authority of their college *in loco parentis*. Many colleges prohibited students from possessing or keeping firearms." [Doc. 72 at 13; *see also* Doc. 49 at 26–27]. Evidence of such collegiate regulations is found in the report of the Commissioner's expert, Professor Saul Cornell. These include the following:

- Yale College's prohibition in 1800 on students' possession of any guns or gun powder.[19]

- An 1811 regulation at the University of Georgia providing that: "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[20]

- An 1838 University of North Carolina Ordinance which stated: "No Student shall keep a dog, or firearms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane."[21]

[Doc. 50-1 at 14–15 & nn.64–66 and accompanying text]. According to Professor Cornell, these rules "support the conclusion that, for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms." [Doc. 50-1 at 15].

---

[19] *The Laws of Yale-College, in New-Haven, in Connecticut, Enacted by the President and Fellows, the Sixth Day of October, A.D. 1795*, at 26 (1800).

[20] *The Minutes of the Senatus Academicus* 1799–1842, p.73 University of Georgia Libraries (1976), *available at* http://dlg.galileo.usg.edu/do:guan_ua0148_ua0148-002-004-001.

[21] Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina 15 (1838). Aside from the other problems identified with these proposed analogues below, a rule from 1838 stretches the boundaries of what may reasonably be interpreted as falling within the period referred to as the founding era.

The Court cannot agree that these rules and regulations demonstrate a relevantly similar historical tradition of restrictions on 18-to-20-year-olds possessing or carrying firearms. For one thing, none of these proposed analogues appears to be the product of a legislative body elected by founding-era voters, but instead they are rules established by the institutions' boards of trustees or other leadership. Moreover, the reach of these prohibitions—students at three colleges in an era when higher education was attended by few—is not enough to suggest an original public understanding that restrictions on 18-to-20-year-olds' possession and carrying of firearms were consistent with the Second Amendment. Indeed, they would not have prevented a person under the age of 21 who was not a student at one of the schools from possessing or carrying a firearm, and they undoubtedly applied with equal force to students older than 21.

Moreover, considering whether such regulations are "relevantly similar" must also involve an inquiry into why the cited university regulations at issue burden the students' right to armed self-defense, and whether that motivation is akin to the purpose of the age requirement in Minnesota's permitting scheme. *Bruen*, 142 S. Ct. at 2132–33. The Minnesota Legislature made the empirical judgment that individuals under 21 present greater risks when carrying firearms and believed preventing them from carrying the handguns in public is consistent with the Second Amendment. *See* Minn. Stat. § 624.714, subd. 22 (indicating that the legislature recognizes the "fundamental, individual right to keep and bear arms" protected by the Second Amendment and stating that the "provisions of this section are declared to be necessary to accomplish compelling state interests in

regulation of those rights").[22] One can similarly surmise that the leadership of Yale and the Universities of Georgia and North Carolina imposed restrictions on student possession of firearms for comparable safety reasons. But identifying that a proposed analogue and a modern regulation are both aimed at promoting safety by limiting accidents and intentional violence is not enough to suggest that the campus rules are "distinctly similar" historical analogues. *Bruen*, 142 S. Ct. at 2131.

The Commissioner fares no better with the suggestion that because these rules derive from the colleges' *in loco parentis* guardianship responsibilities, they reveal a historical tradition that people under 21 were minors without rights. [Doc. 72 at 13]. The argument is that the rules stemmed from the institutions' assumption of the "obligations incident to the parental relation," because they have acquired custody of the student and "such power of control over the person of the child as is incident to the family government." 29 William Mack, *Cyclopedia of Law and Procedure* 1670–71 (1908).[23] However, the age

---

[22] The Minnesota Supreme Court has observed that the permitting requirement was enacted "'to prevent the possession of firearms in places where they are most likely to cause harm in the wrong hands, i.e., in public places where their discharge may injure or kill intended or unintended victims.'" *State v. Hatch*, 962 N.W.2d 661, 664 (Minn. 2021) (quoting *State v. Paige*, 256 N.W.2d 298, 303 (Minn. 1977)). The Expert Report of Professor John J. Donohue, offered by the Commissioner, also observes that "the age-based restriction on gun carrying adopted by Minnesota and challenged in this case promotes public health and safety by generating meaningful reductions in violent crime, firearm accidents, gun theft, and suicide." [Doc. 50-1 at 54]. Generally speaking, Professor Donohue's report catalogues the evidence he relied on to support his opinion that individuals under the age of 21 present greater public safety risks.

[23] *See Brinkerhoff v. Merselis' Executors*, 24 N.J.L 680, 683 (1855) (stating that the "proper definition of a person *in loco parentis* to a child is, a person who means to put himself in the situation of the lawful father of the child, with reference to the father's office and duty of making provision for the child" or someone "discharging parental duties" (citing, among other English cases, *Wetherby v. Dixon* [1815], 34 Eng. Reprint 568)).

requirement in Minnesota's permit-to-carry law does not stem from a similar justification.[24] These proposed analogues, therefore, are "relevantly similar" in their motivation for intruding on the right at the center of the Second Amendment in only the most general way. Overall, they do not demonstrate a founding-era tradition of firearm regulation consistent with the challenged law.

**Municipal Ordinances**

The Commissioner also points to two municipal laws that, although they post-date ratification, can reasonably be linked to the founding era: an 1803 New York ordinance, and an 1817 ordinance from Columbia, South Carolina. [Doc. 49 at 27; Doc. 50-1 & nn.67–68]. The New York ordinance "To Prevent the Firing of guns in the City of New York," provided that if the person firing the weapon was a minor, then the guardian would

---

It seems likely that the Commissioner's focus on the *in loco parentis* rationale behind these regulations is to provide further support for his position that those who were legally minors in 1791 would not have been included among "the people" to whom the Second Amendment's protections extend. The Court has considered it in that context as well, and unfortunately for the Defendants, the argument does not change the Court's conclusion regarding the first step of the *Bruen* test.

[24] It is also worth noting that a person standing *in loco parentis* may have a duty to prevent the minor from harming others to avoid incurring tort liability. 67A Corpus Juris Secundum, Parent and Child § 370, *Tort liability and rights of action*. If the campus rules at issue were passed with the purpose of institutional avoidance of tort liability in mind, one would be hard pressed to say that such a reason is relevantly similar to any reason the Minnesota Legislature likely included the age requirement in its permitting scheme.

responsible for paying the $5 fine.[25] The 1817 Columbia ordinance similarly prohibited the firing of weapons by anyone within the town, subject to a $5 fine for any violation, but if a minor or indigent person broke the law and was unable to pay, then the firearm could be seized and sold to pay the fine.[26] However, these proposed analogues are not "relevantly similar" because they burden the right to bear arms for different reasons and in different ways than Minnesota's age requirement. As to *how* they burden the right, they place restrictions on the discharge of firearms, but do not ban carrying them outright. And as to the *why*, both ordinances contain a whereas clause generally citing dangers associated with the discharge of weapons within city or town. Though the remedies for each recognize that a minor might be less able to pay the fine, both the laws governed conduct regardless of age, prohibiting conduct of adults of any age.

### Other Founding-Era Analogues

The Commissioner has proposed no other founding-era firearm regulations as historical analogues justifying Minnesota's age requirement. Other courts looking for

---

[25] Ordinance of the City of New York, to Prevent the Firing of Guns in the City of New York § 1, *Laws and Ordinances, Ordained and Established by the Mayor, Alderman and Commonalty of the City of New-York, in Common-Council Convened, for the Good Rule and Government of the Inhabitants and Residents of Said City* 83–84 (1803), https://firearmslaw.duke.edu/laws/edward-livingston-laws-and-ordinances-ordained-and-established-by-the-mayor-aldermen-and-commonalty-of-the-city-of-new-york-in-common-council-convened-for-the-good-rule-and-government-of-the-inh/.

[26] An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), *Ordinances of the Town of Columbia, (S.C.) Passed Since the Incorporation of Said Town: To Which are Prefixed the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto* 61 (1823), https://firearmslaw.duke.edu/laws/ordinances-of-the-town-of-columbia-s-c-passed-since-the-incorporation-of-said-town-to-which-are-prefixed-the-acts-of-the-general-assembly-for-incorporating-the-said-town-and-others-in-relati/.

historical restrictions from the founding era on the rights of 18-to-20-year-olds to keep and bear arms have similarly come up empty. *McCraw*, 2022 WL 3656996, at *9–10 (finding that Texas had failed to identify any relevantly similar historical analogue for its law prohibiting 18–20-year-olds from applying for a license to carry); *Hirschfeld*, 5 F.4th at 439 ("At the time of ratification, there were no laws restricting minors' possession or purchase of firearms").[27] But the Commissioner argues that a narrow focus on the presence—or absence—of laws expressly prohibiting people under 21 from carrying firearms creates a skewed perception of the reality of gun possession during the founding era.

The Commissioner states that "context is key to understanding historical analogues to Minnesota's permitting scheme from the Founding Era." [Doc. 72 at 13]. The Commissioner points to Professor Cornell's response to a deposition question asking him to identify a law from the founding era restricting 18-to-20-year-olds from purchasing or carrying firearms. Professor Cornell testified that he was aware of no such laws, but deemed the inquiry a "bad question." [Doc. 72 at 14 (citing Cornell Dep. 177:9–21) (alteration in original)]. And in his expert report, Professor Cornell explains that "[a]ny effort to understand the Second Amendment and the history of gun regulation must . . . canvass a variety of historical topics, including such diverse subfields as legal history,

---

[27] *See also Swearingen*, 545 F. Supp. 3d at 1256 ("[T]his Court has found no case or article suggesting that, during the Founding Era, any law existed that imposed restrictions on 18-to-20-year-olds' ability to purchase firearms. . . . Given the amount of attention this issue has received, if such a law existed, someone surely would have identified it by now. Thus, this Court proceeds under the assumption that no law restricting the purchase of firearms by 18-to-20-year-olds existed at the Founding.").

social history, cultural history, economic history, and military history," because failing to do so risks adopting a "discredited 'tunnel vision' approach to historical analysis." [Doc. 50-1 at 9–10]. Essentially, the Commissioner's expert argues that the absence of founding-era laws restricting 18-to-20-year-olds from publicly carrying firearms only permits an inference that the public understood that group to possess a corresponding constitutional right to public carry if one makes anachronistic and flawed assumptions about what that regulatory silence means.

Professor Cornell's testimony raises a compelling question about the propriety of drawing conclusions about a modern regulation's validity from the absence of laws prohibiting 18-to-20-year-olds from possessing weapons during the founding era. Professor Cornell persuasively argues that without the proper contextual framing, the straightforward search for so-called "relevantly similar" laws will yield a conclusion that is unsound as a matter of historical methodology. And such a critique highlights the challenge of having judges, most of whom are not trained historians, look narrowly at laws on the books to discern true historical understandings. But persuasive as one may find this criticism, *Bruen* instructs lower courts that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131. Here, while it might be more analytically sound to consider the context Professor Cornell referenced, the Court cannot discern how to incorporate that context into *Bruen*'s mandated approach to analogical reasoning. Ultimately, the Court is constrained to conclude that

Defendants have not met their burden to show that Minnesota's challenged law is consistent with the nation's founding-era history and tradition of firearm's regulation.

### Reconstruction-Era Analogues

The Commissioner points to potential analogues from before and after ratification of the Fourteenth Amendment as evidence that Minnesota's age requirement is consistent with the nation's history and tradition of firearm regulation. These include several laws from shortly before the Civil War,[28] and 19 regulations enacted between 1875 and 1899 that prohibited, with limited exception, selling or otherwise furnishing pistols, revolvers, or other deadly weapons to groups variously identified as minors, minors under 16, and minors under the age of 21.[29] As explained above, relying on laws so far removed in time from the ratification of the Second Amendment to demonstrate the "historical tradition of firearm regulation" contemplated by *Bruen* would "giv[e] postenactment history more

---

[28] 1856 Ala. Acts 17; 1856 Tenn. Pub. Acts. 92; 1859 Ky. Acts 245. The text of these statutes, and others referenced in this section, may be found online at https://firearmslaw.duke.edu/repository/search-the-repository/ (under Subjects, select "Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible," choose desired Jurisdictions from the list below, and click on "Submit" button).

[29] 1883 Kan. Sess. Laws 159; 1883 Wis. Sess. Laws 290 § 2; 1890 La. Acts 39, § 1; 1882 Md. Laws 656, § 2; 1875 Ind. Acts 59; 1876 Ga. Laws 112; 1878 Miss. Laws 175; 1881 Del. Laws 716; 1881 Fla. Laws 87; 1881 Ill. Laws 73; 1881 Pa. Laws 111; 1882 W. Va. Acts 421; 1883 Mo. Laws 78; 1884 Iowa Acts 86; 1890 Okla. Laws 495; 1890 Wyo. Sess. Laws 127; 1893 N.C. Sess. Laws 468; 1895 Neb. Laws Relating to the City of Lincoln 237; 1897 Tex. Gen. Laws 221. See also Doc. 50-1 at 25–26 (Table Two); *Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 202 & n.14 (5th Cir. 2012) ("Arms-control legislation intensified through the 1800s, . . . and by the end of the 19th century, nineteen states and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of 'minors' to purchase or use particular firearms while the state age of majority was set at age 21."), *abrogated by Bruen*, 142 S. Ct. at 2127 n.4.

weight than it can rightly bear." 142 S. Ct. at 2135–36; *McCraw*, 2022 WL 3656996, at *11 (same).

Nonetheless, the Court has carefully reviewed the text of each of the 19th century laws offered by the Commissioner as possible analogues. Even aside from the fact that they were enacted decades after the founding, for various reasons, none of these regulations is "relevantly similar" to the age requirement in Minnesota's permit-to-carry law. Several of the Reconstruction-era laws pointed to by the Commissioner prohibited sales of firearms to minors, but did not place restrictions on minors receiving them from parents or even employers.[30] And other proffered laws limited firearm possession by those under the age of 16, but not the 18-to-20-year-old cohort at issue in Minnesota's law. 1881 Fla. Laws 87; 1881 Pa. Laws 423. In addition, the Nevada statute "only prohibits those under twenty-one from *concealed* carry of pistols," but not from carrying altogether. *NRA II*, 714 F.3d at 344 (Jones, J. dissental) (emphasis in original). These restrictions do not burden the Second Amendment right in a manner distinctly similar to the age requirement Minnesota's permit-to-carry law.

In sum, the Commissioner's reliance on statutes passed in the second half of the 19th century does not support his burden to show the age requirement in Minn. Stat.

---

[30] 1878 Miss. Laws 175–76, § 2 (prohibiting only sales to minors); 1881 Fla. Laws 87, § 1 (allowing sales or other transactions to minors with permission of the parent); 16 Del. Laws 716 (1881) (prohibiting sales to minors); 1881 Ill. Laws 73 (exceptions for transfers by the "father, guardian, or employer" of a minor); 1883 Mo. Laws 76 (allowing transfers to minors with parental consent); 1897 Tex. Gen. Laws 221–22 (permitting transfers with written consent of parent or guardian).

37

§ 624.714, subd. 2(b)(2), is consistent with the nation's history and tradition of firearm regulations as required by *Bruen*.

### D. Policy Concerns

Missing from the above application of *Bruen*'s test is any discussion of either the legitimacy of the reasons Minnesota adopted the age requirement or the tailoring of the means to fit the purposes served by the law. The Commissioner submitted the Expert Report of Professor John J. Donohue in connection with the summary judgment briefing. Professor Donohue, an economist and law professor with a focus on empirical legal studies, discusses the relevant population of young adults, including important features of their neurobiological and behavioral development, increased risks associated with them having greater access to weapons, the effectiveness of Minnesota's existing regulations in addressing higher rates of violence among the population of young adults, the empirical data regarding whether public carry among the population will actually result in effective use of guns for protection, and other issues. [Doc. 50-1 (beginning at p.54 of the attachment)]. *Amici curiae*, Giffords Law Center to Prevent Gun Violence and Protect Minnesota, similarly link the still-developing nature of 18–20-year-olds' brains to increased impulsivity and a prediction that greater access to firearms among young adults leads to disproportionate rates of violent crimes involving firearms and suicides. [Doc. 71 at 12–28]. Indeed, Minnesota enacted the age requirement in 2003 for reasons that align with these very concerns, with the Legislature balancing safety interests against its understanding of the right to keep and bear arms. Minn. Stat. § 624.714, subd. 22. There is

no basis in the record for the Court to question the conclusions reached by Professor Donohue's Report and *amici*.

If the Court were permitted to consider the value of these goals and how well Minnesota's age requirement fits the ends to be achieved, the outcome here would likely be different. But whatever the evidence may reveal about the wisdom behind enacting a 21-year-old requirement for publicly carrying a handgun, such analysis belongs to a regime of means-end scrutiny scuttled by *Bruen*. Under *Bruen*, the balancing of interests in public safety and the right to keep and bear arms has already been "struck by the traditions of the American people." 142 S. Ct. at 2131 (citing *Heller*, 554 U.S. at 635). Second Amendment jurisprudence now focuses a lens entirely on the choices made in a very different time, by a very different American people. Given the relative dearth of firearms regulation from the most relevant period where that lens is aimed, the endeavor of applying *Bruen* seems likely to lead, generally, to more guns in the hands of more people, not just young adults.[31] Some Minnesotans are surely fine with that result. Others may wonder what public safety measures are left to be achieved through the political process where guns are concerned. But *Bruen* makes clear that today's policy considerations play no role in an analytical framework that begins and ends more than two hundred years ago.

---

[31] *United States v. Rahimi*, No. 21-11001, 2023 WL 2317796 (5th Cir. 2023) (applying *Bruen* to hold that 18 U.S.C. § 922(g)(8), which makes it a crime to possess a firearm while subject to a domestic violence restraining order, violates the Second Amendment).

### E.  Conclusion

Because the plain text of the Second Amendment covers the Plaintiffs' proposed course of conduct and Defendants have not met their burden under the historical prong of *Bruen*'s test, Plaintiffs are entitled to judgment as a matter of law on their Second Amendment claim. As noted above, Plaintiffs seek both a declaratory judgment and injunctive relief. Specifically, they ask for the following relief in their Complaint:

> a) Declare that Minn. Stat. § 624.714, subd. 1a and § 624.714, subd. 2(b)(2), their derivative regulations, and all related laws, policies, practices, and customs violate—facially, as applied to otherwise qualified 18–20-year-olds, or as applied to otherwise qualified 18–20-year-old women—the right of Plaintiffs and Plaintiffs' similarly situated members to keep and bear arms as guaranteed by the Second Amendment and Fourteenth Amendments to the United States Constitution; [and]
>
> b) Enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with him from enforcing, against Plaintiffs and Plaintiffs' similarly situated members Minn. Stat., § 624.714, subd. 1a and § 624.714, subd. 2(b)(2), their derivative regulations, and all related laws, policies, practices, and customs that would impede or criminalize Plaintiffs and Plaintiffs' similarly situated members' exercise of their right to keep and bear arms.

[Compl., Prayer for Relief].

Based on the record here, the Court grants Plaintiffs' motion for summary judgment, but will not direct entry of Judgment giving Plaintiffs the declaratory and injunctive relief specifically requested in their Complaint. Because the Court has concluded that the age requirement is unconstitutional, Defendants will ultimately be enjoined from denying a permit to carry a pistol from an otherwise-qualified applicant who is at least 18 years old.

However, nothing before the Court establishes that, once enforcement of the age requirement is enjoined and it forms no impediment to receipt of a permit by those over the age of 18, it would still be unconstitutional to require 18–20-year-olds to first obtain a permit pursuant to the permitting requirement in Minn. Stat. § 624.714, subd. 1a, as older Minnesotans must now do.

Consistent with the foregoing, the Court finds that Plaintiffs are entitled to the following relief: (1) a declaration that Minn. Stat. § 624.714, subd. 2(b)(2)'s requirement that a person must be at least 21 years of age to receive a permit to publicly carry a handgun violates the federal constitutional right of 18–20-year-olds to keep and bear arms; and (2) Defendants are enjoined from enforcing the minimum-age requirement in Minn. Stat. § 624.714, subd. 2(b)(2), against 18–20-year-olds, provided that any individual Plaintiff or other 18–20-year-old who applies to receive a permit-to-carry is not otherwise ineligible.[32]

## IV.    Defendants' Motions

For the same reasons that the Court has granted the Plaintiffs' summary judgment on the merits of their Second Amendment claim, the Court concludes that the Defendants are not entitled to summary judgment on the merits of the constitutional arguments explored above. In support of their motions, Defendants raised other arguments that have

---

[32] The Court notes that in *McCraw*, a case involving a successful challenge to Texas' 21-year-old minimum-age requirement for a permit-to-carry, the court stated that although "Texas cannot impose a 'substantial burden on public carry' for 18-to-20-year-olds, Texas could, under *Bruen*, require 18-to-20-year-olds to satisfy additional objective criteria when compared to those above the age of 21." *McCraw*, 2022 WL 3656996, at *11 n.9.

not yet been addressed in this Order. These remaining issues do not change the outcome for the Defendants, and their motions are denied.

### A. Standing

The Commissioner argues that the Plaintiffs cannot establish standing. [Doc. 78 at 3]. And in any event, standing "is a jurisdictional requirement, [that] 'can be raised by the court sua sponte at any time during the litigation.'" *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1156–57 (8th Cir. 2008) (quoting *Delorme v. United States*, 354 F.3d 810, 815 (8th Cir. 2004)). Article III standing requires a plaintiff to show "(1) that he or she suffered an 'injury-in-fact, (2) a causal relation between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Id.* at 1157 (quoting *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000)). An organization may bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1022 (8th Cir. 2012) (quotations omitted).

The Court has no trouble concluding that Plaintiffs have met their burden to show that they have standing. Courts addressing nearly identical claims on very similar records have found the requisite criteria are satisfied for Article III standing. *See McCraw*, 2022 WL 3656996, at *2 (finding that individual and organizational plaintiffs had standing to challenge 21-year-old age restriction in Texas' permit-to-carry law on similar facts). The Sheriffs' implicit suggestion that Plaintiffs have shown no injury because the Sheriffs have

never received an application for a permit-to-carry from the individual Plaintiffs or anyone else under the age of twenty-one does not defeat the Plaintiffs' standing. Indeed, submission of such an application would have been futile.[33] *See Pucket*, 526 F.3d at 1162 ("[W]e may find a plaintiff has standing even if he or she has failed to take steps to satisfy a precondition if the attempt would have been futile."); *McCraw*, 2022 WL 3656996, at *2 (noting that the plaintiffs did not need to violate the permit-to-carry statute to show standing, but could meet the injury requirement by showing they intended to engaged in arguably protected, but prohibited conduct, with a credible threat of prosecution). Similarly, the Commissioner's suggestion at the hearing that the discovery in this case failed to reveal any immediate harm does not undermine the Plaintiffs' standing. Publicly carrying a handgun in Minnesota without a permit is a criminal offense, Plaintiffs have provided uncontroverted evidence of an intention to engage in conduct arguably protected by the Second Amendment, and nothing in the record suggests Plaintiffs would be free from enforcement of any criminal penalties should they choose to violate the law. Because there exists a credible threat of prosecution if Plaintiffs engage in the arguably protected conduct at issue, they satisfy the imminence requirement of injury-in-fact. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014) (discussing the injury-in-fact requirement where there is a credible threat of prosecution) (quotation marks omitted); *Christian v. Nigreli*, 22-CV-695 (JLS), --- F. Supp. 3d ---, 2022 WL 17100631, at *4

---

[33] Moreover, the declarations submitted by organizational plaintiffs MGOC, SAF, and FPC set forth a sufficient basis for the Court to conclude that these associations have standing to bring claims on behalf of their members.

(W.D.N.Y. Nov. 22, 2022) (applying *Driehaus* in the Second Amendment context). Accordingly, the Court concludes that Plaintiffs have Article III standing in this matter.

### B.  Proper Defendants

In slightly different ways, the Commissioner and the Sheriffs argue that they are each entitled to summary judgment because they are not the proper parties against whom Plaintiffs should have brought their Second Amendment claims. The Commissioner does not point his finger directly at the Sheriffs, and they, in turn, do not expressly say that Plaintiffs should only have sued the Commissioner. But the Commissioner essentially contends he is not the proper defendant because he is not directly responsible for issuing the permits, and the Sheriffs suggest that the responsibility rests with the State rather than their respective counties. If both the Commissioner and the Sheriffs were correct, Plaintiffs would potentially be without a means to obtain relief for the alleged violation of their constitutional rights.

The Court concludes that the Commissioner and the Sheriffs are both properly named Defendants in this litigation.

### 1.  *Ex Parte Young* and the Commissioner

The Commissioner asserts that the Plaintiffs' official-capacity claims against him are jurisdictionally barred by Eleventh Amendment sovereign immunity. Because Minnesota has not waived that immunity, and 42 U.S.C. § 1983 does not override it, the Commissioner argues that the only exception that would allow Plaintiffs' claims to go forward would be that recognized in *Ex parte Young*, 209 U.S. 123 (1908). "In *Ex parte Young*, the Supreme Court recognized Eleventh Amendment sovereign immunity does not

bar certain suits seeking declaratory and injunctive relief against state officers in their individual capacities based on ongoing violations of federal law." *Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, File No. 19-cv-1949 (ECT/DTS), 2020 WL 1333154, at *2 (D. Minn. Mar. 23, 2020) ("*Freeman*") (brackets and internal quotation omitted) (quoting *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1131 (8th Cir. 2019)).[34] According to the Commissioner, the *Ex parte Young* exception does not apply because the Commissioner is not responsible for enforcement of the permit-to-carry statute and has not threatened to commence any proceedings to enforce the statute.

The Court concludes that Plaintiffs' claims for prospective declaratory and injunctive relief may proceed against the Commissioner. Under the *Ex parte Young* doctrine, for the defendant "to be amenable for suit challenging a particular statute the [defendant] must have some connection with the enforcement of the act." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (internal quotation marks omitted); *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (same). But the official's connection "'does not need to be primary authority to enforce the challenged law.'" *Church v. Missouri*, 913 F.3d 736, 748 (8th Cir. 2019) (quoting *281 Care*, 638 F.3d at 632).

Here, the thrust of the Commissioner's argument is that the Sheriffs, and not the Commissioner, are "responsible for reviewing, investigating, denying and issuing licenses

---

[34] *Freeman* explains that discussion of the *Ex parte Young* exception has not always been precise regarding a distinction about official-capacity or individual-capacity claims, but the distinction appears to be "insignificant in these cases. The point is that *Ex parte Young* permits suits against state officers for prospective declaratory and injunctive relief—not damages—the Eleventh Amendment notwithstanding." 2020 WL 1333154, at *2 n.3.

under the statute." The Commissioner suggests that his connection to the statute is only "ministerial" and he is not charged with enforcing the statute as a matter of law. [Doc. 49 at 13]. But the statutory scheme plainly gives the Commissioner "some connection" with enforcement of the act. Indeed, the Commissioner is required by Minn. Stat. § 624.7151 and § 624.714, subd. 3, to develop statewide standards for application forms that are consistent with the criteria set forth in § 624.714, subd. 2(b). The record demonstrates that the Commissioner created such a form, which among other things, requires an applicant to provide his or her date of birth. [Doc. 43-1]. Though no one suggests an injunction should require removal of the date-of-birth box from the form, it is clear that the Commissioner facilitates enforcement of the age requirement. More directly, the Commissioner is required to make the standardized forms available on the Internet, Minn. Stat. § 624.714, subd. 3(h), which he has done.[35] And on that same Minnesota Department of Public Safety website, the requirements for getting a permit to carry are listed on a Frequently Asked Questions page. That FAQ section includes an indication that the applicant "[m]ust be at least 21 years of age."[36] The Commissioner, consistent with the current language of the statute, informs members of the public who are 18–20-year-olds that they are ineligible to receive a permit to carry.

The Court concludes that the Commissioner is not entitled to summary judgment based on his argument that he is the wrong Defendant. Even if the Commissioner does not

---

[35] https://dps.mn.gov/divisions/bca/bca-divisions/administrative/Pages/firearms-permit-to-carry.aspx.

[36] https://dps.mn.gov/divisions/bca/bca-divisions/administrative/Pages/Permit-to-Carry-FAQ.aspx.

"have the full power to redress [Plaintiffs'] injury," *281 Care*, 638 F.3d at 633, Plaintiffs have sufficiently demonstrated that he has some connection to enforcement of the statute such that he can be ordered to provide meaningful prospective injunctive relief.

### 2. *Monell* and the Sheriffs

The Sheriffs likewise argue that they are the wrong defendants, but they base their argument on *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Under *Monell*, a municipality can be a "person" subject to liability for constitutional violations pursuant to 42 U.S.C. § 1983 when the violation at issue was caused by an official municipal policy. 436 U.S. at 690–91. "For a municipality to be liable, a plaintiff must prove that a municipal policy or custom was the moving force behind the constitutional violation." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (quotations and brackets omitted). The Sheriffs argue that Plaintiffs cannot prevail against them under *Monell* because when the Sheriffs deny a permit to carry a handgun, they are simply following a statutory obligation to apply Minn. Stat. § 624.714.[37] According to the Sheriffs, Plaintiffs cannot show that any county policy is implicated in this case at all, let alone one that is the moving force behind the alleged violation of Plaintiffs' Second Amendment rights.

---

[37] The Sheriffs aptly and thoroughly discuss the unsettled answer to the issue of when a municipality may be sued pursuant to *Monell* for enforcement of state law. As one court in this District put it: "[t]he short story is that the Supreme Court has not decided the issue. Nor has the Eighth Circuit. And the other circuits are split." *Freeman*, 2020 WL 1333154, at *2 (quoting *Slaven v. Engstrom*, 710 F.3d 772, 781 n.4 (8th Cir. 2013) ("Whether, and if so when, a municipality may be liable under § 1983 for its enforcement of state law has been the subject of extensive debate in the circuits.")).

Here, for purposes of enforcing the age requirement in Minn. Stat. § 624.714, subd. 2(b)(2), and issuing permits to carry, the Sheriffs are arms of the State. The Court reaches this conclusion based on its review of the Sheriffs' role in the statutory licensure scheme. *Evans v. City of Helena-West Helena*, 912 F.3d 1145, 1146 (8th Cir. 2019) ("Whether the clerk acts on behalf of the State, the City, or the County depends on the definition of the clerk's official functions under the relevant state law.").

Under Minnesota's permit-to-carry law, the Sheriffs implement the permitting scheme. In doing so, they process applications on a form created by the Commissioner for statewide administration. Minn. Stat. § 624.714, subd. 3 (form and contents of application); *id.* § 624.7151 (requiring adoption of standardized forms). While Sheriffs process applications for residents of the counties in which they have been elected, "nonresidents" are permitted to apply to any sheriff for a permit to carry. *Id.* § 624.714, subd. 2 (citing § 171.01, subd. 42). When they review, process, and issue or deny a permit, including if they were to deny a permit to a person under the age of 21, the Sheriffs are exercising authority on behalf of the State of Minnesota. *Id.* § 624.714, subd. 2(b) (providing that the sheriff "must issue a permit to an applicant if the person" meets specified criteria); *id.* § 624.714, sudb. 6(a). The permit cards issued by the Sheriffs are on a standardized form adopted by the Commissioner. *Id.* § 624.714, subd. 7(a). The Sheriffs collect application fees, but are required to send portions of those fees back to the Commissioner to be deposited into the general fund. *Id.* § 624.714, subd. 3(f); *id.* § 624.714, subd. 7(c)(1). Any portion of the fees collected by the Sheriffs must be held in a segregated fund and only used to pay the costs of administering the permitting regime. *Id.* § 624.714, subd. 21. The

Sheriffs are required to provide the Department of Public Safety with basic data required to allow the Commissioner to complete reports to the Minnesota Legislature regarding the issuance of carry permits. *Id.* § 624.714, subd. 20(b).

Considering "the definition of the [Sheriffs'] functions under relevant state law," *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997), the Court finds that for purposes of enforcing the provisions of Minn. Stat. § 624.714, the Sheriffs actually represent the State of Minnesota. And like the Commissioner, the Sheriffs are significantly involved in implementing the unconstitutional prohibition on law-abiding 18–20-year-olds' right to publicly carry firearms for self-defense. Accordingly, as acting State officials for purposes of their enforcement of the permit-to-carry law, the Sheriffs have a sufficient connection with the ongoing enforcement to allow the Plaintiffs' claims for prospective injunctive relief to go forward against them under the doctrine of *Ex parte Young. See Freeman*, 2020 WL 1333154, at *2–3; *see also McMillian* (holding that Alabama sheriffs acting in their law enforcement capacities represented the State of Alabama).

## V.   Order

For the foregoing reasons, **IT IS HEREBY ORDERED that:**

1. Plaintiffs' Motion for Summary Judgment [Doc. 40] is **GRANTED IN PART**;

2. Judgment is granted to Plaintiffs on the issue of whether Minn. Stat. § 624.714, subd. 2(b)(2), violates the right of the individual Plaintiffs and the otherwise-qualified 18–20-year-old members of MGOC, SAF, and FPC to

keep and bear arms as guaranteed by the Second and Fourteenth Amendments to the United States Constitution;

    a. The Court declares that Minn. Stat. § 624.714, subd. 2(b)(2)'s requirement that a person must be at least 21 years of age to receive a permit to publicly carry a handgun in Minnesota violates the rights of individuals 18–20 years old to keep and bear arms protected by the Second and Fourteenth Amendments; and

    b. Defendants are enjoined from enforcing the 21-year minimum-age requirement in Minn. Stat. § 624.714, subd. 2(b)(2), against the individual Plaintiffs and otherwise-qualified 18–20-year-olds;

3. Commissioner Harrington's Motion for Summary Judgment [Doc. 45] is **DENIED**; and

4. Sheriffs Lorge, Wolbersen, and Starry's Motion for Summary Judgment [Doc. 52] is **DENIED**.

**Let Judgment be Entered Accordingly**.

Date: March 31, 2023

                              _s/ Katherine Menendez_
                              Katherine Menendez
                              United States District Judge